# EXHIBIT 1

FILED
9/8/2021 10:58 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| **SUMMONS** | **ALIAS - SUMMONS** (2/28/11) CCG 0001 A |

FILED DATE: 9/8/2021 10:58 AM   2021CH04537

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, _____CHANCERY_____ DIVISION

14732124

No. _____2021 CH 04537_____

NPM Venture LLC

_____

**(Name all parties)**

v.

The City of Chicago, acting through the Chicago Department of Transportation, and Gia Biagi, in her official capacity as Commissioner of the Chicago Department of Transportation

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
Cook County, IL

## ☒ SUMMONS  ☐ ALIAS SUMMONS

To each Defendant: City of Chicago Law Department, 30 N. LaSalle Street, Suite 700, Chicago, IL 60602

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☒ **Richard J. Daley Center, 50 W. Washington, Room _____, Chicago, Illinois 60602**

| | | |
|---|---|---|
| ☐ **District 2 - Skokie** 5600 Old Orchard Rd. Skokie, IL 60077 | ☐ **District 3 - Rolling Meadows** 2121 Euclid Rolling Meadows, IL 60008 | ☐ **District 4 - Maywood** 1500 Maybrook Ave. Maywood, IL 60153 |
| ☐ **District 5 - Bridgeview** 10220 S. 76th Ave. Bridgeview, IL 60455 | ☐ **District 6 - Markham** 16501 S. Kedzie Pkwy. Markham, IL 60428 | ☐ **Child Support** 28 North Clark St., Room 200 Chicago, Illinois 60602 |

**You must file within 30 days after service of this Summons, not counting the day of service.**
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

| | |
|---|---|
| Atty. No.: _____90747_____ | WITNESS, _9/8/2021 10:58 AM IRIS Y. MARTINEZ_ |
| Name: _Michael R. Levinson / Seyarth Shaw LLP_ | |
| Atty. for: _Plaintiff NPM Venture, LLC_ | |
| Address: _233 S. Wacker Drive, Suite 8000_ | |
| City/State/Zip: _Chicago, IL 60606_ | Date of service: _____, _____ |
| Telephone: _(312) 460-5868_ | (To be inserted by officer on copy left with defendant or other person) |
| Service by Facsimile Transmission will be accepted at: _____ | |
| | (Area Code)   (Facsimile Telephone Number) |

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Copy Distribution - White: 1. ORIGINAL - COURT FILE Canary: 2. COPY Pink: 3. COPY Gold: 4. COPY

| 2120 - Served | 2121 - Served | FILED |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | 9/8/2021 10:58 AM |
| 2320 - Served By Mail | 2321 - Served By Mail | IRIS Y. MARTINEZ |
| 2420 - Served By Publication | 2421 - Served By Publication | CIRCUIT CLERK |
| **SUMMONS** | **ALIAS - SUMMONS** | COOK COUNTY, IL |
| | | (2/28/11) CCG N001 |

2021CH04537
14732124

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, _____CHANCERY_____ DIVISION

No. _____2021 CH 04537_____

NPM Venture LLC

_____
**(Name all parties)**

**v.**

The City of Chicago, acting through the Chicago Department of Transportation, and Gia Biagi, in her official capacity as Commissioner of the Chicago Department of Transportation
_____

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
Cook County, IL

## ☒ SUMMONS ☐ ALIAS SUMMONS

**To each Defendant:** Commissioner Gia Biagi, Chicago Department of Transportation, 2 N. LaSalle Street, Suite 1100, Chicago, IL 60602

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☒ **Richard J. Daley Center, 50 W. Washington, Room** _____, **Chicago, Illinois 60602**

| ☐ **District 2 - Skokie** | ☐ **District 3 - Rolling Meadows** | ☐ **District 4 - Maywood** |
|---|---|---|
| 5600 Old Orchard Rd. | 2121 Euclid | 1500 Maybrook Ave. |
| Skokie, IL 60077 | Rolling Meadows, IL 60008 | Maywood, IL 60153 |
| ☐ **District 5 - Bridgeview** | ☐ **District 6 - Markham** | ☐ **Child Support** |
| 10220 S. 76th Ave. | 16501 S. Kedzie Pkwy. | 28 North Clark St., Room 200 |
| Bridgeview, IL 60455 | Markham, IL 60428 | Chicago, Illinois 60602 |

**You must file within 30 days after service of this Summons, not counting the day of service.**
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

**WITNESS,** 9/8/2021 10:58 AM IRIS Y. MARTINEZ

Atty. No.: 90747

Name: Michael R. Levinson / Seyfarth Shaw LLP

Atty. for: Plaintiff NPM Venture, LLC

Address: 233 S. Wacker Drive, Suite 8000

City/State/Zip: Chicago, IL 60606

Telephone: (312) 460-5868

Service by Facsimile Transmission will be accepted at: _____

Date of service: _____, _____
(To be inserted by officer on copy left with defendant or other person)

(Area Code)   (Facsimile Telephone Number)

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Copy Distribution - White: 1. ORIGINAL - COURT FILE  Canary: 2. COPY Pink: 3. COPY  Gold: 4. COPY

FILED DATE: 9/8/2021 10:58 AM   2021CH04537

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| NPM VENTURE LLC, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 2021CH04537 |
| THE CITY OF CHICAGO, acting through the Chicago Department of Transportation, and GIA BIAGI, in her official capacity as Commissioner of the Chicago Department of Transportation. | ) |
| Defendants. | ) |

## VERIFIED COMPLAINT

This is an action for declaratory judgment, mandamus, promissory estoppel, injunctive relief and money damages arising from denial of a Harbor Permit for construction of a marina at Navy Pier by the City of Chicago ("City"), acting through the Chicago Department of Transportation ("CDOT") and CDOT's Commissioner Gia Biagi ("Biagi"), among others.

## Parties

1.　　NPM Venture LLC ("NPM") is an Illinois  limited liability company with its principal place of business in Riverwoods, Illinois.

2.　　The City of Chicago ("The City") is an Illinois municipal corporation subject to suit pursuant to 65 ILCS 5/2-2-5.

3.　　Gia Biagi ("Biagi") is the Commissioner of CDOT. At relevant times as alleged below, the City acted through CDOT and Biagi, among others.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Jurisdiction and Venue**

4.    This Court has jurisdiction pursuant to 735 ILCS 5/2-209(a)(1) and venue is proper in this Court pursuant to 735 ILCS 5/2-103 because the City's principal office is located in Cook County and the events giving rise to this action occurred here.

**Background**

**Navy Pier**

5.    Navy Pier is one of Chicago's top attractions, offering events, public programs, culture and dining. Nearly nine million people a year visit Navy Pier. Pursuant to the Metropolitan Pier and Exposition Authority Act, 70 ILCS 210/4, the Metropolitan Pier & Exposition Authority ("MPEA") holds title to Navy Pier. MPEA is authorized to carry out or otherwise provide for the recreational, cultural, and commercial development of Navy Pier. MPEA has a nine member Board, four appointed by the Mayor of the City, four appointed by the Governor of the State of Illinois, and the chairperson selected by a majority of the eight appointed members.

6.    MPEA describes the mission of Navy Pier as follows: "to be a world-class public place that celebrates and showcases the vitality of Chicago, and provides for the enjoyment of Chicago-area residents and visitors, by creating an eclectic mix of public, cultural, recreational, retail, dining, entertainment and other compatible uses attracting a broad-range of visitors, and managed within a business framework that provides for the long-term financial sustainability of Navy Pier."

7.    To achieve its stated mission, MPEA transferred responsibility to operate Navy Pier to Navy Pier, Inc. ("NPI"), by Lease Agreement dated April 26, 2011. NPI is an Illinois not-for-profit corporation that was formed for the purpose of operating Navy Pier and "facilitat[ing] the ongoing recreational, educational, cultural and other development of Navy Pier for the

2

benefit of the general public, and all activities incidental or related thereto." The Lease

Agreement identifies those activities as including, maintaining, repairing, operating, designing,

financing, subleasing, licensing, developing, re-developing and/or demolishing the grounds,

building, facilities, and/or improvements of, and located on Navy Pier. The Lease Agreement

further provides that Navy Pier "may be used for any lawful purpose in compliance with the City

of Chicago Institutional Planned Development No. 527, as amended, and as same may be

amended from time-to-time." (A copy of the Lease Agreement is attached  as Exhibit 1 and

incorporated herein).

8.      Institutional Planned Development 527 ("PD 527") is a City of Chicago

Ordinance passed pursuant to the City's planned development process that governs development

of Navy Pier. The planned development process is required for certain projects to ensure

adequate public review, encourage unified planning and development, promote economically

beneficial development patterns that are compatible with the character of the existing

neighborhoods, allow design flexibility, and encourage protection and construction of the City's

natural resources. (Chap. 17-8-0101-0106). The planned development process involves a detailed

review and hearings by various City Departments and the City Council to assure, among other

things, that a proposed development and use "is compatible with the surrounding area in terms of

uses."  (Chap. 17-13-0609-B).

9.      In June 2016, MPEA announced the Navy Pier Centennial Vision, also known as

the Framework Plan, which was the first phase of a comprehensive redevelopment plan for Navy

Pier in recognition of Navy Pier's centennial. NPI and MPEA described the Centennial Vision as

"a framework for reimagination" that includes "dramatically reimagined, pier-wide

3

enhancements, new dining options, and compelling landscape and design features that continue to elevate the Pier's status."

10.     In 2016, MPEA applied to amend PD 527 to construct and operate a marina in an area called the "North-Slip," between Navy Pier and the City's Jardine Water Treatment Plant, and other improvements to Navy Pier included in the Centennial Vision. After extensive review and hearings by the Plan Commission, the Department of Planning & Development Review, the Zoning Administrator, the City Council Committee on Zoning, Landmarks and Building Standards and others (including myriad departmental reviews), the City Council approved the proposed marina in the North Slip and the other improvements to Navy Pier on September 25, 2016. The City Council unanimously passed an Ordinance amending PD 527, to provide for a marina as follows:

> The perimeter of the north and south dock area of the Navy Pier and Headlands Subareas may be used to dock boats and ships, and passengers may embark and disembark from such boats and ships along the docks of the Navy Pier . . . .

The Amended PD 527 Ordinance depicts the marina and its location at the north edge of Navy Pier directly across the North Slip from the Jardine Water Treatment Plant:

Jardine Plant

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Navy Pier

The Amended PD 527 Ordinance requires that "[a]ll work proposed in the public way" be done "in accordance with the Department of Transportation Construction Standards," but states that "no further approvals shall be required under this Planned Development of the Zoning Ordinance for the improvements undertaken in accordance with the plans." (Select portions of Amended PD 527 are attached as Exhibit 2 and incorporated herein).

### NPI and MPEA Select NPM To Build and Operate the Approved Marina

11.     On May 25, 2016, NPI issued a "Request for Qualifications and Proposal Part 1 Transient Boat Slip Developer & Operator" to develop and operate a marina in the North Slip, as approved in PD 527, in the exact location set forth in MPEA's PD application as later approved by the City Council in the amended PD 527 Ordinance. The Request specified that this location "will be the only available area for use in the project" and "[w]hile the project does not require the full use of the designated area, the project itself is limited to that area." NPM, among others, responded to NPI's Request and NPM expended significant money and other resources responding. (A copy of NPI's Request for Qualifications and Proposals Part 1 is attached as Exhibit 3 and incorporated herein).

12.     On September 22, 2016, in connection with MPEA's application to amend PD 527, NPI issued a "Request for Qualification and Proposal Part 2 Transient Boat Slip Developer & Operator" requesting a further detailed proposal for the marina from NPM. Once again, Part 2 made clear that the marina was to be built and operated "on the north side of Navy Pier," in accordance with MPEA's PD application for a marina in the North Slip. NPM expended significant additional money and other resources responding to the Request Part 2. (A copy of NPI's Request for Qualifications and Proposals Part 2 is attached as Exhibit 4 and incorporated herein).

5

69091176v.6

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

13.     As a result of this two-part process, NPI and MPEA selected NPM to develop and build the marina. NPI and NPM signed a Memorandum of Understanding on February 28, 2017 and signed the Navy Pier License Agreement (the "License Agreement") on August 17, 2017. The License Agreement granted NPM a renewable, twenty-five-year license to design, construct, finance, maintain and operate "a transient watercraft docking facility, boat slips and ancillary facilities" on the north side of Navy Pier, again in the exact location specified in the Amended PD 527 Ordinance, depicted in the License Agreement as follows:



The marina specified in the License Agreement is in accordance with all requirements of the Amended PD 527 Ordinance.

14.     The License Agreement required NPM to "apply for and diligently pursue all permits and governmental approvals required to construct and operate" the marina and required NPI to "reasonably cooperate" with NPM in the governmental approval process, including using its "best efforts and tak[ing] all steps reasonably necessary" to have MPEA cooperate in providing whatever approvals, certifications and other acknowledgements as are needed. The

6

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

License Agreement also promised that NPM would "peaceably and quietly hold and enjoy the Licensed Area." (A copy of the License Agreement as amended is attached as Exhibit 5 and incorporated herein).

15.     NPM immediately began to perform its obligations under the License Agreement. Among other things, NPM commenced preliminary engineering efforts including wave studies, geotechnical review, environmental review, and technical site layout review.  Over a period of approximately 12 months, NPM implemented all technical engineering design modifications. NPM  prepared and submitted all required permit applications and detailed planning documents and drawings, including final engineering drawings, and responded to all inquiries from State and Federal regulatory agencies.  NPM incurred over $1 million in costs and fees performing under the License Agreement.

16.     Following passage of Amended PD 527 and execution of the License Agreement, Chicago Mayor Rahm Emanuel publicly announced the marina at Navy Pier's 2017 fundraising dinner.

17.     NPM  prepared a Joint Application to the United States Army Corps of Engineers ("USACE") and the Illinois Department of Natural Resources ("IDNR") for construction of the marina in the North Slip. The marina proposed in the Joint Application was in accordance with all requirements of the Amended PD 527 Ordinance. USACE has the authority under 33 C.F.R. 325.8(b) to evaluate and issue permits for construction projects in connection with navigable waters. The Rivers, Lakes and Streams Act, 615 ILCS 5/18(c) ("RLS Act") specifically authorizes IDNR to issue a permit to "any person, firm or corporation" to construct "harbor or mooring facilities for watercraft" in the North Slip. NPM requested MPEA as owner of Navy Pier to sign and submit the Joint Application, as requested by IDNR, and MPEA did so on

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

August 24, 2017. Both USACE and IDNR subsequently issued permits preliminarily approving construction of the marina in the North Slip, subject to the applicant obtaining any other necessary permits.

**The City, Through CDOT and Biagi, Denies the Harbor Permit**

18.     Section 10-40-330 of the Municipal Code governs construction and repairs of harbors. It requires a Harbor Permit from CDOT to "build, construct or repair" any dock, bridge or other structure in or within 40 feet of the harbor. The Code further provides:

> The Commissioner shall issue the permit desired, upon payment of the permit fees hereinafter provided, unless it shall appear that the work to be done will result in unduly obstructing the harbor or in endangering the safety of any dock, pier, bridge breakwater or other structure located upon and along the harbor or pollute the harbor or is inconsistent with the Chicago River Design guidelines.

Section 10-40-330 does not vest the Commissioner or CDOT with any authority or discretion to deny a Harbor Permit unless the "work to be done" creates one of the enumerated hazards. Rather, the Commissioner of CDOT is required to issue a Harbor Permit so long as the proposed construction work is not unduly obstructive or unsafe.

19.     At NPM's request and direction pursuant to the License Agreement, MPEA signed an application, prepared by NPM, to CDOT for a Harbor Permit. In support of that application, NPM corresponded with CDOT and submitted extensive project construction drawings and other materials for the proposed marina, many at CDOT's specific request for such drawings.  By letters dated April 24, 2020 and June 15, 2020, signed by Biagi, CDOT denied the Harbor Permit. The sole basis for CDOT's denial was that the "marina development along the lines you have proposed and at the location you have applied for presents unacceptable security risks due to its proximity to the Jardine Water Treatment Plant." (Copies of Biagi's letters are attached as Exhibits 6 and 7 and are incorporated herein). CDOT and Biagi did not determine that the work to be done in constructing the marina created any of the hazards enumerated in

8

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

Section 10-40-330. Nor did CDOT and Biagi deny the Harbor Permit for any reason other than the purported "security risks" of the proposed marina.

**The Jardine Water Treatment Plant**

20.     The City completed construction of the Jardine Water Treatment Plant in 1954, under permit from the Secretary of the Army. The Secretary of the Army Permit stipulated, among other things, that construction and operation of the Plant would not cause any "unreasonable interference with navigation" and that " . . . no attempt shall be made by the permittee or the owner to forbid the full and free use by the public of all navigable waters at or adjacent to the work or structure." (A copy of the Secretary of Army Permit is attached as Exhibit 8 and incorporated herein).

21.     In connection with constructing the Jardine Plant and applying to the Secretary of the Army for a permit, the City Council passed an ordinance on March 2, 1951 (the "Jardine Ordinance") that provided, among other things, that "no attempt shall be made by the permittee or the owner to forbid the full and free use by the public of all navigable waters at or adjacent to the Plant." (A certified copy of the Jardine Ordinance is attached as Exhibit 9 and incorporated herein).

22.     In *Bowes v. City of Chicago*, 3 Ill. 2d 175 (1954), the Illinois Supreme Court rejected a lawsuit seeking to enjoin construction of the Jardine Plant and cited the above provisions of the Secretary of Army Permit in finding that "construction of the filtration plant will not . . . materially interfere with navigation." *Id*.

23.     The North Slip is located inside the Chicago Harbor breakwater near a larger area just north of the Jardine Water Treatment Plant known as the "Playpen." During boating season, hundreds if not thousands of recreational boats transit or randomly moor in the Playpen. Large

9

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

scale events such as Boat-A-Palooza and the Chicago Scene Boat Party also draw a large number of boats to the area. Except for a small Security Zone in the middle of the north side of the Jardine Water Treatment Plant, boats are legally free to transit the north and east sides of the Plant without restriction or monitoring of any kind. Recreational and other boats frequently transit and dock in the North Slip itself during such events as the America's Cup race. (Attached as Exhibit 10  and incorporated herein are pictures which fairly and accurately depict boats in and around the Jardine Water Treatment Plant at various times).

24.     The Coast Guard is responsible for security and safety in all navigable waters within the United States, including the waters surrounding the Jardine Water Treatment Plant. See, 46 U.S.C. § 70001 *et. seq*, 14 U.S.C. § 1 *et seq*. The Coast Guard is authorized to impose so-called "Security Zones" to restrict transit on navigable waters. On November 14, 2011, the Coast Guard limited a Security Zone that had been on the entire north side of the Jardine Water Treatment Plant to  a 100-yard arc around the center of the north wall of the Plant. *See* 35 CFR § 165.190. There is no Security Zone covering the North Slip.[1] The Coast Guard does not preclude, and has not indicated any objection to, construction or operation of a marina on the north side of Navy Pier. The Coast Guard does not require any permit to construct or operate a marina in that location.

25.     By letter dated November 6, 2020, NPM requested CDOT and Biagi to reconsider its denial of the Harbor Permit and requested a meeting to address their security concerns, but CDOT and Biagi did not respond to NPM's letter. (A copy of NPM's letter is attached as Exhibit

---

[1] On April 21, 2021, the City placed buoys 100 yards out around the entire Plant, contrary to the limited Security Zone ordered by the Coast Guard, and also improperly placed two "No Boating" buoys at the mouth of the North Slip. These buoys violate both the Secretary of the Army's Permit for the Jardine Plant and also the City's own Jardine Ordinance.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

11). NPI, MPEA, NPM and the City subsequently discussed other alternatives in an effort to settle this dispute, but no settlement was reached.

26.     NPM has suffered substantial money and other damages from Defendants' actions in an amount to be proven. NPM's damages include fees and expenses it incurred in performing under the License Agreement, increased raw material and construction costs resulting from the delay occasioned by Defendants' denial of the Harbor Permit, and loss of use and value of the marina. NPM also faces irreparable injury for which it may have no adequate remedy at law if a Harbor Permit for the Navy Pier marina is not promptly issued. Among other things, the License Agreement may be rendered worthless,  unless construction of the marina begins promptly, it may not be able to be built at all because of sunset provisions in federal and state permits and/or grants and escalating costs of construction  and NPM, Navy Pier, and the citizens of Chicago will lose the benefit of the 2022 and future boating seasons, as well as the opportunity to use the marina in connection with events planned for those boating seasons. These losses may not be calculable in money damages.

## COUNT I
### Declaratory Judgment

27.     NPM brings this Count for a declaratory judgment pursuant to 735 ILCS 5/2-701. There is an actual controversy between NPM and Defendants regarding Defendants' denial of a Harbor Permit for construction of a marina on the north side of Navy Pier, NPM re-alleges and incorporates herein paragraphs 1 through 26.

28.     Defendants exceeded their authority in denying the Harbor Permit and the denial is void for each of the following separate and independent reasons:

69091176v.6

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

A.    Section 10-40-330 of the Municipal Code does not provide Defendants any authority or discretion to deny the Harbor Permit based on the proposed location of the marina presenting security risks due to its proximity to the Jardine Water Treatment Plant;

B.    Denial of the Harbor Permit contravenes the City's legislative enactment in the Amended PD 527 Ordinance which specifically and expressly approved locating the marina on the north side of Navy Pier across the North Slip from the Jardine Water Treatment Plant and specified that no further approvals were required;

C.    Denial of the Harbor Permit contravenes the State of Illinois' legislative enactment in the RLS Act, which specifically and expressly approved locating a marina on the north side of Navy Pier across the North Slip from the Jardine Water Treatment Plant;

D.    Denial of the Harbor Permit interferes with the full and free use by the public of the navigable waters at or adjacent to the Jardine Water Treatment Plant in violation of the Secretary of Army Permit and the City's own Jardine Ordinance;

E.    Denial of the Harbor Permit violates the requirement announced by the Illinois Supreme Court in *Bowes v. City of Chicago*, 3 Ill. 2d 175 (1954) that operation of the Jardine Water Treatment Plant would not cause any "unreasonable obstruction to the free navigation" of the waters surrounding the Plant.

29.    As a result of each of the foregoing, Defendants acted without authority, usurped legislative authority and exceeded their jurisdiction.

30.    NPM has been injured and faces continuing injury, including irreparable injury, from Defendants' actions.

WHEREFORE, NPM requests that this Court declare, decree and adjudge that: i) Defendants exceeded their authority in denying the Harbor Permit; ii) their denial of the Harbor

69091176v.6

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Permit, as reflected in Biagi's April 24, 2020 and June 15, 2020 letters or otherwise, is null and

void; iii) the Harbor Permit should promptly issue; iv) NPM is entitled to such further relief as

becomes necessary or proper based on the Court's declaration, including temporary, preliminary

and permanent injunctive relief and money damages; and v) NPM is entitled to an award of its

reasonable attorney's fees and costs.

## COUNT II
### (Writ of Mandamus)

31.     NPM brings this Count for a writ of mandamus compelling Biagi to issue the

Harbor Permit for construction of a marina on the north side of Navy Pier pursuant to MPEA's

application. NPM re-alleges and incorporates herein paragraphs 1 through 30.

32.     Defendants, acting through Biagi, had a clear duty to issue the Harbor Permit

because it met the requirements of Section 10-40-330 of the Municipal Code. Section 10-40-330

specifies that the Commissioner "shall issue the permit desired" so long as the "work to be done"

does not result in the enumerated hazards. Biagi had no discretion to deny the Harbor Permit for

any reason not specified in Section 10-40-330. Biagi has the ministerial duty to issue Harbor

Permits on applications that comply with Section 10-40-330, including MPEA's application.

33.     Biagi also had a clear duty to issue the Harbor Permit because the Amended PD

527 Ordinance specified that "no further approvals shall be required under this Planned

Development or the Zoning Ordinance," Biagi had no discretion to impose a further approval

requirement based on the proximity of the already approved marina to the Jardine Water

Treatment Plant. Biagi has the ministerial duty to issue Harbor Permits on applications that

comply with Section 10-40-330, including MPEA's application.

34.     Biagi also had a clear duty to issue the Harbor Permit because both the Secretary

of the Army Permit and the Jardine Ordinance specified that the City had no authority to forbid

69091176v.6

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

the full and free use of the navigable waters at or adjacent to the Jardine Water Treatment Plant. Biagi had no discretion to deny the Harbor Permit based on the marina's location at or on waters in proximity to the Plant. Biagi has the ministerial duty to issue Harbor Permits on applications that comply with 10-40-330, including MPEA's application.

35.     Biagi breached her clear ministerial duties to issue a Harbor Permit on MPEA's fully compliant application. She denied the Harbor Permit for a reason that is not enumerated in Section 10-40-330 of the Municipal Code. She also imposed a further approval requirement, contrary to the Amended PD 527 Ordinance and she violated both the Secretary of the Army Permit and the Jardine Ordinance. Section 10-40-330, Amended PD 527, the Secretary of the Army Permit and/or the Jardine Ordinance required Biagi to issue the Harbor Permit based on the fully compliant application, but she did not do so.

36.     NPM has a clear right to an order compelling Biagi to fulfill her ministerial duty by issuing the Harbor Permit. Through its License Agreement with NPI, NPM has the right and obligation to "design, construct, finance, maintain, and operate" the Navy Pier marina on behalf of NPI and MPEA. Included are the right and obligation to "apply for and diligently pursue" all necessary permits, including a Harbor Permit. NPM also has the right to "peaceably and quietly hold and enjoy" the marina. Biagi improperly interfered with these rights by denying the Harbor Permit for a reason not permitted under law, even though NPM presented a fully compliant application.

WHEREFORE, NPM requests that this Court: i) issue a writ of mandamus ordering Biagi to issue a Harbor Permit for construction of a marina on the north side of Navy Pier pursuant to MPEA's application; ii) order such other and further relief as is appropriate, including

69091176v.6

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

temporary, preliminary and permanent injunctive relief and money damages; and iii) award NPM

its reasonable attorney's fees and costs.

## COUNT III
### Due Process Violations

37.     NPM brings this Count for violation of NPM's due process rights. NPM re-

alleges and incorporates herein paragraphs 1 through 36.

38.     Defendants' denial of the Harbor Permit violated NPM's due process rights under

Article 1, Section 2 of the Illinois Constitution and the Fifth and Fourteenth Amendments to the

United States Constitution. NPM has a property interest in the Harbor Permit, which Biagi and

CDOT had no discretion to deny, and in the License Agreement, pursuant to which NPM has

various fundamental rights, including the right to design, construct, finance, maintain and operate

the marina at Navy Pier, the right to quietly enjoy the premises on which the marina is located,

and riparian rights to use and access and to allow others to use and access the navigable waters of

Lake Michigan from those premises. NPM expended significant time and money preparing to

perform and performing under the License Agreement.

39.     Defendants took and deprived NPM of its property and fundamental rights

without compensation. Denial of the Harbor Permit was illegal, arbitrary, unreasonable,

capricious and without any rational basis and it bears no substantial relationship to the public

welfare. Except for a small Security Zone on the north side of the Jardine Water Treatment Plant,

the City is specifically and legally precluded from interfering with or forbidding the full and free

use of the waters around the Plant. In addition, the City's denial of the Harbor Permit does not

specify any security risk. Recreational boats and other watercraft frequently transit the waters

around the Jardine Water Treatment Plant and have done so for nearly 70 years.  An actively

69091176v.6

managed marina at Navy Pier, where the boaters are known and registered, will provide greater security in the North Slip and for the Jardine Water Treatment Plant than exists today.

40.     Despite numerous requests over a period of years, Defendants also did not provide any opportunity for NPM, NPI or MPEA to address the asserted security risks that caused CDOT and Biagi wrongly to deny the Harbor Permit. They did not ask for any input or materials regarding security while the Harbor Permit application was pending. Nor did they respond to NPM's November 6, 2020 letter, which identified numerous security features NPM had previously committed to implement and requested a meeting with CDOT and Biagi to address security concerns. Those security features included:

- establishing and clearly identifying a restricted area along the entire south edge of the Jardine Water Treatment Plant property;

- placing buoys in restricted areas, providing signage warning that mooring is not allowed;

- providing the Department of Water Management with two security cameras on Navy Pier with intrusion detection capabilities that tie into Jardine's existing security;

- contributing money for fencing along the south edge of the Jardine property;

- employing an armed guard from 11 PM to 7 AM;

- coordinating security with Jardine personnel;

- requiring boaters not registered with the marina to radio or telephone marina security before entering the North Slip;

- inviting the Chicago Marine Police, the IDNR Police and the Chicago Fire Department and/or Coast Guard to moor vessels at the marina for first responders.

Defendants thus failed to consider all relevant and crucial aspects before denying the Harbor Permit and their decision-making was not rational.

41.     Defendants' illegal, arbitrary, capricious, unreasonable, and irrational denial of the Harbor Permit damaged NPM by rendering or threatening to render the License Agreement

69091176v.6

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

worthless, preventing NPM from using the premises licensed under the License Agreement, infringing and denying NPM its aforementioned rights, causing NPM to lose the value of its substantial investment in the Navy Pier marina and causing NPM millions of dollars in damages. Defendants' actions also made it impossible for NPM to perform under the License Agreement.

WHEREFORE, NPM requests that the Court enter a judgment: i) finding that Defendants' denial of the Harbor Permit was an improper taking and deprivation of property without compensation in violation of the Illinois and United States Constitutions, was illegal, arbitrary, unreasonable, capricious and irrational, bears no relationship to the public welfare and violated NPM's due process rights; ii) entering a temporary restraining order, preliminary injunction and permanent injunction ordering Defendants to issue the Harbor Permit and/or enjoining them from refusing to issue the Harbor Permit; iii) ordering the City to pay NPM's damages in an amount to be determined, representing the value of NPM's costs and investment in the marina and the value of its License Agreement and fundamental rights which the City improperly took from NPM; iv) ordering such other and further relief as is appropriate, and; v) ordering the City to pay NPM's reasonable attorney's fees and costs.

<div align="center">

**COUNT IV**
**Promissory Estoppel**

</div>

42.     NPM brings this Count for promissory estoppel. NPM re-alleges and incorporates paragraphs 1 through 41.

43.     As a result of the Amended PD 527 Ordinance, the City unambiguously represented to MPEA, NPI and the general public, including NPM, that the City approved locating a marina on the north side of Navy Pier across the North Slip from the Jardine Water Treatment Plant and that no further approvals for a marina at that location would be necessary, other than complying with CDOT construction standards. As a result of the Jardine Ordinance,

<div align="center">17</div>

69091176v.6

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

the City unambiguously represented to MPEA, NPI and the general public, including NPM, that the City would not forbid the full and free use of the waters at or adjacent to the Jardine Water Treatment Plant.

44. The City also knew at least as early as 2016 that MPEA planned to construct and operate a marina on the north side of Navy Pier. The City knew that NPI had solicited requests to developers to build and operate the marina and that NPI and MPEA entered into the License Agreement. The City further knew that NPM as licensee under the License Agreement had or would expend substantial resources performing under the License Agreement. The City publicly announced the marina and, until Biagi's April 24, 2020 letter, the City never indicated that a marina could not be built or operated on the north side of Navy Pier. Indeed, in late 2019, CDOT itself requested that NPM make certain changes to and provide substantial additional material in support of the Harbor Permit application, as if CDOT were actually considering the application on its merits, without ever indicating that the marina could not be built because of "security risks." These actions and omissions constitute further and additional representations by the City that a marina could be located on the north side of Navy Pier.

45. NPM relied on those representations by, among other things, preparing and submitting responses to NPI's two Requests for Qualifications/Proposals, entering the License Agreement with NPI and spending significant time and money preparing to perform and performing under the License Agreement. NPM's reliance on the City's representations was expected and foreseeable by the City. The City breached its representations by denying the Harbor Permit for the marina based solely on it being located on the north side of Navy Pier. NPM relied to its detriment on the City's representations and suffered damages. The City's actions have worked a fraud and injustice on NPM.

69091176v.6

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

WHEREFORE, NPM requests that the Court enter a judgment: i) finding that Defendants are estopped from denying the Harbor Permit and from disapproving locating a marina on the north side of Navy Pier; ii) entering a temporary restraining order, preliminary injunction and permanent injunction ordering Defendants to issue the Harbor Permit and/or enjoining them from refusing to issue the Harbor Permit; iii) ordering the City to pay NPM's damages in an amount to be determined; iv) ordering such other and further relief as is appropriate; and v) ordering the City to pay NPM's reasonable attorney's fees and costs.

<div align="center">NPM VENTURE LLC</div>

By: ___/s/ Michael R. Levinson_____
<div align="center">One of its Attorneys</div>

Michael R. Levinson (mlevinson@seyfarth.com)
Marcus Mintz (mmintz@seyfarth.com)
Bessie Fakhri (bfakhri@seyfarth.com)
Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL  60606
(312) 460-5000
Firm No. 90747

Dated: September 8, 2021

69091176v.6

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## <u>VERIFICATION</u>

Under the penalties provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

NPM VENTURES LLC

By: _____
       Randy Podolsky

69091176v.6

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# EXHIBIT 1



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# LEASE AGREEMENT

by and between

**The Metropolitan Pier and Exposition Authority,**
a municipal corporation and body politic
of the State of Illinois,

and

**Navy Pier, Inc.,**
an Illinois not-for-profit corporation.

**TABLE OF CONTENTS**

<div style="text-align: right">**Page**</div>

DEFINITIONS ............................................................................................... V

RECITALS ................................................................................................... 1

ARTICLE 1.  SCOPE AND TERM OF AGREEMENT ......................................... 2

    1.1  Premises Covered ............................................................................. 2

    1.2  Use of the Premises .......................................................................... 2

    1.3  Ownership of Improvements ............................................................... 2

    1.4  Term of Agreement ........................................................................... 3

    1.5  Renewal Options .............................................................................. 3

    1.6  Marshaling Yards ............................................................................. 3

    1.7  Addresses of Parties ......................................................................... 3

    1.8  Successors and Assigns ..................................................................... 4

ARTICLE 2.  GENERAL CONSIDERATIONS ................................................... 4

    2.1  Agreement Documents ...................................................................... 4

    2.2  Severability ..................................................................................... 5

    2.3  Compliance with Laws ...................................................................... 5

    2.4  Governing Law ................................................................................ 5

    2.5  Contract Administrator ...................................................................... 6

    2.6  Framework Plan ............................................................................... 6

    2.7  Quiet Enjoyment .............................................................................. 6

ARTICLE 3.  RENT/NET LEASE/TAXES ....................................................... 7

    3.1  Rent .............................................................................................. 7

    3.2  Modified Net Agreement ................................................................... 7

    3.3  Real Estate Taxes ............................................................................ 7

    3.4  Inspection of Records ....................................................................... 8

    3.5  Right to Contest .............................................................................. 8

    3.6  Assignment to Tax Exempt Entity ....................................................... 8

    3.7  Final Determination .......................................................................... 8

ARTICLE 4.  CONDITION OF PREMISES ...................................................... 9

    4.1  Property Accepted "As-Is" ................................................................. 9

    4.2  Environmental Matters ...................................................................... 9

    4.3  Pre-Commencement Improvements ..................................................... 10

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

13508341.10

# TABLE OF CONTENTS
(continued)

Page

ARTICLE 5.    FUTURE DEVELOPMENT .................................................................. 10

    5.1    General ................................................................................. 10

    5.2    LESSEE's Development ........................................................ 11

    5.3    AUTHORITY Not Liable ...................................................... 11

    5.4    Miscellaneous Permits ......................................................... 12

    5.5    Easements ............................................................................. 12

    5.6    Capital Improvements Account ............................................ 12

ARTICLE 6.    OPERATION OF PREMISES ............................................................. 12

    6.1    Operation of the Premises .................................................... 12

    6.2    Revenues .............................................................................. 13

    6.3    Assignment of Existing Pier Agreements ............................ 13

    6.4    Service Contracts ................................................................. 13

    6.5    Administrative Services ....................................................... 13

    6.6    License of Intangibles .......................................................... 14

    6.7    Employees ............................................................................ 16

    6.8    Payment of Utilities ............................................................. 17

    6.9    Budget .................................................................................. 17

    6.10   Working Capital Loan .......................................................... 18

ARTICLE 7.    PERSONAL PROPERTY ................................................................... 18

    7.1    Transfer of Personal Property .............................................. 18

    7.2    Title to Vehicles .................................................................. 19

    7.3    Personal Property on the Premises ....................................... 19

ARTICLE 8.    ASSIGNMENT OF AUTHORITY'S RIGHTS
                AS TENANT UNDER LEASES ....................................................... 19

    8.1    Assignment of Gateway Park Lease ..................................... 19

    8.2    Assignment of Other Leases ................................................ 19

ARTICLE 9.    SUBLETTING .................................................................................... 19

    9.1    Transfer of Existing Subleases ............................................ 19

    9.2    Subletting by LESSEE ........................................................ 20

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

13508341.10

**TABLE OF CONTENTS**

(continued)

9.3 Attornment and Non-disturbance ................................................................ 20

ARTICLE 10. ASSIGNMENT OF THIS AGREEMENT ........................................... 20

10.1 Transfer of AUTHORITY's Interest ......................................................... 20

10.2 Assignment ............................................................................................... 20

ARTICLE 11. MAINTENANCE, REPAIR AND REPLACEMENT ......................... 21

11.1 Duty to Perform Structural Maintenance, Repairs and Replacement ........ 21

11.2 Housekeeping, Buildings, Grounds and Paved Areas ............................... 21

11.3 Landscaping .............................................................................................. 21

11.4 Capital Replacement ................................................................................. 21

ARTICLE 12. EMERGENCY CLOSING AND DAMAGE TO PREMISES .............. 22

12.1 Emergency Closing ................................................................................... 22

12.2 Limitation of AUTHORITY's Liability ................................................... 22

12.3 Damage or Destruction ............................................................................. 22

12.4 Fixtures and Equipment ............................................................................ 22

ARTICLE 13. INSURANCE ...................................................................................... 22

13.1 LESSEE Insurance .................................................................................... 22

13.2 Property Insurance .................................................................................... 23

13.3 Certain Other Insurance ............................................................................ 23

13.4 Insurance Not a Limitation on Liability ................................................... 24

13.5 Sublessees ................................................................................................. 24

13.6 Insurance for First Year of Term .............................................................. 24

13.7 Pollution Legal Liability ........................................................................... 24

ARTICLE 14. INDEMNITY ...................................................................................... 25

14.1 Indemnity by LESSEE .............................................................................. 25

14.2 Indemnity by the AUTHORITY ............................................................... 25

14.3 Representations of the LESSEE ................................................................ 25

14.4 Representations of the AUTHORITY ....................................................... 26

ARTICLE 15. TERMINATION AND EXPIRATION OF THE AGREEMENT .......... 27

**TABLE OF CONTENTS**

(continued)

<div align="right">

**Page**

</div>

| | | |
|---|---|---|
| 15.1 | Transition of Services | 27 |
| 15.2 | Peaceful Surrender after Termination | 27 |
| 15.3 | Condemnation | 27 |

ARTICLE 16. INTENTIONALLY OMITTED ............................................ 28

ARTICLE 17. ESTOPPEL CERTIFICATE ............................................. 28

| | | |
|---|---|---|
| 17.1 | Estoppel Certificates | 28 |

ARTICLE 18. DEFAULT AND REMEDIES ............................................ 29

| | | |
|---|---|---|
| 18.1 | Events of Default | 29 |
| 18.2 | Remedies | 29 |
| 18.3 | Waiver of Breach | 30 |
| 18.4 | Waiver of Remedies | 30 |
| 18.5 | Dispute Resolution Procedures | 30 |

ARTICLE 19. FINANCING ............................................................... 31

| | | |
|---|---|---|
| 19.1 | LESSEE Financing | 31 |

ARTICLE 20. FORCE MAJEURE (UNAVOIDABLE DELAY) .......................... 32

| | | |
|---|---|---|
| 20.1 | Force Majeure | 32 |

ARTICLE 21. THE AUTHORITY'S RIGHTS .......................................... 32

| | | |
|---|---|---|
| 21.1 | Inspection | 32 |

ARTICLE 22. MISCELLANEOUS ...................................................... 32

| | | |
|---|---|---|
| 22.1 | Heading | 32 |
| 22.2 | Time | 32 |
| 22.3 | Memorandum of Lease | 33 |
| 22.4 | Consent | 33 |
| 22.5 | Cooperation | 33 |
| 22.6 | Third Party Consents | 33 |
| 22.7 | Inability to Perform | 34 |
| 22.8 | Counterparts | 34 |
| 22.9 | Third Parties | 34 |

</div>

13508341.10

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# TABLE OF CONTENTS

(continued)

Page

| | | |
|---|---|---|
| EXHIBIT A-1 | LEGAL DESCRIPTION OF NAVY PIER | 36 |
| EXHIBIT A-2 | SITE PLAN OF NAVY PIER | 37 |
| EXHIBIT A-3 | LEGAL DESCRIPTION OF GATEWAY PARK | 38 |
| EXHIBIT B | MARSHALING YARD SPACE | 41 |
| SCHEDULE 2.7 | PERMITTED ENCUMBRANCES | 42 |
| SCHEDULE 4.3 | PRE-COMMENCEMENT IMPROVEMENTS | 43 |
| SCHEDULE 6.4 | SERVICE CONTRACTS | 44 |
| SCHEDULE 6.6.1 | NAVY PIER MARKS | 45 |
| EXHIBIT C | PROMISSORY NOTE | 46 |
| SCHEDULE 7.2 | VEHICLES | 48 |
| SCHEDULE 8.2 | OTHER LEASES | 49 |
| SCHEDULE 9.1 | EXISTING SUBLEASES | 50 |
| EXHIBIT D | LESSEE INSURANCE REQUIREMENTS | 54 |
| SCHEDULE 14.4.3 | NOTICES OF VIOLATIONS | 58 |
| SCHEDULE 14.4.4 | LIST OF PENDING DISPUTES | 60 |
| SCHEDULE 14.4.5 | EXISTING HAZARDOUS SUBSTANCES | 61 |
| EXHIBIT E | FORM OF MEMORANDUM OF LEASE | 62 |

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

13508341.10

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# SUMMARY OF DEFINED TERMS

<u>TERM</u>                                          <u>SECTION DEFINED IN</u>

| Term | Section Defined In |
|---|---|
| Act | Recital A |
| ADA | 2.3 |
| Agreement | Preamble |
| Annual Budget | 6.9 |
| Approved Operations | Recital E |
| Arbitration Panel | 18.5 |
| AUTHORITY | Preamble |
| Capital Improvements Acount | 5.6 |
| City | Recital B |
| Contract Administrator | 2.5 |
| Designated Person/Designated Persons | 18.5.1 |
| Dispute | 18.5 |
| Effective Date | Preamble |
| Environmental Laws | 4.2.1 |
| Event of Default | 18.1 |
| Existing Subleases | 9.1 |
| Existing Hazardous Substances | 14.4.5 |
| Framework Plan | 2.6 |
| Gateway Park | Recital B |
| Gateway Park Lease | Recital B |
| Hazardous Substances | 4.2.1 |
| Improvements | Recital C |
| Laws | 2.3 |
| Lease Commencement Date | 1.4 |
| LESSEE | Preamble |
| LESSEE Indemnified Parties | 4.2.2 |
| LESSEE Insurance Requirements | 13.1 |
| List of Pending Disputes | 14.4.4 |
| Material Expenditure | 6.10 |
| Marshaling Yard Space | 1.6 |
| MBE/WBE Plan | 6.7.4 |
| Mechanics' Lien(s) | 5.2.3 |
| Memorandum of Lease | 22.3 |
| Navy Pier | Recital A |
| Navy Pier Mark/Navy Pier Marks | 6.6.1 |
| Notices of Violations | 14.4.3 |
| Other Leases | 8.2 |
| Party/Parties | Recital F |
| Permitted Encumbrances | 2.7 |
| Personal Property | 7.1 |
| Pier Agreements | 6.2 |
| Pollution Insurance | 24 |

13508341.10

## SUMMARY OF DEFINED TERMS

<u>TERM</u>                                                                                    <u>SECTION DEFINED IN</u>

Pre-Commencement Improvements.................................................................................. 4.3
Pre-Existing Environmental Condition/Pre-Existing Environmental Conditions ................... 4.2.2
Premises .................................................................................................................. Recital C
Promissory Note.......................................................................................................... 6.10
Proposed Amendment.................................................................................................. 2.6.1
Proposed Initial Budget................................................................................................ 6.9
PUD............................................................................................................................ 1.2
Redeveloped Improvements......................................................................................... 5.2.1
Rent........................................................................................................................... 3.1
Repair/Repairs............................................................................................................ 11.1
Second Notice ............................................................................................................ 22.4
Service Contracts ....................................................................................................... 6.4
Sublease/Subleases .................................................................................................... 9.2
Sublessee/Sublessees ................................................................................................. 9.3
Taxes........................................................................................................................ 3.3
Term......................................................................................................................... 1.4
Third Party Consents.................................................................................................. 22.6
Transition Period........................................................................................................ 2.6
Working Capital Loan.................................................................................................. 6.10
Unavoidable Delay...................................................................................................... 20.1
Vehicles.................................................................................................................... 7.2

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

This LEASE AGREEMENT (the "**Agreement**") is made this 26th day of April, 2011 (the "**Effective Date**"), by and between The Metropolitan Pier and Exposition Authority, a municipal corporation and body politic of the government of the State of Illinois (the "**AUTHORITY**"), having its principal office at 301 E. Cermak, Chicago, Illinois, and Navy Pier, Inc., an Illinois not-for-profit corporation ("**LESSEE**"), having its principal office at 600 East Grand Avenue, Chicago, IL 60611.

<div align="center">

**WITNESSETH**

</div>

In consideration of the mutual covenants herein contained, the receipt and sufficiency of which the parties acknowledge, the AUTHORITY and LESSEE hereby agree as follows:

<div align="center">

**RECITALS**

</div>

A.       Pursuant to the Metropolitan Pier and Exposition Authority Act 70 ILCS 210/4 (the "**Act**"), the AUTHORITY holds title to, and is authorized to carry out or otherwise provide for the recreational, cultural, commercial or residential development of real property legally described on **Exhibit A-1**, depicted on **Exhibit A-2**, and commonly known as "**Navy Pier**" and to construct, equip, and maintain grounds, buildings and facilities for those purposes.

B.       Pursuant to that certain Intergovernmental Cooperation Agreement Regarding the Navy Pier and The Navy Pier Headlands dated as of August 25, 1992, by and between the City of Chicago (the "**City**") and the AUTHORITY and that certain Lease Agreement dated as of December 11, 2002, as amended, and as same may be amended from time-to-time, by and between the City and the AUTHORITY (collectively, the "**Gateway Park Lease**"), the AUTHORITY leases the real property legally described on **Exhibit A-3** and commonly known as "**Gateway Park**".

C.       Navy Pier and Gateway Park are operated together by the AUTHORITY as a tourist attraction.  Navy Pier and Gateway Park along with all parking areas, structures, landscaping, buildings and other improvements now or hereafter located thereon, including the Pre-Commencement Improvements (defined hereafter), and the Redeveloped Improvements (defined hereafter) (the Pre-Commencement Improvements, and the Redeveloped Improvements are collectively, the "**Improvements**").  Navy Pier, Gateway Park, and the Improvements are collectively herein the "**Premises**."

D.       The AUTHORITY identifies the mission of Navy Pier as follows:  to be a world-class public place that celebrates and showcases the vitality of Chicago, and provides for the enjoyment of Chicago-area residents and visitors, by creating an eclectic mix of public, cultural, recreational, retail, dining, entertainment and other compatible uses attracting a broad-range of visitors, and managed within a business framework that provides for the long-term financial sustainability of Navy Pier.  Further, the AUTHORITY recognizes that in order to further such mission and advance these public purposes, it is desirable to transfer responsibility for the operation of the Premises to LESSEE.

E.       LESSEE is an Illinois not-for-profit corporation formed for the purpose of: (a) supporting, sustaining, and investing its funds and to lessen the burdens of government in and for the operation of Navy Pier, so as to facilitate the ongoing recreational, educational, cultural and

<div align="center">

1

</div>

other development of Navy Pier for the benefit of the general public, and all activities incidental or related thereto, including, without limitation, implementation of the Framework Plan (defined hereafter); (b) maintaining, repairing, operating, designing, financing, subleasing, licensing, developing, redeveloping, and/or demolishing the grounds, buildings, facilities, and/or Improvements of, and located on, the Premises consistent with the Framework Plan (all such permitted activities are collectively, "**Approved Operations**"); and (c) supporting and benefiting the AUTHORITY through the development and operations of Navy Pier for the achievement of the AUTHORITY's own governmental purposes.

     **F.**    In consideration of the foregoing, the AUTHORITY and LESSEE (each a "**Party**," and collectively, "**Parties**") agree that it would be in the best interests of the public and Navy Pier that the AUTHORITY transfer to, and LESSEE accept the transfer of, responsibility for the management, operation, and maintenance of the Premises and the implementation of the Framework Plan in the manner and to the extent provided in this Agreement;

     NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, the AUTHORITY and LESSEE hereby agree as follows:

## ARTICLE 1. SCOPE AND TERM OF AGREEMENT

     **1.1**    **Premises Covered.**  Subject to the terms of this Agreement, the AUTHORITY hereby leases (and subleases, as applicable), the Premises to LESSEE, and LESSEE hereby leases the Premises from the AUTHORITY, for the purpose of implementing the Approved Operations with respect to the Premises. LESSEE shall have full and unimpaired access to and use of the Premises at all times during the Term except as otherwise provided for in this Agreement.

     **1.2**    **Use of the Premises.**  Navy Pier may be used for any lawful purpose in compliance with the City of Chicago Institutional Planned Development No. 527, as amended, and as same may be amended from time-to-time (the "**PUD**"). Except to the extent expressly permitted by the Gateway Park Lease, the City and/or the PUD, Gateway Park may be used only for public parks, gardens and gathering places; walkways, bicycle paths and ramps; boat and ship docking, passenger embarking and disembarking; public transportation facilities; movable commercial vendors' facilities; kiosks and other similar structures; and related and accessory uses and support facilities all in compliance with the PUD. Notwithstanding the foregoing, LESSEE may not use any part of the Premises for (a) any business which is noxious or unreasonably offensive because of the emission of noise, smoke, dust or odors, (b) adult bookstores, pornographic or sexually-oriented shops, (c) massage parlors, (d) any central laundry or dry cleaning plant, (e) tattoo parlor, topless or nude performances, or any sexually oriented business, (f) any establishment that sells alcoholic beverages for off premises consumption, (g) any use that constitutes a public nuisance, (h) flea markets or pawn shops, (i) the sale of drug paraphernalia or a "head shop," or (j) any other use that is reasonably determined by the AUTHORITY to be unlawful or against the public policy; provided, however, no use shall be deemed "against public policy" to the extent same is in compliance with the Framework Plan.

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

**1.3** **Ownership of Improvements.** Title to the Improvements shall not be transferred or conveyed to LESSEE but shall throughout the Term, be and remain the property of the AUTHORITY.

**1.4** **Term of Agreement.** The term of this Agreement shall be for twenty five (25) years, commencing at 12:01 a.m., central time, on July 1, 2011 (the "**Lease Commencement Date**") and ending at midnight on June 30, 2036, unless extended pursuant to Section 1.5 or unless terminated pursuant to the provisions of this Agreement (as it may be extended in accordance with the terms of this Agreement, the "**Term**"). The AUTHORITY shall deliver possession of the Premises to LESSEE on the Lease Commencement Date.

**1.5** **Renewal Options.** Provided no Event of Default (defined hereafter) is then in existence, LESSEE, with the approval of the AUTHORITY, shall have four (4) separate rights to renew the Term, which shall be deemed automatically exercised by LESSEE unless either Party notifies the other that the Term will not be extended at least twelve (12) months prior to the expiration of the original Term of this Agreement or any renewal term as the case may be. The Term shall automatically renew to extend for an additional term of twenty (20) years each (for a total renewal period not exceeding an aggregate of eighty (80) years), upon all of the terms, covenants and conditions contained in this Agreement. Upon each exercise by LESSEE (which shall be automatic, as aforesaid) of a renewal option, the Term of the Agreement shall be extended for a twenty (20) year period, and the number of renewal options then remaining available to LESSEE shall be reduced accordingly.

**1.6** **Marshaling Yards.** The AUTHORITY hereby grants to LESSEE the right to use certain parking areas located south of McCormick Place and shown on **Exhibit B** (the "**Marshaling Yard Space**") for the purpose of parking trailers storing items used in connection with the Approved Operations generally consistent with the practice in existence on the Lease Commencement Date (approximately 80 to 100 trailers). The AUTHORITY may revoke the license granted by this Section 1.6 at anytime upon reasonable notice to LESSEE if the AUTHORITY no longer controls the Marshaling Yard Space. The AUTHORITY shall endeavor to provide not less than 120 days notice of termination. Throughout the Term the AUTHORITY shall use commercially reasonable efforts to make the Marshaling Yard Space or alternative trailer storage space available to LESSEE. During the Term, all property situated in the Marshaling Yard Space (or at an alternative location made available by the AUTHORITY) and belonging to LESSEE, its agents, contractors, employees, or invitees, shall be situated at such location at the risk of LESSEE only, and the AUTHORITY shall not be liable for damage, theft, misappropriation, or loss of that property.

**1.7** **Addresses of Parties.** Any notice, consent or other communication given pursuant to this Agreement shall be in writing and shall be delivered, sent by certified or registered mail (return receipt requested and postage prepaid), personal delivery, or nationally recognized overnight courier, addressed as follows:

To AUTHORITY:

Metropolitan Pier and Exposition Authority

3

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Corporate Center
301 E. Cermak Road
Chicago, Illinois 60616
Attention:  Chief Executive Officer


With a copy to:

Metropolitan Pier and Exposition Authority
Corporate Center
301 E. Cermak Road
Chicago, Illinois 60616
Attention:  General Counsel


To LESSEE:

Navy Pier, Inc.
Attn:  General Manager and General Counsel
Navy Pier
600 East Grand Avenue
Chicago, IL 60611
Telephone:  312-595-5385

and:

Navy Pier Inc.
Attn:  Board Chairman
c/o Navy Pier
600 East Grand Avenue
Chicago, IL 60611

or such other persons or addresses as either the AUTHORITY or LESSEE may from time to time designate by notice to the other.  A notice, other communication or approval shall be deemed to have been sent and received (i) on the day it is delivered, or if such day is not a business day or if the notice is received after ordinary office hours (time of place of receipt), the notice, other communication or approval shall be deemed to have been sent and received on the next business day, or (ii) on the date such notice is refused or returned as undeliverable, so long as same has been sent to the address provided in, or provided in accordance with, this Section.

**1.8    Successors and Assigns.**  The covenants, conditions and agreements contained in this Agreement shall bind and inure to the benefit of the Parties hereto and their respective permitted successors and their assigns, as provided herein.


## ARTICLE 2.  GENERAL CONSIDERATIONS

4

**2.1     Agreement Documents.**  The following documents taken as a whole, constitute this Agreement and are hereby incorporated herein:  (1) the executed Agreement; and (2) all exhibits and schedules attached hereto.

**2.1.1     Order of Precedence.**  In the event that any provision in any of the exhibits or schedules attached hereto were to conflict with any provision in this Agreement, the provisions in this Agreement shall govern over the provisions of any such exhibits and schedules.

**2.1.2     Contents of Agreement.**  This Agreement, with the exhibits and schedules attached hereto, constitutes the entire understanding by and between the Parties hereto, and, except for those other documents which are expressly referenced and incorporated into this Agreement, this Agreement supersedes any prior negotiations, agreements, understandings or statements at any time made or had by and between the Parties hereto or any of their agents or employees.  No amendment or modification hereof shall be deemed valid unless first reduced to writing and dated and signed by the Parties hereto.  No waiver of any of the provisions of this Agreement or any rights granted by the terms hereof shall be valid unless such waiver is in writing, duly executed and dated by the Party sought to be charged therewith.

**2.2     Severability.**  If any term, covenant, condition or provision of this Agreement or the application thereof to any circumstance or to any person, firm or corporation shall be invalid or unenforceable as a matter of law, and the LESSEE has not terminated the Agreement pursuant to Section 22.7 below, the remaining terms, covenants, conditions and provisions of this Agreement or the application thereof to any circumstances or to any person, firm or entity other than those to which any term, covenant, condition or provision is held invalid or unenforceable as a matter of law, shall not be affected thereby and each remaining term, covenant, condition and provision of this Agreement shall be valid and shall be enforceable to the fullest extent permitted by law.

**2.3     Compliance with Laws.**  Subject to the terms of this Agreement, LESSEE, its officers, agents and employees shall comply with all laws, ordinances, rules, regulations, covenants, conditions, and restrictions (collectively "**Laws**"), enacted by any governmental authority, quasi-governmental authority, or association body which has the authority to regulate the Premises, including Title III of the Americans with Disabilities Act (the "**ADA**") and the provision of such auxiliary aids or alternate services as may be required by the ADA.

**2.4     Governing Law.**  LESSEE and the AUTHORITY agree that the terms and provisions of this Agreement shall be construed in accordance with the laws of the State of Illinois and all questions of interpretation and construction of the language herein shall be governed by the laws of the State of Illinois.  If LESSEE is presented with a request for documents by any administrative agency or with a subpoena *duces tecum* regarding any documents which may be in its possession by reason of this Agreement, LESSEE shall use reasonable efforts to give prompt notice of same to AUTHORITY.  AUTHORITY, at its sole cost and expense, may contest such process by any means available to it before such records or documents are submitted to a court or other third party; *provided, however,* that LESSEE's subpoena or request to extend the time to produce such documents is otherwise extended.  If AUTHORITY is presented with a request for documents by any administrative agency or with

a subpoena *duces tecum* regarding any documents which may be in its possession by reason of this Agreement, AUTHORITY shall use reasonable efforts to give prompt notice of same to LESSEE. LESSEE, at its sole cost and expense, may contest such process by any means available to it before such records or documents are submitted to a court or other third party; *provided, however*, that AUTHORITY's subpoena or request to extend the time to produce such documents is otherwise extended.

**2.5     Contract Administrator.**   Upon execution of this Agreement, the Chief Executive Officer of the AUTHORITY shall name a representative who shall have the authority to give all approvals and consents and take all necessary action on behalf of the AUTHORITY while administering this Agreement, with the exception of items which, in the judgment of the Chief Executive Officer of AUTHORITY, require approval by AUTHORITY's Chief Executive Officer or the Chief Financial Officer or the Board. This representative shall be known as the "**Contract Administrator**." The initial Contract Administrator shall be: the Chief Executive Officer of the AUTHORITY. Throughout the Term the AUTHORITY may from time to time replace the Contract Administrator by notice delivered and shall notify LESSEE in accordance with the provisions of Section 1.7.

**2.6     Framework Plan.**   During the period beginning on the date of this Agreement and ending on the Lease Commencement Date (the "**Transition Period**") the Parties shall develop a comprehensive long term plan to maintain Navy Pier as a high-profile public attraction and to guide the redevelopment of Navy Pier. The plan shall set forth business objectives (including the intent to maintain the public nature of Navy Pier), a master land use plan, investment priorities, development costs and potential sources of private and public funding along with the conditions to be satisfied by the LESSEE in order to maintain existing public funding and to secure any future public funding. The plan developed during the Transition Period and amended by the Parties throughout the Term in accordance with Section 2.6.1 or Section 22.5 is the "**Framework Plan**".

**2.6.1     Amendments to Framework Plan.**   Throughout the Term, the LESSEE shall have the right to propose an amendment or modification to the Framework Plan (the "**Proposed Amendment**") by submitting to the AUTHORITY an initial draft of the Proposed Amendment for review and approval by AUTHORITY. The AUTHORITY shall within sixty (60) days after receipt of such initial draft of the Proposed Amendment either provide comments to such Proposed Amendment or approve the same, and the AUTHORITY's failure to respond within sixty (60) days after receipt of such initial draft shall be deemed approval by the AUTHORITY. If the AUTHORITY provides the LESSEE with comments to the initial draft of the Proposed Amendment, which shall, in any event, be commercially reasonable, the LESSEE shall provide a revised Proposed Amendment to the AUTHORITY incorporating the AUTHORITY's comments within forty-five (45) days after receipt of the AUTHORITY's comments. This process shall be repeated, if necessary, until the Proposed Amendment has been finally approved (or deemed approved) by both Parties.

**2.7     Quiet Enjoyment.**   Except as otherwise provided for in this Agreement, and so long as no Event of Default is then in existence, the AUTHORITY hereby covenants and agrees that LESSEE shall have the peaceful and quiet possession and enjoyment of the

Premises against all parties claiming adversely thereto by, through, or under the AUTHORITY subject, however, to matters defined on **Schedule 2.7** (the "**Permitted Encumbrances**").

## ARTICLE 3. RENT/NET LEASE/TAXES

**3.1    Rent.** Beginning on the Lease Commencement Date and on each anniversary thereof during the Term, LESSEE shall pay annual rent in the amount of one dollar ($1.00) ("**Rent**"). Payment of Rent due under this Agreement shall be made to the AUTHORITY no later than the tenth (10th) day of the year for which it is due. Rent and all other sums due to the AUTHORITY hereunder shall be paid by check, bank cashier's check or other acceptable method payable to the AUTHORITY and shall be mailed or delivered to the AUTHORITY at the address set forth in Section 1.7. LESSEE shall have the right to pre-pay, without penalty or charge, some or all of the Rent due under this Agreement at any time; however, in the event of a termination of this Lease, any pre-paid Rent shall be non-refundable to LESSEE.

**3.2    Modified Net Agreement.** Except as otherwise provided for in this Agreement: (i) LESSEE is to bear all expenses and make all payments for the maintenance, operation and development of; (ii) LESSEE hereby takes subject thereto and shall perform all duties and obligations with relation to the Premises, including the development and operation thereof; (iii) no matter from whatever source arising, if LESSEE shall be ordered or required to be done by lawful authority or by the terms of this Agreement in, upon or with respect to the Premises, the same shall be done and fulfilled at the sole expense and risk and responsibility of LESSEE during the Term of this Agreement without any expense, risk, liability or obligation whatsoever to or upon the AUTHORITY or the AUTHORITY's successors, grantees or assigns of the Premises. The AUTHORITY shall not be liable for, and LESSEE shall pay, all federal, state, or local taxes owed in connection with this Agreement.

**3.3    Real Estate Taxes.** LESSEE acknowledges that the AUTHORITY's interest in the Premises is exempt from leasehold, real estate, and other property taxes ("**Taxes**"). LESSEE shall pay when due any Taxes assessed or levied on the subject Premises where attributable to LESSEE's use of the Premises. LESSEE shall notify the appropriate taxing body that LESSEE is occupying the Premises pursuant to the terms of this Agreement. To the extent the appropriate taxing body determines that Taxes, if any, are to be assessed on the Premises as a result of LESSEE's occupancy, LESSEE shall thereafter contact the appropriate taxing body to ascertain the tax amount, if any, assessed on the subject Premises. LESSEE shall pay such amounts and LESSEE shall provide the AUTHORITY with proof of such payment within ten (10) days of such payment. Provided, it is the understanding and expectation of the Parties that LESSEE has been established and will be operated in a manner which renders its interests in the Premises exempt from Taxes. It is the intention of the Parties that the transfer of interests made by this Agreement will not render the Premises taxable to any degree greater than existed prior to the date of this Agreement. In the event of a change in Laws, or the issuance of other binding interpretation or administrative ruling concerning the taxation of the Premises, the Parties agree to amend this Agreement in accordance with Section 22.5 to keep in effect or otherwise secure tax exempt status for the Premises, which amendments may include permitting the re-organization of LESSEE to render LESSEE's interest in the Premises exempt for Taxes to the maximum extent permitted by law.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**3.4    Inspection of Records.**  LESSEE agrees, upon the written request of the AUTHORITY, to make available to the AUTHORITY for its inspection at LESSEE's principal place of business in Illinois, receipts or records of the appropriate taxing authority or other proof evidencing the payment of Taxes reasonably satisfactory to the AUTHORITY.

**3.5    Right to Contest.**  Upon giving prior written notice to the AUTHORITY of LESSEE's intention to contest, LESSEE shall have the right to contest by appropriate proceedings diligently conducted in good faith, in the name of LESSEE or the AUTHORITY or both, without material cost or expense to the AUTHORITY, the validity or application of any Taxes, of any mechanics' lien, or of any governmental law or regulation.  If payment of any Taxes or mechanics' lien or if compliance with any governmental law or regulation may legally be delayed pending the prosecution of any such proceeding without subjecting LESSEE or the AUTHORITY to any liability, civil or criminal, for failure to pay such Taxes or mechanics' lien or to comply with such governmental law or regulation, or subject the Premises to a forced sale, LESSEE may delay such payment or compliance, as the case may be, until the final determination of such proceeding.  Even if such lien, charge, forced sale or civil liability would be incurred by reason of any such delay, LESSEE may, with the prior written consent of the AUTHORITY, contest as aforesaid and delay as aforesaid, provided that such contest or delay does not subject the AUTHORITY to criminal liability, damages or expense and provided that LESSEE (i) furnishes to the AUTHORITY, upon AUTHORITY's request, security, reasonably satisfactory to the AUTHORITY, but in no event greater than the contested sums owed plus any penalties, late fees, and/or interest that might be applied thereto as a result of such contestation and delayed payment, and (ii) prosecutes the contest with due diligence.  The AUTHORITY shall not be required to join in any proceedings referred to in this Section 3.5 unless the provisions of any applicable law, rule or regulation at the time in effect shall require that such proceeding be brought by and/or in the name of the AUTHORITY, in which event the AUTHORITY shall join in the proceedings or permit the same to be brought in its name if LESSEE shall pay all direct, out-of-pocket, and reasonable expenses in connection therewith and also shall indemnify and hold the AUTHORITY harmless against all direct, out-of-pocket, and reasonable liabilities, damages, cost and expenses in connection therewith.

**3.6    Assignment to Tax Exempt Entity.**  Throughout the Term the AUTHORITY shall cooperate with LESSEE in connection with LESSEE's efforts to maintain or secure tax exempt status for the Premises.  The AUTHORITY's cooperation may include permitting an assignment or sublease to an affiliate of LESSEE's for the purpose of qualifying for real estate tax exempt status.

**3.7    Final Determination.**  On final determination of any Taxes, of any mechanics' lien, or of any governmental law or regulation, LESSEE shall promptly pay any judgment rendered with all proper costs and charges and shall have any lien, charge or liability imposed, released or satisfied, as the case may be, at LESSEE's own expense, and if LESSEE shall fail to do so, the AUTHORITY may, at its option and notwithstanding the notice provisions of this Agreement, immediately pay any such final judgment, lien, charge, or liability.  If LESSEE shall fail to pay when due, or contest with due diligence the validity or amount of any Taxes, of any mechanics' lien, or of any governmental law or regulation, or to give the AUTHORITY security as hereinabove provided, the AUTHORITY may, but shall not be required to, contest

8

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

the validity or amount of any such Taxes, any mechanics' lien, or of any governmental law or regulation or compromise the same without inquiring into the validity of the claim or the reasonableness of the amount thereof. In the event the AUTHORITY takes any of the actions described in this <u>Section 3.7</u>, LESSEE shall reimburse the AUTHORITY for all direct, reasonable, and out-of-pocket sums expended by the AUTHORITY in connection therewith.

## ARTICLE 4. CONDITION OF PREMISES

**4.1    Property Accepted "As-Is".**  Except as expressly set forth in this Agreement, LESSEE agrees to accept the possession of the Premises in its "as-is" condition as of the Effective Date, subject only to normal wear and tear between the Effective Date and the Lease Commencement Date. The Parties acknowledge and agree that Lessee has not conducted an inspection with respect to the Pre-Existing Environmental Conditions, if any, and, therefore, LESSEE is not familiar with Pre-Existing Environmental Conditions, if any. Except as set forth in this Agreement, the AUTHORITY makes no representation or warranty as to the condition of the Premises.

**4.2    Environmental Matters.**

**4.2.1    Definitions.**  The following terms shall have the following definitions: (a) **"Environmental Laws"** means all federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees or requirements of any government authority regulating, relating to, or imposing liability or standards of conduct concerning any Hazardous Substances (as defined below), or pertaining to occupational health or industrial hygiene, protection of the environment, management or use of natural resources, waste management or pollution (including, without limitation, releases and disposal to air, land, surface water and groundwater), as now or may at any later time be in effect; and (b) **"Hazardous Substances"** means any substance, chemical, compound, contaminant, waste, condition, object or material which is or may be hazardous to human health or safety or the environment due to its ignitability, corrosivity, reactivity, explosiveness, toxicity, carcinogenicity, infectiousness, radioactivity or other harmful or potentially harmful properties or effects, including, without limitation, those substances included within the definitions of "hazardous substance," "hazardous waste," "hazardous material," "toxic substance," "solid waste," or "pollutant or contaminant" or otherwise regulated under any Environmental Laws; and other substances, materials, and wastes that are or become regulated or classified as hazardous or toxic under federal, state or local laws or regulations and includes, without limitation, asbestos and petroleum (including crude oil and any fraction thereof), petroleum byproducts, MTBE, volatile organic compounds, semi-volatile organic compounds, metals, herbicides, insecticides, fungicides or PCBs.

**4.2.2    Limit of LESSEE's Liability.**  Except as provided for in <u>Section 4.2.3</u>, LESSEE shall not be liable or responsible for any liability, claim, cause of action, cost, expense, fee or damage, including, without limitation, whether to person or property, arising out of or relating to the presence of any Hazardous Substance on, under, around, within, adjacent to, released from, or generated upon, the Premises on or before the Lease Commencement Date (each a **"Pre-Existing Environmental Condition,"** collectively, the **"Pre-Existing Environmental Conditions"**). The AUTHORITY shall protect, indemnify, defend and hold LESSEE and its officers, directors, shareholders, partners, members, agents, employees,

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Sublessees, contractors, representatives, tenants, licensees, invitees, and permitted successors and/or assigns (collectively, the "**LESSEE Indemnified Parties**") harmless from and against any and all liabilities, obligations, claims, damages, penalties, causes of actions, fees, judgments, costs and expenses (including, without limitation, investigative costs, reasonable attorneys' fees and expenses, expert witness fees and court costs) imposed upon, incurred by or asserted against the LESSEE Indemnified Parties which concern, arise in connection with or result from in any manner, directly or indirectly, from the Pre-Existing Environmental Conditions. This indemnification shall survive the expiration or termination of this Agreement.

      **4.2.3**     **Limit of AUTHORITY's Liability.**  Except as provided for in Section 4.2.2, and except to the extent same is due in whole or in part to the negligence or willful misconduct of the AUTHORITY or any AUTHORITY Party (defined hereinafter), the AUTHORITY shall not be liable or responsible for any liability, claim, cause of action, cost, expense, fee or damage including, without limitation, whether to person or property, arising out of or relating to the presence of any Hazardous Substance on, under or adjacent to the Premises during the Term. Except to the extent caused by the AUTHORITY's actions, LESSEE shall protect, indemnify, defend and hold the AUTHORITY harmless from and against any and all liabilities, obligations, claims, damages, penalties, causes of actions, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses, expert witness fees and court costs) imposed upon, incurred by or asserted against the AUTHORITY which concern, arise in connection with or result from in any manner, directly or indirectly, from the introduction of Hazardous Substances onto the Premises during the Term. This indemnification shall survive the expiration or termination of this Agreement only to the extent third parties have undertaken LESSEE's obligations hereunder.

      **4.3**     **Pre-Commencement Improvements.**  The AUTHORITY, at its sole cost and expense, is currently performing and during the Transition Period and for a reasonable period following the Lease Commencement Date, will continue to cause to be performed, certain improvements to the Premises described on **Schedule 4.3** (the "**Pre-Commencement Improvements**"). LESSEE hereby grants AUTHORITY, its employees, agents and contractors the right to enter onto the Premises after the Lease Commencement Date for the purpose of performing and completing the Pre-Commencement Improvements. The AUTHORITY shall proceed diligently to cause the Pre-Commencement Improvements to be substantially completed within a commercially reasonable period of time, and AUTHORITY shall further use all commercially reasonable efforts to avoid interfering with LESSEE's or its Sublessees' or patrons' access to, and use of, the Premises in connection with the Pre-Commencement Improvements.

## ARTICLE 5. FUTURE DEVELOPMENT

      **5.1**     **General.**  LESSEE shall use commercially reasonable efforts to implement the Approved Operations during the Term to the extent LESSEE deems necessary or desirable in its reasonable business judgment.

**5.2    LESSEE's Development**.

**5.2.1    Construction and Redevelopment**.  Throughout the Term and in compliance with the Framework Plan, LESSEE shall cause the remodeling, demolition, and/or redevelopment of existing improvements and construction of additional improvements at the Premises to the extent LESSEE deems necessary or desirable in its reasonable business judgment (collectively, the "**Redeveloped Improvements**").  All construction contracts and contracts for architecture and design of the Redeveloped Improvements shall provide that, if this Agreement is terminated for any reason, then, at the election of the AUTHORITY, the contractor shall continue to perform its obligations under the contract for the benefit of the AUTHORITY.  Upon completion of any Redevelopment Improvements, and to the extent same are actually prepared in connection therewith, LESSEE shall deliver to the AUTHORITY final plans and specifications for the Redeveloped Improvements which shall include full civil, architectural, site, structural, mechanical, electrical and plumbing plans, and the originals of such documents shall be transferred to AUTHORITY upon the expiration or early termination of this Agreement.

**5.2.2    Duty to Provide Copies of Warranties and Manuals.**  Upon completion of construction of the Redeveloped Improvements, LESSEE shall provide to the AUTHORITY copies of any warranties concerning the design, materials and work in LESSEE's possession.  At such time, LESSEE shall also provide the AUTHORITY with copies of any operations and maintenance manuals, including all manufacturers' warranties, operations and maintenance requirements, and equipment data for each component of the Redeveloped Improvements which are in LESSEE's possession.  The originals of all documents referenced in this Section shall be transferred to AUTHORITY upon the expiration or early termination of this Agreement.

**5.2.3    Liens.**  Except as otherwise provided for in this Agreement, the cost of any Redeveloped Improvements and alterations made to the Premises shall be paid in cash or its equivalent so that the Premises shall at all times be free of liens for labor and materials supplied or claimed to have been supplied to the Premises.  The existence of any mechanics, laborers', materialmen's, suppliers' or vendors' liens or rights thereto (collectively, "**Mechanics' Lien(s)**") shall not constitute a violation of this <u>Section 5.2.3</u> if payment is not yet due under the contract which is the foundation thereof.  LESSEE shall, however, have the right to contest with due diligence the validity or amount of any Mechanics' Lien pursuant to <u>Section 3.5</u> above.  Neither LESSEE, nor any Sublessee, nor any agent, employee, representative, contractor or subcontractor of either LESSEE or any Sublessee shall have any power or authority to do any act or thing or to make any contract or agreement which will bind the AUTHORITY without the written approval of the AUTHORITY.  Nothing contained herein shall preclude LESSEE or any Sublessee from acquiring any moveable fixture, trade fixture or personal property by lease or from granting a purchase money security interest to the vendor of such moveable fixture, trade fixture or personal property.  Notice is hereby given that the AUTHORITY shall not be liable for any labor or materials furnished or to be furnished to LESSEE upon credit, and that pursuant to Section 3 of the Act, no mechanic's, materialmen's or other lien for any such labor or materials shall issue against any real property of the AUTHORITY.

**5.3    AUTHORITY Not Liable.**  The AUTHORITY shall have no responsibility or obligation to LESSEE or to any Sublessee, contractor, subcontractor, supplier, materialman,

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

workman or other person who shall engage in or participate in any construction of any Improvements or in any additions, alterations, changes or replacements thereto, unless the AUTHORITY shall expressly undertake such responsibility or obligation hereunder or pursuant to an agreement executed by the AUTHORITY.

**5.4** **Miscellaneous Permits.** LESSEE shall comply with all Laws, governing the work to be performed in carrying out the construction of the Redeveloped Improvements. The AUTHORITY shall assist and cooperate with LESSEE, at no cost to the AUTHORITY, in connection with requests by LESSEE for permits, licenses, variances or other approvals from any governmental authority which may be necessary for or which will facilitate the implementation of the Approved Operations pursuant to the Framework Plan and this Agreement, including executing applications and agreements and amendments.

**5.5** **Easements**. The AUTHORITY agrees to join in granting or dedicating such public or private utility company easements as may be required for the implementation of the Approved Operations within thirty (30) days of written request therefor; provided, however, that any such dedications or easements shall be subject to the prior reasonable approval of the AUTHORITY. LESSEE agrees to permit the AUTHORITY to grant or dedicate such public or private utility company easements at the Premises as may be requested of the AUTHORITY; provided, however, that any such dedications or easements shall be subject to the prior reasonable approval of LESSEE. Any such easements or dedications, and any improvements located therein, shall be installed, operated, maintained and replaced at the sole cost and expense of the applicable utility provider or the AUTHORITY. Notwithstanding anything herein to the contrary, the AUTHORITY shall not consent to an encumbrance of, or voluntarily encumber, its interest in this Agreement, the Premises and/or the Improvements, or any part thereof, with any easement, covenant, condition or restriction which would materially diminish LESSEE's rights under this Agreement, materially increase LESSEE's obligations under this Agreement, or otherwise materially interfere with LESSEE's ability to implement the Approved Operations, or access to, the Premises, without the prior written consent of LESSEE. Failure of LESSEE to deliver to the AUTHORITY written notice of disapproval or approval within thirty (30) days of written request therefor will constitute and be deemed disapproval of the applicable easement.

**5.6** **Capital Improvements Account.** On or before the Lease Commencement Date, the AUTHORITY shall deposit a mutually agreed upon amount into an account established by LESSEE for the sole and exclusive benefit, and under the sole and exclusive control, of LESSEE, to be used for the implementation of the Approved Operations, including deferred maintenance and capital improvements, and for other rights of LESSEE set forth herein (the "Capital Improvements Account").

## ARTICLE 6. OPERATION OF PREMISES

**6.1** **Operation of the Premises.** LESSEE shall have exclusive authority to operate and manage, and shall be responsible for managing and operating the Premises in accordance with this Agreement and the Framework Plan. The Framework Plan will require that LESSEE offer to the general public free admission to the public portions of the Premises, which portions

12

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

LESSEE may designate from time-to-time in its reasonable business discretion in compliance with the Framework Plan.

      **6.1.1**    **LESSEE's Duties.** In connection with discharging its responsibilities under this Agreement, and except as set forth herein to the contrary, the LESSEE shall, among other things: (i) be responsible for all operating expenses and capital expenditures; (ii) hire and employ such personnel as shall, in its judgment, be required to operate, manage and maintain the Premises in accordance with the provisions of this Agreement and the Framework Plan, and, in connection therewith, shall have sole authority and responsibility to determine the personnel policies and practices of the Premises; (iii) maintain the Premises as provided in this Agreement; (iv) establish and maintain a disaster recovery plan and manage all provisions of such plan; and (v) establish and maintain risk management, safety programs and controls as necessary to maintain the insurance coverage required under this Agreement.

      **6.2**    **Revenues.** Revenues from leases, licenses, sponsorship agreements, Subleases, concessions, parking agreements, and other agreements that permit any person or entity to occupy or possess in any manner any part of the Premises or to affiliate itself with the Premises (collectively, the "**Pier Agreements**") and all other revenue of any kind generated by the Premises shall be paid to and belong to LESSEE during the Term. LESSEE shall apply such revenue exclusively to the implementation of the Approved Operations, and all expenditures related thereto.

      **6.3**    **Assignment of Existing Pier Agreements.** The AUTHORITY hereby conveys, transfers and assigns to LESSEE all right, title and interest in to the Pier Agreements, such assignment to be effective as of the Lease Commencement Date. LESSEE hereby assumes and agrees to keep, perform and fulfill (or otherwise terminate, to the extent permitted thereby) all of the AUTHORITY's obligations under the Pier Agreements relating solely to the Approved Operations, which accrue during the Term.

      **6.4**    **Service Contracts.** LESSEE shall have the right without the approval of the AUTHORITY to modify or enter into, or otherwise terminate (to the extent permitted thereby) contracts of any term in connection with the operation, repair and maintenance of the Premises, as well as any other contracts relating to LESSEE's implementation of the Approved Operations ("**Service Contracts**"). The AUTHORITY hereby conveys, transfers and assigns to LESSEE all right, title and interest in and to the Service Contracts presently in effect at the Premises and listed on **Schedule 6.4** attached hereto, effective as of the Lease Commencement Date and such other Service Contracts which may have been omitted from Schedule 6.4 but which the Parties subsequently agree were in effect at the Premises effective as of the Lease Commencement Date. LESSEE hereby assumes and agrees to keep, perform and fulfill all of the AUTHORITY's obligations relating to the Approved Operations under the Service Contracts which are required to be performed by the AUTHORITY under the Service Contracts during the Term.

      **6.5**    **Administrative Services.** To the extent permitted by Law, and to the extent the AUTHORITY has resources available, the AUTHORITY shall at LESSEE's request make available to LESSEE, at the actual costs incurred by the AUTHORITY, finance, legal,

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

purchasing and human resource, information technology, risk management, and other administrative functions.

**6.6    License of Intangibles.**  The AUTHORITY hereby grants to LESSEE the exclusive right to use (including the right to make derivative works) during the Term any and all intellectual property or other intangible personal property owned by the AUTHORITY related to or used in connection with the operation of the Premises, including without limitation, the rights of the AUTHORITY in and to any surveys, plats, plans and specifications, architectural and engineering drawings for the Premises, soil tests, contract rights (including causes of actions, warranties and indemnities under contracts for the design and construction of the improvements to the Premises), copyrights and copyrightable works, claims, development approvals and permits, but specifically EXCLUDING (except as set forth in Section 6.6.1) any right to the Navy Pier Marks (defined hereafter).  At the expiration or earlier termination of this Agreement, LESSEE shall assign to the AUTHORITY, or its designee, all right, title and interest in and any and all intellectual property or other  intangible personal property owned by the LESSEE related to or used in connection with the operation of the Premises during the Term.

**6.6.1    Intellectual Property.**  AUTHORITY owns all right, title and interest to the trademarks and service marks listed on **Schedule 6.6.1**, whether registered or unregistered, all in the form and visual identity generally used in connection with the operation of Navy Pier (collectively, the "**Navy Pier Marks**," each a "**Navy Pier Mark**").  During the Term of and subject to the terms of this Agreement, the AUTHORITY grants to LESSEE an exclusive, worldwide, royalty-free, and fully paid-up right and license to use the Navy Pier Marks for purposes of LESSEE's performance under this Agreement, and for the promotion of the Premises, the Approved Operations, and/or to generate income for LESSEE in accordance with the Framework Plan.  LESSEE shall not use the Navy Pier Marks for any other purpose without the AUTHORITY's prior written permission, which may be withheld at the AUTHORITY's sole discretion.  LESSEE agrees that each Navy Pier Mark will always be reproduced as shown on **Schedule 6.6.1** in its entirety with no alterations, obstructions or modifications.  LESSEE agrees to use the appropriate trademark symbol (either TM or ®) and, as space allows, to reference the AUTHORITY as the owner of the Navy Pier Marks by inclusion of the following language on materials developed pursuant to this Agreement:

_____          _____

_____ **are registered trademarks/service marks of the Metropolitan Pier and Exposition Authority and are used with permission.  All rights reserved.**

**6.6.1.1**    LESSEE acknowledges that Navy Pier Marks have secondary meaning in the eyes of purchasers and the public, that the Navy Pier Marks enjoy an excellent reputation and that the provision of goods or services of poor quality under the Navy Pier Marks could adversely affect such reputation.  LESSEE agrees that it will comply with any additional reasonable trademark usage guidelines that the AUTHORITY may communicate to LESSEE from time to time which AUTHORITY reasonably believes are necessary to prevent the loss of AUTHORITY's and/or LESSEE's rights in and to the Navy Pier Marks.  Upon request, LESSEE will make available to the AUTHORITY copies or originals of any materials bearing any of the Navy Pier Marks as requested by the AUTHORITY from time to time.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

LESSEE agrees that it shall use its best efforts to maintain the reputation of Navy Pier, and further agrees that its use of the Navy Pier Marks pursuant to this Agreement shall be of a quality at least as high as the quality of goods and services offered at Navy Pier prior to this Agreement.

**6.6.1.2** Other than the express rights and licenses granted herein with respect to the Navy Pier Marks, nothing herein will grant LESSEE any other right, title or interest in the Navy Pier Marks. All goodwill resulting from LESSEE's use of the Navy Pier Marks shall inure solely to the AUTHORITY. Notwithstanding anything contained herein to the contrary, any consideration and/or income earned during the Term relating to the license, sub-license, or use of the Navy Pier Marks which is permitted herein shall inure to LESSEE's benefit to be used for LESSEE's implementation of the Approved Operations. During the Term, LESSEE may develop additional trade or service marks relating to the Premises or to services or events held on the Premises. Any marks developed by LESSEE during the Term shall be owned by the AUTHORITY and shall be considered licensed Navy Pier Marks under this Agreement.

**6.6.1.3** LESSEE will not, at any time during or after this Agreement:

(a) register, attempt to register, or claim any interest (other than the license granted herein) in the Navy Pier Marks;

(b) challenge, oppose, contest the use of, or otherwise knowingly adversely affect the ownership or validity of the Navy Pier Marks (including any act or assistance to an act that may infringe or lead to the infringement of any such marks); or

(c) use any of the Navy Pier Marks for or in connection with any business, goods or services other than as contemplated under this Agreement.

**6.6.1.4** Subject to the prior written approval of the AUTHORITY, LESSEE is hereby entitled to sub-license any of the rights granted under Section 6.6.1. Sub-licenses must contractually bind any sub-licensee both to LESSEE and AUTHORITY, and include all of the obligations and restrictions of Section 6.6.1.1, Section 6.6.1.2 and Section 6.6.1.3 in favor of both LESSEE and AUTHORITY. If LESSEE has submitted a proposed sub-license to the AUTHORITY pursuant to this Section 6.6.1.4, the AUTHORITY shall have been deemed to approve such sub-license unless the AUTHORITY has disapproved the proposed sub-license within ten (10) business days of its submission to the AUTHORITY. The AUTHORITY hereby grants its approval to LESSEE to enter into sponsorship or other similar promotional agreements with third parties provided such agreements are consistent with the Framework Plan and the mission for Navy Pier set forth in Recital D.

**6.6.1.5** Each party will promptly notify the other party in writing should it become aware of any actual or suspected infringement or unapproved use(s) by any third party of the Navy Pier Marks. Institution and management of any action or proceeding to terminate, prevent or seek appropriate remedies for any infringement of the Navy Pier Marks will be entirely and solely within the discretion of the AUTHORITY; provided, however, that LESSEE be permitted to institute such proceedings upon the written authorization of the AUTHORITY which will not be unreasonably withheld.

**6.6.1.6** At a date to be mutually agreed between the Parties, but in no event earlier than eighteen (18) months after the Effective date or later than twenty-four (24) months after the Effective Date, the Parties agree to meet to (i) evaluate LESSEE's conduct under the licenses granted in this <u>Section 6.6.1</u>, (ii) discuss the status of any enforcement actions under <u>Section 6.6.1.5</u>, and (iii) consider whether ownership of the Navy Pier Marks should be assigned to LESSEE. LESSEE acknowledges and agrees that this <u>Section 6.6.1.6</u> does not constitute an option to purchase the Navy Pier Marks, and that any assignment of the Navy Pier Marks shall be subject to further negotiations between the Parties.

**6.7     Employees.** On or before the Lease Commencement Date, the AUTHORITY, at its sole cost and expense, shall be responsible for notifying, terminating, compensating, and otherwise attending to the termination of all of the AUTHORITY's employees employed at the Premises. The AUTHORITY shall protect, indemnify and hold harmless the LESSEE Indemnified Parties from and against any and all liabilities, obligations, claims, damages, penalties, causes of actions, fees, judgments, costs and expenses (including, without limitation, investigative costs, reasonable attorneys' fees and expenses, expert witness fees and court costs) imposed upon, incurred by or asserted against the LESSEE Indemnified Parties which concern, arise in connection with or result from in any manner, directly or indirectly, from the AUTHORITY's disengagement and/or termination of AUTHORITY's employees.

**6.7.1     Senior Staff.** During the Transition Period the AUTHORITY and the LESSEE shall identify, and LESSEE shall hire, certain senior staff currently working at Navy Pier to be engaged in their current positions for a period of two (2) years beginning on the Lease Commencement Date unless terminated for cause.

**6.7.2     Security Personnel.** For the period commencing on the Lease Commencement Date through and including December 31, 2011, the AUTHORITY shall provide and the LESSEE shall engage the services of personnel to perform security services at the Premises substantially consistent with security services delivered on the Effective Date; provided, however, AUTHORITY shall direct such security personnel to take direction from LESSEE. LESSEE shall reimburse the AUTHORITY for the actual out of pocket costs of security services on a monthly basis within five (5) business days of receipt of the AUTHORITY's invoice for the security services. From and after December 31, 2011, the AUTHORITY shall have no responsibility to provide any form of security at the Premises.

**6.7.3     Anti-Discrimination.** During the performance of this Agreement, LESSEE shall not discriminate on the basis of race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental handicap, unfavorable discharge from military service, parental status, or sexual orientation with respect to employment practices, providing access to the Premises and services under LESSEE's management, the solicitation for or purchase of goods or services, or the subcontracting of work in the performance of this Agreement.

**6.7.4     MBE/WBE Plan.** LESSEE shall demonstrate a good faith effort to develop a plan to increase the participation of minorities and women in the operation of the Premises (the "**MBE/WBE Plan**"). Specifically the MBE/WBE Plan will provide for the achievement of a certain level of participation of women and minorities employed at the Premises and in connection with the procurement of resources used in connection with the

Approved Operations and the construction and development of Improvements. LESSEE shall review, revise and update its MBE/WBE Plan throughout the Term. LESSEE agrees that it will include MBE/WBE participation requirements consistent with the MBE/WBE Plan in every contract or subcontract it awards to vendors seeking to provide goods and/or services to LESSEE in the course of LESSEE's performance of its obligations under the Agreement. LESSEE will be responsible for monitoring compliance with the foregoing provisions. In the event that a contractor or subcontractor fails to accept these provisions in its contract, LESSEE will select another vendor, unless no other vendor is available to provide the same or substantially similar service at comparable cost. In addition, LESSEE will not utilize any contractor or subcontractor declared by the Illinois Human Rights Commission or Department of Human Rights to be ineligible for contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations. LESSEE may rely on any written confirmation from the Illinois Department of Human Rights, at the time that LESSEE enters into a particular contract, that the particular contractor has not been declared ineligible.

**6.8    Payment of Utilities.** LESSEE shall, at all times during the Term of this Agreement, promptly pay all charges for water, sewer, electric current, telephone, gas, trash or refuse hauling, cable and/or other communication and any other public or private utility service used or consumed at the Premises during the Term not payable by Sublessees. At the LESSEE's request and to the extent feasible, the Parties shall jointly purchase utilities and/or use their joint purchasing power for the purchase of goods and services.

**6.9    Budget.** No later than one hundred twenty (120) days after the Effective Date, LESSEE shall prepare and deliver to AUTHORITY a balanced operating budget for the remainder of such calendar year setting forth the proposed revenue and expenses to be generated and incurred by LESSEE for such period of time (the "**Proposed Initial Budget**"). On or before each December 1 thereafter during the Term, LESSEE shall prepare and deliver to the AUTHORITY a balanced operating budget for the Premises for the following calendar year setting forth the proposed revenue and expenses to be generated and incurred by LESSEE for such following year (each the "**Annual Budget**"). For purposes of this Agreement, an operating budget shall be deemed to be balanced if the budget reflects break even or positive cash flow which shall be defined as earnings before depreciation, amortization and other non-cash expenses. The Proposed Initial Budget and each Annual Budget shall be consistent with the Framework Plan, shall be substantially in a form reasonably acceptable to the AUTHORITY and shall include, among other items, the costs associated with and estimates of all other amounts (in categories as opposed to itemized expenditures) which LESSEE estimates it will spend during the following calendar year in performing the Approved Operations. To the extent the Proposed Initial Budget and/or any Annual Budget is not balanced, whether due to unforeseen costs and expenses or otherwise, LESSEE shall detail the reasons for same, and shall provide the AUTHORITY with LESSEE's plans to cause future budgets, over time, to be balanced. In addition to the Annual Budget, LESSEE shall deliver to the AUTHORITY a schedule of all Subleases, concession and sponsorship agreements, contracts for construction of Redeveloped Improvements executed by the LESSEE during the preceding year. LESSEE shall also make available for review such other documents in LESSEE's possession which are reasonably requested by the AUTHORITY which may include summaries or abstracts of material agreements included on the schedule and shall provide any other detail on the budget

as is reasonably requested by the AUTHORITY. LESSEE agrees to use all reasonable efforts to operate the Premises within the parameters of each Annual Budget.

      **6.9.1**     **Budget Year.** Except as provided in this <u>Section 6.9</u>, a budget year shall be a calendar year, commencing January 1 and ending December 31, with the first budget year being the remainder of the calendar year in which this Agreement is made and the last budget year ending on the date this Agreement terminates or expires.

      **6.9.2**     **Other Financial Reporting.** On or before March 31 of each year of the Term, LESSEE shall also provide the AUTHORITY with operating statements (including, without limitation, a balance sheet and a profit and loss statement) for the Premises for the previous calendar year which shall be in a form reasonably acceptable to AUTHORITY.

      **6.10**     **Working Capital Loan.** Prior to the Lease Commencement Date, the AUTHORITY shall provide to LESSEE a Five Million and No/100 Dollars ($5,000,000.00) loan for initial working capital ("**Working Capital Loan**"). No interest will accrue on the Working Capital Loan, and same shall be due and payable in full on the third anniversary of the Lease Commencement Date. The Working Capital Loan shall be evidenced by a promissory note in the form attached hereto as **Exhibit C** (the "**Promissory Note**"). Notwithstanding anything contained herein to the contrary, in the event that any Taxes not applicable as of the Effective Date are or will be assessed against this Agreement, the Premises, or which would otherwise constitute an obligation of LESSEE hereunder during the first three (3) years of the Term, LESSEE may, by notice to AUTHORITY, extend the term of the Promissory Note for a period of time reasonably necessary for LESSEE to achieve a balanced operating budget. In addition, in the event an unforeseen "Material Expenditure" (defined hereafter) occurs during the first three (3) years of the Term, LESSEE may, by notice to AUTHORITY, request that the AUTHORITY consent to the extension of the term of the Promissory Note for a period of time reasonably necessary for LESSEE to pay, or procure financing for, such Material Expenditure. As used herein, the term "**Material Expenditure**" shall mean a cost or expenditure which is not foreseen and is significant enough to materially negatively affect or prevent LESSEE's ability to comply with the terms of this Agreement, which may include: (i) a capital expenditure that was unknown by AUTHORITY and LESSEE as of the Effective Date; (ii) the obligation to comply with any Laws (to the extent such compliance is LESSEE's obligations hereunder), the non-compliance of which was not known to AUTHORITY OR LESSEE as of the Effective Date, and of which LESSEE or AUTHORITY receives a notice of violation on or after the Effective Date; and (iii) any liability related to the Premises which was not reasonably anticipated or foreseen by the LESSEE or the AUTHORITY.

## ARTICLE 7. PERSONAL PROPERTY

      **7.1**     **Transfer of Personal Property.** The AUTHORITY agrees to transfer by a quit claim Bill of Sale to LESSEE for the Term of this Agreement the title to all machinery, equipment, trade fixtures, furniture, or any other personal property (the "**Personal Property**") of whatever kind and nature presently used in connection with the operation of the Premises.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

**7.2    Title to Vehicles.** The AUTHORITY shall cause title to the vehicles described on **Schedule 7.2** ("**Vehicles**") to be transferred to LESSEE effective on the Lease Commencement Date.  Title to any vehicles owned by LESSEE at the expiration or earlier termination of this Agreement shall be transferred to the AUTHORITY.

**7.3    Personal Property on the Premises.**  All Personal Property not referenced in Section 7.1 or Section 7.2 which LESSEE may desire to use in the operation of the Premises shall be purchased, furnished, installed, maintained and operated at LESSEE's sole cost and expense.  At the expiration or earlier termination of this Agreement, LESSEE shall convey to the AUTHORITY or its designee all Personal Property used in connection with the operation of the Premises not described in Section 7.1.

### ARTICLE 8.  ASSIGNMENT OF AUTHORITY'S RIGHTS

### AS TENANT UNDER LEASES

**8.1    Assignment of Gateway Park Lease.**  The AUTHORITY hereby conveys, transfers and assigns to LESSEE all of AUTHORITY's right, title and interest in and to the Gateway Park Lease effective as of the Lease Commencement Date.  LESSEE hereby assumes and agrees to keep, perform and fulfill all of the AUTHORITY's obligations under the Lease which are required to be performed by the AUTHORITY under the Gateway Park Lease and which accrue during the Term.

**8.1.1    Consents.**  During the Transition Period the AUTHORITY shall use commercially reasonable efforts to obtain the consent of the City and any other necessary party to the assignment of the Gateway Park Lease as described in Section 8.1.

**8.2    Assignment of Other Leases.**  The AUTHORITY is the tenant under the leases described on **Schedule 8.2** attached hereto (the "**Other Leases**").  The AUTHORITY hereby conveys, transfers and assigns to LESSEE all right, title and interest in and to the Other Leases effective as of the Lease Commencement Date.  LESSEE hereby assumes and agrees to keep, perform and fulfill all of the AUTHORITY's obligations under the Lease which are required to be performed by the AUTHORITY under the Other Leases and which accrue during the Term.

### ARTICLE 9.  SUBLETTING

**9.1    Transfer of Existing Subleases.**  The AUTHORITY hereby conveys, transfers and assigns to LESSEE all right, title and interest in and to the leases described on **Schedule 9.1** attached hereto (the "**Existing Subleases**") effective as of the Lease Commencement Date.   LESSEE hereby agrees, using LESSEE's reasonable business judgment, to enforce the obligations of the Sublessees under the Existing Subleases as LESSEE deems necessary or appropriate, and LESSEE assumes and agrees to keep, perform and fulfill all of the AUTHORITY's obligations under the Existing Subleases which are required to be performed by the AUTHORITY under the Existing Subleases, and which accrue during the Term.  To the extent the subordination of any Sublease (defined hereafter) is required in order to cause this Lease to be senior to such Existing Subleases, AUTHORITY

shall, at its sole cost, use all reasonable efforts to procure such subordination as necessary or as otherwise reasonably required by LESSEE.

**9.2     Subletting by LESSEE.**  LESSEE may sublet and/or license all or a part of Navy Pier for any lawful purpose pursuant to the terms of this Agreement and the Framework Plan.  LESSEE may not sublet Gateway Park without the prior written consent of the AUTHORITY and the City; provided, however to the extent permitted by the Gateway Park Lease LESSEE shall have the right to license the use of Gateway Park to third parties in accordance with the Framework Plan.  The Existing Subleases and all subleases entered into by the LESSEE during the Term are herein individually, a "**Sublease**" and collectively, the "**Subleases**".

**9.3     Attornment and Non-disturbance.**  The AUTHORITY hereby agrees that all sublessees of Subleases (individually, a "**Sublessee**" and collectively, the "**Sublessees**") shall have the right of quiet enjoyment notwithstanding the expiration of this Agreement or the termination or cancellation of this Agreement due to a breach of this Agreement by LESSEE or other early termination.  In the event of the expiration or earlier termination of this Agreement prior to the expiration of any Sublease, AUTHORITY agrees that so long as the Sublessee thereunder is not in default under its Sublease (beyond any applicable notice or cure period) the AUTHORITY shall recognize such Sublease and not disturb such Sublessee's rights thereunder.  In consideration of such agreement by the AUTHORITY, all Subleases entered into on or after the Lease Commencement Date shall include an attornment provision whereby the Sublessee agrees that if this Agreement is terminated for any reason, the Sublessee shall attorn to the AUTHORITY and shall consider the AUTHORITY as the sublandlord for all purposes under the Sublease.  In no event shall the AUTHORITY, as sublandlord, be liable for any act or omission of LESSEE, under any Sublease prior to the date of the AUTHORITY's succession, nor shall the AUTHORITY, as sublandlord, be subject to any offsets or defenses which the Sublessee may have against the LESSEE, nor bound by any rent or additional rent that the Sublessee may have paid for more than the then-current installment, except as provided in its Sublease.

## ARTICLE 10.  ASSIGNMENT OF THIS AGREEMENT

**10.1     Transfer of AUTHORITY's Interest.**  To the extent permitted by Laws, the AUTHORITY may assign or transfer its interest in the Premises and this Agreement to a third party governmental entity without the prior written approval of LESSEE and, upon such transfer or assignment, the AUTHORITY shall thereupon be released and discharged from all covenants and obligations of the AUTHORITY thereafter accruing, but such covenants and obligations shall be binding upon the successor of the AUTHORITY.

**10.2     Assignment**.  Except in connection with a collateral assignment or other assignment for financing purposes in accordance with Article 19, LESSEE shall have no right to assign this AGREEMENT without the prior written consent of the AUTHORITY, which consent may be withheld in the AUTHORITY's sole discretion.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## ARTICLE 11. MAINTENANCE, REPAIR AND REPLACEMENT

**11.1  Duty to Perform Structural Maintenance, Repairs and Replacement.** LESSEE shall, at its expense and as often as reasonably necessary or appropriate, in LESSEE's reasonable business judgment, to comply with the Framework Plan, and except as otherwise required by Laws, make all structural Repairs to the Improvements, and Repair, replace and maintain (including preventive maintenance) all components thereof, including, without limitation, conducting any applicable testing and upgrading required by federal or state agencies for all: exterior windows; structural walls; roof assembly; electric wiring; risers; plumbing, heating, ventilating and air conditioning facilities in the Improvements.  In addition, LESSEE or the applicable utility provider shall, at their expense, make all Repairs and replacements to the sanitary sewer and storm water systems serving the Premises and Repair, maintain and replace all components thereof.  Further, LESSEE assumes the full and sole responsibility for the condition, operation, repair, maintenance (including preventive maintenance) and operation of the Premises and the AUTHORITY, shall not under any circumstance be responsible for any maintenance, repairs, changes or alterations whatsoever.  Any costs, expenses, damages, fees, or liabilities incurred by LESSEE in performing its obligations under this Section 11.1 which are attributable or directly or indirectly related to Pre-Existing Environmental Conditions shall be subject to the indemnity provisions of Section 4.2.2.  When used in this Article 11, the term "**Repairs**" or "**Repair**" shall include replacements or renewals, when necessary in LESSEE's reasonable business judgment, and in compliance with the Framework Plan.  All Repairs made by LESSEE shall be in quality at least equal to the original construction of the Improvements.  LESSEE shall not commit or knowingly allow any waste or damage to be committed on any portion of the Premises.

**11.2  Housekeeping, Buildings, Grounds and Paved Areas.**  LESSEE, at its own expense, shall clean, and keep continuously clean, the Premises.  LESSEE shall perform such housekeeping functions as are necessary, in LESSEE's reasonable business judgment, to comply with the Framework Plan, to keep the aforesaid areas, including the equipment therein, in working order and in a safe, orderly and presentable condition at all times, and will make adequate arrangements for painting, cleaning, collecting of paper and trash, sweeping, degreasing and other arrangements for general good housekeeping, and keeping the Premises free of insects, rodents, vermin and other pests.

**11.3  Landscaping.**  LESSEE shall maintain and replace as necessary and desirable, in LESSEE's reasonable business judgment, to comply with the Framework Plan, existing and future trees, shrubbery, prairie plantings, trees, shrubbery and plantings within the Premises.  LESSEE shall have the right to modify, remove, replace, and/or relocate landscaping on the Premises as LESSEE so desires, so long as same is consistent with the Framework Plan.

**11.4  Capital Replacement.**  When capital replacement of any item is required due to equipment failure or obsolescence, and capital replacement is desirable, in LESSEE's reasonable business judgment, to comply with the Framework Plan, then LESSEE shall cause the replacement of such item.

## ARTICLE 12. EMERGENCY CLOSING AND DAMAGE TO PREMISES

**12.1    Emergency Closing.**  In the event of any emergency, including partial or total destruction of all or a portion of the Premises, the AUTHORITY, using its good faith discretion, reserves the right to close all or a portion of the Premises when such action, in the discretion of the AUTHORITY, is in the best interest of the health and safety of the public. LESSEE agrees that it shall not hold the AUTHORITY liable for any damages or loss of business resulting from such action.

**12.2    Limitation of AUTHORITY's Liability.**  Except as otherwise provided for in this Agreement, the AUTHORITY shall not be liable or responsible to LESSEE for any loss or damage to any property or person arising from its actions pursuant to Section 12.1 or occasioned by theft, fire, act of God, public enemy, injunction, riot, strike, insurrection, war, court order, or requisition or order of governmental body or authority.

**12.3    Damage or Destruction.**  In case of damage to or destruction to a portion of the Premises (including the Improvements) by fire or any other cause, LESSEE, but only to the extent of insurance proceeds actually received by LESSEE, shall, to the extent LESSEE chooses in its reasonable business discretion, either restore the same as nearly as possible to their value, condition and character immediately prior to such damage or destruction, or redevelop, demolish, re-use, and/or re-purpose such portion of the Premises as LESSEE deems necessary and appropriate, all in accordance with the Framework Plan.  If, during the Term, the whole or substantially all of the Premises and/or the Improvements shall be damaged or destroyed, this Agreement shall terminate as of 12:01 a.m., central time, on the date that such damage or destruction occurs, and after that, both the AUTHORITY and LESSEE shall be released from all obligations under this Agreement, except as otherwise set forth herein.  Upon any such termination of this Agreement, LESSEE shall assign to the AUTHORITY all of LESSEE's rights to all insurance proceeds related to such damage or destruction.

**12.4    Fixtures and Equipment.**  In the event of damage or destruction of the Personal Property or any part thereof by fire or any other cause, LESSEE, but only to the extent of insurance proceeds actually received by LESSEE, shall, to the extent LESSEE chooses in its reasonable business discretion, replace and repair any and all of its Personal Property necessary to properly and adequately continue its operations at the Premises, or redevelop, demolish, re-use, and/or re-purpose such Personal Property as LESSEE deems necessary and appropriate, all in accordance with the Framework Plan.  LESSEE agrees that such work will be promptly commenced and prosecuted to completion with due diligence.

## ARTICLE 13. INSURANCE

**13.1    LESSEE Insurance.**  Except as otherwise set forth in this Article 13, LESSEE shall procure and maintain, at its own expense, for the Term of this Agreement, all required insurance as set forth in this Article 13 and on **Exhibit D** (the "**LESSEE Insurance Requirements**") to this Agreement. Policy limits, coverages and deductibles shall be reviewed annually and may be reasonably adjusted by the AUTHORITY if prudent and customary for similar properties, considering the use of the Premises, levels of inflation, risk of loss, premium expenses, and other relevant factors; provided, however, that the amount of property damage

insurance which LESSEE shall maintain with respect to the Premises shall never be less than the amounts required pursuant to Section 13.2.

**13.2    Property Insurance.**

**13.2.1    Real Property.**  All risk (including special perils) commercial property insurance, insuring LESSEE for the amount of one hundred percent (100%) of the full replacement cost of the Improvements.  Provided, in the event market or other conditions renders the cost or industry practice for such insurance impractical, the Parties may modify this requirement as provided in Section 22.5 of this Agreement.

**13.2.2    Personal Property.**  LESSEE shall maintain sufficient insurance in favor of LESSEE to cover the Personal Property for the amount of one hundred percent (100%) of the full replacement cost of the Personal Property.  Provided, in the event market or other conditions renders the cost or industry practice for such insurance impractical, the Parties may modify this requirement as provided in Section 22.5 of this Agreement.

**13.2.3    Additional Insured**.  The insurance policies provided under this Section 13.2 shall identify the AUTHORITY and, if required by the Gateway Lease, the City, as additional insureds, and LESSEE as its interest may appear.

**13.2.3.1**    AUTHORITY shall deliver to LESSEE an original or a certified copy of each policy or policies, referred to in this Section 13.2 (with all required policy endorsements), plus certificates evidencing the existence thereof, all in such form or forms as the LESSEE may reasonably require, at least thirty (30) days prior to the Lease Commencement Date.  Notwithstanding the provisions of this Section 13.2.3.1, the Parties hereto acknowledge that the above policies may contain exclusions from coverage which are reasonable and customary for policies of such type.  Each such policy or certificate shall, to the extent available for such insurance, contain a valid provision or endorsement stating, "This policy will not be cancelled or materially changed or altered without first giving 30 days' notice thereof to NPI General Manager and NPI General Counsel, sent by certified mail, return receipt requested."

**13.2.3.2**    During the Term, a renewal binder of coverage (or evidence of such renewal) shall be delivered to AUTHORITY at least thirty (30) days prior to a policy's expiration date.

**13.3    Certain Other Insurance.**  LESSEE shall require (i) that all Sublessees and users of the Premises provide certificates of insurance evidencing appropriate insurance, as required by the agreement with such user and (ii) that all parties providing services or goods pursuant to Service Contracts, or other agreements provide certificates of insurance evidencing appropriate insurance as required by their respective contracts.

In accordance with industry standards LESSEE shall require that any contractor or subcontractor performing services for LESSEE acquire and maintain insurance including as applicable, the following with limits as consistent with such industry standards:

- General Liability

- Auto Liability

- Umbrella Liability

- Workers Compensation with Statutory limits and Employers Liability limits no less than $500/$500/$500

- A blanket waiver of subrogation in favor of the AUTHORITY and LESSEE

- Kotecki Waiver Endorsement in favor of the AUTHORITY

- Pollution Liability for construction projects

- Hostile fire coverage is required for the Premises

- TRIA/Terrorism coverage is required

LESSEE on behalf of the AUTHORITY may cause such contractors and subcontractors to name LESSEE and the AUTHORITY as an additional insured under any insurance maintained by such contractors and subcontractors pursuant to the terms of such third party agreements and in such event to deliver to LESSEE promptly after request therefor a certified copy of such policy and/or a certificate evidencing the existence thereof.

**13.4    Insurance Not a Limitation on Liability.**  LESSEE expressly understands and agrees that the insurance requirements, coverages and limits described in this Article 13 and **Exhibit D** of this Agreement shall, in no way limit LESSEE's liabilities and responsibilities specified in this Agreement or required by Laws.

**13.5    Sublessees.**  The proof of insurance policies and insurance coverage required to be furnished by LESSEE to the AUTHORITY under this Agreement may, at the election of LESSEE, be furnished and/or paid for by any Sublessee or other person having an insurable interest in the Premises, and the AUTHORITY shall accept such policies as though they had been supplied and paid for by LESSEE, provided such policies shall otherwise comply with the requirements of this Agreement.

**13.6    Insurance for First Year of Term.**  For the period commencing on the Lease Commencement Date through and including June 30, 2012, the AUTHORITY shall provide the insurance required to be carried by LESSEE pursuant to Section 13.2 and paragraphs 1, 2, and 3 of **Exhibit D** attached hereto substantially consistent with insurance maintained by AUTHORITY for the Premises on the Effective Date.  LESSEE shall reimburse the AUTHORITY for the actual out of pocket costs of insurance coverage on a monthly basis within thirty (30) business days of receipt of the AUTHORITY's invoice for the insurance coverage.  From and after June 30, 2012, the AUTHORITY shall have no responsibility to provide any form of insurance required by this Agreement.

**13.7    Pollution Legal Liability.**  Lessor shall maintain pollution legal liability insurance during the Term similar to its current coverage which covers the Premises and in accordance with industry standards ("**Pollution Insurance**") .  LESSEE shall reimburse the

AUTHORITY for the actual annual out of pocket costs of such Pollution Insurance allocable to the Premises within thirty (30) business days of receipt of the AUTHORITY's invoice for the insurance coverage.

## ARTICLE 14. INDEMNITY

**14.1    Indemnity by LESSEE.**  Subject to the terms of this Agreement, and except to the extent that any such liability is caused by the negligence or willful misconduct of the AUTHORITY, its employees, agents and contractors, LESSEE hereby agrees to indemnify, defend and hold the AUTHORITY and its employees, agents and contractors harmless from and against any and all claims, demands, actions, liabilities, damages, cost and expenses (including reasonable attorneys' fees) arising from or related to (a) any use or occupancy of the Premises during the Term, (b) any Event of Default, or (c) any damage to any property (including property of employees and invitees of LESSEE) or any bodily or personal injury, illness or death of any person (including employees and invitees of LESSEE) occurring in or on the Premises or any part thereof during the Term and from any cause whatsoever, and/or any such damage, bodily or personal injury, illness, or death which occurs during the Term and which is caused by the negligence or willful misconduct of the LESSEE, its employees, agents or contractors.

**14.2    Indemnity by the AUTHORITY.**  Except to the extent that any such liability is caused by the negligence or willful misconduct of LESSEE, its employees, authorized agents and contractors, the AUTHORITY hereby agrees to indemnify, defend and hold LESSEE Indemnified Parties, harmless from and against all third party claims, demands, actions, liabilities, damages, cost and expenses (including reasonable attorneys' fees) arising from or related to: (a) any costs, expenses, fees, salaries, or benefits, arising out of or relating to, the AUTHORITY's use, license, lease, development, repair, replacement, and operation of all or any portion of the Premises prior to the Lease Commencement Date, (b) any occurrence on or about the Premises which occurred prior to the Lease Commencement Date or after the expiration or earlier termination of this Agreement, (c) any default in the performance of AUTHORITY's obligations under this Agreement, or (d) any damage or alleged damage to any property or any bodily or personal injury, illness or death of any person occurring in, on or about the Premises or any part thereof which occurred prior to the Lease Commencement Date and/or any such damage, bodily or personal injury, illness, or death which occurs during the Term and which is caused by the negligence or willful misconduct of the AUTHORITY, its employees, agents or contractors.  AUTHORITY's obligations pursuant to this <u>Section 14.2</u> shall survive the expiration or early termination of this Agreement.

**14.3    Representations of the LESSEE**.  The LESSEE hereby makes the following representations and warranties:

**14.3.1    Due Organization.**  That the LESSEE is duly organized, validly existing and in good standing as a not-for-profit corporation under the laws of the State of Illinois and has full authority to enter into and perform this Agreement, and the person or persons signing this Agreement and any documents executed pursuant hereto on the LESSEE's behalf have full power and authority to bind the LESSEE.

**14.3.2    No Conflicts.**  That the execution, delivery and performance of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate the charter of or other agreements made by or binding upon the LESSEE.

**14.3.3    Bylaws**.  LESSEE covenants and warrants to the AUTHORITY that throughout the Term the Bylaws of LESSEE shall (i) provide that meetings of the board of directors shall be open to the public; provided, however, the board can conduct private executive sessions, so long as any actions taken by the board of directors shall be made during meetings which are open to the public; (ii) include conflict of interest and ethics provisions; and (iii) require that the Chairperson of the Board, the Secretary-Treasurer and the Chief Executive Officer of the AUTHORITY be members of LESSEE's voting board.

**14.4    Representations of the AUTHORITY**.  The AUTHORITY hereby makes the following representations and warranties to its actual knowledge, being limited to the knowledge of the Chief Executive Officer of the AUTHORITY, without independent inquiry or investigation:

**14.4.1    Authority**.  That the AUTHORITY has full authority to enter into and perform this Agreement, and the person or persons signing this Agreement and any documents executed pursuant hereto on the AUTHORITY's behalf have full power and authority to bind the AUTHORITY.

**14.4.2    No Conflicts**.  That the execution, delivery and performance of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate the ACT or charter of or other agreements relating to forming or governing the AUTHORITY.

**14.4.3    Violations.**  Except as set forth in **Schedule 14.4.3** ("**Notices of Violations**"), the AUTHORITY has not received notice from any governmental authority or any third party, and AUTHORITY is not, aware of any condition of the Premises or the Improvements which violates any Laws.

**14.4.4    Pending Disputes.**  Except as set forth in **Schedule 14.4.4** ("**List of Pending Disputes**"), the AUTHORITY has received no notice, and AUTHORITY is not aware of any pending or threatened actions, suits, or proceedings, including without limitation, condemnation proceedings, before any court or governmental department, commission, board, bureau, agency or instrumentality which would materially and adversely affect the current or future ownership, use, or expenses of the Premises.

**14.4.5    Hazardous Substances.**  Except as set forth in **Schedule 14.4.5** ("**Existing Hazardous Substances**"), the AUTHORITY has received no notice, and has no actual knowledge of the location or existence of any Hazardous Substances located on, in, under or adjacent to the Premises.

**14.4.6    Prior Rights.**  That, as of the Lease Commencement Date, there are no (i) mortgages or indenture bonds which constitute a lien on the AUTHORITY's title to the Premises, (ii) leases or other agreements that permit any person or entity to occupy or possess the Premises, except for Subleases and Pier Agreements, Service Contracts, or Permitted

Encumbrances, (iii) parties, who, other than AUTHORITY, have any senior or preferred rights to the rights granted to LESSEE under this Agreement and (iv) agreements, encumbrances, claims, controversies, or other matters affecting or relating to the Premises other than as expressly described in this Agreement or in the Permitted Encumbrances.

**14.4.7    Default.**  AUTHORITY has not received notice of default with respect of any of its obligations or liabilities pertaining to the Premises.

**14.4.8    Disclosure.**  If, from and after the Effective Date until the Lease Commencement Date, AUTHORITY discovers or becomes aware of any information which would cause any of the representations or warranties of AUTHORITY contained in this Agreement to become materially inaccurate, false, or misleading, AUTHORITY shall immediately notify LESSEE of same in writing.

## ARTICLE 15.  TERMINATION AND EXPIRATION OF THE AGREEMENT

**15.1    Transition of Services.**  Upon the termination or expiration of this Agreement, LESSEE shall, reasonably cooperate, at no material cost to LESSEE, with the AUTHORITY or any succeeding lessee to achieve an orderly transition of services without interruption of such service to the patrons of the Premises.

**15.1.1**    As part of transition of services, all funds held in the Capital Improvement Account and any accounts owned by LESSEE and income from all sources, including from revenue described in Section 6.2 above, shall be turned over to the AUTHORITY or its designee; provided, however, any funds donated to LESSEE and not able to be expended prior to termination or expiration shall be delivered to the AUTHORITY and applied to expenses related as closely as possible to the original intention of the donor.  In the event it is determined that any such funds are not legally capable of being transferred to the AUTHORITY, the Parties shall mutually agree to disposition of any such funds in a manner consistent with the doctrine of cy-pres.

**15.1.2**    If and to the extent permitted by Laws, LESSEE shall voluntarily dissolve upon the expiration or earlier termination of this Agreement.

**15.2    Peaceful Surrender after Termination.**  LESSEE shall, upon termination or expiration of this Agreement peacefully quit, surrender and deliver unto the AUTHORITY, its successors or assigns, the Premises.  All alterations, Improvements and other additions made to the Premises during the Term shall be and remain the property of the AUTHORITY and shall not be removed by LESSEE upon termination or expiration hereof; provided, however, that all trade fixtures, furniture, machinery, equipment and other personal property of whatever kind and nature kept or installed on the Premises by a Sublessee shall remain the respective Sublessee's property, and same shall be promptly removed by the respective Sublessee upon termination of the applicable Sublease, to the extent required thereby.

**15.3    Condemnation.**

**15.3.1    Total Taking.**  If, during the Term, the whole or substantially all of the Premises shall be taken pursuant to any condemnation or eminent domain proceeding, this

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Agreement shall terminate as of 12:01 a.m., central time, on the date that the condemnor has the right to possession of the Premises, and after that, both the AUTHORITY and LESSEE shall be released from all obligations under this Agreement, except as otherwise expressly set forth herein and the entire award shall be paid to the AUTHORITY. Notwithstanding anything contained herein to the contrary, AUTHORITY agrees not to institute, effectuate, or request condemnation of, or any eminent domain proceeding for, all, or any portion, of the Premises in order to be entitled to terminate, amend, or otherwise effect LESSEE's rights under this Agreement, nor LESSEE's use of the Premises as permitted hereby. AUTHORITY's obligations under the foregoing sentence shall survive the early termination of this Agreement.

        **15.3.2    Partial Taking.** If, during the Term, less than all of the Premises is taken, but such portion taken is so that the remaining Premises can no longer be operated for the purposes set forth herein and in accordance with the Framework Plan, in LESSEE's reasonable business judgment, or if by reason of any Laws the use of the Premises for the purposes specified in this Agreement shall become unlawful, then and after the taking, the LESSEE may terminate this Agreement and any condemnation award shall be payable to the AUTHORITY. If only a part of the Premises is taken pursuant to any condemnation or eminent domain proceeding and this Agreement is not terminated, then, to the extent LESSEE deems necessary or desirable in its reasonable business judgment, LESSEE shall restore the Improvements to either restore the remaining portion of the Premises as nearly as possible to their value, condition and character immediately prior to such damage or destruction, or redevelop, demolish, re-use, or re-purpose such portion of the Premises as LESSEE deems necessary and appropriate in accordance with the Framework Plan. The aforementioned work shall begin within a reasonable time after the taking and shall be prosecuted diligently.

        **15.3.3    Award.** If a condemnation or eminent domain proceeding is instituted by any entity having such powers, and this Agreement is not terminated, any award shall be payable to LESSEE. If this Agreement is terminated as a result of condemnation or eminent domain proceedings, any award shall be paid to the AUTHORITY.

        **15.3.4    Purchase in Lieu of Taking.** For the purposes of this <u>Section 15.3</u>, any purchase by a governmental entity by competent authority of all or part of the Premises, in lieu of a taking or condemnation thereof under powers of eminent domain, shall be deemed to be an actual taking or condemnation thereof; provided, however no such sale or purchase shall be permitted without the prior written approval of LESSEE. Any payment made during the Term in lieu of an award shall be paid to LESSEE.

## ARTICLE 16. INTENTIONALLY OMITTED

## ARTICLE 17. ESTOPPEL CERTIFICATE

        **17.1    Estoppel Certificates.** Within thirty (30) days after request by either Party the Party to whom request is made shall execute and deliver to the requesting party a written certificate as to the status of this Agreement, to such Party's knowledge, without duty of inquiry or investigation, of any existing defaults, the status of the payments and performance of the parties required hereunder and such other information that may be reasonably requested.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## ARTICLE 18.  DEFAULT AND REMEDIES

**18.1    Events of Default.**  The following events shall be deemed to be events of default (each, an "**Event of Default**") by LESSEE under this Agreement:

**18.1.1**    Failure by LESSEE to make any payment or comply in any material respect with the Framework Plan, or with any term, provision or covenant of this Agreement for a period of ninety (90) days after written notice thereof to LESSEE specifying such failure and requesting that it be remedied.  If the default cannot reasonably be cured within ninety (90) days, LESSEE shall not be in default of this Agreement if LESSEE gives written notice and commences to cure the default within the ninety (90) day period and diligently continues to cure the default pursuant to a schedule mutually approved by LESSEE and the AUTHORITY.

**18.1.2**    LESSEE fails to pay any money due under the Promissory Note when due, and such failure continues for more than sixty (60) days, except as otherwise permitted herein.

**18.1.3**    LESSEE abandons the Premises or any portion thereof; provided, however, LESSEE's abandonment of the Premises or any portion thereof due to condemnation shall not be deemed as an Event of Default for purposes of this Section 18.1.  Nothing contained in this Section 18.1.3 shall be deemed abandonment or shall preclude LESSEE from closing all or a portion of the Premises for emergency, safety, health, or redevelopment reasons, nor for any other reason which LESSEE determines necessary or desirable in its reasonable business purpose, so long as LESSEE is otherwise in compliance with the terms of this Agreement and the Framework Plan.

**18.1.4**    If LESSEE voluntarily files a petition in bankruptcy or for insolvency or for reorganization under any bankruptcy or insolvency statute or makes any arrangement or assignment for the benefit of creditors; or if a petition in bankruptcy or insolvency is filed against the LESSEE that is not dismissed, withdrawn or otherwise stayed within ninety (90) days after filing; or LESSEE is adjudicated as bankrupt or as insolvent; or a receiver or trustee is appointed for all, or substantially all, of the property of the LESSEE upon an insolvency, and said receiver or trustee is not discharged or ordered removed or his appointment otherwise stayed within ninety (90) days after his appointment.

No such notice given under this Section 18.1 shall be deemed a forfeiture or a termination of this Agreement unless the AUTHORITY so elects in the notice.

**18.2    Remedies.**  Upon the occurrence of any of the aforesaid Events of Default, the AUTHORITY may pursue any one or more of the following remedies:

**18.2.1    Termination of Agreement.**  Terminate this Agreement, in which event LESSEE shall surrender the Premises to the AUTHORITY immediately, and if LESSEE fails to do so the AUTHORITY may, without prejudice to any other remedy which it may have for possession, and to the extent permitted by law, enter upon and take possession of the Premises and expel or remove LESSEE and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim of damages therefor; and LESSEE agrees to pay to the AUTHORITY upon demand the amount of all direct,

29

reasonable, and out-of-pocket loss and damage which the AUTHORITY may suffer by reason of such termination, including, but not limited to, the cost of recovering the Premises and the unpaid balance of all rental or other sums of money hereby reserved to the date of termination.

**18.2.2    Take Over of LESSEE's Responsibilities.** Enter upon the Premises without being liable for prosecution or any claim for damages therefor, and do whatever LESSEE is obligated to do under the terms of this Agreement; and LESSEE agrees to reimburse the AUTHORITY upon demand for any reasonable expenses which the AUTHORITY may incur in thus effecting compliance with LESSEE's obligations under this Agreement, and LESSEE further agrees that the AUTHORITY shall not be liable for any damages resulting to LESSEE from such action, unless caused by the negligence or willful misconduct of AUTHORITY, its agents, contractors, servants, employees or otherwise.

**18.3    Waiver of Breach.**   The failure by the AUTHORITY or LESSEE to seek redress for violation of, or to insist upon the strict performance of, any condition or covenant of this Agreement, or to exercise any right or remedy consequent upon a violation of this Agreement, shall not constitute a waiver of any such breach or subsequent breach, or of such covenants, terms, conditions, rights and remedies.   No provision of this Agreement shall be deemed to have been waived by the AUTHORITY or LESSEE unless such provision is waived in writing.

**18.4    Waiver of Remedies.**   Pursuant to any of the foregoing, the exercise of one remedy by either Party hereto shall not preclude the exercise of any other remedy by that Party provided by the terms of this Agreement or provided by law or in equity, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of rental or other financial obligations due the AUTHORITY hereunder or of any damages occurring to the AUTHORITY by reason of the Event of Default.   Failure or delay by the AUTHORITY to enforce one or more of the remedies provided herein or provided by law upon the occurrence of an Event of Default, shall not be deemed or construed to constitute a waiver thereof or preclude the exercise thereof during the continuance of any other Event of Default, hereunder, nor be deemed or construed to be a waiver of any other or subsequent Event of Default. Notwithstanding the foregoing, the AUTHORITY is obligated to use all commercial efforts to mitigate any damages occurring by reason of an Event of Default.   Further notwithstanding anything contained herein to the contrary, in no event shall either Party be liable to the other Party for consequential, special, or punitive damages under any circumstances whatsoever.

**18.5    Dispute Resolution Procedures.**   The Parties desire to cooperate with each other in the management and operation of the Premises pursuant to the terms hereof.   In keeping with this cooperative spirit and intent, the Parties shall attempt in good faith to resolve any dispute, claim, or controversy arising out of, or related to or under this Agreement (each a "**Dispute**") within thirty (30) days following receipt by the other Party of notice of such Dispute.   If the Parties are unable to resolve the Dispute within such 30-day period, then, upon notice by a Party to the other Party, the Dispute shall be referred to the Designated Persons of each Party prior to either Party initiating arbitration, and the Designated Persons shall negotiate in good faith to resolve any such Dispute, conferring as often as they deem reasonably necessary.   If the Designated Persons cannot resolve such Dispute within the lesser of:  three (3) meetings; or an additional sixty (60) days, then the further remedy of either party shall be

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

limited to initiating binding arbitration of such Dispute, including, but not limited to, any Dispute arising out of or relating to the validity, enforceability, and scope of the provisions of this Agreement. The parties agree that such arbitration shall be settled by a three-arbitrator panel ("**Arbitration Panel**") administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules. Judgment on, and enforcement of, the award rendered by that panel may be entered in the Circuit Court of Cook County. The place of arbitration shall be Chicago, Illinois. Without waiving any other remedy under this Agreement, upon a showing of immediate irreparable injury and the inadequacy of any remedy at law, either party may seek from the Circuit Court of Cook County any emergency interim injunctive relief that is necessary to protect the rights or property of that party pending the establishment of the Arbitration Panel. Once the Arbitration Panel is established, either party seeking injunctive relief pending the rendering of the arbitration award shall apply to the Arbitration Panel for that relief. Venue in any permissible judicial action under this Section arising out of this Agreement and/or between the LESSEE and AUTHORITY shall be in the Circuit Court of Cook County, State of Illinois. Service of process on AUTHORITY may be made either by registered or certified mail, personal delivery, or nationally recognized overnight courier addressed as provided for in Section 1.7 or by personal delivery on the Contract Administrator (defined hereafter). Service of process on LESSEE may be made either by registered or certified mail, personal delivery, or nationally recognized overnight courier addressed as provided for in Section 1.7 or by delivery to the LESSEE's registered agent for service of process in the State of Illinois.

### 18.5.1 Designated Persons.

(a) AUTHORITY hereby designates the Chief Executive Officer as its Designated Person who shall have the authority set forth in this Section 18.5.

(b) LESSEE hereby designates NPI General Manager, or such person's designee, as its Designated Person who shall have express authority to bind LESSEE with respect to matters of this Agreement.

A Party may, by written notice to the other Party, designate a substitute Designated Person for itself.

### 18.5.2 Tolling. 

If a Party receiving a notice of default under this Agreement contests, disputes or challenges the propriety of such notice by making application to the dispute resolution procedure in this Section 18.5, any cure period that applies to such default shall be tolled for the time period between such application and the issuance of a final award or determination.

## ARTICLE 19. FINANCING

**19.1 LESSEE Financing.** The Parties will cooperate in LESSEE's efforts to secure financing for the Approved Operations, which may include the AUTHORITY making its bonding capacity available to LESSEE and/or consenting to financing with debt obligations that extend beyond the term of the Lease.

## ARTICLE 20. FORCE MAJEURE (UNAVOIDABLE DELAY)

**20.1    Force Majeure.**  A delay by either LESSEE or the AUTHORITY shall not constitute a default, nor shall LESSEE or the AUTHORITY be held liable for loss or damage, if and to the extent that such delay, failure, loss or damage is caused by occurrences beyond the reasonable control of such Party, and its agents, employees, contractors, subcontractors and consultants, including, but not limited to, acts of God or the public enemy, expropriation or confiscation of facilities, compliance with any order or any request of any governmental authority, court, or person purporting to act therefor, if any penalty or material adverse consequence would be likely to result from non-compliance therewith (and if such order or request was not reasonably foreseeable as of the Effective Date), acts of declared or undeclared war, weapons of war employing atomic fission or radioactive force, whether in time of peace or war, public disorders, rebellion, sabotage, revolution, earthquake, floods, riots, area-wide strikes, labor or employment difficulties affecting the trades generally, delays in transportation, inability or delays of a party to obtain necessary materials, equipment, manpower or governmental entitlements, approvals or permits due to existing or future laws, rules or regulations or requirements of governmental authorities, or any other causes, whether direct or indirect; and whether or not of the same class or kind as those specifically above named, not within the reasonable control of such party, or its agents, employees, contractors, subcontractors or consultants, and that by the exercise of reasonable diligence such party is unable to prevent.  Any such occurrence is referred to in this Agreement as an "**Unavoidable Delay.**"  The Party delayed by an Unavoidable Delay shall give the other Party written notice of the occurrence of the Unavoidable Delay within ten (10) business days of such occurrence.

## ARTICLE 21. THE AUTHORITY'S RIGHTS

**21.1    Inspection.**  The AUTHORITY shall have the right to reasonably inspect and review the operations at the Premises, to insure compliance with the standards set forth in this Agreement and in the Framework Plan.  Except in the case of an emergency, the AUTHORITY shall either comply with any notice requirement of a Sublessee in its Sublease of which the AUTHORITY has notice or has the consent of the Sublessee to enter the subleased premises. The AUTHORITY's inspection of the Premises shall not unreasonably interfere with the use thereof by LESSEE or its Sublessees and/or patrons.

## ARTICLE 22. MISCELLANEOUS

**22.1    Heading.**  The captions used throughout this Agreement are for convenience and reference only and the words contained therein shall in no way be held or used to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement.

**22.2    Time.**  In the event the provisions of this Agreement require any act to be done or action to be taken hereunder on a date which is a Saturday, Sunday, or legal holiday, such act or action shall be deemed to have been validly performed or taken if performed or taken on the next succeeding day which is not a Saturday, Sunday, or legal holiday.  All time periods in this Agreement shall be based on calendar days, unless otherwise specifically stated to be based on business days.

**22.3    Memorandum of Lease.**  The AUTHORITY and LESSEE agree to execute a memorandum of lease ("**Memorandum of Lease**") in the form attached hereto as **Exhibit E.** Within thirty (30) days of the date of this Agreement, the AUTHORITY shall cause the Memorandum of Lease to be recorded with the Cook County Recorder of Deeds.

**22.4    Consent of the Parties.**  Except to the extent expressly stated herein to the contrary, in the event either Party's consent or approval is required under this Agreement, such Party shall not unreasonably withhold, condition, or delay such consent or approval. Furthermore, in the event either Party does not respond to a request for its consent or approval within the time frame(s) specifically permitted herein (or within thirty (30) days if no time frame is so specified), then the requesting Party may resubmit such request in writing to the Party for which consent or approval is being requested with a notice set forth at the top of its request for approval, containing a legend in 14 point bold type which states in bold and all-capital letters: "URGENT NOTICE OF WAIVER OF RIGHTS BY [*INSERT APPLICABLE PARTY*]," and the content of such notice further states in bold and all capital letters:  "IF [*INSERT APPLICABLE PARTY*] FAILS TO RESPOND TO THIS NOTICE WITHIN SEVEN (7) BUSINESS DAYS AFTER [*INSERT APPLICABLE PARTY*]'S RECEIPT OF SAME, THEN [*INSERT APPLICABLE PARTY*]'S CONSENT TO [*ENTER MATTER FOR WHICH CONSENT OR APPROVAL IS BEING REQUESTED*] SHALL BE DEEMED TO HAVE BEEN GIVEN" ("**Second Notice**").  In the event the requesting Party submits a Second Notice, and if the Party for which consent or approval is being requested fails to respond thereto within such seven (7) business day period, then such Party's consent solely to the matter for which consent or approval is being requested as set forth in the Second Notice shall automatically deemed to have been given.

**22.5    Cooperation.**  To the extent reasonably requested by LESSEE, AUTHORITY shall use all good faith, commercially reasonable efforts to assist LESSEE with its compliance with the terms of this Agreement, its implementation of the Approved Operations, and its efforts to implement, the Framework Plan. The Parties acknowledge and agree that the Term, if and as extended, is likely to extend for a significant period of time.  Therefore, the Parties agree to cooperate and work in good faith to further the objectives of this Agreement and the Framework Plan (as same may be amended from time to time), which cooperation may include amending this Agreement as necessary to effectuate such goals and to respond to tax, procurement, employment and labor practices, and other matters which may arise during the Term.  The Parties also agree to amend the Framework Plan as mutually agreed, to reflect changes in the Premises, society, economic factors, and other factors which are unknown and or which have not been, or cannot be, reasonably foreseen as of the Effective Date; provided, however, the Parties' first and foremost goal shall be to attempt to cause this Agreement and the Premises to comply with the Framework Plan to the extent both Parties believe same to be desirable and/or necessary.

**22.6    Third Party Consents.**  During the Transition Period, the Parties shall identify all third party consents necessary for the Parties to effect this Agreement ("**Third Party Consents**"). The AUTHORITY shall use commercially reasonable efforts to obtain the Third Party Consents prior to the Lease Commencement Date. Thereafter the Parties will cooperate and work together in good faith to secure the Third Party Consents.

**22.7    Inability to Perform.**  If LESSEE reasonably determines that it is no longer able to implement the Approved Operations or otherwise comply with the terms of this Agreement, including the Framework Plan, LESSEE may terminate this Agreement upon not less than one hundred eighty (180) days notice to AUTHORITY; provided, however, in the event LESSEE's reason for termination is due to:  (a) AUTHORITY's failure to procure the City's consent pursuant to Section 8.1.1; (b) AUTHORITY's failure to make the payments required of it pursuant to Section 5.6 and/or Section 6.10; and/or (c) AUTHORITY's failure to procure the Third Party Consents pursuant to Section 22.6, LESSEE may terminate this Agreement by notice to the AUTHORITY within ninety (90) days after the expiration of the Transition Period, such termination to be effective no sooner than thirty (30) days, and no longer than ninety (90) days, after giving such notice of termination.

**22.8    Counterparts.**  This Agreement may be executed in counterparts, and via electronic means, including facsimile, e-mail, and PDF, and each counterpart, whether an original signature or an electronic copy, shall be deemed an original for the purposes of this Agreement, and shall bind the Party so providing its signature by such means.

**22.9    Third Parties.**  No third party to this Agreement shall be deemed a beneficiary or intended beneficiary hereof.

<div align="center">

**[SIGNATURE PAGE FOLLOWS]**

</div>

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**THE METROPOLITAN PIER AND
EXPOSITION AUTHORITY**

James Reilly
Trustee

**Attest**

_____

**NAVY PIER, INC.,
an Illinois not-for-profit corporation**

By:_____
Sarah Garvey
Chairperson

**Attest**

_____

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

## EXHIBIT A-1
## EXHIBIT A-1

### LEGAL DESCRIPTION OF NAVY PIER

BEGINNING AT THE NORTHEAST CORNER OF LOT 7 IN THE CHICAGO DOCK AND CANAL CO'S PESTIGO DOCK ADDITION IN SAID SECTION 10; THENCE "DUE EAST" ON THE EXTENSION EAST OF THE NORTH LINE OF SAID LOT, 460.40 FEET TO THE PLACE OF BEGINNING; THENCE SOUTH 0 DEGREES 08 MINUTES 20 SECONDS WEST ON A LINE PARALLEL WITH THE EAST LINE OF SAID LOT, 289.23 FEET; THENCE DUE WEST 2.60 FEET; THENCE SOUTH 0 DEGREES 08 MINUTES 20 SECONDS WEST, 37.00 FEET; THENCE DUE EAST, 44.00 FEET; THENCE SOUTH 0 DEGREES 08 MINUTES 20 SECONDS WEST, 63.00 FEET TO THE SOUTH FACE OF A CONCRETE BULKHEAD; THENCE SOUTH 89 DEGREES 57 MINUTES 35 SECONDS EAST ON SAID SOUTH FACE, 2,332.66 FEET TO A POINT ON THE EXTENSION SOUTH OF THE WEST FACE OF THE BRICK TERMINAL BUILDING IN NAVY PIER; THENCE NORTH 0 DEGREES 06 MINUTES EAST ON SAID LINE EXTENDED SOUTH AND ALSO ALONG SAID WEST FACE AND ALSO ON THE EXTENSION NORTH THEREOF, 390.12 FEET TO THE NORTH FACE OF A CONCRETE BULKHEAD; THENCE NORTH 89 DEGREES 58 MINUTES 55 SECONDS WEST ALONG SAID NORTH FACE, 2,373.80 FEET TO THE PLACE OF BEGINNING;

AND ALSO AS TO THAT PART OF THE LAND FALLING WITHIN A TRACT OF LAND DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF LOT 7 IN THE CHICAGO DOCK AND CANAL CO'S PESHTIGO DOCK ADDITION IN SAID SECTION 10; THENCE "DUE EAST" ON THE EXTENSION EAST OF THE NORTH LINE OF SAID LOT, 2,834.20 FEET; THENCE "DUE SOUTH " 0.95 FEET TO THE POINT OF INTERSECTION OF THE NORTH FACE OF A CONCRETE BULKHEAD AND THE EXTENSION NORTH OF THE WEST FACE OF THE BRICK TERMINAL BUILDING IN NAVY PIER, SAID POINT BEING THE PLACE OF BEGINNING OF THIS TRACT OF LAND; THENCE S 89 DEGREES 52 MINUTES 30 SECONDS EAST ON SAID NORTH FACE OF THE CONCRETE BULKHEAD, 666.70 FEET TO THE NORTHEAST CORNER THEREOF, SAID CORNER BEING 2.40 FEET SOUTH OF SAID EXTENSION EAST OF THE NORTH LINE OF SAID LOT 7; THENCE SOUTH 0 DEGREES 06 MINUTES WEST ON THE EAST FACE OF SAID BULKHEAD, 294.0 FEET TO THE SOUTHEAST CORNER THEREOF; THENCE NORTH 89 DEGREES 56 MINUTES WEST ON THE SOUTH FACE OF SAID BULKHEAD, 666.70 FEET TO A POINT IN THE AFORESAID WEST FACE OF THE BRICK TERMINAL BUILDING EXTENDED SOUTH; THENCE NORTH 0 DEGREES 06 MINUTES EAST ON SAID LINE EXTENDED SOUTH AND ALONG SAID WEST FACE OF BUILDING AND ALONG ITS EXTENSION NORTH, 294.68 FEET TO THE POINT OF BEGINNING.

## **EXHIBIT A-2**

## **SITE PLAN OF NAVY PIER**



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

## EXHIBIT A-3

### LEGAL DESCRIPTION OF GATEWAY PARK

PARCEL 1: (STREETER DRIVE AND ENTRANCE LANES FOR PIER AND PIER PARK AREA)

A PARCEL OF LAND IN THE FRACTIONAL NORTHEAST 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, AND ACCRETIONS THERETO, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF LOT 7 IN THE CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SAID SECTION 10; THENCE SOUTH ALONG SAID EAST LINE OF LOT 7 A DISTANCE OF 514 FEET TO THE SOUTH LINE OF SAID LOT 7; THENCE WEST ALONG THE SOUTH LINE OF SAID LOT 7 TO THE WEST FACE OF THE DOCK ON THE EAST SIDE OF OGDEN SLIP; THENCE SOUTHERLY ALONG THE FACE OF SAID DOCK TO THE NORTH LINE OF THE PROPERTY CONVEYED TO THE UNITED STATES OF AMERICA BY QUIT CLAIM DEED FROM THE CITY OF CHICAGO; THENCE EAST ALONG SAID NORTH LINE A DISTANCE OF 100 FEET, MORE OR LESS, TO THE EAST LINE OF AFORESAID PROPERTY; THENCE SOUTH ALONG SAID EAST LINE A DISTANCE OF 217 FEET TO THE NORTH LINE OF A PROPERTY CONVEYED TO THE UNITED STATES OF AMERICA BY DEED FROM THE CITY OF CHICAGO, DECEMBER 8, 1921, RECORDED AS DOCUMENT NUMBER 7347325; THENCE EAST ALONG SAID LINE A DISTANCE OF 426 FEET, MORE OR LESS, TO THE EAST FACE OF DOCK EXTENDING SOUTH FROM NAVY PIER; THENCE NORTH ALONG SAID DOCK LINE TO THE POINT OF INTERSECTION WITH THE SOUTH LINE OF NAVY PIER; THENCE NORTH 00 DEGREES 08 MINUTES 20 SECONDS EAST 63.00 FEET; THENCE DUE WEST 44.00 FEET; THENCE NORTH 00 DEGREES 08 MINUTES 20 SECONDS EAST 37.00 FEET; THENCE DUE EAST 2.60 FEET; THENCE NORTH 00 DEGREES 08 MINUTES 20 SECONDS EAST ON A LINE PARALLEL WITH THE EAST LINE OF SAID LOT 7, 289.23 FEET; THENCE DUE WEST ON THE EXTENSION WEST OF THE NORTH LINE OF SAID LOT 7, 460.40 FEET TO THE PLACE OF BEGINNING, IN COOK COUNTY, ILLINOIS.

PARCEL 2: (PARTLY IN STREETER DRIVE AND INCLUDES INTERSECTIONS OF STREETER AND ILLINOIS, STREETER AND RAMP FROM LAKE SHORE DRIVE AND STREETER AND GRAND)

THE EAST 100 FEET OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PARCEL 3:

THAT PART OF THE NORTH 1/2 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, AND ACCRETIONS THERETO, DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION OF THE WEST SIDE OF THE DOCK ON THE EAST SIDE OF THE OGDEN SLIP WITH THE NORTH LINE OF THE TRACT OF LAND CONVEYED BY THE CITY OF CHICAGO TO THE UNITED STATES OF AMERICA BY DEED DATED AUGUST 10, 1920 AND RECORDED DECEMBER 8, 1921 AS DOCUMENT NO. 7347325 IN BOOK 16850, PAGE 532; RUNNING THENCE EAST ON THE NORTH LINE OF SAID TRACT, A DISTANCE OF 80 FEET; THENCE NORTH AT RIGHT ANGLES TO THE NORTH LINE OF SAID TRACT, 217 FEET; THENCE WEST ON A LINE PARALLEL TO AND 217 FEET NORTH OF THE NORTH LINE OF SAID TRACT, 100 FEET, MORE OR LESS, TO THE WEST SIDE OF SAID DOCK ON THE EAST SIDE OF THE OGDEN SLIP; THENCE SOUTH AND SOUTHEASTERLY ON THE WEST SIDE OF SAID DOCK TO THE POINT OF BEGINNING.

PARCEL 4:

THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED IN THE RECORDER'S OFFICE OF COOK COUNTY, ILLINOIS ON SEPTEMBER 17, 1889 IN BOOK 39 OF PLATS AT PAGE 18, AS DOCUMENT NUMBER 1157023, WHICH LIES WEST OF THE WEST LINE OF THE EAST 100 FEET OF SAID LOT 7; SOUTH OF THE SOUTH LINE OF THE NORTH 366 FEET OF SAID LOT 7; AND EAST OF THE EAST BOUNDARY LINE OF PARCEL "D" OF LANDS CONVEYED TO THE COMMISSIONERS OF LINCOLN PARK BY DEED DATED JULY 25, 1929 AND RECORDED IN THE RECORDER'S OFFICE OF COOK COUNTY, ILLINOIS ON JULY 27, 1929 AS DOCUMENT NUMBER 10439522 IN COOK COUNTY, ILLINOIS.

PARCEL 5A: (GRAND AVENUE WEST OF PARCEL 2)

THE NORTH 74 FEET OF LOT 7 (EXCEPT THAT PART LYING WEST OF THE EAST LINE OF NORTH LAKE SHORE DRIVE, AS RELOCATED IN 1982-1983, AND EXCEPT THE EAST 100 FEET OF SAID LOT 7) IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED IN THE RECORDER'S OFFICE OF COOK COUNTY, ILLINOIS ON SEPTEMBER 17, 1889 IN BOOK 39 OF PLATS AT PAGE 18 AS DOCUMENT NUMBER 1157023, IN COOK COUNTY, ILLINOIS.

PARCEL 5B: (ILLINOIS STREET WEST OF PARCEL 2)

THE SOUTH 74 FEET OF THE NORTH 366 FEET OF LOT 7 (EXCEPT THAT PART LYING WEST OF THE EAST LINE OF NORTH LAKE SHORE DRIVE, AS RELOCATED IN 1982-1983, AND EXCEPT THE EAST 100 FEET OF LOT 7) IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED IN THE RECORDER'S OFFICE OF COOK COUNTY, ILLINOIS ON SEPTEMBER 17, 1889 IN BOOK 39 OF PLATS AT PAGE 18 AS DOCUMENT NUMBER 1157023, IN COOK COUNTY, ILLINOIS.

PARCEL 6: (NORTH PART OF PIER ENTRANCE AREA AND PARK WEST AND ADJOINING)

THAT PART OF THE FRACTIONAL NORTHEAST 1/4 OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, AND ACCRETIONS THERETO, DESCRIBED AS FOLLOWS:

LYING SOUTH OF A LINE 400 FEET NORTH OF THE NORTH LINE OF EAST GRAND AVENUE, AND LYING NORTH OF SAID NORTH LINE OF EAST GRAND AVENUE, AND SAID NORTH LINE EXTENDED EAST (SAID NORTH LINE ALSO BEING THE NORTH LINE OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION RECORDED SEPTEMBER 17, 1889 AS DOCUMENT NUMBER 1157023, BEING A SUBDIVISION OF SECTION 10 AFORESAID), AND LYING EAST OF THE EAST LINE OF NORTH LAKE SHORE DRIVE, AS RELOCATED IN 1982-1983, AND LYING WEST OF THE EAST FACE OF THE CONCRETE DOCK WALL, LOCATED NORTH OF THE NAVY PIER STRUCTURE,(EXCEPT A STRIP OF LAND 63 FEET WIDE LOCATED ON THE EAST SIDE OF NORTH LAKE SHORE DRIVE AS LOCATED IN 1929 BETWEEN EAST OHIO STREET APPROACH AND EAST GRAND AVENUE) IN COOK COUNTY, ILLINOIS.

PARCEL 7: (STRIP OF LAND BETWEEN PARCEL 4 AND OGDEN SLIP PILINGS)

A PARCEL OF LAND IN THE FRACTIONAL NORTHEAST 1/4, AND ACCRETIONS HERETO, OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, BETWEEN THE SOUTH LINE OF PARCEL "A" HEREINAFTER DESCRIBED AND THE WATER'S EDGE OF OGDEN SLIP (MICHIGAN CANAL), ALL AS SHOWN ON PLAT OF SURVEY BY EMMET KENNEDY

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

AND COMPANY, AND REFLECTED IN PLAT BY CHICAGO GUARANTEE SURVEY COMPANY, ORDER NO. 7009003, IN COOK COUNTY, ILLINOIS.

PARCEL "A" (SHOWN FOR REFERENCE ONLY):

THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED IN THE RECORDER'S OFFICE OF COOK COUNTY, ILLINOIS ON SEPTEMBER 17, 1889 IN BOOK 39 OF PLATS AT PAGE 18, AS DOCUMENT NUMBER 1157023, WHICH LIES WEST OF THE WEST LINE OF THE EAST 100 FEET OF SAID LOT 7; SOUTH OF THE SOUTH LINE OF THE NORTH 366 FEET OF SAID LOT 7; AND EAST OF THE EAST BOUNDARY LINE OF PARCEL "D" OF LANDS CONVEYED TO THE COMMISSIONERS OF LINCOLN PARK BY DEED DATED JULY 25, 1929 AND RECORDED IN THE RECORDER'S OFFICE OF COOK COUNTY, ILLINOIS ON JULY 27, 1929 AS DOCUMENT NUMBER 10439522, IN COOK COUNTY, ILLINOIS.

PARCEL 8: (STRIP OF LAND BETWEEN PARCEL 2 AND OGDEN SLIP PILINGS)

A PARCEL OF LAND IN THE FRACTIONAL NORTHEAST 1/4, AND ACCRETIONS THERETO, OF SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION OF THE SOUTH LINE OF LOT 7 WITH THE WEST LINE OF THE EAST 100.00 FEET OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION, ACCORDING TO THE PLAT THEREOF RECORDED IN THE RECORDER'S OFFICE OF COOK COUNTY, ILLINOIS ON SEPTEMBER 17, 1889, IN BOOK 39 OF PLATS AT PAGE 18, AS DOCUMENT NUMBER 1157023; THENCE NORTH 89 DEGREES 10 MINUTES 06 SECONDS EAST ALONG THE SOUTH LINE OF LOT 7, A DISTANCE OF 100.00 FEET TO THE SOUTH EAST CORNER OF SAID LOT 7; THENCE SOUTH 0 DEGREES 08 MINUTES 58 SECONDS EAST ALONG THE SOUTHERLY EXTENSION OF THE EAST LINE OF SAID LOT 7 FOR A DISTANCE OF 5.00 FEET MORE OR LESS TO THE SOUTH FACE OF THE STEEL SHEET PILINGS ALONG THE NORTH SIDE OF THE OGDEN SLIP; THENCE WESTERLY ALONG THE AFORESAID SOUTH FACE OF THE PILINGS 100.00 FEET TO THE WEST LINE OF THE EAST 100.00 FEET OF SAID LOT 7 EXTENDED SOUTHERLY; THENCE NORTH 0 DEGREES 08 MINUTES 58 SECONDS WEST ALONG SAID WEST LINE AS EXTENDED SOUTHERLY FOR A DISTANCE OF 5.00 FEET MORE OR LESS TO THE HEREINABOVE DESIGNATED POINT OF BEGINNING (EXCEPTING THEREFROM THAT PART THEREOF FALLING IN PARCEL 1 AFORESAID) IN, COOK COUNTY, ILLINOIS.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

## EXHIBIT B

### MARSHALING YARD SPACE



## SCHEDULE 2.7

### PERMITTED ENCUMBRANCES

1. That certain Metropolitan Pier and Exposition Authority Right of Entry Agreement in favor of the Chicago Transit Authority, dated September 2, 2009; and

2. Exceptions described on the current title commitment to be attached.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

## SCHEDULE 4.3

### PRE-COMMENCEMENT IMPROVEMENTS

1.  Project 2010-41: Navy Pier - Repair to precast concrete at Entrance One.

2.  Project 2010-42: Navy Pier - Restoration of Lakeview Terrace.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## SCHEDULE 6.4

## SERVICE CONTRACTS

| DOCUMENT NAME | DATE | PARTIES |
|---|---|---|
| Agreement (to provide security) | January 9, 1996 | The City of Chicago, through its Police Department, and the Metropolitan Pier and Exposition Authority |
| Expressway Partnership Agreement | March 15, 2000 | The Chicago Gateway Green Committee and the Metropolitan Pier and Exposition Authority |
| Agreement between the City of Chicago, by and through its Department of Fleet Management, and the Metropolitan Pier and Exposition Authority for the Purchase of Fuel | January 1, 2006 | City of Chicago, by and through its Department of Fleet Management, and the Metropolitan Pier and Exposition Authority |

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## SCHEDULE 6.6.1

## NAVY PIER MARKS

| NAME OF TRADEMARK | Classes | Next Action Date | Serial No. | Date of Registration | Registration No. | Date of 1st Use |
|---|---|---|---|---|---|---|
| DEMONS OF THE DEEP | 41 | 5/22/2013 | 77018843 | 5/22/2007 | 3243433 | Sep-05 |
| GHOSTLY GARDENS | 41 | 5/22/2013 | 77018829 | 5/22/2007 | 3243432 | Sep-05 |
| GO A LITTLE OVERBOARD | | Not Yet Filed | | | | 2008 |
| NAVY FEAR | 41 | 5/22/2013 | 78928630 | 5/22/2007 | 3244698 | Sep-03 |
| NAVY FEAR & FUN | 41 | 8/16/2011 | 78358292 | 8/16/2005 | 2985173 | Jul-03 |
| NAVY PIER | 18, 21, 25, 28, 35, 36, 39, 41, 42 | 10/31/2020 | 75672858 | 10/31/2000 | 2399323 | 18, 21, 25, 28 (1995); 36 (May-1995); 35, 42 (May-1931); 39, 41 (Dec-1927) |
| NAVY PIER & DESIGN (PATCH) | 41 | 11/13/2013 | 78928828 | 11/13/2007 | 3335071 | Jul-05 |
| NAVY PIER CHICAGO & DESIGN (NEW) | 35, 36, 39, 41, 43 | 10/23/2012 | 77073180 | 10/23/2007 | 3315999 | Nov-06 |
| NAVY PIER CHICAGO & DESIGN (NEW) (ABANDONED) | 18, 21, 25 | ALLOWED TO LAPSE | 77073168 | Abandoned | | None |
| NAVY PIER CHICAGO & DESIGN (OLD) | 35, 41 | 12/26/2015 | 74375558 | 12/26/1995 | 1943338 | 1/1/1993 |
| PIER PALS (CANCELED) | 28 | 7/17/2007 | 76098929 | 7/17/2001 | 2469770 | 3/15/2000 |
| SKYLINE STAGE CHICAGO & DESIGN | 41 | 7/3/2011 | 75933563 | 7/3/2001 | 2465424 | May-94 |
| SKYLINE STAGE CHICAGO & DESIGN (CANCELED) | 41 | 7/24/2007 | 75938111 | 7/24/2001 | 2471351 | May-94 |
| WINTER WONDERFEST | 41 | 1/28/2013 | 76406672 | 1/28/2003 | 2681010 | 10/8/2001 |

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## EXHIBIT C

## PROMISSORY NOTE

$5,000,000.00                                              _____ __, 2011

On or before June 30, 2014 (the "Maturity Date"), the undersigned, for value received, promises to pay to the order of The Metropolitan Pier and Exposition Authority, a municipal corporation and body politic of the government of the State of Illinois (the "Lender") FIVE MILLION AND No/100 DOLLARS ($5,000,000.00), without interest.  The Maturity Date may be extended only by the written agreement of the undersigned and the Lender or in accordance with that certain lease agreement by and between the Lender, and Navy Pier, Inc., an Illinois not-for-profit corporation, dated April ___, 2011 (the "Lease").

All payments hereunder (a) shall be made in immediately available funds in lawful money of the United States of America and (b) shall be made at the principal office of the Lender at Metropolitan Pier and Exposition Authority Corporate Center, 301 E. Cermak Road, Chicago, Illinois  60616 (or at such other office as the holder hereof may designate in writing from time to time).

The undersigned may prepay all or any portion of this Note at any time without premium or penalty.

A default in the payment when due of any principal of this Note; or default and continuance thereof for five days in the payment when due of any other amount payable by the undersigned hereunder shall constitute an "Event of Default" under this Note.

If any Event of Default occurs, the Lender may declare all amounts payable hereunder to be immediately due and payable, without presentment, demand or notice of any kind.

If any amount payable hereunder is not paid when due (by acceleration or otherwise), the undersigned will pay all costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) incurred by the Lender in connection with collection of such amount and the enforcement of its rights hereunder (whether or not any lawsuit is ever filed).

The undersigned waives any right to a trial by jury in any action or proceeding to enforce or defend any rights (i) under this Note or under any amendment, instrument, document or agreement delivered or which may in the future be delivered in connection herewith or (ii) arising from any banking relationship existing in connection with this Note, and agrees that any such action or proceeding shall be tried before a court and not before a jury.  All disputes hereunder shall be resolved pursuant to the provisions of Section 18.5 of the Lease.

The undersigned represents that the loan evidenced by this Note is a business loan, transacted solely for the purpose of operating the Premises (as defined in the Lease).

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

The rights and privileges of the Lender hereunder shall inure to the benefit of its successors and assigns.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

THIS NOTE HAS BEEN DELIVERED IN CHICAGO, ILLINOIS AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS.

IN WITNESS WHEREOF, the undersigned has caused this Note to be duly executed and delivered as of the day and year first above written.

Navy Pier, Inc.


By: _____

Title: _____

47

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## SCHEDULE 7.2

## VEHICLES

| No | Tag No | Description | Model | VIN | Year | Title No | Plate No |
|----|--------|-------------|-------|-----|------|----------|----------|
| 1 | 22383 | Vehicle, van | TRITON E-350 | IFTSE34L9XHB62978 | 1999 | | M126481 |
| 2 | 27105 | Vehicle, Truck Pickup | F250 XL | 1FTNF20516EA60229 | 2006 | X5228680047 | M151984 |
| 3 | 27106 | Vehicle, Truck Pickup | RANGER REGULAR CAB | 1FTZR15E85PA94098 | 2006 | X5228680048 | M151955 |
| 4 | 26384 | TROLLEY BUS w/rear lift | NP LOGO 208H0FE | 1FCNF53S530A02815 | 2003 | T3094857025 | M136274 |
| 5 | 26475 | TROLLEY BUS w/rear lift | NP LOGO 208H0FE | 1FCNF535330A02814 | 2003 | T3094857023 | M135275 |
| 6 | 26489 | TROLLEY BUS w/rear lift | NP LOGO 208H0FE | 1FCNF53S130A02813 | 2003 | T3094857024 | M135273 |
| 7 | 26521 | TROLLEY BUS w/rear lift | NP LOGO 208H0FE | 1FCNF53S730A02816 | 2003 | T3099856027 | M136295 |
| 8 | 26675 | TROLLEY BUS w/rear lift | NP LOGO 208H0FE | 1FCNF535530A06802 | 2003 | T4062051015 | M145672 |
| 9 | 26676 | TROLLEY BUS w/rear lift | NP LOGO 208H0FE | 1FCNF53S330A06801 | 2003 | T4062051016 | M145673 |
| 10 | 26696 | TROLLEY BUS w/rear lift | NP LOGO 208H0FE | 1FCNF53S730A06803 | 2003 | T4062051014 | M145675 |
| 11 | 26697 | TROLLEY BUS w/rear lift | NP LOGO 208H0FE | 1FCNF53S930A06804 | 2003 | T4062051017 | M145674 |
| 12 | 12748 | Vehicle, Shuttle Bus | AREOTECH 220 | 1FDXE40F2WHA16072 | 1988 | T8063472008 | M105427 |
| 13 | 27308 | Vehicle, truck | Explorer 4x2 (4-Door) | 1FMEU62E06UB51116 | 2006 | X6181672108 | M158430 |
| 14 | 27309 | Vehicle, truck | Explorer 4x2 (4-Door) | 1FMEU62E26UB51117 | 2006 | X618672107 | M158429 |

48

## SCHEDULE 8.2

## OTHER LEASES

| DOCUMENT NAME | DATE | PARTIES |
|---|---|---|
| Lease (to provide parking spaces) | September 11, 2009 | The City of Chicago and the Metropolitan Pier and Exposition Authority |

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# SCHEDULE 9.1

**LEASE AGREEMENTS**

| | TENANT TRADE NAME | TENANT | Expiration Date | Option |
|---|---|---|---|---|
| | **RESTAURANTS** | | | |
| 1 | Billy Goat Tavern | Billy Goat North II, Inc. | 5/31/2011 | (2) Five Year Options |
| 2 | Bubba Gump Shrimp Co. | Bubba Gump Shrimp Co. Restaurants, Inc. | 5/31/2013 | No |
| 3 | Capi's Italian Restaurant | Bubba Gump Schrimp Co. Restaurants, Inc. | 10/31/2018 | (2) Five Year Options |
| 4 | Crystal Garden Café (Chango Loco) | Stefani's Pier Front, Inc. | 5/31/2016 | (2) Ten Year Options |
| 5 | Dock Street Café | TKE, Inc. | 1/7/2012 | No |
| 6 | Haagen Dazs Café | Third Coast Ice Cream Partners, LLC | 9/31/11 | No |
| 7 | Harry Caray's Tavern | Harry Caray'sTavern Navy Pier, L.P. | 11/30/2019 | (3) Five Year Options |
| 8 | Margaritaville | Margaritaville of Chicago, LLC | 10/31/2021 | (3) Five Year Options |
| 9 | McDonald's | McDonald's Corporation/BT II, Inc. (franchisee) (Publicly traded on NYSE) | 10/30/2030 | No |
| 10 | Navy Pier Beer Garden | Pier 1996, Inc. | 5/31/2016 | (2) Ten Year Options |
| 11 | Riva | Stefani's Pier Front, Inc. | 8/31/2015 | (2) Ten Year Options |
| | **FOOD COURT** | | | |
| 12 | America's Dog | Serv-U-Rite | 1/6/2013 | No |
| 13 | Auntie Anne's Pretzels | MSE Branded Foods | 2/28/2015 | (1) Five Year Option |
| 14 | Ben & Jerry's | Robinson-Hill Marketing Group, Inc. | 1/5/2014 | No |
| 15 | Carnelli's Deli | Serv-U-Rite | 9/30/2011 | No |
| 16 | Connie's Pizza | MADI TY, Inc. | 9/30/2011 | No |

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

| 17 | Garrett Popcorn Shop | Caramel Crisp LLC | 9/30/2014 | (1) Five Year Option |
| 18 | Greek Delight | Greek Delight, Inc. | 9/30/2011 | No |
| 19 | Icandylicious | I love Chicago, Inc. | 9/30/2015 | (1) Five Year Option |
| 20 | Jamba Juice | MSE Branded Foods | 2/28/2015 | (1) Five Year Option |
| 21 | King Wah | King Wah Express | 9/30/2011 | No |
| 22 | Starbuck | Rena's Fudge Shop | 3/30/2013 | No |
| 23 | Twisted Lizard | Chicago Pier, Inc. | 9/30/2015 | No |
| | **RETAIL SHOPS** | | | |
| 24 | Build-a-Bear | Build-a-Bear Workshop, Inc. | 4/30/2013 | No |
| 25 | East West News (Family Pavilion) | East West News Corp., Inc. | 6/30/2014 | (1) Five Year Option |
| 26 | Life in the Windy City | Color, Inc. | 9/30/2014 | (1) Five Year Option |
| 27 | Making History | Color, Inc. | 5/31/2012 | No |
| 28 | Navy Pier Ahoy Chicago | Paperweight, Inc. | 12/31/2014 | (1) Five Year Option |
| 29 | Oh Yes Chicago! and Dog E Works | OYC, Inc. | 1/7/2015 | (1) Five Year Option |
| 30 | Sports Store | Chicago Sport & Novelty | 9/30/2011 | No |
| 31 | USO of Illinois | United Service Organizations of Illinois, Inc. | 5/31/2012 | No |
| | **ATTRACTIONS** | | | |
| 32 | Amazing Chicago | Amazing Ventures, Inc. | 9/30/2011 | No |
| 33 | Chicago Children's Museum | Chicago Children's Museum | 9/22/2013 | Possible term can extend through 9/22/2025 |
| 34 | Chicago Shakespeare Theater | Shakespeare Repertory | 10/31/2014 | (5) Fifteen Year Options |
| 35 | Navy Pier Imax Theatre | IMAX Chicago Theatre, LLC | 12/31/2012 | (1) Five Year Option |
| 36 | WBEZ | The WBEZ Alliance, Inc. | 5/31/2094 | No |

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

### BOATS

| 37 | Anita Dee | Tee Dee Enterprises, Inc. | 9/30/2011 | No |
|----|-----------|---------------------------|-----------|-----|
| 38 | Kanan | Kanan Cruises, Inc. | 4/30/2015 | 5 year option |
| 39 | Mystic Blue | Entertainment Cruises, Inc. | 9/30/2011 | No |
| 40 | Odyssey | Entertainment Cruises, Inc. | 9/30/2011 | No |
| 41 | Seadog | Entertainment Cruises, Inc. | 12/31/2011 | 5 year option |
| 42 | Shoreline  (South Dock) | Shoreline Marine Company, Inc. | 12/31/2011 | 5 year option |
| 43 | Shoreline Marine (Celebration) (Ogden Slip) | Shoreline Marine Company, Inc. | 3/31/2011 | No |
| 44 | Shoreline (Bright Star) | Shoreline Marine Company, Inc. | 3/31/2011 | No |
| 45 | Shoreline OS02 (Giddy Up) | Shoreline Marine Company, Inc. | 3/31/2011 | No |
| 46 | Shoreline GSA Property | Shoreline Marine Company, Inc. | 12/31/2011 | 5 year option |
| 47 | Shoreline River | Shoreline Marine Company, Inc. | 12/31/2011 | 5 year option |
| 48 | Windy | Southern Windjammer Ltd. | 10/31/2012 | No |
| 50 | Spirit of Chicago | Entertainment Cruises, Inc. | 9/30/2011 | No |

### STORAGE AGREEMENTS

| | TENANT TRADE NAME | TENANT | EXPIRATION DATE |
|----|-------------------|--------|-----------------|
| | **RESTAURANTS** | | |
| 51 | Harry Caray's Tavern | Harry Caray's Tavern Navy Pier, L.P. | 11/30/2019 |
| | **RETAIL SHOPS** | | |
| 52 | Varsity Stop Outfitters | Color, Inc. | 9/30/2011 |
| | **OTHER MERCHANTS** | | |
| 53 | Ferris Wheel Photos | Photogenic, Inc. | 1/31/2012 |
| | **BOATS** | | |
| 54 | Anita Dee | Tee Dee Enterprises, Inc. | 9/30/2011- Auto Renew |
| 55 | Spirit of Chicago | Entertainment Cruises, Inc. | 2/28/2011- Auto Renew |
| 56 | Shoreline (South Dock) | Shoreline Marine Company, Inc. | 12/31/2011- Auto Renew |

52

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**ANTENNA AGREEMENT**

| | TENANT TRADE NAME | TENANT | EXPIRATION DATE |
|---|---|---|---|
| 57 | AT&T (site #1) | | |
| 58 | AT&T (site #2) | | |
| 59 | Deanli Spectrum Operations | | |
| 60 | Sprint/Nextel | | |
| 61 | T-Mobile | | |
| 62 | U.S. Cellular | | |
| 63 | Verizon | | |
| 64 | XM Radio | | |

## EXHIBIT D

### LESSEE INSURANCE REQUIREMENTS

### [SUBJECT TO COMPARISON WITH AUTHORITY'S CURRENT NON-PROPERTY COVERAGE]

    **1.**    **Commercial General Liability.** LESSEE shall procure and maintain, at its own expense, for the Term of this Agreement, commercial general liability insurance in amounts sufficient to operate the Premises in accordance with this Agreement. On the Lease Commencement Date the LESSEE shall procure the minimum coverage as set forth below:

| Coverage | Limit |
|---|---|
| General Annual Aggregate | $2,000,000 |
| Products Completed Operations Annual Aggregate | $2,000,000 |
| Each Occurrence | $1,000,000 |
| Personal & Advertising Injury | $1,000,000 |
| Employee Benefit Liability – per occurrence limit | $1,000,000 |
| Employee Benefit Liability – aggregate limit | $1,000,000 |
| Fire Damage Legal Liability | $1,000,000 |
| Liquor Liability – each person Bodily Injury | $1,000,000 |
| Liquor Liability – each person Property Damage | $1,000,000 |

In addition to the above coverage limits set forth above, such policy shall contain the following terms:

Additional Insured coverage where required by the Agreement

LESSEE's primary non-contributory

An amusement attraction amendment to cover all inflatables or rides brought to the Premises

A blanket waiver of subrogation in favor of the AUTHORITY

Deletion of Fellow Employee Exclusion

Employee Benefit Liability

If claims made coverage, then the retro date must be prior to the date of this Agreement

Employees as insureds endorsement

General liability coverage must be an occurrence coverage with deductible of no greater than $100,000 per occurrence.

Kotecki Waiver Endorsement in favor of the AUTHORITY

Liquor Law Liability. If LESSEE is servicing liquor, then a $1 million limit is required. If such services are contracted out to a third Party, the host is acceptable but a copy of the vendor's certificate evidencing a $1 million limit of coverage is required

Occurrence Form is required

Pollution. Hostile fire is required for the Premises.

TRIA / Terrorism is required.

2. **Umbrella Liability**. LESSEE shall also procure and maintain, at its own expense, umbrella liability insurance with a minimum per occurrence limit of at least Seventy-Five Million Dollars ($75,000,000), an annual aggregate limit of at least Seventy-Five Million Dollars ($75,000,000) and a products completed operations aggregate limit of at least Seventy-Five Million Dollars ($75,000,000). Such coverage shall be in excess of the commercial general liability insurance, the automobile liability insurance, and the employer's liability insurance described in this Exhibit D , for the entire Premises. Such coverage shall be no more restrictive than the primary coverage listed and shall follow all terms and conditions of the underlying coverages.

3. **Automotive Liability**. LESSEE shall procure and maintain, at its own expense, for the Term of this Agreement, comprehensive automotive bodily injury and property damage liability insurance with an authorized insurance company for business use covering all vehicles operated by LESSEE's officers, agents and employees in connection with the Premises, whether owned by LESSEE or otherwise, including liability under symbol 1 for any auto and coverage for all owned, non-owned and hired autos, with a combined single limit per accident of at least One Million Dollars ($1,000,000), an uninsured motorist limit of at least One Million Dollars ($1,000,000) and an underinsured motorist limit of at least One Million Dollars ($1,000,000).

4. **Employer's Liability**. LESSEE shall procure and maintain, at its own expense, for the Term of this Agreement, employer's liability insurance which shall contain a premises liability policy for bodily injury and property damage to third parties. Such policy shall contain minimum coverage as set forth below:

| Coverage | Limit |
|---|---|
| Each Accident | $ 1,000,000 |
| Per Employee – Disease | 1,000,000 |
| Annual Aggregate - Disease | 1,000,000 |

5. **Employee Practices Liability**. LESSEE shall procure and maintain, at its own expense, for the Term of this Agreement, employee practices liability, including third party, with a per loss limit of at least Five Million Dollars ($5,000,000) and an aggregate limit of liability of at least Five Million Dollars ($5,000,000). Such policy also shall have a retro date prior to or as of the date of execution of this Agreement and the coverage must be kept in force for three years after the termination of this Agreement.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

**6.    Crime Liability.** LESSEE shall procure and maintain, at its own expense, for the Term of this Agreement, crime liability insurance with minimum coverage in the amounts set forth both below, which coverage shall be evidenced on a Discovery Form:

| Coverage | Limit |
|---|---|
| Employee Theft / Dishonesty | $ 1,000,000 |
| On Premise Coverage for Theft, Disappearance, Destruction of money and securities | 1,000,000 |
| Off Premise Coverage for Theft, Disappearance, Destruction of money and securities | 1,000,000 |
| Forgery & Alterations Coverage | 1,000,000 |
| Money Orders/Counterfeit Fraud Coverage | 1,000,000 |
| Funds Transfer Fraud Coverage | 1,000,000 |
| Credit Card Fraud | 1,000,000 |
| Computer Fraud with Funds Transfer including wire funds transfer | 1,000,000 |

**7.    Contractor's Pollution Liability.** LESSEE shall procure and maintain, at its own expense, for each construction project managed by LESSEE during the Term of this Agreement, a broad form contractor's pollution liability insurance policy which covers losses caused by pollution conditions (including sudden and non-sudden pollution conditions) arising from the services and operations of LESSEE or his contractor and all subcontractors pursuant to this Agreement. Such policy shall apply, without limitation, to bodily injury, property damage (including loss of use of damaged property or of property which has not been physically injured or destroyed) and clean-up costs and shall provide coverage for pollution conditions which arise from encountering preexisting environmental conditions at the project site and for liability resulting from the transportation of hazardous wastes. Further, such policy shall be written with a per claim limit of liability of at least Three Million Dollars ($3,000,000) for each occurrence and a policy aggregate of liability of at least Five Million Dollars ($5,000,000) with a deductible no greater than One Hundred Thousand Dollars ($100,000), and shall in remain force for three years after the termination of this Agreement.

**8.    Tenant User General Liability Program.** LESSEE shall provide a tenant liability insurance program that may be offered to third parties who want to use the Premises for an activities such as hosting a meeting or a wedding, but are unable to provide evidence of insurance; provided that it is understood that such program may not be used for conventions. Insurance policies offer through this program shall name LESSEE and the AUTHORITY as additional insureds and shall offer coverage in the as set forth below:

| Coverage | Limit |
|---|---|
| General Annual Aggregate | $2,000,000 |
| Products Completed Operations Annual Aggregate | 2,000,000 |
| Each Occurrence | 1,000,000 |
| Personal & Advertising Injury | 1,000,000 |

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

| Umbrella Coverage | As determined necessary per industry standards |
|---|---|

**9.** **Workers' Compensation.** LESSEE shall at all times maintain worker's compensation insurance with an authorized insurance company, insuring its employees at the Premises in amounts equal to or greater than required under law. Such policy also shall include the following terms: employees as insureds endorsement, other states coverage, USL&H Coverage endorsement (if any), Jones Act Coverage (if any), and voluntary compensation endorsement.

**10.** **Other Types.** Such additional or different types of insurance, including a change in the character or amount of insurance required hereunder, at any time, and from time to time, during the Term as the AUTHORITY shall reasonably deem necessary, upon notice to LESSEE. Within 30 days after demand therefor by the AUTHORITY, LESSEE shall furnish the AUTHORITY with evidence that LESSEE has complied with such demand.

**11.** **Additional Requirements.** Notwithstanding anything to the contrary herein, LESSEE's assumption of liability is independent from, and not limited in any manner by, LESSEE's insurance coverage obtained pursuant to this terms of this Agreement, or otherwise. All amounts owed by LESSEE to the AUTHORITY as a result of the liability provisions of this Agreement shall be paid on demand.

LESSEE shall be the named insured under all of the above policies except policies issued under the tenant user general liability program under which LESSEE shall be named as an additional insured. The AUTHORITY, its trustees, facilities, agents, officers, board members and employees shall be additional insureds under the foregoing insurance policies (except for Worker's Compensation and Contractor's Pollution liability The insurance certificate shall state that the AUTHORITY, its trustees, facilities, agents, officers, board members and employees are additional insureds.

Certificates of insurance or certified copies of the policy, or policies, evidencing the existence of all of the policies required by this Agreement, all in such form as the AUTHORITY may reasonably require, shall be delivered to the AUTHORITY prior to the execution of this Agreement. Notwithstanding the provisions of this Exhibit D, the Parties hereto acknowledge that the above policies may contain exclusions from coverage which are reasonable and customary for policies of such type and acceptable to the AUTHORITY. Each such policy or certificate shall contain a valid provision or endorsement stating, "This policy will not be canceled or materially changed or altered without first giving 60 days' notice thereof to Metropolitan Pier and Exposition Authority Risk Management Department, [_____], Chicago, IL [_____], sent by certified mail, return receipt requested." LESSEE shall provide a renewal certificate annually evidencing all coverage required under this Agreement prior to expiration of LESSEE's insurance program.

All insurance procured by LESSEE in accordance with the requirements of this Agreement shall be primary over any insurance carried by the AUTHORITY and not require

contribution by the AUTHORITY. LESSEE shall waive all rights of subrogation in favor of the AUTHORITY on the general liability insurance policy, the automobile bodily injury and property damage liability insurance and the umbrella liability policy described and the workers' compensation policy described in this <u>Exhibit D</u>. Other than employment practices liability insurance, employee benefit liability insurance, and contractor's pollution liability, all insurance procured by LESSEE shall be pursuant to an occurrence basis policy (rather than a claims made policy). It is acknowledged that employee practices liability insurance and employee benefit liability insurance, and contractor's pollution liability will be on a claims made basis and therefore LESSEE agrees to maintain such insurance in accordance with this Agreement for at least three years following the termination date of this Agreement.

With the exception of Worker's Compensation, the insurance coverage obtained by LESSEE shall contain no non-standard, special and/or unusual exclusions or restrictive endorsements without prior consent of the AUTHORITY. No such insurance coverage shall contain a deductible or self insurance retention in excess of two hundred fifty thousand dollars ($250,000) without the prior consent of the AUTHORITY, unless otherwise agreed. All such insurance policies must be obtained from a carrier licensed or admitted to do business in the State of Illinois having a rating of A-VIII or better from A.M. Best Company or a rating otherwise acceptable to the AUTHORITY.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## SCHEDULE 14.4.3

### NOTICES OF VIOLATIONS

**None**

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## **SCHEDULE 14.4.4**

### **LIST OF PENDING DISPUTES**

**None**

## SCHEDULE 14.4.5

## EXISTING HAZARDOUS SUBSTANCES

There exists at the Premises various solvents and cleaners and other materials kept and used in the normal course of business which are classified as Hazardous Substances, but for which no known release is present. Also, there is possible Hazardous Materials (asbestos and lead based paint) contained with the structure and facilities, but for which no known release is present.

There are no known Hazardous Substances at the Premises except those used and maintain in the normal course of business.

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

## EXHIBIT E

## FORM OF MEMORANDUM OF LEASE

This instrument prepared by
and after recording return to:

Lisa O'Keefe
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606

## MEMORANDUM OF LEASE

This Memorandum of Lease (this **"Memorandum"**) is made between The METROPOLITAN PIER AND EXPOSITION AUTHORITY, a municipal corporation and body politic of the government of the State of Illinois, having its principal office at 301 E. Cermak, Chicago, Illinois, (**"Authority"**) and NAVY PIER, INC., an Illinois not-for-profit corporation, having its principal office at _____, Chicago, Illinois (**"Lessee"**).

1.    The Leased Property. Authority and Lessee have entered into that certain Lease Agreement having an Effective Date of _____ __, 2011 (the **"Lease"**), whereby Authority leased to Lessee and Lessee leased from Authority the property located in the County of Cook, State of Illinois which is legally described on Exhibit A.

2.    Defined Terms/Lease Controls. In the event of any conflict between the terms and provisions hereof and the terms and provisions of the Lease and those of this Memorandum, the provisions of the Lease shall control. All provisions of the Lease are incorporated herein by reference. Terms used herein but not defined in this Memorandum shall have the meanings ascribed thereto in the Lease.

3.    Term. Pursuant to the Lease, Lessee shall have and hold the Premises for a term (**"Term"**) of fifteen (15) years, commencing at 12:01 a.m., central time, on July 1, 2011 and ending at midnight on the June 30, 2026 unless extended pursuant to Section 1.5 of the Lease or sooner terminated as set forth in the Lease.

4.    Counterpart Execution. This Memorandum may be executed simultaneously or in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.    Liens. Notice is hereby given that the Authority shall not be liable for any labor or materials furnished or to be furnished to Lessee upon credit, and that pursuant to Section 3 of the Metropolitan Pier and Exposition Authority Act 70 ILCS 210/4, no mechanic's, materialmen's or other lien for any such labor or materials shall issue against any real property of the Authority.

IN WITNESS WHEREOF, Authority and Lessee have caused this Memorandum to be executed by their duly authorized officers as of an effective date of _____, 2011 for the purpose of providing an instrument for recording.

**AUTHORITY**                                    **LESSEE**

THE METROPOLITAN PIER AND                        NAVY PIER, INC.,
EXPOSITION AUTHORITY,                            an Illinois not-for-profit corporation
a municipal corporation and body politic of the
State of Illinois

By:_____              By: _____
    James Reilly                                  [Name]
    Trustee                                       [Title]

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

63

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

STATE OF ILLINOIS      )
                              ) SS:

COUNTY OF COOK      )

      Personally came before me this _____ day of _____, 2011, the above named James Reilly, Trustee of The Metropolitan Pier and Exposition Authority, a municipal corporation and body politic of the State of Illinois and acknowledged that he executed the foregoing instrument on behalf of said company and by its authority for the purposes set forth therein.

My Commission Expires:

_____            _____
                                         Notary Public

County of Residence:

_____            _____
                                         Printed


STATE OF ILLINOIS      )
                              ) SS:

COUNTY OF COOK      )

      Personally came before me this _____ day of _____, 2011, the above named _____ as _____ of, Navy Pier Inc., an Illinois not-for-profit corporation and acknowledged that he executed the foregoing instrument on behalf of said company and by its authority for the purposes set forth therein.

My Commission Expires:

_____            _____
                                         Notary Public

County of Residence:

_____            _____
                                         Printed

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Exhibit A to Memorandum of Lease

## LEGAL DESCRIPTION OF NAVY PIER

## [SUBJECT TO CONFIRMATION]

A parcel of land lying East of Fractional Section 10, Township 39 North, Range 14 East of the Third Principal Meridian in Cook County, Illinois, described as follows:

Beginning at the North East corner of Lot 7 in the Chicago Dock and Canal Company's Peshtigo Dock Addition in said Section 10;

thence "due East" on the extension East of the North line of said lot, 460.40 feet to the place of beginning;

thence South 0 degrees 08 minutes 20 seconds West on a line parallel with the East line of said lot, 289.23 feet;

thence due West, 2.60 feet;

thence South 0 degrees 08 minutes 20 seconds West, 37.00 feet;

thence due East, 44.00 feet;

thence South 0 degrees 08 minutes 20 seconds West, 63.00 feet to the South face of a concrete bulkhead;

thence South 89 degrees 57 minutes 35 seconds East on said South face, 2,332.66 feet to a point on the extension South of the West face of the Brick Terminal Building in Navy Pier;

thence North 0 degrees 06 minutes East on said line extended South and also along said West face and also on the extension North thereof, 390.12 feet to the North face of a concrete bulkhead;

thence North 89 degrees 58 minutes 55 seconds West along said North face, 2,373.80 feet to the place of beginning.

Also

A parcel of land lying East of fractional Section 10, Township 39 North, Range 14 East of the Third Principal Meridian, in Cook County, Illinois, described as follows:

Beginning at the North East corner of Lot 7 in the Chicago Dock and Canal Company's Peshtigo Dock Addition, in said Section 10;

thence "due East" on the extension East of the North line of said lot 2,834.20 feet;

thence "due South" 0.95 feet to the point of intersection of the North face of a concrete bulkhead and the extension North of the West face of the Brick Terminal Building in Navy Pier, said point being the place of beginning of this tract of land;

thence South 89 degrees 52 minutes 30 seconds East on said North face of the concrete bulkhead, 666.70 feet to the North East corner thereof, said corner being 2.40 feet South of said extension East of the North line of said Lot 7;

thence South 0 degrees 06 minutes West on the East face of said bulkhead, 294.00 feet to the South East corner thereof;

thence North 89 degrees 56 minutes West on the South face of said bulkhead, 666.70 feet to a point in the aforesaid West face of the Brick Terminal Building extended South;

thence North 0 degrees 06 minutes East on said line extended South and along said West face of building and along its extension North, 294.68 feet to the place of beginning.

In addition, that part of the Navy Pier Site and which property is described as follows:

That part of Lot 7, in Chicago Dock and Canal Company's Peshtigo Dock Addition, in Section 10, Township 39 North, Range 14 East of the Third Principal Meridian, according to the plat thereof recorded in the Recorder's Office of Cook County, Illinois on September 17, 1889, in Book 39 of Plats at Page 18, as Document No. 1157023, which lies West of the West line of the East 100.00 feet of said Lot 7; South of the South line of the North 366.00 feet of said Lot 7; and East of the East boundary line of Parcel "D" of the lands conveyed to the Commissioners of Lincoln Park by deed dated July 25, 1929, and recorded in the Recorder's Office of Cook County, Illinois, on July 27, 1929, as Document No. 10439522; in Cook County, Illinois.

Subject to all existing leases and tenancies with all payments under such leases and tenancies being due and payable hereafter to the Grantee; and

Subject to a perpetual easement granted to the State of Illinois, Department of Transportation, for construction, maintenance, operation, repair and replacement of a roadway structure and related appurtenances, as recorded on March 11, 1983 as Document #26533318; and

Subject to perpetual easements, hereby reserved by Grantor and assignable by Grantor, for construction, maintenance, operation, repair and replacement of a roadway structure and related appurtenances upon, under and across the following described property:

**(Parcel 13-b1)**

That part of the North half of the Ogden Slip lying South of Lot 7 in Chicago Dock and Canal Company's Peshtigo Dock Addition in Section 10, Township 39 North, Range 14 East of the Third Principal Meridian bounded and described as follows:

Commencing at a point on the South line of said Lot 7, having a bearing of North 89 degrees 9 minutes 7 seconds East (assumed), 394.377 feet East of the South West corner of said Lot 7; thence South 0 degrees 14 minutes 11 seconds East a distance of 60.629 feet to the point of beginning; thence South 89 degrees 45 minutes 49 seconds West a distance of 14.972 feet; thence South 8 degrees 13 minutes 42 seconds West a distance of 5.751 feet to the center line of aforesaid Slip; thence East along said center line having a bearing North 89 degrees 26 minutes 23 seconds East a distance of 14.608 feet; thence North along a straight line a distance of 5.735 feet to the point of beginning.

**(Parcel 12-b2)**

That part of the North half of the Ogden Slip lying South of Lot 7 in Chicago Dock and Canal Company's Peshtigo Dock Addition in Section 10, Township 39 North, Range 14 East of the Third Principal Meridian Bounded and described as follows:

Beginning at a point on the South line of Lot 7, having a bearing of North 89 degrees 9 minutes 7 seconds East (assumed), 394.377 feet East of the South West corner of said Lot 7; thence South 0 degrees 14 minutes 11 seconds East along a straight line a distance of 53.440 feet; thence Northeasterly along a straight line a distance of 62.744 feet to a point on the South line of said Lot 7, said point being 32.313 feet East of the point of beginning; thence West along the South line of Lot 7 a distance of 32.313 feet to the point of beginning.

**(Parcel 13-c1)**

That part of Lot 7 in Chicago Dock and Canal Company's Peshtigo Dock Addition in Section 10, Township 39 North, Range 14 East of the Third Principal Meridian bounded and described as follows:

Commencing at the point of intersection of the South line of the North 366 feet of said Lot 7, being also the South line of East Illinois Street and the East line of the West 900 feet of said Lot 7; thence West along the South Line of East Illinois Street having a bearing of South 89 degrees 43 minutes 30 seconds West (assumed) a distance of 354.100 feet to the point of beginning; thence South along a straight line bearing South 0 degrees 16 minutes 23 seconds East a distance of 4.259 feet to a point on a curve; thence Westerly and Southwesterly along a curve convex to the North West with a radius of 187.705 feet an arc distance of 257.006 feet, with a chord length of 237.396 feet with a bearing of South 50 degrees 30 minutes 7 seconds West to a point on the South line of said Lot 7; thence West along the South line of said Lot 7 having a bearing of South 89 degrees 9 minutes 7 seconds West a distance of 1.905 feet; thence North 9 degrees 9 minutes 50 seconds East a distance of 7.79 feet to a point of curve; thence Northerly and Northeasterly along a curve convex to the North West with a radius of 170.820 feet an arc distance of 242.871 feet and a chord distance of 222.925 feet with a bearing of North 48 degrees 59 minutes 59 seconds East; thence North 0 degrees 16 minutes 24 seconds West a distance of 1.252 feet to the South line of East Illinois Street; thence East along said South line a distance of 15.605 feet to the point of beginning.

**(Parcel 13-c2)**

That part of Lot 7 in Chicago Dock and Canal Company's Peshtigo Dock Addition in Section 10, Township 39 North, Range 14 East of the Third Principal Meridian bounded and described as follows:

Commencing at the point of intersection of the South line of the North 366 feet of said Lot 7 and the East line of the West 900 feet of said Lot 7; thence South 0 degrees 05 minutes 08 seconds East (assumed) along the East line of the West 900 feet of said Lot 7 a distance of 35.923 feet to the point of beginning; thence continuing South along said East line of the West 900 feet a distance of 25.925 feet; thence South 89 degrees 43 minutes 36 seconds West a distance of 289.205 feet to a point of curve; thence Westerly and Southwesterly along a curve convex to the North West with a radius of 230.855 feet an arc distance of 213.515 feet, with a chord length of 205.985 feet with a bearing of South 63 degrees 14 minutes 0 seconds West, to the South line of said Lot 7; thence South 89 degrees 09 minutes 07 seconds West along said South line a distance of 36.909 feet to a point on a curve; thence Northerly and Northeasterly along a curve convex to the North West with a radius of 155.180 feet an arc distance of 206.408 feet and a chord distance of 191.525 feet with a bearing of North 51 degrees 37 minutes 15 seconds East to a point of tangency; thence East along a straight line having a bearing of North 89 degrees 43 minutes 36 seconds East a distance of 359.822 feet to the point of beginning.

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**(LEGAL DESCRIPTION OF GATEWAY PARK)**

**[SUBJECT TO CONFIRMATION]**

Beginning at the point of intersection of the West side of the dock on the East side of the Ogden Slip with the North line of the tract of land conveyed by the City of Chicago to the United States of America by Deed dated August 10, 1920, and recorded December 8, 1921, as Document 7347325 in Book 16850, page 532; running thence east on the North line of said tract a distance of eighty (80) feet; thence North at right angles to the North line of said tract Two Hundred Seventeen (217) feet; thence West on a line parallel to and Two Hundred Seventeen (217) feet North of the North line of said tract One Hundred (100) feet, more or less, to the West side of said dock on the East side of the Ogden Slip; thence South and Southeasterly on the west side of said dock to the place of beginning, together with a right of way over the public street now adjoining the premises herein conveyed to the United States by the Grantor or such other street or streets as the City of Chicago may hereafter cause to be laid out or dedicated, providing suitable access to the property herein conveyed. The tract of land referred to in the above as having been conveyed by the City of Chicago to the United States of America by deed dated August 10, 1920, being described as follows: A parcel of land adjacent to the North Government Pier, and bounded on the East by Lake Michigan, approximately   Five Hundred (500) long in an Easterly and Westerly direction, and One Hundred (100) feet wide, described as commencing at the junction of the North side of the United States Government Pier (running east from the Ogden Slip) with the East side of the North and South municipal Pier for place of beginning, said place of beginning being Seven Hundred (700) feet, more or less, South, measured at right angles from a point in the North line of East Illinois Street extended one Thousand Five Hundred (1500) feet, more or less, East of the East line of Peshtigo Street; thence Northerly along the said North and South Pier One Hundred Eight (108) fee; thence Westerly at an angle from the South to West of Ninety-one degrees, a distance of Five Hundred Six (506) feet, more or less to the West side of the dock on the East side of the Ogden Slip; thence Southerly at an angle from East to South Seventy-four Degrees Thirty Minutes along the concrete dock One Hundred Three (103) Feet, more or less to the United States Government Pier; thence Easterly at an angle from North to East One Hundred Six (106) degrees Forty minutes along the United States Government Pier for a distance of Four Hundred Eighty (480) feet, more or less to the place of beginning, together with the right of way over the street now adjoining such property or such future streets as the City of Chicago may cause to be laid out or dedicated giving the United States suitable access to said Property, all in that part of the South ½ of the East ½ of the Fractional northeast ¼ of Section 10, Township 39, Range 14, East of the third principal meridian, all in Cook County, Illinois.

Containing 0.47 acres, more or less.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## First Amendment to Lease Agreement

This First Amendment to Lease Agreement (the "**First Amendment**") is made this _____ day of May, 2011 (the "**Effective Date**"), by and between The Metropolitan Pier and Exposition Authority, a municipal corporation and body politic of the government of the State of Illinois (the "**AUTHORITY**"), having its principal office at 301 E. Cermak, Chicago, Illinois, and Navy Pier, Inc., an Illinois not-for-profit corporation ("**LESSEE**"), having its principal office at 600 East Grand Avenue, Chicago, IL 60611.

**Whereas,** The AUTHORITY and the LESSEE have previously entered into a Lease Agreement dated April 26, 2011, with a Lease Commencement Date as defined therein of July 1, 2011, related to properties commonly known as Navy Pier and Gateway Park as more completely described therein (the "**2011 NPI Lease Agreement**"); and,

**Whereas,** certain approvals from the City (the "**Headlands Subarea Approval**") and the United States Secretary of the Interior (the "**GSA Parcel Approval**"), as more fully described herein, are required related to the leasing of Gateway Park which are not likely to be competed by the Lease Commencement Date; and,

**Whereas,** to the greatest extend permitted pending receipt of the Headlands Subarea Approval and the GSA Parcel Approval, the AUTHORITY and the LESSEE intend to vest with the LESSEE management and operational control of Gateway Park consistent with the powers, rights and obligations of the 2011 Lease Agreement.

Now, therefore, inconsideration of the mutual promises covenants and conditions, the AUTHORITY and LESSEE hereby agree that the 2011 NPI Lease Agreement is amended as follows:

## I. Background:

1.1     Pursuant to the Metropolitan Pier and Exposition Authority Act 70 ILCS 210/4 (the "**Act**"), the AUTHORITY holds title to, and is authorized to carry out or otherwise provide for the recreational, cultural, commercial or residential development of real property legally described on **Exhibit A-1**, depicted on **Exhibit A-2** of the 2011 NPI Lease Agreement, and commonly known as "**Navy Pier**" and to construct, equip, and maintain grounds, buildings and facilities for those purposes.

1.2     Pursuant to the following agreements described below the AUTHORITY is lessee of and otherwise controls the area commonly known as **Gateway Park** immediately west of Navy Pier and legally described on **Exhibit A-3** of the 2011 NPI Lease Agreement:

1.2.1   Pursuant to that certain Intergovernmental Cooperation Agreement Regarding the Navy Pier and The Navy Pier Headlands dated as of August 25, 1992, by and between the City of Chicago (the "**City**") and the AUTHORITY (the "**1992 ICA**") the City leased certain property to the AUTHORITY, referred to therein as the **Headlands Subarea**, for development and use by the AUTHORITY as **Gateway Park** subject to certain restrictions, including in Section 3.1.9 that the AUTHORITY "...*shall not sublease or assign the lease of the Leased Premises*

1

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

*without the City's prior approval.*" The Headlands Subarea is shown as Tracts B, C and F on Exhibit F – Parcel Map, attached hereto and made a part hereof.

1.2.2   The 1992 CSA further anticipated leasing additional property to the AUTHORITY to be included as part of Gateway Park upon acquisition by the City from the then owner, the United States of America, and referred to in the 1992 CSA as the **Corp Parcel** and the **GSA Parcel**.  By Quitclaim Deed recorded with the Cook County Recorder of Deeds on February 23, 2000 as document number 00131894, the United States of America conveyed the GSA Parcel to the City subject to certain restrictions, including in Paragraph 3 of the Quitclaim Deed that the GSA Parcel "... *shall not be sold, leased, assigned, or otherwise disposed of except to another eligible governmental agency that the Secretary of the Interior agrees in writing can assure the continued use and maintenance of the property for public park or public recreational purposes subject to the same terms and conditions in the original instrument of conveyance.*" With the approval of the Secretary of the Interior, the City leased the GSA Parcel to the AUTHORITY to be used as part of Gateway Park by a lease agreement dated December 11, 2002 (the "**2002 GSA Parcel Lease**") which included the foregoing restriction and further requires that City approval be obtained before the GSA Parcel is leased. The GSA Parcel is shown as the "GSA Property" on Exhibit F.

## II.  Management and Operation of Gateway Park Pending Approvals:

2.1   LESSEE's status as lessee under the 2011 NPI Lease Agreement shall not be effective as regards of Gateway Park, or such part thereof which has not received a required Headlands Subarea Approval or GSA Parcel Approval, until the required Headlands Subarea Approval and GSA Parcel Approval have been received.  Until such time, the AUTHORITY hereby engages LESSEE to control, operate and manage Gateway Park consistent with the obligations of LESSEE as lessee under the 2011 NPI Lease Agreement.  LESSEE hereby accepts and agrees to act as such managing agent and shall control, operate and manage Gateway Park at all times in the public interest and in accordance with the 2011 Lease Agreement.  It is the intent of the Parties that LESSEE shall have authority over the management, operation and provision of Gateway Park subject to policies, guidelines or directives established consistent with the 2011 NPI Lease Agreement.

2.2   It is expected that Headlands Subarea Approval in relation to the Headlands Subarea may be received prior to GSA Parcel Approval in relation to the GSA Parcel.  At such time as Headlands Subarea Approval is obtained in relation to the Headlands Subarea, LESSEE's status as lessee of the shall commence regardless of the status of GSA Parcel Approval in relation to the GSA.

2.3   Pending receipt of required approvals, the relationship between AUTHORITY and LESSEE as regards Gateway Park shall be that of principal and agent.  Notwithstanding the foregoing, the employees of LESSEE shall not be employees of AUTHORITY and shall not be entitled to the benefit of, nor bound by, the restrictions upon employment with AUTHORITY. Nothing in this Agreement shall be deemed or construed to render AUTHORITY and LESSEE

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

partners, joint venturers, landlord/tenant or any other relationship. The scope of LESSEE's authority and duty as AUTHORITY's agent with respect to Gateway Park are as set forth in the 2011 NPI Lease Agreement, and AUTHORITY and LESSEE both acknowledge and agree that the terms of the 2011 NPI Lease Agreement and the duties and responsibilities of each Party as set forth herein are intended to satisfy any fiduciary or other common law duties that may exist as a result of the relationship between the Parties, including all duties of loyalty, good faith, fair dealing or full disclosure that may be deemed to exist under common law principles of agency or otherwise. Accordingly, to the extent there is any inconsistency between the common law duties and responsibilities of principals and agents and the provisions of the 2011 NPI Lease Agreement, the provisions of the 2011 NPI Lease Agreement shall prevail, it being the intention of the Parties that (i) the 2011 NPI Lease Agreement shall be interpreted in accordance with general principles of contract interpretation without regard to the common law principles of agency (except as expressly provided for in the 2011 NPI Lease Agreement), (ii) any liability between the Parties shall be based solely on principles of contract law and the express provisions of the 2011 NPI Lease Agreement and (iii) the 2011 NPI Lease Agreement constitutes a knowing and intentional waiver by AUTHORITY of any duties or responsibilities (including common law fiduciary duties) owed by an agent to its principal, and a waiver by LESSEE of any obligations of a principal to its agent, to the extent the same are inconsistent with, or would have the effect of modifying, limiting or restricting, the express provisions of the 2011 NPI Lease Agreement.

**III. General Provisions:**

3.1     Except as modified herein, the terms of the 2011 NPI Lease Agreement shall remain in full force and effect.

**[SIGNATURE PAGE FOLLOWS]**

3

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**THE METROPOLITAN PIER AND EXPOSITION AUTHORITY**

James Reilly
Trustee


**Attest**

_____

**NAVY PIER, INC.,**
**an Illinois not-for-profit corporation**

By: _____
Sarah Garvey
Chairperson


**Attest**

_____

4

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

## SECOND AMENDMENT TO LEASE AGREEMENT

This Second Amendment to Lease Agreement between The Metropolitan Pier and Exposition Authority (the "Authority") and Navy Pier, Inc. ("NPI" or the "Lessee" and, together with the Authority, the "Parties") is entered into this 19th day of July, 2011 ("Second Amendment").

**WHEREAS**, the Parties entered into that Lease Agreement dated April 26, 2011, as amended on May, 2011, leasing certain publicly owned property commonly known as Navy Pier and Gateway Park (hereinafter the "Premises") to NPI for management, operation and maintenance consistent with the Framework Plan defined in Section 2.6 of said Lease Agreement ("2011 Lease Agreement"); and,

**WHEREAS**, the parties by resolutions of their respective Boards dated June 30, 2011 approved the Centennial Vision – A Framework for Reimagining Navy Pier, June 2011, as the Framework Plan defined by the 2011 Lease Agreement ("June 2011 Resolutions"); and,

**WHEREAS**, Section 5.6 of the 2011 Lease Agreement provides that the Authority contribute to the Capital Improvements Account a mutually agreed amount of funding to Lessee to undertake various capital improvements to the Premises to implement the Approved Operations thereunder consistent with the Framework Plan; and,

**WHEREAS**, the Premises are and will continue to be publicly owned and were partially constructed or improved with proceeds of tax exempt bonds issued by the Authority ("Tax Exempt Bonds"); and,

**WHEREAS**, some or all of the funds to be provided for the Capital Improvements Account may be derived from amounts on deposit in the Authority's Operating Fund; and,

**WHEREAS**, Section 2.6 of the 2011 Lease Agreement and the June 2011 Resolutions further provide that the 2011 Lease Agreement would be amended as appropriate to provide that, prior to expenditure of funds from the Capital Improvements Account consistent with the Framework Plan, reasonable and necessary provisions are incorporated into the 2011 Lease Agreement to protect the tax exempt status of the Authority's bond funds as well as the Authority's ongoing ability to issue tax exempt bonds for its public purposes;

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements herein, the Parties agree as follows:

1. Notwithstanding the provisions of Section 5.6 of the 2011 Lease Agreement, amounts contributed by the Authority from its Operating Fund and deposited in the Capital Improvements Account shall be restricted for expenditure by Lessee to items that are properly chargeable to capital account (or would be so chargeable with a proper election) under general federal income tax principles.



*Managing McCormick Place Complex and Navy Pier*

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

2. Lessee covenants that it will not take any action, or fail to take any action that would cause the interest on the Tax Exempt Bonds to be included in the gross income of bondholders for federal income tax purposes. Lessee shall take all reasonable actions with respect to the administration and management of Navy Pier as are necessary, appropriate, and in compliance with applicable Authority bond indentures and other applicable rules and regulations, to preserve the tax exempt nature of the Tax Exempt Bonds and to protect the Authority's ongoing ability to issue tax exempt bonds. With respect to protecting the Authority's ongoing ability to issue tax exempt bonds, throughout the term of the 2011 Lease Agreement, including any extension thereof, the parties shall cooperate in identifying and providing such documentation and certifications as may from time to time be required.

3. Without limitation to the foregoing Section 2, with respect to any projects undertaken by Lessee pursuant to the Framework Plan which Lessee desires to finance with funds transferred to Lessee from MPEA's Operating Fund, Lessee shall:

   a. Provide an overall project description with such detail as the Authority may reasonably require, including the nature of the project and the intended uses of funds for the project, to enable the Authority to determine that the expenditure on the project is in conformity with the covenant in Section 2, and

   b. On a calendar quarterly basis, certify to the Authority that all expenditures of Authority funds are currently in compliance with the requirements of this Second Amendment, and

   c. Periodically provide other necessary and appropriate information for future project certificates as the Authority requests.

   **IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first written above.

**THE METROPOLITAN PIER AND EXPOSITION AUTHORITY**

By: _____
         James Reilly, Trustee

Attest: _____

**NAVY PIER, INC.,**
**an Illinois not-for-profit corporation**

By: _____
         Sarah Garvey, Chairperson

Attest: _____



*Managing McCormick Place Complex and Navy Pier*

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## THIRD AMENDMENT TO LEASE AGREEMENT

This Third Amendment to the Lease Agreement between The Metropolitan Pier and Exposition Authority (the "Authority") and Navy Pier, Inc. ("NPI" or the "Lessee" and, together with the Authority, the "Parties") is entered into this day *16* of April, 2014 ("Third Amendment").

**WHEREAS,** the Parties entered into a Lease Agreement dated April 26, 2011, as amended on May 20, 2011 and July 19, 2011, leasing certain publicly owned property commonly known as Navy Pier and Gateway Park (hereinafter the "Premises") to NPI for management, operation and maintenance consistent with the Framework Plan defined in Section 2.6 of said Lease Agreement ("2011 Lease Agreement"); and,

**WHEREAS,** the parties, by Resolutions of their respective Boards dated June 30, 2011, approved the Centennial Vision- A Framework for Reimagining Navy Pier, June 2011, as the Framework Plan defined by the 2011 Lease Agreement ("June 2011 Resolutions"); and,

**WHEREAS,** Section 5.6 of the 2011 Lease Agreement provides that the Authority contribute a mutually agreed upon amount to the Capital Improvements Account a to Lessee to undertake various capital improvements to the Premises to implement the Approved Operations thereunder consistent with the Framework Plan; and,

**WHEREAS,** Resolution No. MPEA 11-10 authorized the deposit of sixty million dollars ($60,000,000) by MPEA into the Capital Improvement Account; and

**WHEREAS,** the Framework Plan includes construction of various improvements to Navy Pier commonly referred to as the "Pierscape Plan"; and

**WHEREAS,** NPI has caused designs and related construction documents to be prepared for the Pierscape Plan and desires to proceed with construction of portions of such work; and

**WHEREAS,** on April 25, 2014 , the MPEA Board adopted Resolution No. 14-XX authorizing the Authority to deposit no more than fifty five million dollars ($55,000,000) into the additional Capital Improvement Account for such construction; and

**WHEREAS,** some or all of the funds to be provided for the Capital Improvements Account may be derived from amounts on deposit in the Authority's Operating Fund; and,

**WHEREAS,** the Second Amendment to the Lease Agreement requires that, any expenditures by Lessee from said Capital Improvements Account shall be restricted for expenditures that are properly chargeable to the capital account under general federal income tax principles; and

**WHEREAS,** under the Second Amendment to the Lease Agreement, Lessee has an obligation to protect the tax exempt status of the Authority's bond funds as well as the Authority's ongoing ability to issue tax exempt bonds for its public purpose; and

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**WHEREAS,** the Premises are and will continue to be publicly owned and were partially constructed or improved with proceeds of tax exempt bonds issued by the Authority ("Tax Exempt Bonds"); and,

**NOW THEREFORE,** in consideration of the foregoing and of the mutual covenants and agreements herein, the Parties agree as follows:

1.      The 2011 Lease Agreement is amended to add Section 5.7, "Deposits to Capital Improvement Account", as follows:

### 5.7 Deposits to Capital Improvement Account.

**5.7.1      Limited to Capital Expenditures.**  Notwithstanding the provisions of Section 5.6 of the Agreement, LESSEE covenants that (i) it shall only apply the amounts contributed by the Authority from its Operating Fund and deposited in the Capital Improvements Account to expenditures by LESSEE for items that are properly chargeable to the capital account (or would be so chargeable with a proper election) under general federal income tax principles; and (ii) it will not take any action, or fail to take any action that would   cause the interest on the Tax Exempt Bonds to be included in the gross income of bondholders for federal income tax purposes.  Lessee shall take all reasonable actions with respect to the administration and management of Navy Pier as are necessary, appropriate, and in compliance with applicable AUTHORITY bond indentures and other applicable rules and regulations, to preserve the tax exempt nature of the Tax Exempt Bonds and to protect the AUTHORITY's ongoing ability to issue tax exempt bonds.  With respect to protecting the AUTHORITY's ongoing ability to issue tax exempt bonds, throughout the term of the Agreement, including any extension thereof, the parties shall cooperate in identifying and providing such documentation and certifications as may from time to time be required.

**5.7.2      Reporting Requirements**. Without limitation to the foregoing Section 5.7.1, with respect to any projects undertaken by LESSEE pursuant to the Framework Plan which LESSEE desires to finance with funds transferred to LESSEE from the AUTHORITY's Operating Fund, LESSEE shall:

        a.   Provide an overall project description with such detail as the AUTHORITY may reasonably require, including the nature of the project and the intended uses of funds for the project, to enable the AUTHORITY to determine that the expenditure on the project is in conformity with the covenant in Section 5.7.1, and

        b.   On a calendar quarterly basis, certify to the AUTHORITY that all expenditures of AUTHORITY funds are currently in compliance with the requirements of this Agreement, as amended; and

        c.   Periodically provide other necessary and appropriate   information for future project certificates as the AUTHORITY requests.

2.   Except as provided herein, the terms and provisions of the 2011 Lease Agreement, as amended, shall remain in full force and effect.

IN **WITNESS WHEREOF**, the Parties have executed this Agreement on this _16_ of April, 2014

_____
James Reilly
Metropolitan Pier and Exposition Authority

_____
Navy Pier Inc.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**AMENDMENT TO MEMORANDUM OF LEASE**

This instrument prepared by
and after recording return to:

Daniel P. Blondin
Exec. VP/General Counsel
Navy Pier, Inc.
600 East Grand Ave.
Chicago, Illinois 60611

**AMENDMENT TO MEMORANDUM OF LEASE**

This Amendment to Memorandum of Lease (this **"Amendment to Memorandum"**) is made between The METROPOLITAN PIER AND EXPOSITION AUTHORITY, a municipal corporation and body politic of the government of the State of Illinois, having its principal office at 301 E. Cermak, Chicago, Illinois, (**"Authority"**) and NAVY PIER, INC., an Illinois not-for-profit corporation, having its principal office at 601 E Grand Avenue, Chicago, Illinois 60611 (**"Lessee"**).

The Authority and Lessee have previously caused to be recorded a certain Memorandum of Lease on May 28, 2011 in the Office of the Cook County Recorder of Deeds as document number 1114610030 ("2011 Memorandum of Lease") which is hereby amended by amending the legal description attached thereto as Exhibit A to read, in full, as follows:

**LEGAL DESCRIPTION OF NAVY PIER**

A PARCEL OF LAND LYING EAST OF THE FRACTIONAL SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF LOT SEVEN (7) IN THE CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SAID SECTION 10; THENCE NORTH 88 DEGREES 11 MINUTES 41 SECONDS EAST, 440.88' FEET; THENCE NORTH 01 DEGREES 48 MINUTES 38 SECONDS WEST, 50.69 FEET TO THE NORTH FACE OF THE CONCRETE BULKHEAD; THENCE 88 DEGREES 15 MINUTES 59 SECONDS EAST ALONG SAID NORTH FACE, 2421.99 FEET; THENCE NORTH 01 DEGREES 45 MINUTES 54 SECONDS WEST, 27.81 FEET;

721623 193

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

THENCE NORTH 88 DEGREES 14 MINUTES 06 SECONDS EAST, 86.98 FEET; THENCE SOUTH 01 DEGREES 45 MINUTES 54 SECONDS EAST, 75.55 FEET TO THE NORTH FACE OF THE CONCRETE BULKHEAD; THENCE NORTH 88 DEGREES 14 MINUTES 47 SECONDS EAST ALONG SAID NORTH FACE, 554.60 FEET TO THE NORTHEAST CORNER OF THE CONCRETE BULKHEAD; THENCE SOUTH 01 DEGREES 40 MINUTES 55 SECONDS EAST, 300.21 FEET TO THE SOUTHEAST CORNER OF THE CONCRETE BULKHEAD; THENCE SOUTH 88 DEGREES 19 MINUTES 19 SECONDS WEST ALONG SAID SOUTH FACE, 557.39 FEET; THENCE SOUTH 01 DEGREES 36 MINUTES 30 SECONDS EAST, 121.41 FEET; THENCE SOUTH 88 DEGREES 07 MINUTES 31 SECONDS WEST , 86.39 FEET; THENCE NORTH 01 DEGREES 52 MINUTES 29 SECONDS WEST, 28.47 FEET TO THE SOUTH FACE OF THE CONCRETE BULKHEAD; THENCE SOUTH 88 DEGREES 16 MINUTES 01 SECONDS WEST ALONG SAID SOUTH FACE, 2358.68 FEET; THENCE NORTH 01 DEGREES 39 MINUTES 59 SECONDS WEST, 63.47 FEET; THENCE SOUTH 88 DEGREES 11 MINUTES 41 SECONDS WEST, 44.00 FEET; THENCE NORTH 01 DEGREES 39 MINUTES 59 SECONDS WEST, 37.00 FEET; THENCE NORTH 88 DEGREES 11 MINUTES 41 SECONDS EAST, 2.60 FEET; THENCE NORTH 01 DEGREES 39 MINUTES 59 SECONDS WEST, 289.23 FEET; THENCE SOUTH 88 DEGREES 11 MINUTES 41 SECONDS WEST, 19.52 FEET TO THE PLACE OF BEGINNING.

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

IN WITNESS WHEREOF, Authority and Lessee have caused this Amendment to Memorandum of Lease to be executed by their duly authorized officers as of an effective date of Apri 20 , 2017 for the purpose of providing an instrument for recording.

**AUTHORITY**

**LESSEE**

THE METROPOLITAN PIER AND

NAVY PIER, INC.,

EXPOSITION AUTHORITY,

an Illinois not-for-profit corporation

a municipal corporation and body politic of the
State of Illinois

By: _Lori J. Healey_

[Name] LORI T. HEALEY

[Title] CEO

By: _Marilynn Gardner_

[Name] MARILYNN GARDNER

[Title] PRESIDENT & CEO

721623 193

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**RESOLUTION NO. 2017- 001**

**A Resolution Authorizing 4th Amendment to Master Lease**

    **BE IT RESOLVED BY THE CHAIRPERSON and BOARD OF DIRECTORS OF THE NAVY PIER INC.** that the Board hereby approves the Fourth Amendment to the Lease Agreement between The Metropolitan Pier and Exposition Authority and Navy Pier, Inc. in the form presented to this meeting.   The Chairperson and Navy Pier Inc. staff are authorized, empowered and directed to execute any required documents and are further authorized to take such steps and actions as may be necessary to implement and carry out the terms of the approved Funding Agreement.

    **PASSED AND APPROVED BY THE CHAIRPERSON AND BOARD OF DIRECTORS OF THE NAVY PIER INC.,** on this 6th day of April, 2017.


_____
**Chairperson**

ATTEST:

_____
**Secretary**

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# FOURTH AMENDMENT TO LEASE AGREEMENT

This Fourth Amendment to the Lease Agreement between The Metropolitan Pier and Exposition Authority (the "Authority") and Navy Pier, Inc. ("NPI" or the "Lessee" and, together with the Authority, the "Parties") is entered into this $\cancel{N}0$ day of April, 2017 ("Fourth Amendment").

**WHEREAS,** the Parties entered into a Lease Agreement dated April 26, 2011, as amended on May 20, 2011, July 19, 2011 and April 16, 2014, leasing certain publicly owned property commonly known as Navy Pier and Gateway Park (hereinafter the "Premises") to NPI for management, operation and maintenance consistent with the Framework Plan defined in Section 2.6 of said Lease Agreement ("2011 Lease Agreement"); and

**WHEREAS,** the parties, by Resolutions of their respective Boards dated June 30, 2011, approved the Centennial Vision - A Framework for Reimagining Navy Pier, June 2011, as the Framework Plan defined by the 2011 Lease Agreement; and

**WHEREAS,** the Framework Plan includes construction of various improvements to Navy Pier commonly referred to as the "Pierscape Plan"; and

**WHEREAS,** NPI has caused designs and related construction documents to be prepared for the Pierscape Plan and desires to proceed with construction of portions of such work; and

**WHEREAS,** the Premises are and will continue to be publicly owned and were partially constructed or improved with proceeds of tax exempt bonds issued by the Authority; and

**WHEREAS,** NPI desires to enter into a sublease with First Hospitality Group (FHG), or its designee ("Hotel Sublessee"), for the purposes of designing, financing, constructing and operating two sites within Navy Pier: the first site for a food and beverage venue, and the second site being a hotel and ancillary facilities including one or more restaurants, subject to the terms of conditions of a sublease between NPI and the Hotel Sublessee (the "Hotel Sublease"); and

**WHEREAS,** NPI has requested that the Authority execute and deliver a Master Lease Non-Disturbance, Recognition and Attornment Agreement in connection with the Hotel Sublease; and

**NOW THEREFORE,** in consideration of the foregoing and of the mutual covenants and agreements herein, the Parties agree as follows:

1.     The 2011 Lease Agreement is hereby amended by revising Section 1.3, "Ownership of Improvements" in its entirety to read as follows:

    **1.3    Ownership of Improvements.** Title to the Improvements shall not be transferred or conveyed to LESSEE but shall throughout the Term, be and remain the property of the AUTHORITY, *provided, however,* that LESSEE may grant any Sublessee (as defined herein) title to any Improvements that are financed, constructed and maintained by such Sublessee pursuant to a Sublease (as defined herein), *provided, further,* that upon termination, expiration or cancellation of such Sublease, title to such Improvements shall automatically revert to the

721623193

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

AUTHORITY, at no cost or expense to AUTHORITY, and LESSEE shall provide such further assurances of such reversion as AUTHORITY may reasonably request.

2.      The 2011 Lease Agreement is hereby amended by revising Section 1.6, "Marshaling Yards" in its entirety to read as follows:

   **1.6    Marshaling Yards.**  The AUTHORITY hereby grants to LESSEE the right to use certain parking areas located south of McCormick Place and shown on Exhibit B (the "Marshaling Yard Space") for the purpose of parking trailers storing items used in connection with the Approved Operations generally consistent with the practice in existence on the Lease Commencement Date (approximately 80 to 100 trailers).  The AUTHORITY may revoke the license granted by this Section 1.6 at any time upon reasonable notice to LESSEE.  The AUTHORITY shall endeavor to provide not less than 90 days' notice of termination.  Throughout the Term, unless the license is revoked pursuant to this Section 1.6, the AUTHORITY shall use commercially reasonable efforts to make the Marshaling Yard Space or alternative trailer storage space available to LESSEE.  During the Term, all property situated in the Marshaling Yard Space (or at an alternative location made available by the AUTHORITY) and belonging to LESSEE, its agents, contractors, employees, or invitees, shall be situated at such location at the risk of LESSEE only, and the AUTHORITY shall not be liable for damage, theft, misappropriation, or loss of that property.

3.      The 2011 Lease Agreement is hereby amended by revising Section 9.3, "Attornment and Non-disturbance" in its entirety to read as follows:

   **9.3    Attornment and Non-disturbance.**  The AUTHORITY hereby agrees that all sublessees of Subleases (individually, a "Sublessee" and collectively, the "Sublessees") shall have the right of quiet enjoyment notwithstanding the expiration of this Agreement or the termination or cancellation of this Agreement due to a breach of this Agreement by LESSEE or other early termination.  In the event of the expiration or earlier termination of this Agreement prior to the expiration of any Sublease, AUTHORITY agrees that so long as the Sublessee thereunder is not in default under its Sublease (beyond any applicable notice or cure period) the AUTHORITY shall recognize such Sublease and not disturb such Sublessee's rights thereunder. In consideration of such agreement by the AUTHORITY, all Subleases entered into on or after the Lease Commencement Date shall include an attornment provision whereby the Sublessee agrees that if this Agreement is terminated for any reason, the Sublessee shall attorn to the AUTHORITY and shall consider the AUTHORITY as the sublandlord for all purposes under the Sublease.  In no event shall the AUTHORITY, as sublandlord, be liable for any act or omission of LESSEE, under any Sublease prior to the date of the AUTHORITY's succession, nor shall the AUTHORITY, as sublandlord, be subject to any offsets or defenses which the Sublessee may have against the LESSEE, nor bound by any rent or additional rent that the Sublessee may have paid for more than the then-current installment, except as provided in its Sublease. In connection with any Sublease, LESSEE may request that the AUTHORITY execute and deliver a non-disturbance agreement, recognition agreement and/or attornment agreement for the benefit of the Sublessee, *provided*, that LESSEE shall reimburse the AUTHORITY for all expenses, including legal fees, incurred by the AUTHORITY in connection with such

721623193

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

agreement and such agreement is in a form reasonably approved by the AUTHORITY.

4.      The 2011 Lease Agreement is hereby amended by revising Exhibit A-1 (Legal Description of Navy Pier) in its entirety as set forth on Exhibit A-1 to this Fourth Amendment. The Parties agree to execute an amendment to a certain memorandum of lease previously recorded on May 28, 2011 in the Office of the Cook County Recorder of Deeds as document number 1114610030 ("Amendment to Memorandum of Lease") in the form attached hereto as Exhibit A-2. Within thirty (30) days of the date of this Agreement, the Lessee shall cause the Amendment to Memorandum of Lease to be recorded with the Cook County Recorder of Deeds.

5.      Any reference to "Gateway Park" in the 2011 Lease Agreement shall be deemed to mean and be the same as Polk Bros Park.

6.      The Lessee shall provide to the Authority a copy of any Transfer Notice (as defined in the Hotel Sublease) it receives pursuant to Section 17.1 of the Hotel Lease within two (2) business days of receipt of such Transfer Notice by LESSEE.

7.      Except as provided herein, the terms and provisions of the 2011 Lease Agreement, as amended, shall remain in full force and effect. This Fourth Amendment may be executed in any number of counterparts, each of which shall be deemed an original, and all of such counterparts shall constitute one agreement. To facilitate execution of this Fourth Amendment, the parties may execute and exchange facsimile counterparts of the signature pages and facsimile counterparts shall serve as originals.

**[SIGNATURE PAGE FOLLOWS]**

721623193

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on this 20 day of April, 2017

Lori T. Healey
Chief Executive Officer
Metropolitan Pier and Exposition Authority

Marilynn Gardner
President & Chief Executive Officer
Navy Pier, Inc.

721623193

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**EXHIBIT A-1**

**LEGAL DESCRIPTION OF NAVY PIER**

A PARCEL OF LAND LYING EAST OF THE FRACTIONAL SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF LOT SEVEN (7) IN THE CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SAID SECTION 10; THENCE NORTH 88 DEGREES 11 MINUTES 41 SECONDS EAST, 440.88' FEET; THENCE NORTH 01 DEGREES 48 MINUTES 38 SECONDS WEST, 50.69 FEET TO THE NORTH FACE OF THE CONCRETE BULKHEAD; THENCE 88 DEGREES 15 MINUTES 59 SECONDS EAST ALONG SAID NORTH FACE, 2421.99 FEET; THENCE NORTH  01 DEGREES 45 MINUTES 54 SECONDS WEST, 27.81 FEET; THENCE NORTH 88 DEGREES 14 MINUTES 06 SECONDS EAST, 86.98 FEET; THENCE SOUTH 01 DEGREES 45 MINUTES 54 SECONDS EAST, 75.55 FEET TO THE NORTH FACE OF THE CONCRETE BULKHEAD; THENCE NORTH 88 DEGREES 14 MINUTES 47 SECONDS EAST ALONG SAID NORTH FACE, 554.60 FEET TO THE NORTHEAST CORNER OF THE CONCRETE BULKHEAD; THENCE SOUTH 01 DEGREES 40 MINUTES 55 SECONDS EAST, 300.21 FEET TO THE SOUTHEAST CORNER OF THE CONCRETE BULKHEAD; THENCE SOUTH 88 DEGREES 19 MINUTES 19 SECONDS WEST ALONG SAID SOUTH FACE, 557.39 FEET; THENCE SOUTH  01 DEGREES 36 MINUTES  30 SECONDS EAST, 121.41 FEET; THENCE SOUTH 88 DEGREES 07 MINUTES  31 SECONDS WEST , 86.39 FEET; THENCE NORTH 01 DEGREES 52 MINUTES 29 SECONDS WEST, 28.47 FEET TO THE SOUTH FACE OF THE CONCRETE BULKHEAD; THENCE SOUTH 88 DEGREES 16 MINUTES  01 SECONDS WEST ALONG SAID SOUTH FACE, 2358.68 FEET; THENCE NORTH  01 DEGREES 39 MINUTES 59 SECONDS WEST, 63.47 FEET; THENCE SOUTH 88 DEGREES 11 MINUTES  41 SECONDS WEST, 44.00 FEET; THENCE NORTH  01 DEGREES 39 MINUTES  59 SECONDS WEST, 37.00 FEET; THENCE NORTH  88 DEGREES 11 MINUTES 41 SECONDS EAST, 2.60 FEET; THENCE NORTH 01 DEGREES 39 MINUTES  59 SECONDS WEST, 289.23 FEET; THENCE SOUTH 88 DEGREES 11 MINUTES  41 SECONDS WEST, 19.52 FEET TO THE PLACE OF BEGINNING.

721623 193

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## EXHIBIT A-2

## FORM OF AMENDMENT TO MEMORANDUM OF LEASE

This instrument prepared by
and after recording return to:

Daniel P. Blondin
Exec. VP/General Counsel
Navy Pier, Inc.
600 East Grand Ave.
Chicago, Illinois 60611

## AMENDMENT TO MEMORANDUM OF LEASE

This Amendment to Memorandum of Lease (this **"Amendment to Memorandum"**) is made between The METROPOLITAN PIER AND EXPOSITION AUTHORITY, a municipal corporation and body politic of the government of the State of Illinois, having its principal office at 301 E. Cermak, Chicago, Illinois, (**"Authority"**) and NAVY PIER, INC., an Illinois not-for-profit corporation, having its principal office at _____, Chicago, Illinois (**"Lessee"**).

The Authority and Lessee have previously caused to be recorded a certain Memorandum of Lease on May 28, 2011 in the Office of the Cook County Recorder of Deeds as document number 1114610030 ("2011 Memorandum of Lease") which is hereby amended by amending the legal description attached thereto as Exhibit A to read, in full, as follows:

## LEGAL DESCRIPTION OF NAVY PIER

A PARCEL OF LAND LYING EAST OF THE FRACTIONAL SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF LOT SEVEN (7) IN THE CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SAID SECTION 10; THENCE NORTH 88 DEGREES 11 MINUTES 41 SECONDS EAST, 440.88' FEET; THENCE NORTH 01 DEGREES 48 MINUTES 38 SECONDS WEST, 50.69 FEET TO THE NORTH FACE OF THE CONCRETE BULKHEAD; THENCE 88 DEGREES 15 MINUTES 59 SECONDS EAST ALONG SAID NORTH FACE,

721623193

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

2421.99 FEET; THENCE NORTH 01 DEGREES 45 MINUTES 54 SECONDS WEST, 27.81 FEET; THENCE NORTH 88 DEGREES 14 MINUTES 06 SECONDS EAST, 86.98 FEET; THENCE SOUTH 01 DEGREES 45 MINUTES 54 SECONDS EAST, 75.55 FEET TO THE NORTH FACE OF THE CONCRETE BULKHEAD; THENCE NORTH 88 DEGREES 14 MINUTES 47 SECONDS EAST ALONG SAID NORTH FACE, 554.60 FEET TO THE NORTHEAST CORNER OF THE CONCRETE BULKHEAD; THENCE SOUTH 01 DEGREES 40 MINUTES 55 SECONDS EAST, 300.21 FEET TO THE SOUTHEAST CORNER OF THE CONCRETE BULKHEAD; THENCE SOUTH 88 DEGREES 19 MINUTES 19 SECONDS WEST ALONG SAID SOUTH FACE, 557.39 FEET; THENCE SOUTH 01 DEGREES 36 MINUTES 30 SECONDS EAST, 121.41 FEET; THENCE SOUTH 88 DEGREES 07 MINUTES 31 SECONDS WEST , 86.39 FEET; THENCE NORTH 01 DEGREES 52 MINUTES 29 SECONDS WEST, 28.47 FEET TO THE SOUTH FACE OF THE CONCRETE BULKHEAD; THENCE SOUTH 88 DEGREES 16 MINUTES 01 SECONDS WEST ALONG SAID SOUTH FACE, 2358.68 FEET; THENCE NORTH 01 DEGREES 39 MINUTES 59 SECONDS WEST, 63.47 FEET; THENCE SOUTH 88 DEGREES 11 MINUTES 41 SECONDS WEST, 44.00 FEET; THENCE NORTH 01 DEGREES 39 MINUTES 59 SECONDS WEST, 37.00 FEET; THENCE NORTH 88 DEGREES 11 MINUTES 41 SECONDS EAST, 2.60 FEET; THENCE NORTH 01 DEGREES 39 MINUTES 59 SECONDS WEST, 289.23 FEET; THENCE SOUTH 88 DEGREES 11 MINUTES 41 SECONDS WEST, 19.52 FEET TO THE PLACE OF BEGINNING.

721623193

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

# EXHIBIT 2

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

31818                JOURNAL--CITY COUNCIL--CHICAGO              9/14/2016

The following are said ordinances as passed (the italic heading in each case not being a part of the ordinance):

*Reclassification Of Area Shown On Map No. 1-E.*    IPD 527,99
*(As Amended)*
*(Application No. 18106)*
*(Common Address:  600 E. Grand Ave.)*

[SO2014-5793]

*Be It Ordained by the City Council of the City of Chicago:*

SECTION 1.  That the Chicago Zoning Ordinance be amended by changing all of the Institutional Planned Development Number 527, as amended, symbols and indications as shown on Map Number 1-E in the area bounded by:

all of the property including Navy Pier, lying south of a line 400 feet north of the north line of East Grand Avenue, lying north of the north line of the Ogden Slip, lying east of the concrete retainer wall at the east end of said slip lying north of property owned by the United States Government located at Streeter Drive and the north bank of the Chicago River, lying east of the east line of North Lake Shore Drive and lying west of the east boundary of Navy Pier and west of the existing dock located north and south of Navy Pier (except all of the block bounded by the north line of East Grand Avenue, the south line of East Illinois Street, the east line of North Streeter Drive and North Lake Shore Drive, commonly known as Lake Point Tower), and except a strip of land 63 feet wide located on the east side of North Lake Shore Drive, between East Ohio Street approach and East Grand Avenue and except the existing right-of-way for East Ohio Street approach, East Grand Avenue, East Illinois Street, North Streeter Drive and the entrance roadway to the Water Filtration Plant, and including the area known as Dime Pier, as more fully delineated on the Property Line Map,

to those of Institutional Planned Development Number 527, as amended.

SECTION 2.  This ordinance shall be in force and effect from and after its passage.

Plan of Development Statements referred to in this ordinance read as follows:

*Institutional Planned Development No. 527,*
*As Amended.*

*Plan Of Development Statements.*

1.  The area delineated herein as Planned Development Number 527, as amended (the "Planned Development") and subject to the use and bulk restrictions contained

Case: 1:21-cv-05353 Document #: 1-1 Filed: 10/08/21 Page 123 of 383 PageID #:127

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

herein consists of the following areas: (i) six (6) tracts of land, identified as Tracts A, B, C, D, E.2 and F; (ii) those portions of Grand Avenue and Illinois Street east of Lake Shore Drive located within the Planned Development boundary; and (iii) the property commonly known as Dime Pier located in Lake Michigan running parallel to and south of Navy Pier in the City of Chicago's Harbor District 1, all as further described on the Subarea Map, Exhibit 7, which is described in Statement 5 and attached hereto (the "Property"). The Navy Pier Subarea consists of Tract A. The Headlands Subarea consists of Tracts B, C, E.2 and F and those portions of Grand Avenue and Illinois Street east of Lake Shore Drive. The Jane Addams Park Subarea consists of Tract D. The Dime Pier Subarea consists of Dime Pier and the marina located south of and parallel to Navy Pier. The boundaries of each subarea are depicted on the Subarea Map, Exhibit 7 herein. The Metropolitan Pier and Exposition Authority ("MPEA"), a political subdivision, body politic and municipal corporation created by an Act of the Illinois legislature, 70 ILCS 210/1, et seq., is the owner of Tract A. The City of Chicago (the "City") is the owner of Tracts B, C, E.2 and F. The Chicago Park District is the owner of Tract D and Dime Pier. Navy Pier, Inc., an Illinois not-for-profit corporation ("NPI") is the authorized applicant for this amendment which relates solely to Tracts A, B, C, E.2 and F. For purposes of this amendment to the Planned Development, the rights conferred on, obligations imposed on, and acknowledgements made on behalf of MPEA shall be deemed to extend to and include the applicant for so long as the applicant is the authorized lessee and operator of Tracts A, B, C, E.2 and F.

Tract D of this Planned Development, known as the Jane Addams Park Subarea, is included in this Planned Development for the purpose of assuring a coordinated approach to the development of the Headlands Subarea. The Site/Landscape Plan for Tract D is referenced in Statement 5 as Exhibit 43, and made a part hereof. The uses permitted in Tract D are public beach and bathing uses and those uses permitted in the Headlands Subarea, except for public transportation facilities; and boat and ship docking, passenger embarking and disembarking.

The obligations and requirements imposed upon MPEA by this Planned Development shall not apply to the Jane Addams Park Subarea, and MPEA shall have no obligation with respect to any Jane Addams Park Subarea development. Where applicable, any such obligations and requirements shall be imposed on the Chicago Park District.

Notwithstanding the provisions of Statement 3 hereof, applications for amendments, modifications or changes to the Jane Addams Park Subarea do not require the consent or the authorization of the owners of the Navy Pier Subarea, the Headlands Subarea or, if different from the Chicago Park District, the Dime Pier Subarea. Notwithstanding the provisions of Statement 3 hereof, applications for amendments, modifications or changes to the Navy Pier Subarea, the Headlands Subarea or, if different from the Chicago Park District, the Dime Pier Subarea do not require the consent or authorization of the owner of the Jane Addams Park Subarea.

FILED DATE: 9/8/2021 9:45 AM　2021CH04537

2. This Planned Development as originally adopted on September 16, 1992, was conditioned on the execution of an Intergovernmental Cooperation Agreement ("ICA"). This agreement was entered into on August 25, 1992, thereby satisfying this condition.

3. The requirements, obligations and conditions contained within this Planned Development as they relate to Tracts A, B, C, E.2 and F shall be binding upon the applicant, its successors and assigns and, if different than the applicant, the legal titleholders and any ground lessors. All rights granted hereunder to the applicant shall inure to the benefit of the applicant's successors and assigns and, if different than the applicant, the legal titleholder and any ground lessors. Furthermore, pursuant to the requirements of Section 17-8-0400 of the Chicago Zoning Ordinance, the Property, at the time of application for amendments, modifications or changes (administrative, legislative or otherwise) to this Planned Development are made, shall be under single ownership or designated control. Single designated control is defined in Section 17-8-0400.

4. All applicable official reviews, approvals or permits are required to be obtained by the MPEA or the Chicago Park District, with respect to their respective subareas, or their respective successors, assignees, lessees, or grantees. Any dedication or vacation of streets or alleys or grants of easements or any adjustment of the right-of-way shall require a separate submittal to the Department of Transportation on behalf of the MPEA or the Chicago Park District, with respect to their respective subareas, or their respective successors, assignees, lessees, or grantees.

Any requests for grants of privilege, or any items encroaching on the public way, shall be in compliance with the plans.

Ingress or egress shall be pursuant to the plans and may be subject to the review and approval of the Departments of Planning and Development and Transportation. Closure of all or any public street or alley during demolition or construction shall be subject to the review and approval of the Department of Transportation.

All work proposed in the public way must be designed and constructed in accordance with the Department of Transportation Construction Standards for Work in the Public Way and in compliance with the Municipal Code of the City of Chicago. Prior to the issuance of any Part II Approval, the submitted plans must be approved by the Department of Transportation.

5. This Plan of Development consists of these 26 statements, the Administrative Approvals (defined below) and the following exhibits and plans attached hereto or referenced below, all of which are incorporated herein and made a part hereof by this reference:

　　1.　Bulk Regulations and Data Table

　　2.　Planned Development Boundary Map

Case: 1:21-cv-05353 Document #: 1-1 Filed: 10/08/21 Page 125 of 383 PageID #:129

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

3.   Zoning and Street System Map

4.   Existing Land-Use Map

5.   Roadway Network Map

6.   Generalized Land-Use Plan

7.   Subarea Map

8.   Site/Landscape Plan -- Headlands Subarea (Polk Bros Park)

9.   Conceptual Site/Landscape Plan -- On-Pier Park and Chicago Shakespeare Theater Expansion

10.   Site Plan -- Navy Pier -- Zone 1

11.   Site Plan -- Navy Pier -- Zone 2

12.   Site Plan -- Navy Pier -- Zone 3

13.   Site Plan -- Navy Pier -- Zone 4

14.   Site Plan -- Navy Pier -- Zone 5

15.   Conceptual Site Plan -- Navy Pier -- Zone 6

16.   South Elevation -- Wave Wall

17.   South Elevation -- Hotel and Terminal Building

18.   West Elevation -- Headhouse

19.   Section -- Polk Bros Park Vehicle Drop-Off

20.   Section -- South Dock at Family Pavilion

21.   Section -- South Dock at Wave Wall 1

22.   Section -- South Dock at Wave Wall 2

23.   Section -- South Dock at Hotel and Festival Hall

24.   Pedestrian Circulation Plan

25.   Auto/Taxi Circulation Plan

Case: 1:21-cv-05353 Document #: 1-1 Filed: 10/08/21 Page 126 of 383 PageID #:130

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

26. Bus/Transit Circulation Plan

27. Bicycle Circulation Plan

28. North Dock Transient Boat Slips

29. Traffic Management Plan

30. Existing Land-Use Area Map (Dime Pier)

31. Property Line and Right-of-Way Adjustment Map (Dime Pier)

32. Generalized Site Plan (Dime Pier)

33. West Building Plan (Dime Pier)

34. East Building Plan (Dime Pier)

35. Landscape Plan (Dime Pier)

36. West Building Elevation (Dime Pier)

37. East Building Elevation (Dime Pier)

38. North Elevation -- Navy Pier -- Zones 1 and 2 (revised December 11, 1997)

39. North Elevation -- Navy Pier -- Zones 3 and 4 (revised December 11, 1997)

40. North Elevation -- Navy Pier -- Zones 5 and 6

41. Section -- North Dock at Family Pavilion

42. Section -- North Dock at Festival Hall

43. Future Headland Subarea Landscape Plan (Federal Parcels)

44. Site/Landscape Plan -- Jane Addams Park Subarea (revised December 11, 1997)

45. Hotel Site Plan

46. Rooftop Venue Site Plan

47. Rooftop Venue Roof Plan

48. Hotel Section

Case: 1:21-cv-05353 Document #: 1-1 Filed: 10/08/21 Page 127 of 383 PageID #:131

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

49.  Skating Rink Plan -- Headlands Subarea (Polk Bros Park)

50.  Sloped-Roof Accessory Structure Elevations and Floor Plan (Polk Bros Park Welcome Pavilion)

51.  East End Elevated Walkway Elevation

52.  East End Elevated Walkway Section

With the exception of the Traffic Management Plan (Exhibit 29), Exhibits 30 -- 37, Exhibits 38 -- 40 and Exhibits 42 -- 44, all other exhibits were prepared by Gensler Architects and are dated July 30, 2014, revised August 18, 2016. Exhibits 30 -- 37 relate to the Dime Pier Subarea, were prepared by BTA/VOA and are dated November 20, 2009. Exhibits 38 -- 40 and Exhibits 42 -- 44 relate to existing improvements, were approved pursuant to Planned Development 527, as amended, on January 14, 1998, were prepared by BTA/VOA, and are dated June 23, 1992, with the exception of Exhibit 38 (North Elevation -- Navy Pier -- Zones 1 and 2), Exhibit 39 (North Elevation -- Navy Pier -- Zones 3 and 4), and Exhibit 44 (Site/Landscape Plan -- Jane Addams Park Subarea), which were revised December 11, 1997. Exhibits 45 -- 52 were prepared by Gensler Architects and are dated July 30, 2014, revised August 18, 2016. Exhibits 30 -- 37 and Exhibits 38 -- 40 and 42 -- 44 are not attached hereto, but are on file with the Department.

The following minor change and site plan approval letters are hereby incorporated by reference and made part of this Planned Development (collectively, the "Administrative Approvals"):

a.  Minor Change and Lakefront Protection Waiver to Theodore Novak dated November 12, 2015

b.  Revised Minor Change and Lakefront Protection Waiver to Theodore Novak dated October 15, 2015

c.  Minor Change and Lakefront Protection Waiver to Theodore Novak dated September 24, 2015

d.  Revised Minor Change and Lakefront Protection Waiver to Theodore Novak dated January 20, 2015

e.  Approval letter to Theodore Novak dated April 1, 2014

f.  Approval letter to Theodore Novak dated December 23, 2013

g.  Administrative Relief Request to Theodore Novak dated August 12, 2013

h.  Revised Lake Michigan and Chicago Lakefront Protection Ordinance Waiver to Theodore Novak dated June 19, 2013

i.  Lake Michigan and Chicago Lakefront Protection Ordinance Waiver to Theodore Novak dated May 14, 2013

j.  Request for Minor Change to Jack Guthman dated December 29, 2004

k.  Request for Minor Change to David Narefsky dated September 27, 2004

l.  Request for Minor Change to Jon Clay dated May 4, 1998

m.  Request for Minor Change to Jon Clay dated October 14, 1997

n.  Request for Minor Change to Jon Clay dated February 26, 1997

o.  Request for Minor Change to Jon Clay dated January 23, 1997

p.  Request for Minor Change to Steven Haemmerle dated August 11, 1993.

Full-sized copies of Exhibits 2 -- 28 and 30 -- 52 are on file with the Department of Planning and Development. In any instance where a provision of this Planned Development conflicts with the Chicago Building Code, the Building Code shall control. This Planned Development conforms to the intent and purpose of the Chicago Zoning Ordinance, and all requirements thereto, and satisfies the established criteria for approval as a Planned Development. In case of a conflict between the terms of this Planned Development Ordinance and the Chicago Zoning Ordinance, this Planned Development Ordinance shall control.

6.  The following uses shall be permitted in the Navy Pier Subarea: pedestrian promenades; public open spaces; public, cultural, and recreational uses; cultural exhibits; participant sports and recreation uses; enclosed public spaces; hotel/motel; multi-purpose exhibition, meeting and reception facilities; shops and restaurants, including without limitation general and limited restaurants, taverns, outdoor patios located at grade and outdoor patios located on a rooftop; boat and ship docking, passenger embarking and disembarking; movable commercial vendors' facilities; kiosks and other similar structures; on-pier accessory and non-accessory parking; roadway ingress and egress; walkways, bicycle paths and ramps; and related and accessory uses and support facilities; and all business and commercial uses allowed in the DX Zoning Districts, except as set forth below.

The following uses shall be prohibited within the Navy Pier Subarea: residential; adult uses; hookah bar; shooting range facilities; funeral and internment service; pawn shop; inter-track wagering facility; battery, tire and auto service station; motor vehicle repair; warehouse establishments; railroad related uses; stadiums, forums or arenas with capacity of over two thousand (2,000) seats; hospital and convalescence

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

Case: 1:21-cv-05353 Document #: 1-1 Filed: 10/08/21 Page 129 of 383 PageID #:133

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

related uses; penal and correctional facilities; electric substations; water filtration and pumping stations; recycling facilities; drive-through facilities; business and professional offices (except as ancillary uses); and transitional shelters.

The following uses shall be permitted in the Headlands Subarea: public parks, which include gardens and gathering places, outdoor recreational activities, fountains, skating rinks, accessory park pavilions, accessory retail sales, walkways, bicycle paths and bicycling, ramps and other similar individual vehicular activities. The following uses shall also be permitted in the Headlands Subarea: boat and ship docking, passenger embarking and disembarking; public transportation facilities; movable commercial vendor's facilities; kiosks and other similar structures; and related and accessory uses and support facilities.

The following uses shall be permitted in the Dime Pier Subarea: marina, harbor facilities, restaurants; kiosks; and other related and accessory uses pursuant to Section 17-6-0203-D of the Chicago Zoning Ordinance.

All of the Property shall remain public places for the use and enjoyment of the public. Any limitations on the public use and any private uses shall be subordinate and ancillary as well as complementary to the predominantly public character of the Property. Consistent with the foregoing, hotels, restaurants and commercial vendors may exclusively occupy areas at the Property, provided that the goods and services offered shall be available to the public as a place of public accommodation. For purposes of this Planned Development, the term "operating hours" shall have the following meanings:

(i)    during the period from May through September, it shall mean, for the interior public spaces of the structures, from at least 9:00 A.M. to 9:00 P.M.;

(ii)   during the period from October through April, it shall mean, for the interior public spaces of the structures, from at least 10:00 A.M. to 5:00 P.M.; and

(iii)  during all periods, it shall mean, for the exterior spaces in the Headlands Subarea, from at least 6:00 A.M. to 11:00 P.M., and for the exterior spaces in the Navy Pier Subarea, from at least 6:00 A.M. to one (1) hour later than the operating hours of the interior public spaces of the structures, as set forth in subsections (i) and (ii) above.

All uses of the Property shall be located, designed, constructed, maintained and operated in accordance with the provisions of this Planned Development.

7   Off-street parking and off-street loading shall be provided upon the Navy Pier Subarea in accordance with the Bulk Regulations and Data Table described in Statement 5 and attached hereto.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

31826                JOURNAL--CITY COUNCIL--CHICAGO                9/14/2016

8. On-premises and off-premises signs are permitted within the enclosed facilities on the Navy Pier Subarea; provided, however, these signs shall be of a limited size, and be appropriate and consistent with the character of the Navy Pier and Headlands Subarea development. On-premises and off-premises signs of no more than one hundred (100) square feet in dimension are permitted outside of the facilities on the Navy Pier Subarea, provided that they are appropriate and consistent with the character of the Navy Pier Subarea and relate to the Navy Pier Subarea uses. All exterior signs, including flashing, animated or moving signs, and all signs inside or out facing and visible from the Headlands Subarea are subject to the prior approval of the Department of Planning and Development (the "Department"). All exterior signs located within the Dime Pier Subarea, including signs on the kiosks, are subject to the prior approval of the Commissioner of the Department (the "Commissioner"), and are limited to on-premises messages. Illuminated, flashing, changing image signs and video display signs are expressly prohibited within the Dime Pier Subarea.

9. The maximum allowable height of any structure within the Planned Development shall conform to the attached Bulk Regulations Table. For purposes of height measurement, the definitions in the Zoning Ordinance shall apply. The height of any building shall also be subject to height limitations, if any, established by the Federal Aviation Administration.

10. The following additional principles shall govern development of the Property:

(i) The Improvements on the Property shall be designed, constructed and maintained in general conformance with all of the exhibits described in Statement 5 of this Planned Development. Landscaping shall be installed and maintained in general conformance with all of the Site/Landscape Plan exhibits described in Statement 5 of this Planned Development. All landscaping shall be properly maintained, at all times, by MPEA.

(ii) Vehicular movement on the Navy Pier Subarea shall be limited to those areas designated on all of the Site Plans, Exhibits 8 through 15, described in Statement 5 and shall be in general conformance with the provisions of the Traffic Management Plan, Exhibit 29 (which may be adjusted administratively from time to time in conformance with Section 17-13-0611), described in Statement 5 of this Planned Development.

(iii) Public pedestrian and bicycle passage during operating hours over all exterior areas depicted on the exhibits as pedestrian walks or pathways, including the south dock and the north dock, shall not be unreasonably restricted; provided, however, that bicycle passage shall be secondary to pedestrian passage, and the applicant may restrict bicycle passage to prevent unreasonably interference with pedestrian passage and to protect pedestrian safety. Public pedestrian passage during operating hours over all interior areas depicted on the Pedestrian Circulation Plan, Exhibit 24,

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

described in Statement 5 of this Planned Development shall not be unreasonably restricted.

(iv)    The south dock shall be divided into east/west zones that are in general conformance with all of the section exhibits, Exhibits 20 through 23, described in Statement 5 of this Planned Development and attached hereto. These zones shall be reasonably sized to accommodate the predominantly public pedestrian character of the south dock. The edge of the south dock shall consist of an approximate 26-foot zone in which various boat and ship docking accessories, pavilions, kiosks, planters and furniture are permitted. To the north and adjacent to this 26-foot zone, there shall be an approximately 20-foot clear zone, free and clear of all obstructions for easy pedestrian passage.

(v)     The edge of the north dock shall consist of an approximately 10-foot zone in which various boat and ship dock accessories, kiosks, planters and furniture are permitted provided that public pedestrian passage is feasible.

(vi)    The boat and ship docking accessories described above include, but are not limited to, gangplanks, stairs and accessory structures, pavilions and kiosks. These accessories shall be appropriate and consistent with the character of the Navy Pier and Headlands Subareas development. They shall be sized and located to avoid unreasonable interference with public pedestrian passage or with public access to the water or lake front vistas. The location of the accessories of each boat or ship shall be limited to the boat dock areas set forth in Statement 11 hereof. They shall be limited to movable or semi-permanent structures.

(vii)   Movable or semi-permanent kiosks are also permitted in the Headlands Subarea and elsewhere along the south dock of the Navy Pier Subarea, except in the clear zones. The kiosks shall be sized and located appropriately and consistently with the character of this Planned Development. Moreover, they shall not unreasonably interfere with public pedestrian passage or with public access to the water or the lake front vista.

(viii)  Permanent kiosks or other permanent buildings or structures located anywhere on the Property are subject to the approval of the Commissioner. The approximately 4,000 square foot "Welcome Pavilion" proposed to be developed in the Headlands Subarea, as depicted on the plans, is hereby approved.

(ix)    The areas depicted on the Conceptual Site/Landscape Plan -- On-Pier Park, Exhibit 9, described by Statement 5 of this Planned Development, west of the area depicted as Chicago Shakespeare Theater Expansion, commonly known as the Crystal Garden and On-Pier Park, shall be designed, constructed and maintained as public spaces to provide areas for

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

passive activities and public gathering and, except as provided herein, at no charge or cost to public users; provided, however, that the restaurant/cafe and catered dining areas depicted in the Conceptual Site/Landscape Plan -- On-Pier Park, Exhibit 9, described in Statement 5 of this Planned Development, may charge customers for their use of said restaurant/cafe and catered dining areas. Within the Crystal Garden, the public space consists of approximately 22,000 square feet of area, centrally located. Each of these public areas shall be (a) handicapped accessible, (b) designed to function as a public space, (c) improved with seating and tables appropriately located and arranged and in reasonable and sufficient quantities to encourage public use, (d) provided with appropriate interior and exterior landscaping, (e) reasonably accessible to restroom facilities and to food and beverage facilities, and (f) except as provided herein, shall be open to the public during all operating hours. Regular musical entertainment, live performances and cultural programs and exhibits within these areas are encouraged. The areas shall be maintained in a clean and litter free condition. The Crystal Garden shall have largely unobstructed views from within the space out to the lake and City.

(x)     Limited private uses of the Crystal Garden during operating hours are permitted; provided, however, these uses, except for the restaurant/cafe and catered dining areas, may occur only very occasionally (from time to time), must be more limited in the summer months than otherwise.

(xi)    It may be necessary in connection with live music, live performances or other events in the Crystal Garden and On-Pier Park to charge a fee to cover the cost of the entertainment. Also, the applicant may charge a reasonable fee to ride the carousel, Ferris wheel, or swing ride, or other rides or attractions, or for special entertainment in the On-Pier Park.

(xii)   Appropriate and decorative lighting of all exterior public pedestrian areas and budget permitting, of appropriate Navy Pier Subarea building features, shall be provided and maintained. In no circumstances should lighting on the Property be directed at Lake Point Tower.

(xiii)  The Navy Pier Subarea, Headlands Subarea and Dime Pier Subarea development contemplated herein are intended to be a single, integrated project; provided, however, that the work described in Exhibits 8 through 27, 38 through 43, and 45 through 52 and the Dime Pier Subarea development may be conducted in stages and phases, as designated by the applicant or, with respect to the Dime Pier Subarea, the Chicago Park District.

(xiv)   The MPEA, with respect to the Headlands and Navy Pier Subareas, and the Chicago Park District, with respect to the Jane Addams Park Subarea and Dime Pier Subarea, shall make appropriate arrangements to ensure public safety and public access to such subareas, to the extent feasible,

Case: 1:21-cv-05353 Document #: 1-1 Filed: 10/08/21 Page 133 of 383 PageID #:137

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

during construction. If requested by any appropriate department of the City, the MPEA or the Chicago Park District, as applicable, shall provide and follow a reasonably acceptable plan and schedule of such arrangements; which plan shall be coordinated with the Department.

11. The perimeter of the north and south dock areas of the Navy Pier and Headlands Subareas may be used to dock boats and ships, and passengers may embark and disembark from such boats and ships along the docks of the Navy Pier and Headlands Subareas, provided that the following principles are followed:

(i)   Pedestrian circulation along, and public access to, the dock's edge and views from the pedestrian areas of the Navy Pier and Headlands Subareas shall not be unreasonably impaired. In the Headlands Subarea (except in areas adjacent to Ogden Slip) and the south dock of the Navy Pier Subarea no more than fifty percent (50%) of each of the dock's length may be occupied by docked boats or ships at any one time, and each docked boat or ship shall be separated from every other docked boat or ship by fifty (50) feet, or if separated by a lesser distance, the total length of any portion of the dock which is occupied by boats or ship at any one time shall not exceed two hundred (200) feet (unless occupied by a single boat longer than two hundred (200) feet in which case said boat shall be separated from every other boat by fifty (50) feet).

(ii)  The operation of docked boats and ships shall be regulated by the MPEA to avoid unreasonable adverse impacts of such uses on the surrounding neighborhood. These impacts include, but are not limited to, noise created by passengers and litter.

(iii) No boats or ships shall be permanently docked on the north, south or east side of the Navy Pier Subarea adjacent to the Auditorium. Embarking and disembarking of boat passengers along any portion of the Headlands (except the easternmost docks) of the Headlands Subarea shall not be permitted after 11:00 P.M. on weekdays and 12:00 A.M. on weekends.

12. The maximum permitted Floor Area Ratio ("FAR") for the site shall be in accordance with the attached Bulk Regulations Table. For the purposes of FAR calculations and measurements, the definitions in the Zoning Ordinance shall apply. For purposes of grade, the definition in the Zoning Ordinance shall apply. The permitted FAR identified in the Bulk Regulations Table has been determined using a Net Site Area of 4,718,841 square feet.

13. The MPEA, with respect to the Navy Pier and Headlands Subareas, acknowledges that the development of such subareas will have unique traffic-generation and parking characteristics which will require diligent and ongoing operational control to assure that the impact of the development on the surrounding traffic network, park

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

uses, pedestrian flow and parking supply will not be unreasonably adverse. The MPEA further acknowledges that, although the streets on the Headlands Subarea will be City-owned streets over which the City shall maintain legal jurisdiction, the generation of traffic activity and the traffic activity itself on these streets will largely be within the control of the MPEA.

Accordingly, the MPEA shall be responsible for implementing certain operational controls over parking and traffic activity expected to occur on the Navy Pier and Headlands Subareas. These operational controls are set forth in the "Traffic Management Plan" ("TMP") Exhibit 29 described in Statement 5 in this Planned Development. The TMP, as it may be amended or otherwise modified from time to time, shall be effective upon passage and approval of this Planned Development, or in accordance with such amendment or modification from time to time, and shall be deemed an integral part of this Planned Development. The MPEA's compliance with the TMP shall be a requirement of this Planned Development.

In order to assure the TMP's effectiveness, the Commissioner may request, not more than once every two years after the effective date of this Planned Development, MPEA to submit, and MPEA shall so submit, reports describing traffic and parking activity and assessing the effectiveness of the various provisions of the TMP as they relate to the Navy Pier and Headlands Subareas, and any recommended modifications thereto. Additionally, the MPEA, or its designated representative, shall cooperate with the City and with applicable transit agencies in the on-going review and updating of the TMP, as it relates to the Navy Pier and Headlands Subareas.

Modifications may be made to the TMP at any time with the approval of the Commissioner. Such modifications and approvals shall be kept on file with the Department.

In order to assure that the provisions of the TMP are properly carried out and that proper and prompt coordination exists among the MPEA and the various departments of the City and the applicable transit departments of the City and the applicable transit agencies and the public, the MPEA shall designate and maintain a Transportation Coordinator ("TC"). The TC may consist of one (1) or more individuals, but in any event, a single person, entity or division of the MPEA shall be readily available and apparent for inquiry by any parties concerned. The TC shall be charged with the responsibility, on behalf of the MPEA, to (a) oversee and coordinate the day-to-day implementation of the TMP, (b) act as a formal point of communication between the MPEA and any other agencies or individuals inquiring or concerned about traffic, or parking-related issues, and (c) coordinate traffic loading and parking management activity with representatives of the City and the appropriate transit agencies.

14. The MPEA acknowledges that with the development of the "River East Corridor", there is a need for a comprehensive traffic management plan for a larger area than that contemplated by the TMP, Exhibit 29. In order to serve this need the creation of a Traffic Management Authority ("TMA") covering that broader area may be

Case: 1:21-cv-05353 Document #: 1-1 Filed: 10/08/21 Page 135 of 383 PageID #:139

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

necessary. In the event a TMA is created, the MPEA agrees to join the TMA; to be an active and participating member of its board; and to cooperate and participate in the creation of such a comprehensive plan, and in the preparation of a funding structure which implements the plan and which at a minimum advances the goal of providing regular, frequent shuttle service to remote parking. The MPEA further agrees to continue to run its remote parking shuttle service at its current level of service as described in the TMP, Exhibit 29. The MPEA shall pay its pro rata share of the funding plan, which shall include its agreement to run its remote parking shuttle service at its current level of service. The Commissioner may approve modifications to the level of shuttle service at the request of MPEA based on updated analyses regarding need and demand for shuttle service.

15. The design of the roadway network located on the Headlands Subarea as depicted on the Roadway Network Map, Exhibit 5, described in Statement 5 of this Planned Development has been determined by the City to be necessary and appropriate to handle the expected uses of the Navy Pier and Headlands Subareas in a safe and efficient manner, while maximizing the availability of open space and park land on the Headlands Subarea The City acknowledges, however, that the actual uses of the Navy Pier and Headlands Subareas may vary from that expected. Accordingly, the Commissioner may request, and MPEA shall submit, not more than once prior to the expiration of the fifth anniversary following the effective date of this amendment to the Planned Development, a traffic study prepared by a traffic engineer assessing the adequacy and sufficiency of the Headlands Subarea's roadway network to handle the actual traffic demand experienced during said period. Following receipt of said study or studies, the Commissioner shall consult with the Commissioner of the Department of Transportation. If the Commissioner of the Department of Planning and Development and the Commissioner of the Department of Transportation determine that changes to said roadway network are necessary or appropriate to accommodate the actual uses of the Navy Pier and Headlands Subareas, while maximizing the availability of open space and park land, said Commissioners shall so notify the MPEA. Such changes shall be limited to modifications or changes to the roadway network. Said Commissioners shall make such determination and send such notice within ninety (90) days following receipt of said study. The City shall, at its own expense and within one (1) year thereafter, make such changes to the roadway network as are required. The MPEA shall, at its own expense and within one (1) year thereafter, make such changes to the landscaping on the Headlands Subarea as are reasonably required as a result of the changes to the roadway network undertaken by the City

16. The parcel depicted on the Subarea Map, Exhibit 7, as Tract E.1, Existing Federal Parcels, is outside the boundaries of this Planned Development. The MPEA acknowledges, however, that such parcel shall be served by access ways over and across the Headlands Subareas. In the event that the MPEA or the City acquire control of this parcel sufficient to allow redevelopment as park land, then the Headlands Subarea shall be reconfigured and landscaped to create a park area which is coordinated with the parcel. Such reconfiguration and landscaping shall be designed, constructed and maintained in general conformance with the

Case: 1:21-cv-05353 Document #: 1-1 Filed: 10/08/21 Page 136 of 383 PageID #:140

Site/Landscape Plan -- Headlands Subarea (Polk Bros Park), Exhibit 8, described in Statement Number 5 and attached hereto. Such reconfiguration and landscaping shall be completed by the MPEA within a reasonable time following the aforesaid acquisition of the necessary rights to the parcel or following substantial completion of the redevelopment of the parcel as park land, whichever is earlier.

Any development of the Headlands Subarea, and particularly of Tract E.2, shall be coordinated with and shall be designed and constructed to accommodate the then existing or known plans for the Turning Basin Park. When and if the Turning Basin Park is developed, the MPEA will permit third parties reasonable access to Tract E.2 in order to coordinate said development with Tract E.2.

17. The MPEA shall manage the uses of the Headlands and Navy Pier Subareas to avoid unreasonably adverse impacts on the surrounding residents. On the Headlands Subarea, no neighborhood festivals shall be permitted.

18  Upon review and determination, "Part II Review", pursuant to Section 17-13-0610 of the Zoning Ordinance, a Part II Review fee shall be assessed by the Department of Planning and Development. The fee, as determined by staff at the time, is final and binding on the applicant and must be paid to the Department of Revenue prior to the issuance of any Part II Approval.

19. The Site and Landscape Plans shall be in substantial conformance with the Landscape Ordinance and any other corresponding regulations and guidelines. Final landscape plan review and approval will be by the Department. Any interim reviews associated with site plan review or Part II Reviews, are conditional until final Part II Approval.

20. The MPEA, with respect to the Headlands and Navy Pier Subareas, and the Chicago Park District, with respect to the Jane Addams Park Subarea and Dime Pier Subarea, shall comply with Rules and Regulations for the Maintenance of Stockpiles promulgated by the Commissioners of the Departments of Streets and Sanitation, Environment and Buildings, under Section 13-32-085 of the Chicago Municipal Code, or any other provision of that Code.

21. The terms and conditions of development under this Planned Development ordinance may be modified administratively, pursuant to Section 17-13-0611-A of the Chicago Zoning Ordinance by the Zoning Administrator upon the application for such a modification by the MPEA, its successors and assigns and, if different than the MPEA, the legal titleholders and any ground lessors.

22. The MPEA and the Chicago Park District acknowledge that it is in the public interest to design, construct and maintain the project in a manner which promotes, enables and maximizes universal access throughout the Property. Plans for all buildings and improvements on the Property shall be reviewed and approved by the Mayor's Office for People with Disabilities to ensure compliance with all applicable laws and

Case: 1:21-cv-05353 Document #: 1-1 Filed: 10/08/21 Page 137 of 383 PageID #:141

FILED DATE: 9/8/2021 9:45 AM　2021CH04537

regulations related to access for persons with disabilities and to promote the highest standard of accessibility.

23. The MPEA and Chicago Park District acknowledge that it is in the public interest to design, construct, renovate and maintain all buildings in a manner that provides healthier indoor environments, reduces operating costs and conserves energy and natural resources. The proposed structures on the Dime Pier Subarea shall be designed and constructed in an energy efficient manner generally consistent with the Leadership in Energy and Environmental Design ("LEED") Green Building Rating System; the roof of the proposed structures will consist of twenty-five percent (25%) of the net roof area covered with photovoltaic panels and the remaining seventy-five percent (75%) covered with high albedo roof materials; in addition, the project will incorporate FSC certified wood products, native plantings, and the heating and cooling system will incorporate natural ventilation that will reduce energy demand through a geothermal system located beneath the floating docks in the harbor. The South Dock and the initial work in Polk Bros Park, which includes the fountain, plaza and surrounding landscaping, has been submitted for certification under the SITES program, a comprehensive rating system for the development of sustainable landscapes administered by Green Business Certification, Inc. The hotel will achieve a LEED certification and 50 percent of its net roof area will be vegetated, meeting the guidelines of the Sustainable Policy of the Department of Planning and Development

24. The MPEA acknowledges that, although the City's Percent for Public Art ordinance is not applicable to the proposed development, the Navy Pier and Headlands Subareas development project is a public project and that the location and placement of art work in appropriate places on the Headlands and Navy Pier Subareas is a worthy public goal. Accordingly the MPEA shall, in its planning for the design and construction of the proposed development, take into consideration the installation of art work as an integral part of interior and exterior spaces. In connection with this requirement, the MPEA shall work with the appropriate representatives of the Public Art Program of the City's Department of Cultural Affairs and Special Events.

25. The plans are hereby approved in their entirety and no further approvals shall be required under this Planned Development or the Zoning Ordinance for the improvements undertaken in accordance with the plans, other than Part II Approval (per Section 17-13-0610 of the Zoning Ordinance). Applicant and DPD, at either party's request, may continue to evolve the design of the elevations or materials, and changes to such elevations or materials, if any, shall, if mutually agreed upon, be reviewed by DPD pursuant to Section 17-13-0800.

26. The improvements contemplated by this Planned Development are anticipated to be conducted in phases. Unless substantial construction of any of the improvements contemplated by this amendment to the Planned Development and depicted in the plans, including without limitation the hotel to be constructed in the Navy Pier Subarea, the Welcome Pavilion to be constructed in the Headlands Subarea, or any of the improvements depicted the Conceptual Site Plan -- Navy Pier -- Zone 6

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

31834          JOURNAL--CITY COUNCIL--CHICAGO          9/14/2016

(Exhibit 15) have commenced within six (6) years following adoption of this amendment to the Planned Development (subject to extension for one additional year as set forth in Section 17-13-0612 of the Chicago Zoning Ordinance), then this amendment to the Planned Development shall expire by separately introduced ordinance, if any, in which event the zoning of the Property shall revert to Planned Development 527, as amended, on January 13, 2010.

[Exhibits 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 42, 43 and 44
referred to in these Plan of Development Statements
unavailable at time of printing.]

[Exhibits 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20,
21, 22, 23, 24, 25, 26, 27, 28, 41, 45, 46, 47, 48, 49, 50, 51 and 52
referred to in these Plan of Development Statements printed
on pages 31844 through 31879 of this *Journal*.]

Exhibits 1 and 29 referred to in these Plan of Development Statements read as follows:

*Exhibit 1.*

*Institutional Planned Development No. 527, As Amended.*

*Plan Of Development.*

*Bulk Regulations And Data Table.*

Net Site Area:

    Aggregate Area:                            4,718,841 square feet (108.33 acres)

    Navy Pier Subarea:                       29.1 acres

    Headlands Subarea:                     20.4 acres

    Jane Addams Park Subarea:            5.3 acres

    Dime Pier Subarea:                     53.5  acres

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

31870     JOURNAL--CITY COUNCIL--CHICAGO     9/14/2016



FINAL FOR PUBLICATION

NORTH DOCK TRANSIENT BOAT SLIPS

EXHIBIT 28

TRANSIENT BOAT SLIPS

SECURITY ZONE

TRANSIENT BOAT SLIPS

PLANNED DEVELOPMENT NUMBER 527, AS AMENDED

APPLICANT:    NAVY PIER INC.
ADDRESS:      600 EAST GRAND AVENUE
INTRODUCED:   JUNE 23, 2014
PLAN COMMISSION:   AUGUST 18, 2016

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# EXHIBIT 3

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# REQUEST FOR QUALIFICATIONS AND PROPOSAL

## PART I

## TRANSIENT BOAT SLIP DEVELOPER & OPERATOR

## NAVY PIER



Navy Pier, Inc.

May 25, 2016

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# TABLE OF CONTENTS

Section 1          Invitation and Overview

Section 2          Objectives, Scope of Service and Timeline

Section 3          RFQ/P Process and Submission Requirements

Section 4          Evaluation Criteria

Section 5          Conditions and Disclosures


Exhibits:          1. Deal Parameters

                   2. RFQ/P Process Timeline

                   3. Navy Pier Background & Performance Data

                   4. Proposed Layout

                   5. Insurance Requirements

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# SECTION 1: INVITATION AND OVERVIEW

## 1.1 Invitation

Navy Pier, Inc. (NPI) is issuing Part 1 of its Request for Qualifications and Proposal for a Transient Boat Slip Developer and Operator as detailed more specifically in this RFQ/P. NPI invites firms experienced in the development and operations of transient boat slip to submit a proposal outlining their qualifications in response to this RFQ for Navy Pier's transient boat slip development.

NPI's selection of a Developer for the project will proceed as further described below.

Part I – Submission of Qualifications. Proposers are requested to submit written responses that outline their knowledge and experience in providing transient boat slip development services. Based on the Part I responses, NPI will then identify a short list of Proposers that are best qualified to participate in Part II of the selection process.

Part II – Submission of Proposals. NPI will then request the shortlisted Proposers to submit proposals in response to Part II of the RFQ/P for a transient boat slip developer.

## 1.2 Overview

Navy Pier, Inc. is a 501(c)(3) not-for-profit corporation responsible for the operation and redevelopment of Navy Pier. Under a long-term lease with the Metropolitan Pier and Exposition Authority (the "MPEA"), NPI is undertaking the renovation of Navy Pier and is now proceeding with the selection of a Transient Boat Slip Developer who may be responsible for developing, operating, and maintaining boat slips described later in this RFQ/P.

Navy Pier has been an icon and popular destination throughout much of Chicago's history. It offers a diverse and eclectic Chicago experience and is positioned in one of the most unique settings in the world. The Pier brings together city, lakefront, and water in an extraordinary context seen nowhere else.

Navy Pier is in the process of implementing its Centennial Vision. The Centennial Vision is a framework for reimagining Navy Pier as it enters its centennial year in 2016. Navy Pier is Illinois' most popular and distinctive attraction with annual attendance of 8.6 million. The Centennial Vision will build on this foundation of success to create a truly great public place, world-class attraction, and memorable experience for visitors.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Consistent with the principles outlined in the Centennial Vision, the development of transient boat slips on the north side of Navy Pier offers a unique opportunity to connect Navy Pier to the lake and the Great Lakes boating community. The transient boat slips will provide an alternative means of access to Navy Pier and serve as a catalyst to generate activity on the north side of Navy Pier and significantly enhance the guest experience there.  The dining, entertainment and other attractions at Navy Pier, both existing and planned, will serve as a significant anchor to drive boating traffic to the Pier.

Navy Pier is celebrating its centennial in 2016 and has been in its current form for nearly 20 years.  As with any destination or attraction, improvements and revisions are required to maintain  the current base of business, but also attract new untapped markets. In June of 2011, NPI issued its Centennial Vision, a framework plan that outlines  NPI's long-term vision that would guide the redevelopment of the Pier.

NPI has selected the urban design and landscape architectural firm of James Corner Field Operations ("JCFO") to lead the redesign of Navy Pier's Pierscape, its outdoor public spaces. Led by its founder  James Corner, JCFO is an award-winning  landscape architecture and urban design firm that has gained international recognition  for projects, including New York City's Highline,  a project  where  JCFO turned a 1.45-mile  stretch of an abandoned  railway  viaduct  into a thriving public park – economically  boosting  a once all-but-disregarded area of New York City.

NPI worked with Gensler to develop The Centennial Vision and the Pierscape competition that resulted in the selection of JCFO and their t e a m to  design and  implement Pierscape. Gensler continues to serve in  the role of Executive Architect NPI assisting in  the coordination of the various components of the Centennial Vision.

NPI has created a plan, with Gensler and James Corner Field Operations, that improves  the existing product and adds new revenue  producing features that  expand not  only  the demographics served, but extends the commerce on Navy Pier later into the night (and overnight via  a new hotel) and beyond  the warm months to more of a year-round  destination. Annual attendance at Navy Pier is approximately 8.6 million people and it remains the top attraction in Illinois.

The Centennial Vision breaks the Pier into  a number of discrete  components that  include the interior and exterior portions of the Pier.  The exterior  portions of Navy Pier are referred to as its "Pierscape."  The further development of the framework  plan presented in the Centennial Vision  is outlined as follows:

- * Pierscape
  - Polk Bros Park
  - Crystal Garden
  - Pier Park
  - East End
  - South Dock
- * Family and Leisure
  - Family Pavilion Remodeling
  - South Arcade Expansion and Food Court

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

- Chicago Children's Museum Expansion
* Chicago Culture
  - Chicago Shakespeare Theater Expansion
  - Additional Dining
* Events and Entertainment
  - Hotel
  - Dining and Entertainment
  - Terminal Building Restaurant

The following image shows the four sections of the Project.



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

The following provides a general description of the scope of the redevelopment projects.

## Headhouse Plaza + Polk Bros Park Promenade



This completed project includes the creation of a plaza in front of the Headhouse with the elimination of two through lanes of traffic and modifications to the signage and traffic signals to allow for the reconfiguration of traffic serving the Pier. This will lessen pedestrian interaction with traffic and increase the park-like feel of Polk Bros Park. This work included expanding the outdoor dining space for the Headhouse restaurants along with new paving, landscaping, kiosks and lighting.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537



Polk Bros. Park Fountain and Plaza

This project includes the creation of a new, highly interactive fountain that will be better connected to the Headhouse and all of Navy Pier.

## South Dock



This project includes the replacement of existing paved surfaces and landscaping; replacement of vender kiosks and covered pavilions; boat kiosks, ramps, and infrastructure; and replacement of lighting and sound systems along the South Dock from the Headhouse to the historic buildings at the east end of Navy Pier, along with the addition of new landscaping and utilities.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## South Arcade Renovation



This work includes the reconstruction of the existing South Arcade and a 5,000-square f o o t expansion of the space; a new exterior storefront system with glass doors and windows; construction of a new Grand Staircase to Pier Park; interior renovations including new finishes; and the addition of approximately 12,500 square feet of new restaurant and food court tenants within the approximately 35,000-square foot South Arcade.

## Family Pavilion Renovation



This planned improvement includes interior renovations, including new floor and ceiling finishes; new interior storefront systems for retail tenant spaces; new kiosk construction for retail and food vendors; new stairs from the first floor to second floor, and construction of new restrooms. In addition, with a new long-term lease executed with Navy Pier, Inc. the Chicago Children's Museum will be undertaking an expansion and renovation of the museum.

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

## East End Dining + Entertainment



NPI is planning to develop and construct approximately 54,000 square feet of dining and entertainment space within existing structure on the south side of the Festival Hall and within the Terminal Building structure on the east end of the Pier. Portions of this work may be undertaken by NPI, a third party, or the Hotel Developer.

## Hotel



NPI is working with a developer to add an approximately 220 room hotel along the south edge of Festival Hall. The hotel concept is expected to cater both to families as well as visitors coming to the Pier for a to-be-developed nightlife experience.

In addition to the work described above, NPI is planning to improve other components of the Pier as outlined in the Centennial Vision, including the renovation of the Crystal Garden, Pier Park, East End Park as well as the completion of Polk Bros. Park. NPI is also working closely with its cultural partner, the Chicago Shakespeare Theater, on its expansion at the Pier.

The following provides a general description of the scope of some of those redevelopment projects.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Polk Bros Park Landscaping and Roadway



The reconstruction of the southern half of Polk Bros. Park scheduled for completion in 2017, includes an east-facing sloped lawn for viewing the lake along with live performances and other entertainment and west-facing steps looking back to the City. Future work includes the north end of Polk Bros Park which consist of a new space for visitors called Wildflower Hill and in the center of the park, a welcome pavilion.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

## Crystal Garden



Future work in the Crystal Garden would include new landscaping to better accommodate cultural events and activities along with landscaping that will better connect this interior park with the planned improvements to the adjacent on-Pier park.

## Pier Park



Near term improvements to Pier Park include the addition of a new observation wheel. The new wheel is larger than its predecessor and includes climate controlled cars for a comfortable year-round guest experience. The long term renovations to the park would include the installation of an undulating walking surface that will eliminate the need for stairs and ramps within the park.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## East End Park



The East End Park reconstruction will include an elevated arc-shaped overlook and pedestrian walkway above the dock providing uninterrupted views to the horizon. The addition of landscaping will create a more comfortable and welcoming space along the lower level terrace and fountain.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## SECTION 2:  OBJECTIVES, SCOPE OF SERVICES AND TIMELINE

### 2.1 Objective

For Part I of this RFQ/P, NPI seeks to establish a shortlist of qualified transient boat slip developers that will be invited to submit proposals as part of Part II of this RFQ/P process.  The RFP will outline the scope of services requested by NPI, including financing, developing and operating boat slips at Navy Pier.



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## 2.2 Scope of Services

NPI seeks the development of transient boat slips on the north side of Navy Pier.

The Developer will manage its own development process, including financing and construction, but in coordination with NPI in order to minimize the interruption of commercial activities on the Pier and to ensure that the development is integrated with existing Navy Pier facilities and the planned dining and entertainment development.

The Developer will be expected to conceive a concept for the boat slips that is creative and consistent with the goals set forth in the Centennial Vision. This project must be developed and completed utilizing the highest standards and quality materials throughout.

In addition to planning and managing the normal and required construction activity on the Boat Slip Project, the selected Developer will be expected to:

a. Manage the construction activity in a manner that minimizes any and all disruption to the daily operation of Navy Pier and the activities of the Pier's workforce and visitors.

b. Manage and provide for the successful completion of LEED sustainability certification programs.

c. Maintain an MBE/WBE program and Equal Employment Opportunity program that meets or exceeds the established goals.

d. Manage the Boat Slip construction activities to ensure opening the boat slips at the earliest feasible date.

e. Provide all necessary utilities to operate the Boat Slip, including modifications to the existing utility system that may be required to make the necessary connections.

f. The Transient Boat Slip facility must provide restroom facilities and accommodations for their clients.

g. Operate a first class Transient Boat Slip Facility and maintained to the highest standards.

h. Operator must provide adequate staffing and security measures for the boat slips.

An economic proposal will be submitted by the prospective developers in Part II of the RFQ/P process.

## 2.3 Construction Timeline

Navy Pier will remain open to the public throughout its reconstruction. NPI intends for the construction activity for all projects, including the boat slips, to be completed with minimal disruption to its existing activities and the businesses that operate on Navy Pier.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## SECTION 3: RFQ/P PROCESS AND SUBMISSION REQUIREMENTS

### 3.1 RFQ/P Process

The Request for Qualifications and Proposal submission and review process will consist of two parts.

Part I is an open invitation to all Proposers to provide a written response outlining their qualifications, knowledge, and experience in developing and operating transient boat slips. Part I Submittals are due no later than twelve o'clock noon (12:00 PM) central time on Friday, July 8, 2016. Based on the responses submitted in Part I, NPI will select a short list of Proposers for further consideration in Part II of the RFQ/P process.

In Part II, NPI will request additional information, including a proposed boat slip concept, proposed operator, project budget, conceptual design, project schedule, financing plan and economic proposal, and other relevant information. This information is not to be submitted as part of the Proposer's Part I submittal.

Proposers are advised to carefully read the requirements for providing submittals in response to this RFQ/P as described herein. Additional information regarding this RFQ/P may be made available from time to time on the website www.navypier.com/doingbusiness. The link to any documents will be available on this website. NPI requests that all Proposers that intend to respond to this RFQ/P register Proposer's company name, contact person, title, phone number, and email with Valerie L. Hawthorne-Berry, Director of Procurement, at vhawthorne-berry@navypier.com in order to be included in future communications, including any addenda.

If the RFQ/P is amended, NPI will issue a revision by written addendum on the website noted above and notify all prospective Proposers who have provided valid contact information as stated above. Proposers are solely responsible for obtaining all such addenda and acknowledging receipt of any addenda that have been issued.

Proposers are to contact Valerie L. Hawthorne-Berry by email with questions concerning this RFQ/P and should not rely on representations, statements, or explanations other than those made in this RFQ/P or in any written addendum to this RFQ/P. No contact regarding this process, formal or informal, shall be made with staff or board of NPI or any major stakeholder entity, such as MPEA, the City of Chicago or any entity with operations on Navy Pier. Any such communication will be grounds for elimination from the process.

Written questions will be accepted via e-mail, until five (5:00) PM central time, Wednesday, June 15, 2016. Questions should be submitted in writing to vhawthorne-berry@navypier.com A summary of questions with any related responses will be issued as an addendum on the website and all Proposers who have provided Navy Pier with valid contact information will be notified via email.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

RFQ/P submittals for Part I are due no later than 12:00 PM noon central time on Friday, July 8, 2016 at Navy Pier, 600 East Grand Avenue, Chicago, IL 60611, ATTN: Navy Pier Transient Boat Slips RFQ/P Director of Procurement in the Pier's Administrative Offices on the mezzanine level of the Headhouse. Proposers must submit one (1) original unbound hard copy and six (6) bound hard copies of the RFQ/P submittal that include all information in the format outlined in this RFQ/P. In addition, an electronic copy or link to such copy of the submittal saved in PDF format should also be sent to Valerie L. Hawthorne-Berry via email or emailed link. The subject line should read "Transient Boat Slip Developer and Operator RFQ." ELECTRONIC RESPONSE"

All proposals must be submitted with a table of contents identifying page numbers in a plastic binder with section dividers for each item under Proposal Submission. Hard copy submittals and supporting documentation must be submitted in a sealed package/envelope labeled "Request for Qualifications and Proposals for Transient Boat Slip Developer – PART I." Facsimile copies will not be accepted.

A timeline showing the important dates for the RFQ/P process is attached hereto as Exhibit 2.

Proposers are solely responsible for submitting a timely and complete response to this RFQ/P on or before the stated time and date. NPI will in no way be responsible for delays caused by the U.S. Post Office or any other entity or by any occurrence. Proposals received after twelve o'clock noon (12:00) PM central time, on Friday, July 8, 2016, may be deemed non-responsive and ineligible for consideration, at NPI's discretion.

By submitting a response, Proposer agrees to accept and abide by the terms of this RFQ/P. NPI reserves the right to reject any or all submittals, to waive any informality or irregularity, and to accept any responsive submittals, which it may deem to be in the best interest of NPI. Only submittals from responsible Proposers complying with the provisions of this RFQ/P will be considered.

Submittals will be considered incomplete if they do not bear the signature of an agent of the Proposer who is authorized to contractually bind the Proposer. The submittals can be withdrawn at any time, if requested in writing, until the deadline date at which time it will be considered final.

NPI shall not be responsible for expenses incurred in obtaining the RFQ/P or preparing any submittal related to this process. Such costs shall not be included in the Proposal.

Proposals will be evaluated by NPI. NPI reserves the right, in its sole and absolute discretion, to determine which Proposers, if any, are qualified to perform the services set requested by way of this RFQ/P and to reject any or all Proposals.

## 3.2 RFQ/P SUBMISSION REQUIREMENTS

This document provides the necessary information for Proposers to prepare their Part I submittal. Proposers should carefully read the submission requirements to ensure that submittals fully and

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

accurately meet the requirements of Part I. Emphasis should be on conforming to the instructions, responding to the requirements, and ensuring the completeness and clarity of content as succinctly as possible. The following outlines the information to be included in the submittal for Part I.

## 1. Transmittal Letter

Shall serve as a Certificate of Authority and must be signed by an officer, member or partner of the Developer with authority to contractually bind the Developer. The letter shall identify the Developer and provide the name, title, address, telephone number and email address of the contact person(s) for the Developer.

## 2. Executive Summary

Provide highlights of the submittal materials and reasons your firm or team should be selected.

## 3. Developer Overview

a)  Provide an overview of the Developer's qualifications and experience. If the Developer consists of more than one firm or business entity, provide information on each.

b)  Provide a concise overview of the Developer's organizational structure, composition legal form, role of key personnel in each area of expertise proposed for the project. If a joint venture, provide all requested information for the joint venture as well as each member entity or individual.

c)  Provide a list of current Developer projects completed or underway.

d)  The Proposer should provide resumes of the key individuals that comprise the development entity and outline their role. Resumes should outline the professional experience, education, professional recognition and description of role on key relevant projects.

## 4. Qualifications

The Proposer should provide evidence of its experience and past performance on:

a)  Projects of similar scope and complexity (urban in nature) and prominence, where Proposer was the developer.

b)  Experience with transient boat slip concepts that serve a comparable demographic profile to that which would be expected at Navy Pier.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

c)  Proposer's performance record with similar projects with emphasis on timely completion.

d)  Proposer's experience and performance financing projects of a similar nature in a timely fashion.

e) Proposer's experience and performance operating projects of a similar nature in a mixed use urban environment.

f)  Experience with LEED certified projects.

The Proposer shall include examples of projects that the Proposer believes best meet the criteria above. The information must include:

a)  Project name and location.

b)  Name, address, telephone number and email address for the project owner, owner's project manager and/or owner's contact person on the project.

c)  Description of the project, including type of facility, project budget and schedule.

d)  Role and listing of services provided by the Developer.

e)  Name, title and role of key personnel used to perform services.

f)  Description of the business arrangement under which the boat slips were developed.

g)  Project start and completion dates and adherence to project schedule.

h)  Listing of claims from the last five years, which impacted Developer and the status/resolution of those claims.

<u>5. Financial Qualifications</u>

The following financial documents must be included.

a)  Financial Statements for the last three years, such as balance sheets and profit and loss statements.

b)  Evidence of current financial capabilities of the Proposer including, without limitation, references from banking institutions and accounting firms.

c)  Evidence of Proposer's experience and ability to finance the project with an identification of the range or anticipated capital necessary to develop the project.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

d)   Statement describing any litigation, arbitration or similar proceeding currently pending, or pending at any time during the past five years against the Proposer with claims exceeding $50,000.

6. Transient Boat Slip Concept

Provide a brief description of the transient boat slip concept suggested for this area along with expectations about the market segments targeted for such a development and an overview of the amenities and services that would be planned for such a project.

.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## SECTION 4: EVALUATION CRITERIA

In evaluating the Proposals, NPI will consider the quality and strength of the following:

1. Experience and Qualifications: Experience, qualifications and performance on past projects of similar quality, complexity and size.

2. Financial Stability and Capability: Demonstrated financial stability and capability of the developer.

3. Ability to Meet NPI's objectives as stated in this document.

## SECTION 5: CONDITIONS AND DISCLOSURES

The following conditions apply to the foregoing Request for Qualifications and Proposal ("RFQ/P") issued by Navy Pier, Inc. ("NPI"):

1. Participation in this RFQ/P is open to all interested firms. Where qualifications are submitted by a joint venture, consortium or teams, the team must designate one firm or individual to serve as the team lead and primary point of contact for the project. The team will need to include firms that are licensed to do business in the City of Chicago.

2. All requests for interpretation must be made in writing and submitted electronically as set forth in this document. NPI's representatives will respond to written questions. The deadline for questions and answers is set forth within Exhibit 2 in this document.

Contact with NPI staff or board is not allowed during the RFQ/P submittal process period, beginning with the issue date of this document and concluding with the selection of a Developer, except as may be initiated and authorized by NPI as part of the RFQ/P selection process. No contact with relevant stakeholder entities, such as MPEA or the City of Chicago, is allowed regarding this process during the RFQ/P process period. All communications regarding this process should be made through the email and website provided in this document.

3. By submitting its qualifications, the Proposer agrees to accept and abide by the terms and conditions of this document.

4. This document does not represent a commitment or offer by NPI to enter into an agreement with the Proposer or to pay any costs incurred in the preparation of a response to this RFQ/P.

5. Final award of any contract is contingent upon the execution of an agreement between Navy Pier, Inc. and the selected Proposer.

6. NPI reserves the right to request additional information or clarification of information provided by the Proposers when it believes such information is necessary to properly evaluate a submittal.

7. Proposers acknowledge that submittals will not be returned to the sender. NPI reserves the right to retain any ideas in a submittal regardless of whether a Proposer is selected.

8. NPI maintains a minority and female owned business enterprise procurement program for work it undertakes. With respect to this RFQ/P, NPI's goals for MBE and WBE participation in the performance of the services contemplated herein are 25% and 5%, respectively. Proposers should include a specific statement acknowledging these goals in its cover letter provided in Part I. Specific details of the Proposer's plan to incorporate MBE/WBE firms need only be provided by qualified Proposers in Part II of the selection process.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

9. NPI will require an Equal Employment Opportunity program for this project. With respect to this program, NPI will provide more detailed information with Part II of this RFQ/P process.

10. The selected Proposer is responsible for all existing and future applicable federal, state, and local taxes, whether direct or indirect, incurred in connection with this contract. NPI is exempt by law from Retailers' Occupation Tax, the Service Occupation Tax (both state and local), the Use Tax, and the Service Use Tax in Illinois on materials or services purchased in connection with this project.

11. The Proposers shall not offer any gratuities, favors or anything of monetary value to any official or employee of NPI for the purposes of influencing the outcome of the RFQ/P response selection process.

12. The Proposers shall not collude in any manner or engage in any practices with any other Proposer that may restrict or eliminate competition or otherwise restrain trade. Violation of this instruction will cause the Proposer's submittal to be rejected by NPI. This prohibition is not intended to preclude joint ventures or subcontracts.

13. Proposals that do not comply with the submittal requirements of the RFQ/P, or that contain omissions, erasures, alterations or additions not called for, or that are irregular in any way, may be rejected as nonresponsive and insufficient. Notwithstanding the foregoing, NPI reserves the right, in its sole and absolute discretion, to waive any or all failures, irregularities or informalities in a Proposal, or failures to comply with this RFQ/P, when such a waiver is considered to be a waiver in NPI's best interest. In addition to any other basis for rejection, any Proposer found to have falsified any information to NPI in relation to this or any other RFQ/P, or which has been barred from doing business with NPI, the City of Chicago or State of Illinois, or which has been convicted of a felony related to procurement contracting with any unit of government, may be rejected.

14. NPI shall have the right to reject any or all Proposals for any reason whatsoever, in its sole and absolute discretion. In addition, NPI reserves the right to: (a) reject or cancel any or all Proposals; (b) reject any portion(s) of a Proposal; (c) reissue the RFP with or without modification; (d) negotiate all Proposal elements; and (e) reject all proposals and to undertake the work contemplated herein in a different manner.

15. NPI owns all Proposals. Proposals will not be returned to Proposers. All costs and expenses incurred by each Proposer in preparing, developing and/or submitting its Proposal(s), including preparing any designs, drawings or specifications in response to this RFQ/P, shall be borne by the Proposer alone, regardless of whether or not such Proposer is awarded the work. In confirmation and furtherance thereof, NPI shall not be responsible for, nor pay or reimburse any such cost to Proposer(s) for any such costs or expenses.

16. NPI shall retain full title to and ownership of all Proposals. Unsuccessful Proposers shall retain the copyright and other intellectual property rights, if any, to the unique design elements of their Proposals; provided, however, NPI may use and reproduce any design or other elements of a Proposal that are not subject to a copyright or other intellectual property right of the Proposer, and do so in connection with the design, construction and operation of the Project.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# EXHIBIT 1.  DEAL PARAMETERS

NPI anticipates that Developer will be solely responsible for debt and equity to finance and complete the Transient Boat Slip Project.

NPI anticipates entering into a participating lease or license agreement with fixed annual payments and a variable lease or license payment tied to gross revenue from the operation of the transient boat slips.

Developer shall finance the Transient Boat Slip Project and begin construction by a specified date and complete the project at the earliest feasible date.

NPI anticipates that the agreement will include obligations for the length of the operating season and the level of services provided as part of the operation.  Commercial boat operations will be prohibited.

Navy Pier is subject to a project labor agreement with certain trade unions. In performing any construction work at navy Pier, including developing boat slips, the Developer and all of its contractors (including subcontractors of any tier), will be required to comply with the project labor agreement.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## Exhibit 2. RFQ/P Process Timeline

The dates listed below are targeted dates and subject to change.

## Submittal of Qualifications

| | |
|---|---|
| May 25, 2016 | Request for Qualifications Issued |
| June 15, 2016 | Last Day for Written Questions |
| June 22, 2016 | Response to Written Questions |
| July 8, 2016 | Part I Proposals Due |

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## EXHIBIT 3.  NAVY PIER BACKGROUND &  PERFORMANCE DATA

### Background and History

Designed in 1909, Navy Pier was the only one of five proposed public piers planned by architect and city planner Daniel Burnham, which opened in 1916 under the original name Municipal Pier No. 2. Burnham desired that the lakefront remain accessible to the general public and believed strongly that the lakefront was the property of the people. While the Pier has had many roles during its history, it has actualized Burnham's visions perhaps most vividly since its renovation in 1995 to a tourist, recreational, amusement and cultural hub for the city. It is Chicago's most popular tourist attraction and yet remains a vital site for regional culture as well.

The Pier originally served two major functions, both an indoor and outdoor civic leisure destination and as a dock for freight and passenger transport. Intended as an area to embrace nature, visitors would seek out the scenic location and take in the atmosphere during various events. For a period during World War I, the Pier's purpose was expanded to accommodate several Navy and certain Army personnel, along with the Red Cross. During World War II the Pier closed to the public to function as a Naval training facility. Over the course of World War II thousands of servicemen were trained within the Pier's refashioned facilities.

The following picture depicts Navy Pier as Municipal Pier No. 2 in its early years.

Figure 1



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

At the conclusion of the war and up until 1965, Navy Pier again was altered to house the University of Illinois at Chicago, until UIC relocated to the Chicago Circle campus in 1965 and the Pier fell into neglect. In an attempt to revitalize the Pier in 1976, the East End buildings were renovated and used as exhibition halls for summer events and festivals but over time fell back into disrepair. In 1989, the City of Chicago evaluated the Pier for potential use by the public as it once functioned. This led to the formation of the Metropolitan Pier and Exposition Authority (MPEA), which also owns McCormick Place, the purpose of which was to take control of Pier revitalization and ongoing operations. The remodeled Pier was unveiled to the public in 1995 and developed into the icon that it is today, combining dining, family entertainment, and diverse retail shops into a unique experience.

The following table shows the historical attendance of Navy Pier in its current form.

Table 1

| Navy Pier Attendance History | |
| --- | --- |
| Year | Annual Total |
| 1995 | 3.000.000 |
| 1996 | 4,500,000 |
| 1997 | 6,100,000 |
| 1998 | 8,248,000 |
| 1999 | 7,915,000 |
| 2000 | 9,060,000 |
| 2001 | 8,150,000 |
| 2002 | 8,395,000 |
| 2003 | 8,935,000 |
| 2004 | 8,750,000 |
| 2005 | 8,620,000 |
| 2006 | 8,775,000 |
| 2007 | 8,420,000 |
| 2008 | 8,305,000 |
| 2009 | 8,050,000 |
| 2010 | 8,690,000 |
| 2011 | 8,600,000 |
| 2012 | 9,175,000 |
| 2013 | 8,900,000 |
| 2014 | 8,500,000 |
| 2015 | 8,585,000 |
| Source: NPI | |

The peak attendance was 9.175 million in 2012 and has remained above eight million since 1999. Navy Pier's staying power suggests that expansions and improvements to the mixed-use destination will have similar staying power for an increased user base.

Navy Pier's commercial tenants generate approximately $110 million in annual sales from approximately 8.6 million visitors. This includes retail, restaurants, attractions and tour and dinner cruise boats.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

NPI has rental agreements with commercial boat operators running distinct operations that include sightseeing tour boats, dinner cruises, private charters and water taxis. In 2015, the tour boats at Navy Pier attracted 1.3 million passengers and generated more than $44.7 million in gross sales.

Navy Pier has attractions, restaurants, food stalls and retailers integrated throughout the Pier. The majority of commercial tenants are located in the Family Pavilion, South Arcade and along South Dock. Tenants are comprised of both local establishments and national brands. Navy Pier operates its restaurant and food kiosk spaces with a negligible vacancy rate.

In 2013, Navy Pier's sit down restaurants and food court generated $38 million in gross sales. The sit-down restaurants generated the most sales with $28.5 million or nearly $850 per square foot. The food court generated approximately $1, 250 per square foot. The renovation of the Family Pavilion and the expansion of the South Arcade provide an opportunity to remerchandise portions of the Pier.

The restaurant and dining programming throughout Navy Pier is planned to undergo some of the most significant changes during the renovations and expansion. Planned changes to the eastern half of the Pier include 54,000 square feet of new dining and entertainment paces primarily along Festival Hall. These spaces will be a complimentary and synergistic development with the proposed hotel development. The convenience of restaurants and entertainment on the Pier will not only help to serve hotel visitors but encourage longer visitation on the Pier into the evenings as well as off season.

Festival Hall is the main exhibition space on Navy Pier that can be used for public shows, trade shows and large events. Festival Hall offers 170,000 square feet of flexible and functional space. In addition, there are 36 meeting rooms totaling 44,000 square feet that can be used for a variety of uses. Festival Hall is a destination for special events such as SOFA, Winter WonderFest, and the Chicago Flower and Garden Show that all continue to draw year-round visitors. One of the largest special events held every December is Winter WonderFest, providing an influx of visitors and revenue during the winter off-season, attracting more than 635,000 visitors. Adjacent to Festival Hall there is The AON Grand Ballroom which will continue to serve as one Chicago's premier banquet facilities.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## EXHIBIT 4.    SITE PLAN/VISUAL ELEMENTS

The Boat Slip area is conceptual in nature and is intended to demonstrate how the boat slips fit within the existing structures at Navy Pier. The area designated below will be the only available area for use in the project.  While the project does not require the full use of the designated area, the project itself is limited to this area



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## EXHIBIT 5. Insurance Requirements

1.   The Developer must procure and maintain, at its own expense, for as long as the contract is in effect, the insurance coverages set forth below, in amounts specified by Navy Pier's Director of Risk Management and must provide NPI with certificates evidencing such coverage prior to performing any of the licensed  services:

   a.   **Commercial General Liability**

| **Coverage** | **Limit** |
| --- | --- |
| General Aggregate | $2,000,000 |
| Products Liability/Completed | |
| Oper. Aggregate | $1,000,000 |
| Each Occurrence | $1,000,000 |
| Personal & Advertising Injury | $1,000,000 |

Commercial General Liability Insurance written on an ISO CG 00 01 occurrence form or the equivalent. Coverage for completed operations/product liability for at least twenty-four (24) months after completion of Contractor's Work shall be maintained. Commercial General Liability aggregate limits must be on a per project basis. The Commercial General Liability policy shall specifically include ISO forms CG 20 10 and CG 20 37 ED 07 04 or the equivalent as approved by Owner.

Endorsement specifically covering the liability assumed by the Developer under this Contract or evidence of blanket contractual liability that specifically addresses the exposures of this Contract, Products & Completed Operations Liability including claims brought by divers and their tenders,  sudden & accidental seepage & pollution coverage, watercraft exclusion deleted or modified to address the exposures of this Contract, and "in rem" endorsement with minimum limits of $1,000,000 per occurrence.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

b.     **Workers' Compensation and Employer's Liability**

| Coverage | Limit |
|---|---|
| Workers' Compensation | Statutory |
| Employer's Liability | |
| Each Accident | $1,000,000 |
| Per Employee - Disease | $1,000,000 |
| Annual Aggregate - Disease | $1,000,000 |

Workers' Compensation policy should include In REM endorsement, U.S. Longshore and Harbor (USL&H) endorsement, and a Maritime Employer's Liability (MEL) endorsement (i.e., Jones Act, Death on the High Seas Act and transportation, wages, maintenance and cure). Workers' Compensation/ Employer's Liability policies shall be endorsed to waive the insurer's right of subrogation against NPI and MPEA.

c.     **Automobile Liability**

| Coverage | Limit |
|---|---|
| Bodily Injury and Property Damage | |
| Combined - Combined Single Limits | $1,000,000 |
| Uninsured/Underinsured Motorist - | |
| Occurrence | $1,000,000 |

Commercial Automobile Liability Insurance for bodily injury and property damage arising from the ownership, operation, maintenance or use of owned, non-owned, or hired vehicles, including coverage for contractual liability.

d.     **Umbrella Coverage**

| Coverage | Limit |
|---|---|
| Per Occurrence | $10,000,000 |
| General Aggregate | $10,000,000 |

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Coverage must be in excess of Commercial General Liability, Auto Liability and Employers Liability. It must be no more restrictive than the primary coverage.

e.   **Professional Liability Coverage**

| Coverage | Limit |
|---|---|
| Per Wrongful Act | $1,000,000 |
| Annual Policy Aggregate | $1,000,000 |

Definition of Professional Services must encompass all professional services associated with this agreement and the policy definition of professional service should require Navy Pier Inc. written approval and authorization.

f.   **Hull & Machinery, Protection & Indemnity (P&I) and Pollution**

| Coverage | Limit |
|---|---|
| Hull and Machinery | |
| Occurrence | Vessel Value |
| P&I | |
| Occurrence | $1,000,000 |
| Pollution | $5,000,000 |

Hull & Machinery per American Institute Hull Clauses (amended for the vessel operations at the shipyard) or equivalent to the fair market value of the vessel. Any references to "other than Company" or other Company limitations will be deleted by endorsement to the policy as respects the naming of Navy Pier as an additional assured.  Coverage to include wreck removal; P&I per P&I form SP 23 or equivalent (amended for the vessel operations at the shipyard) with a minimum limit of $1,000,000 per occurrence. Any references to "other than Company" or other Company limitations will be deleted by endorsement to the policy as respects the naming of Navy Pier as an

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

additional assured; <u>Pollution</u> per Water Quality Insurance Syndicate (WQIS) or equivalent with a minimum limit of $5,000,000.

g.   **Builder's Risk**

| <u>Coverage</u> | <u>Limit</u> |
|---|---|
| "All Risk" | Full Insurable Value |

2.   All insurance companies must be rated A-VIII or better by the A. M. Best Company.

3.   Developer's assumption of liability is independent from, and not limited in any manner by, the Developer's insurance coverage obtained pursuant to this contract, or otherwise.  All amounts owed by Developer to NPI and MPEA as a result of the liability provisions of the Developer shall be paid on demand.

4.   None of the requirements contained herein as to types and limits or NPI and MPEA approval of insurance, coverage to be maintained by the Developer are intended to and shall not in any manner limit, qualify or quantify the liabilities and obligations assumed by Developer under the Agreement, for the term of this Agreement and any other agreement with NPI and MPEA or otherwise provided by law.

5.   Developer expressly understands and agrees that any insurance or self-insurance programs maintained by NPI and MPEA shall apply in excess of and not contribute with insurance provided by them under the Agreement.

6.   All policies should be written on an occurrence basis with the exception of professional liability coverage.

7.   All policies must amend the other insurance clause to be Primary and Non Contributory for any liability arising directly or indirectly from the Services.

8.   NPI and MPEA, their facilities, agents, officers, board members and employees must be named as additional insureds on the general liability, auto liability and umbrella liability policies.

9.   Developer agrees to require its subcontractors to comply with the insurance provisions required of Developer pursuant to this Agreement unless Developer, NPI and MPEA mutually agree to modify these requirements for subcontractors whose work is of relatively small scope.  Developer agrees that it will contractually obligate its subcontractors to promptly advise Developer of any changes or lapses of the requisite insurance coverage and Developer agrees to promptly advise NPI and MPEA of any

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

such notices Developer receives from its subcontractors.  Developer agrees that it will contractually obligate its subcontractors to indemnify and hold harmless NPI and MPEA to the same extent that Developer is required to do so as provided in this Agreement. Developer assumes all responsibility for monitoring subcontractor's contracts and insurance certificates for compliance with the insurance and other provisions of this Agreement until final completion of services.

10.     Each of the insurance policies required of Contractor shall be endorsed to waive and shall require all Subcontractors of every tier to waive all subrogation rights on behalf of itself and its insurers against NPI and MPEA.

11.     If policies are canceled for any reason, thirty (30) day notice is required to be given to the Risk Management Department.

12.     Failure to obtain and maintain required insurance shall constitute a breach of the Agreement and the Developer will be liable for any and all costs, liabilities, damages and penalties resulting to NPI and MPEA from such breach, unless a written waiver of the specific insurance requirement is provided to the Developer by NPI and MPEA.

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
          Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# EXHIBIT 4

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

REQUEST FOR QUALIFICATION AND PROPOSAL

PART II

TRANSIENT BOAT SLIP DEVELOPER & OPERATOR

NAVY PIER



Navy Pier, Inc.
*22 September 2016*

# TABLE OF CONTENTS

Section 1          Invitation and Overview

Section 2          Objectives and Scope of Services

Section 3          Proposed Transient Boat Slips

Section 4          RFQ/P Process

Section 5          Submission Requirements

Section 6          Evaluation Criteria

Section 7          Conditions and Disclosures


Exhibit 1          RFQ/P Timeline

Exhibit 2          Term Sheet

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# SECTION 1:  INVITATION AND OVERVIEW

1.1 Invitation

Navy Pier, Inc. (NPI) is issuing Part II of its Request for Qualifications and Proposal for a Transient Boat Slip Developer and Operator as detailed more specifically in this RFQ/P.  NPI is inviting the short-listed firms or teams (Developers) from Part I to participate in the proposal submission.

NPI's selection of a Developer for the project will proceed as described in this RFQ/P Part II.


1.2 Overview

Navy Pier, Inc. is a 501(c)(3) not-for-profit corporation responsible for the operation and redevelopment of Navy Pier. Under a long-term lease with the Metropolitan  Pier and Exposition Authority (the "MPEA"),  NPI is undertaking the renovation  of Navy Pier and is now proceeding with the selection of a Transient Boat Slip Developer & Operator who would be responsible for developing, operating, and maintaining boat slips described later in this RFQ/P.

Navy Pier has been an icon and popular destination throughout much of Chicago's history. It offers  a diverse  and eclectic  Chicago  experience  and  is positioned  in one of the most unique settings in the  world. The Pier brings together city, lakefront, and water in an extraordinary context seen nowhere else.

Navy Pier is in the process of implementing its Centennial Vision. The Centennial Vision is a framework for reimagining Navy Pier as it enters its centennial year in 2016. Navy Pier is Illinois' most popular and distinctive attraction with annual attendance of 8.6 million. The Centennial Vision will build on this foundation of success to create a truly great public place, world-class attraction, and memorable experience for visitors.

Consistent with the principles outlined in the Centennial Vision, the development of transient boat slips on the north side of Navy Pier offers a unique opportunity to connect Navy Pier to the lake and the Great Lakes boating community.  The transient boat slips will provide an alternative means of access to Navy Pier and serve as a catalyst to generate activity on the north side of Navy Pier and significantly enhance the guest experience there. The dining, entertainment and other attractions at Navy Pier, both existing and planned, will serve as a significant anchor to drive boating traffic to the Pier.

Navy Pier is celebrating its Centennial and has been in its current form for nearly 20 years.  As with any destination or attraction, improvements and revisions are required to maintain the current base of business, but also attract new untapped markets. In June of 2011, NPI issued its Centennial Vision, a framework plan that outlines NPI's long-term vision that would guide the redevelopment of the Pier.

NPI has selected the urban design and landscape architecture firm of James Corner Field Operations ("JCFO") to lead the redesign of Navy Pier's Pierscape, its outdoor public spaces. Led by its founder  James Corner, JCFO is an award-winning  landscape architecture and urban design firm that has gained international  recognition  for projects, including New York City's  Highline,  a project  where  JCFO turned a 1.45-mile  stretch  of an abandoned railway viaduct  into a  thriving public park – economically boosting  a once all-but-disregarded  area of New York City.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

NPI worked with Gensler to develop The Centennial Vision and the Pierscape design competition that resulted in the selection of JCFO and their team to design and implement Pierscape. Gensler continues to serve in the role of Executive Architect assisting NPI in the coordination of the various components of the Centennial Vision.

NPI has  created  a  plan with Gensler  and  James  Corner  Field  Operations  that  improves   the existing product and adds new revenue  producing features that expand not  only the demographics served, but extends the commerce on Navy Pier later into the night (and overnight with  a new hotel) and beyond the warm months to more of a year-round  destination. Annual attendance at Navy Pier is approximately 8.6 million people and it remains the top attraction in Illinois.

## SECTION 2: OBJECTIVE AND SCOPE OF SERVICES

2.1 Objective

The objective of this RFQ/P is outlined in the scope of services requested by NPI and includes financing, developing and operating transient boat slips at Navy Pier.

2.2 Scope of Services

NPI seeks the development of transient boat slips on the north side of Navy Pier.

The Developer will manage its own development process, including financing and construction, but in coordination with NPI in order to minimize the interruption of commercial activities on the Pier and to ensure that the development is integrated with existing Navy Pier facilities and the planned dining and entertainment development.

The Developer will be expected to conceive a concept for the boat slips that is creative and consistent with the goals set forth in the Centennial Vision. This project must be developed and completed utilizing the highest standards and quality materials throughout.

In addition to planning and managing the normal and required construction activity on the Transient Boat Slip Project, the selected Developer will be expected to:

a.  Manage the construction activity in a manner that minimizes any and all disruption to the daily operation of Navy Pier and the activities of the Pier's workforce and visitors.

b.  Manage and provide for the successful completion of LEED sustainability certification programs.

c.  Maintain an MBE/WBE program and Equal Employment Opportunity program that meets or exceeds the established goals.

d.  Manage the Boat Slip construction activities to ensure opening the boat slips at the earliest feasible date.

e.  Provide all necessary utilities to operate the Boat Slip, including modifications to the existing utility system that may be required to make the necessary connections.

f.  The Transient Boat Slip facility must provide restroom facilities and accommodations for their clients.

g.  Operate a first class Transient Boat Slip Facility and maintained to the highest standards.

h.  Operator must provide adequate staffing and security measures for the boat slips.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# SECTION 3:  PROPOSED TRANSIENT BOAT SLIPS

NPI anticipates entering into a License Agreement with a Developer based upon the business terms outlined in a Term Sheet that is proposed and negotiated as part of this RFP process.  Under the License Agreement, the Developer would commit to the financing, development and operation of transient boat docking facilities in a manner that meets the goals of NPI and within a time frame acceptable to NPI.

The Project shall be designed in a first class manner and shall be consistent from a design standpoint with the recently completed improvements.  The facilities shall include a publicly accessible floating walkway immediately adjacent to the North Dock of Navy Pier and running the length of the North Dock.  The Project may limit public access to docks perpendicular to the length of Navy Pier and connected to the floating public walkway.  The Project shall include any necessary physical improvements to Navy Pier to provide a connection between the existing Pier and the newly installed boat docking facilities.  The publicly accessible walkway shall be accessed at multiple locations along the length of Navy Pier and such locations should provide connections to locations where access from the south side of the Pier currently exists.

All necessary amenities and functions such as restrooms shall be provided within the boat docking facilities and not on Navy Pier itself.  The Developer shall be responsible for all costs to provide needed utility services to the boat docking facilities, including any necessary infrastructure changes on Navy Pier itself.

NPI has been working with the Chicago Navy Memorial Foundation, Inc. to locate a memorial honoring veterans of the United States maritime services.  The location of the memorial would be in the water at the west end of the north side of Navy Pier in the approximate location designated on Figure 1.  The Developer may locate boat docking facilities in this location but such facilities would need to be removed when the Navy Memorial Foundation commences its improvements.  Final plans for the memorial and the necessary fundraising activities have not been completed so the date of the commencement of the Foundation's improvements is not known at this time and is subject to a variety of contingencies.

NPI anticipates entering into a participating lease or license agreement with fixed annual payments and a variable lease or license payment tied to gross revenue from the operation of the transient boat slips.  The Developer will be solely responsible for all debt and equity to finance and complete the Transient Boat Slip Project and would be responsible for securing all approvals necessary to construct and operate the transient boat docks.

The Developer shall finance the Transient Boat Slip Project and begin construction by a specified date and complete the project at the earliest feasible date.  The construction of the boat slips shall be completed with minimal disruption to Navy Pier's ongoing operations and that of the businesses that operate on Navy Pier.

The Developer will be expected to comply with the insurance provisions provided in Part I of this RFQ/P.

NPI anticipates that the agreement will include obligations for the length of the operating season and the level of services provided as part of the operation.  Commercial boat operations will be prohibited.

Navy Pier is subject to a project labor agreement with certain trade unions. In performing any construction work at Navy Pier, including developing boat slips, the Developer  and all of  its contractors (including subcontractors  of any tier), will be  required to comply with the Project Labor Agreement.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537



*Figure 1.*

# SECTION 4: RFQ/P PROCESS

4.1 RFQ/P Process

Proposers are advised to carefully read the requirements for providing submittals in response to this RFQ/P as described herein. Additional information regarding this RFQ/P may be made available from time to time and will be emailed directly to the Proposers.

If this document is amended, NPI will issue a revision by written addendum on the website noted above and notify the shortlisted Proposers. Proposers are solely responsible for obtaining all such addenda and acknowledging receipt of any addenda that have been issued.

Proposers are to contact Valerie L. Hawthorne-Berry by email with questions concerning this RFQ/P and should not rely on representations, statements, or explanations other than those made in this RFQ/P or in any written addendum to this RFQ/P. No contact regarding this process, formal or informal, shall be made with staff or the Board of NPI or any major stakeholder entity, such as MPEA, the City of Chicago or any entity with operations on Navy Pier. Any such communication will be grounds for elimination from the process.

Written questions will be accepted via e-mail, until five (5:00) PM central time, Thursday, October 13, 2016. Questions should be submitted in writing to vhawthorne-berry@navypier.com. A summary of questions with any related responses will be issued as an addendum on the website and all Proposers who have provided Navy Pier with valid contact information will be notified via email.

RFQ/P submittals for Part II are due no later than 12:00 PM noon central time on Thursday, November 3, 2016 at Navy Pier's Administrative Offices on the second level of the Headhouse whose address follows:

Navy Pier
600 East Grand Avenue
Chicago, IL 60611
ATTN:   Director of Procurement
        Part II RFQ/P Submittal
        Navy Pier Transient Boat Slip Developer & Operator

Proposers must submit one (1) original unbound hard copy and six (6) bound hard copies of the RFQ/P submittal that include all information in the format outlined in this RFQ/P. In addition, an electronic copy or link to such copy of the submittal saved in PDF format should also be sent to Valerie L. Hawthorne-Berry via email or emailed link. The subject line should read "Part II RFQ/P Electronic Submittal Navy Pier Transient Boat Slip Developer & Operator"

All proposals must be submitted with a table of contents identifying page numbers in a plastic binder with section dividers for each item under Proposal Submission. Hard copy submittals and supporting documentation must be submitted in a sealed package/envelope labeled "Part II RFQ/P Submittal Navy Pier Transient Boat Slip Developer & Operator" Facsimile copies will not be accepted.

A timeline showing the important dates for the RFQ/P process is attached hereto as Exhibit 1.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Proposers are solely responsible for submitting a timely and complete response to this RFQ/P on or before the stated time and date. NPI will in no way be responsible for delays caused by the U.S. Post Office or any other entity or by any occurrence.

Proposals received after twelve o'clock noon (12:00) PM central time, on Thursday November 3, 2016, may be deemed non-responsive and ineligible for consideration, at NPI's discretion.

By submitting a response, Proposer agrees to accept and abide by the terms of this RFQ/P. NPI reserves the right to reject any or all submittals, to waive any informality or irregularity, and to accept any responsive submittals, which it may deem to be in the best interest of NPI. Only submittals from responsible Proposers complying with the provisions of this RFQ/P will be considered.

Submittals will be considered incomplete if they do not bear the signature of an agent of the Proposer who is authorized to contractually bind the Proposer. The submittals can be withdrawn at any time, if requested in writing, until the deadline date at which time it will be considered final.

NPI shall not be responsible for expenses incurred in obtaining the RFQ/P or preparing any submittal related to this process. Such costs shall not be included in the Proposal.

Proposals will be evaluated by NPI. NPI reserves the right, in its sole and absolute discretion, to determine which Proposers, if any, are qualified to perform the services set requested by way of this RFQ/P and to reject any or all Proposals.

NPI may elect to conduct interviews and/or request additional information from one or more Proposers at its discretion and may also negotiate any elements of the Developer's proposal.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# SECTION 5:  SUBMISSION REQUIREMENTS

This document provides the necessary information for Proposers to prepare their Part II submittal. Proposers should carefully read the submission requirements to ensure that submittals fully and accurately meet the requirements of Part II. Emphasis  should be  on  conforming  to  the instructions, responding  to  the  requirements,  and  ensuring the  completeness  and  clarity of content as succinctly as possible.  The following outlines the information to be included in the submittal for Part II.

## 1. Transmittal Letter

Shall serve as a Certificate of Authority and must be signed by an officer, member or partner of the Developer with authority to contractually bind the Developer.  The  letter shall identify the Developer and  provide  the  name,  title, address,  telephone  number  and email address  of the contact person(s) for the Developer.

## 2. Executive Summary

Provide highlights of the submittal materials and reasons your firm or team should be selected.

## 3. Developer Team Overview

To the extent not already provided as part of the Proposer's Part I submittal, provide information on each member of the Developer's team, including at a minimum, the architect/engineer, construction manager or general contractor, and to the extent that they are different entities, the Developer/owner and manager.  Such supplemental information should include the legal name, principal officers, background and tasks to be performed by each member of the Development Team along with the team members experience and qualifications, and comparable projects that are completed or underway.

A description of the type of entity that will develop and operate the transient boat docking facilities (e.g. corporation, LLC, joint venture, etc.) and a list of other owners of interest that may provide equity to the ownership entity and the estimated percentage of ownership of each.

## 4. Qualifications

To the extent not already provided as part of the Proposer's Part I submittal, provide information on qualifications of each member of the Developer's team as provided for in this RFQ/P Part I.

## 5. Financial Qualifications

To the extent not already provided as part of the Proposer's Part I submittal, provide the following financial documents:

a)  Financial Statements for the last three years, such as balance sheets and profit and loss statements.

b)  Evidence of current financial capabilities of the Proposer including, without limitation, references from banking institutions and accounting firms.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

c)   Evidence of Proposer's experience and ability to finance the project with an identification of the range or anticipated capital necessary to develop the project.

d)   Statement describing any litigation, arbitration or similar proceeding currently pending, or pending at any time during the past five years against the Proposer with claims exceeding $50,000.

e)   Evidence of Proposer's ability to secure the insurance as set forth in Part I of the RFQ/P.

<u>6. Transient Boat Slip Concept</u>

Provide a detailed description of the transient boat slip concept proposed for the north side of Navy Pier and an overview of the amenities and services that would be planned for such a project along with a description of how a boater would access such facilities and services.  Include an overview of the number of slips and size boats to be accommodated along with plans and renderings illustrating the proposed concept.

<u>7. Equal Employment Opportunity Plan and MBE/WBE Plan</u>

Provide a description of Proposer's Equal Employment Opportunity Plan and the plan to meet or exceed NPI's MBE and WBE goals.

<u>8. Proposed Business Terms (Exhibit 2)</u>

The Proposer shall complete Exhibit 2 indicating the business terms that it proposes for the development and operation of the transient boat slips at Navy Pier.  The Proposer shall provide terms where indicated and shall provide any comments or additional terms that it believes will be necessary for it to enter into an agreement.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## SECTION 6:  EVALUATION CRITERIA

In evaluating the Proposals, NPI will consider the quality and strength of the following:

1.   Developer Team

2.   Physical Development Proposal

3.   Proposed Concept

4.   Operation and Management Plan

5.   Project Schedule and Timeline

6.   Project Budget, Financing Plan, and Developer Financial Capability

7.   Commitment to LEED and certification level

8.   Equal Opportunity Employment Plan and MBE/WBE Plan

9.   Proposed Deal Terms (Exhibit 2:  Term Sheet)

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

# SECTION 7:  CONDITIONS AND DISCLOSURES

The following conditions apply to the foregoing Request for Qualifications and Proposal ("RFQ/P") issued by Navy Pier, Inc. ("NPI"):

1. Participation in Part II of this RFQ/P is open to the short-listed firms or teams from Part I.  The team will need to include firms that are licensed to do business in the City of Chicago.

2. All requests for interpretation must be made in writing and submitted electronically as set forth in this document. NPI's representatives will respond to written questions. The deadline for questions and answers is set forth within Exhibit 1 in this document.

   Contact  with NPI staff  or the Board  is not allowed during the  RFQ/P  submittal process  period, beginning with the issue date of this document and concluding with the selection of a Developer, except  as may be initiated  and authorized  by NPI as part  of the  RFQ/P selection  process.  No contact with relevant stakeholder entities, such as MPEA or the City of Chicago, is allowed regarding this process during the RFQ/P process period. All communications regarding this process should be made through the email and website provided in this document.

3. By submitting its qualifications, the Proposer agrees to accept and abide by the terms and conditions of this document.

4. This document does not represent a commitment or offer by NPI to enter into an agreement with the Proposer or to pay any costs incurred in the preparation of a response to this RFQ/P.

5. Final award of any contract is contingent upon the execution of an agreement between Navy Pier, Inc. and the selected Proposer.

6. NPI reserves the right to request additional information or clarification of information provided by the Proposers when it believes such information is necessary to properly evaluate a submittal.

7. Proposers acknowledge that submittals will not be returned to the sender. NPI reserves the right to retain any ideas in a submittal regardless of whether a Proposer is selected.

8. NPI maintains a minority and female owned business enterprise procurement program for work it undertakes. With respect to this RFQ/P, NPI's goals for MBE and WBE participation in the performance of the services contemplated herein are 25% and 5%, respectively.  Proposers should include a specific statement acknowledging these goals in its cover letter provided in Part II.

9. NPI will require an Equal Employment Opportunity program for this project.

10. The selected Proposer is responsible for all existing and future applicable federal, state, and local taxes, whether direct or indirect, incurred in connection with this contract. NPI is exempt by law from Retailers' Occupation Tax, the Service Occupation Tax (both state and local), the Use Tax, and the Service Use Tax in Illinois on materials or services purchased in connection with this project.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

11. The Proposers shall not offer any gratuities, favors or anything of monetary value to any official or employee of NPI for the purposes of influencing the outcome of the RFQ/P response selection process.

12. The Proposers shall not collude in any manner or engage in any practices with any other Proposer that may restrict or eliminate competition or otherwise restrain trade. Violation of this instruction will cause the Proposer's submittal to be rejected by NPI. This prohibition is not intended to preclude joint ventures or subcontracts.

13. Proposals that do not comply with the submittal requirements of the RFQ/P, or that contain omissions, erasures, alterations or additions not called for, or that are irregular in any way, may be rejected as nonresponsive and insufficient. Notwithstanding the foregoing, NPI reserves the right, in its sole and absolute discretion, to waive any or all failures, irregularities or informalities in a Proposal, or failures to comply with this RFQ/P, when such a waiver is considered to be a waiver in NPI's best interest. In addition to any other basis for rejection, any Proposer found to have falsified any information to NPI in relation to this or any other RFQ/P, or which has been barred from doing business with NPI, the City of Chicago or State of Illinois, or which has been convicted of a felony related to procurement contracting with any unit of government, may be rejected.

14. NPI shall have the right to reject any or all Proposals for any reason whatsoever, in its sole and absolute discretion. In addition, NPI reserves the right to: (a) reject or cancel any or all Proposals; (b) reject any portion(s) of a Proposal; (c) reissue the RFP with or without modification; (d) negotiate all Proposal elements; and (e) reject all proposals and to undertake the work contemplated herein in a different manner.

15. NPI owns all Proposals. Proposals will not be returned to Proposers. All costs and expenses incurred by each Proposer in preparing, developing and/or submitting its Proposal(s), including preparing any designs, drawings or specifications in response to this RFQ/P, shall be borne by the Proposer alone, regardless of whether or not such Proposer is awarded the work. In confirmation and furtherance thereof, NPI shall not be responsible for, nor pay or reimburse any such cost to Proposer(s) for any such costs or expenses.

16. NPI shall retain full title to and ownership of all Proposals. Unsuccessful Proposers shall retain the copyright and other intellectual property rights, if any, to the unique design elements of their Proposals; provided, however, NPI may use and reproduce any design or other elements of a Proposal that are not subject to a copyright or other intellectual property right of the Proposer, and do so in connection with the design, construction and operation of the Project.

17. NPI may request presentations and interviews after the submittals are received and factor such discussions into its evaluation of the proposals.

# EXHIBIT 1. RFQ/P TIMELINE

The dates listed below are targeted dates and subject to change.  All times are Central time.

| | | |
|---|---|---|
| Thursday September 22, 2016 | | Request for Proposals Issued |
| Thursday October 13, 2016 | By 5:00 PM | Last Day for Written Questions |
| Thursday October 20, 2016 | By 5:00 PM | Response to Written Questions |
| Thursday November 3, 2016 | By 12:00 PM | Part II Proposals Due |

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# EXHIBIT 2.  TERM SHEET

Proposed form of term of sheet follows.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537



**DRAFT**
**PROPOSED BUSINESS TERMS**
**TRANSIENT BOAT SLIPS**

Set forth below is an outline of the proposed business terms that would form the basis of a License Agreement between the Developer and Navy Pier Inc. (NPI) for the development and operation of transient boat slips at Navy Pier. The Proposer shall provide terms where indicated and shall provide any comments or additional terms that it believes will be necessary for it to enter into an agreement.

**LICENSEE:**  _____ [Legal entity that will execute License Agreement]

**LICENSOR:**  Navy Pier, Inc.

**LICENSED AREA:**  That portion of Navy Pier to which the boat docking facilities are attached.  The location and configuration of the boat docking facilities are more fully described and shown in Attachment A. *[The boat docking facilities will be limited to the area north of Navy Pier designated in Figure 1 of this RFQ/P.]*  The license agreement will include provisions related to the potential use of a portion of the location of the boat docking facilities by the Navy Memorial Foundation, Inc.

**PROJECT:**  The design and program of the transient boat slip Project are shown in Attachment A.

**TERM:**  The term of the License Agreement will be _____ years.

**BUDGET:**  The total development budget for the Project is estimated to be $_____, details of which are provided in Attachment B. This includes all hard and soft costs for the Project.

**PERMITTED USE:**  Licensee's use of the Licensed Area shall be for the operation of transient boat slips. The Project will consist of approximately _____ boat slips. The concept of the transient boat slips is further described in Attachment C. Licensee will be prohibited from operating a bar, restaurant, or retail store (other than the ancillary sale of sundries to meet the boating needs of the Licensee's patrons) from the transient docking facilities.  Licensee will be responsible for complying with all laws, ordinances applicable for its operation of the transient docking facilities. Only the short-term mooring of boats shall be permitted and no boats that dock in the Licensed Area shall be permitted to conduct commercial activities. *[Developer to propose limits on what constitutes short-term mooring.]*

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**ZONING APPROVALS:**   Landlord has secured the necessary zoning approvals to operate the transient boat docking facilities.  All subsequent regulatory approvals, including any Part II Zoning Approvals, will be the responsibility of the Licensee.

**DELIVERY CONDITION:**   The Licensed Area shall be licensed on an as-is basis.

**DESIGN AND CONSTRUCTION:**   The Licensee shall be responsible for the complete design, engineering, construction, and installation of the transient boat docking facilities and is responsible for completing and paying for all required permits related to the Project. Licensee shall restore any portions of Navy Pier disrupted by its construction so that it can be used by Landlord for its intended purpose.

The Project shall be designed by an architect/engineer acceptable to NPI and the Project design shall be subject to the approval of NPI.

Navy Pier is subject to a Project Labor Agreement with certain trade unions.  In performing any construction work at Navy Pier, Licensee and all of its contractors (including subcontractors of any tier) will be required to comply with the Project Labor Agreement.

Landlord has established MBE and WBE participation goals and policies for work that takes place at Navy Pier and construction by Licensee will need to be consistent with those goals and policies.

Licensee will construct its improvements in a manner that will achieve a LEED certification level of _____ for the Project and the Project will be operated in a sustainable manner (subject to further definition in the License Agreement).

**COMMENCEMENT DATE:**   The term of the License Agreement and the payment of Rent will commence on the earlier of the date the Licensee opens for business, or ____ months after Licensor delivers the Licensed Area to the Licensee for the construction of its improvements. The Licensee shall secure funding for the Project at a date mutually agreed to by the Parties.

**RENT:**   The Licensee will pay to NPI annual base rent of $_____ plus ____% of gross revenue in excess of $_____, which shall include all pre-tax revenues derived from slip rentals and other rentals and income derived from goods and services sold within the Licensed Area.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**TAXES AND UTILITIES:**
To the extent applicable, Licensee shall be responsible for paying any taxes for its separately assessed parcel to the applicable taxing authority.

Licensee shall be responsible for the cost of all utilities serving its facilities.

**MAINTENANCE & REPAIR:**
Licensee, at the expense of Licensee shall be responsible for the maintenance and repair of all of its improvements. Licensee shall maintain and operate the Licensed Area in first-class condition and manner and in accordance with all current laws, codes, and ordinances.

**SIGNAGE:**
Placement of Licensee's signage is subject to Licensor's approval.

**LANDLORD'S SPONSORSHIP AGREEMENTS:**
Landlord reserves the right to enter into agreements to grant exclusive sales or advertising rights ("Sponsorship Agreements") to certain products, brands or services ("Official Brands") on Navy Pier. To the extent permitted by law, Licensee agrees to, sell, advertise, feature, promote and display the Official Brand or Brands and no others within the same sponsorship category. Licensee shall not sell, serve, advertise, promote or display at Navy Pier any competing products, brands, or services within, from or outside of the transient boat docking facilities nor in advertisements, promotional material or displays referring to Navy Pier or utilizing Landlord's logos or service marks.

**OPERATING REQUIREMENT:**
Licensee shall be open for business from _____. *[Developer to propose operating hours and times of year during which the transient boat docking facilities will be open for business.]*

**FINANCING:**
Licensee shall be responsible for financing the design, construction, and development of the Project. Licensee's financing plan is included in its Proposal.

Prior to the commencement of construction by Licensee, it shall furnish evidence that it has funds on hand in an amount in excess of 110% of the Licensee's costs to construct and furnish the Project and shall, in addition to a performance and payment bond to be provided by Licensee's contractor, furnish a bond or letter of credit guaranteeing the Licensee's completion of such improvements.

The License Agreement shall contain additional provisions related to financing the project. Proposer shall provide any financing requirements related to its proposal.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**ATTACHMENT A**

**OUTLINE OF BOAT DOCKING AREA AND CONCEPTUAL DESIGN DRAWINGS AND RENDERINGS**

*[To be provided by Proposer/Licensee]*

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**ATTACHMENT B**

**PROPOSED DETAILED DEVELOPMENT BUDGET**

*[To be provided by Proposer/Licensee]*

**ATTACHMENT C**

**TRANSIENT BOAT SLIP CONCEPT DESCRIPTION**

*[To be provided by Proposer/Licensee]*

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**ADDENDUM NO.1**
**REQUEST FOR QUALIFICATION AND PROPOSAL PART II**
**TRANSIENT BOAT SLIP DEVELOPER & OPERATOR**
*19 October 2016*

The due date for Responses to Part II to this Request for Qualification and Proposal for a Transient Boat Slip Developer & Operator shall be extended until Thursday November 17, 2016 at 12:00 PM.

**SUPPLEMENTAL INFORMATION**

The following supplemental information is attached and is being provided in response to questions that have been received.

1. Project Labor Agreement.
2. Modifications to the Planned Development.
3. Survey of Navy Pier.
4. Plan showing approximate dimensions of space available for transient boat docking facilities. The dimension shown on the plan and the area available for the movement of boats are approximate and will be subject to subsequent confirmation with regulatory authorities and the City of Chicago Department of Water Management. This plan is being included to provide a consistent basis upon which the proposals shall be based.

**RESPONSE TO QUESTIONS**

*1. Must the Developer provide a public walkway along the entire length of the Pier?*

Yes, a public walkway along the entire length of the Pier must be provided. However, the Developer may include an alternate proposal if it so chooses, modifying the amount of public access being provided. Such alternate proposal may be considered by Navy Pier at its discretion.

*2. Are there limits on the number of days that a vessel can be docked at Navy Pier?*

The Transient Boat Docking Facilities at Navy Pier are intended for use by boaters that dock their boats on a permanent or seasonal basis at a location other than Navy Pier. As such, it is assumed that there would be no demands on vehicular parking at Navy Pier because the visitors to the Pier will have arrived and departed by boat. The intention for this facility is that it bring as many unique visitors as possible to the Pier by boat over the course of a season. The Developer shall include with its proposal a set of restrictions for the length of stay to be included in a license agreement, should it be selected as the Developer. Such restrictions should be consistent with the objectives described above.

*3. Can commercial operations that do not compete with the boats that dock on the south side of Navy Pier be included as a part of the operation of the Transient Boat Docking Facilities?*

As stated above, the intention for this facility is that it bring as many unique visitors to the Pier by boat as possible over the course of a season. The proposal should not be based upon securing any rights to commercial activities, regardless of whether they do not compete with any other boat that presently docks at Navy Pier or any other use that exists on Navy Pier itself. The Developer may submit an alternate to its proposal that includes commercial activities that do not compete with any current use on or docked at Navy Pier or in Ogden Slip. The alternate proposal should include a very clear definition of what types of commercial activities the Developer proposes to be permitted.

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
　　　　　Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM　2021CH04537

# EXHIBIT 5

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**NAVY PIER**

**LICENSE AGREEMENT**

**BETWEEN**

**NAVY PIER, INC.**
**("LICENSOR")**

**and**

**NPM VENTURE LLC**
**("LICENSEE")**

7822277_7

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

RECITALS        4

ARTICLE 1 - DEFINITIONS AND ATTACHMENTS .................................................. 5
      Section 1.1     Certain Defined Terms. ................................................................ 5
      Section 1.2     Attachments. ............................................................................... 8

ARTICLE 2 - LICENSE ............................................................................................ 9
      Section 2.1     License Granted. ........................................................................ 9
      Section 2.2     Permitted Use. ........................................................................... 9
      Section 2.3     Licensor Approval Required. .................................................... 10
      Section 2.4     Access Rights. ........................................................................... 10

ARTICLE 3 - TERM ................................................................................................ 11
      Section 3.2     Option to Extend: ...................................................................... 11
      Section 3.3     Termination. .............................................................................. 11
      Section 3.4     Holding Over. ........................................................................... 12

ARTICLE 4 - USE .................................................................................................... 12
      Section 4.1     Prompt Occupancy and Use. ..................................................... 12
      Section 4.2     Licensee Organization and Management. ................................. 13
      Section 4.3     Trade Name. ............................................................................. 13
      Section 4.4     Operating Hours. ...................................................................... 13
      Section 4.5     Compliance with Laws. ............................................................ 13

ARTICLE 5 - TERM COMMENCEMENT AND FEES ........................................... 14
      Section 5.1     Term Commencement Date. ..................................................... 14
      Section 5.2     Fees Payable. ............................................................................ 14
      Section 5.3     Base Fee. ................................................................................... 15
      Section 5.4     Percentage Fee. ........................................................................ 15
      Section 5.5     Statement of Gross Operating Revenues; Audit. ..................... 16
      Section 5.6     Payment of Fee. ........................................................................ 18

ARTICLE 6 - TAXES ............................................................................................... 18
      Section 6.1     Real Property Taxes. ................................................................. 18
      Section 6.2     Other Taxes. ............................................................................. 18
      Section 6.3     Evidence of Payment. ............................................................... 19
      Section 6.4     Right to Contest. ....................................................................... 19

ARTICLE 7 - IMPROVEMENTS ............................................................................. 20
      Section 7.1     Condition of the Docking Facilities. ........................................ 20
      Section 7.2     Licensee Improvements Timelines. .......................................... 20
      Section 7.3     Licensee's Financing. ............................................................... 22
      Section 7.4     Mechanic's Liens. ..................................................................... 24
      Section 7.5     Licensee's Improvements and Trade Fixtures. ......................... 24
      Section 7.6     Security Interest. ...................................................................... 25

7822277_7

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

| | | |
|---|---|---|
| Section 7.7 | Security Deposit. | 25 |
| ARTICLE 8 - OPERATIONS | | 28 |
| Section 8.1 | Character of Business. | 28 |
| Section 8.2 | Design | 28 |
| Section 8.3 | Additional Provisions Regarding Operations. | 28 |
| Section 8.4 | Signs and Advertising. | 30 |
| Section 8.5 | Modifications and General Appearance. | 30 |
| Section 8.6 | Exterminator Service. | 30 |
| Section 8.7 | Trash and Garbage Removal. | 30 |
| Section 8.8 | Service Contracts. | 31 |
| Section 8.9 | Environmental Requirements. | 31 |
| ARTICLE 9 - REPAIRS AND ALTERATIONS | | 35 |
| Section 9.1 | Repairs to be Made by Licensor. | 35 |
| Section 9.2 | Repairs to be Made by Licensee. | 36 |
| Section 9.3 | Damage to Licensed Area. | 37 |
| Section 9.4 | Alterations by Licensee. | 37 |
| Section 9.5 | Changes and Additions to Navy Pier. | 38 |
| ARTICLE 10 - COMMON AREAS | | 38 |
| Section 10.1 | Use of Common Areas. | 38 |
| Section 10.2 | Management and Operation of Common Areas. | 38 |
| ARTICLE 11 - - LICENSOR'S INTELLECTUAL PROPERTY/ SPONSORSHIP RIGHTS | | 39 |
| Section 11.1 | Ownership Rights. | 39 |
| Section 11.2 | Exclusive Sponsorship Agreements. | 39 |
| ARTICLE 12 - UTILITIES | | 39 |
| Section 12.1 | Water, Electricity, Telephone and Sanitary Sewer. | 39 |
| Section 12.2 | Heating, Ventilating and Air Conditioning; Natural Gas; No Propane. | 40 |
| Section 12.3 | Miscellaneous Utilities. | 40 |
| Section 12.4 | Fire Protection System. | 40 |
| Section 12.5 | Discontinuances and Interruptions of Utility Services. | 41 |
| ARTICLE 13 - INDEMNITY AND INSURANCE | | 41 |
| Section 13.1 | Indemnity by Licensee. | 41 |
| Section 13.2 | Parties Not Responsible for Acts of Others. | 41 |
| Section 13.3 | Insurance. | 42 |
| ARTICLE 14 - - DAMAGE AND DESTRUCTION | | 42 |
| Section 14.1 | Licensee's Obligation to Repair. | 42 |
| Section 14.2 | Option to Terminate License. | 43 |
| Section 14.3 | Insurance Proceeds. | 43 |

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

ARTICLE 15 - ASSIGNMENTS, TRANSFERS AND SUBLETTING ......................... 44
    Section 15.1    Licensor's Consent Required........................................ 44
    Section 15.2    Acceptance of Fee from Transferee .............................. 46

ARTICLE 16 - DEFAULTS AND REMEDIES ..................................................... 47
    Section 16.1    "Event of Default" Defined. ...................................... 47
    Section 16.2    Bankruptcy. ............................................................. 48
    Section 16.3    Remedies. ................................................................ 50
    Section 16.4    Remedies Cumulative. ............................................... 53
    Section 16.5    No Waiver. .............................................................. 53
    Section 16.6    Right to Re-Enter. .................................................... 53
    Section 16.7    Calculation of Percentage Fee Following Event of Default.......... 54
    Section 16.8    Removal of Property. ................................................ 54
    Section 16.9    Attorneys' Fees. ...................................................... 54

ARTICLE 17 - MISCELLANEOUS ................................................................. 55
    Section 17.1    Parking................................................................... 55
    Section 17.2    Marketing Program. ................................................. 55
    Section 17.3    Notices. .................................................................. 56
    Section 17.4    Estoppel Certificates. ............................................... 57
    Section 17.5    Inspections and Access by Licensor. ........................... 57
    Section 17.6    Successors and Assigns. ............................................ 57
    Section 17.7    Compliance with Laws and Regulations. ...................... 58
    Section 17.8    Americans with Disabilities Act .................................. 58
    Section 17.9    Captions and Headings. ............................................. 58
    Section 17.10    Additional or Successor Docking Facilities. .................. 59
    Section 17.11    Employment; Customers........................................... 59
    Section 17.12    Project Labor Agreements. ........................................ 61
    Section 17.13    Security. ................................................................. 61
    Section 17.14    No Joint Venture. .................................................... 62
    Section 17.15    No Modification. ...................................................... 62
    Section 17.16    Construction. .......................................................... 62
    Section 17.17    Severability. ............................................................ 62
    Section 17.18    Third Party Beneficiary. ........................................... 62
    Section 17.19    No Recording. ......................................................... 62
    Section 17.20    Corporate Licensees; Fictitious Names........................ 63
    Section 17.21    Applicable Law ........................................................ 63
    Section 17.22    Waiver of Jury Trial. ................................................ 63
    Section 17.23    Limitation of Right of Recovery Against Licensor. ......... 63
    Section 17.24    Licensee's Intellectual Property. ................................. 64
    Section 17.25    Time of Essence. ..................................................... 64
    Section 17.26    License Subject to Prime Lease. .................................. 64
    Section 17.27    Employees Appearance. ............................................ 65
    Section 17.28    Force Majeure. ........................................................ 65
    Section 17.29    Brokers................................................................... 65
    Section 17.30    Quiet Enjoyment. .................................................... 65

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("**License**") made as of the 7th day of August, 2017, ("**Effective Date**") by and between **NAVY PIER, INC.**, an Illinois not-for-profit corporation ("**Licensor**") and **NPM VENTURE LLC**, a Delaware limited liability company ("**Licensee**").

## W I T N E S S E T H:

THAT FOR AND IN CONSIDERATION of the mutual covenants and agreements in this License contained, the parties covenant and agree as follows:

## RECITALS

A.     Pursuant to the Metropolitan Pier and Exposition Authority Act, 70 ILCS 210, Metropolitan Pier and Exposition Authority, a municipal corporation and body politic of the government of the State of Illinois (the "**Authority**" or "**Prime Lessor**") holds title to, and is authorized to carry out or otherwise provide for the recreational, cultural, commercial or residential development of the real property depicted on Exhibit A and commonly known as Navy Pier, and to construct, equip, and maintain grounds, buildings and facilities for those purposes.

B.     Navy Pier, together with other property commonly known as "Polk Bros. Park", is operated as a tourist attraction.

C.     The Authority and Licensor have entered into that certain License Agreement dated April 26, 2011 (as the same has been and may be amended, the "**Prime Lease**") pursuant to which the Authority transferred to, and Licensor accepted the transfer of, responsibility for the redevelopment, management, operation and maintenance of Navy Pier, Polk Bros. Park and the parking areas, structures, landscaping, buildings and other improvements then or thereafter located thereon.

D.     Licensor is an Illinois not-for-profit corporation formed for the purposes of (a) supporting, sustaining, and investing its funds and to lessen the burdens of government in and for the redevelopment and operation of Navy Pier, so as to facilitate the ongoing recreational, educational, cultural and other development of Navy Pier for the benefit of the general public, and all activities incidental or related thereto, including, without limitation, implementation of the Framework Plan (as defined in the Prime Lease); (b) performing such other Approved Operations (as defined in the Prime Lease); and (c) supporting and benefiting the Authority through the development and operations of Navy Pier for the achievement of the Authority's own governmental purposes.

E.     Licensee is a for profit limited liability company, and desires to enter into this License for the purposes of designing, financing, constructing and operating a transient watercraft docking facility, boat slips and ancillary facilities (the "**Docking Facilities**"), subject to the terms and conditions set forth in this License.

4

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## ARTICLE 1 -DEFINITIONS AND ATTACHMENTS

**Section 1.1**     **Certain Defined Terms**.

As used in this License, the term:

"**ADA**" has the meaning set forth in Section 4.5.

"**Additional Fees**" has the meaning set forth in Section 5.2(iii).

"**Adjoining Lake Area**" means the area of water immediately adjoining Navy Pier North Dock as generally shown on the Exhibit A and within which a portion of the Docking Facilities is to be located.

"**Assessor**" has the meaning set forth in Section 6.1.

"**Authority**" has the meaning set forth in Recital A.

"**Bankruptcy Code**" has the meaning set forth in Section 16.1.1.9.

"**Base Fee**" has the meaning set forth in Section 5.3.1.

"**Base Fee Adjustment Date**" has the meaning set forth in Section 5.3.2.

"**Base Fee Adjustment Notice**" has the meaning set forth in Section 5.3.2.

"**Base Fee Commencement Date**" has the meaning set forth in Section 5.3.1.

"**Boating Season**" means that period of time from and including June 1st and ending on August 31st each calendar year.

"**Casualty**" has the meaning set forth in Section 14.1.1.

"**Common Areas**" means all areas, space, and equipment provided by Licensor or others for the common or joint use and benefit of the licensees and other occupants of Navy Pier and their employees, agents, servants, customers, patrons and other invitees, including, but not limited to, automobile parking areas, driveways, lobbies, elevators and entrances and exits thereto, employee parking areas, if any, truckways, loading docks and areas, delivery passageways, package pick-up stations, pedestrian sidewalks and ramps, landscaped areas, interior pedestrian walkway areas, exterior stairways, plazas, courts, ramps, common seating areas, first aid stations, restroom areas, comfort stations and other areas and improvements as they may be altered, reduced, expanded and replaced from time to time and shall at all times be subject to the exclusive control and management of Licensor. The presence of carts or kiosks within certain areas and facilities does not alter the character of an area as Common Areas if it otherwise would qualify as Common Areas.

"**Completion Security**" has the meaning set forth in Section 7.3.4.2.

5

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

"**Default Rate**" means an annual rate of interest equal to the lesser of (i) the maximum rate of interest for which corporate entities may lawfully contract in the State of Illinois or (ii) five percent (5%) plus the prime rate (however referred to) then in effect at Chase Bank or its successor ("**Chase**"), changing automatically and simultaneously with any announced change by Chase in the prime rate.

"**Development Agreement**" has the meaning set forth in Section 7.2.3.

"**Docking Facilities**" has the meaning set forth in Recital E, as more fully defined in Section 2.2.

"**Docking Facilities Extensions**" has the meaning set forth in Section 2.4.2.

"**Docking Facility Manager**" has the meaning set forth in Section 4.2.2.

"**Docking Facilities Trade Name**" shall be the name that Licensee shall use with respect to the Docking Facilities, and such name shall be subject to Licensor reasonable approval. Licensor agrees that such name may, but is not required to, include the name "Navy Pier". The parties agree that the initial Docking Facilities Trade Name may be "Navy Pier Marina", or "The Marina at Navy Pier" or "The Docks at Navy Pier", which name Licensee can amend, change or alter at any time, subject to Licensor reasonable approval as stated in the immediately preceding sentence.

"**Docking Facility Walkway**" has the meaning set forth in Section 2.4.2.

"**Effective Date**" has the meaning set forth in the introductory paragraph.

"**Extension Option**" has the meaning set forth in Section 3.2.

"**Extension Term**" has the meaning set forth in Section 3.2.

"**Fees**" has the meaning set forth in Section 5.2.

"**Gross Operating Revenues**" has the meaning set forth in Section 5.5.1.

"**Governmental Approvals**" has the meaning set forth in Section 5.1.2.

"**Hazardous Materials**" has the meaning set forth in Section 8.9.1.

"**Initial Term**" has the meaning set forth in Section 3.1.

"**Laws**" has the meaning set forth in Section 4.5.1.

"**Letter of Credit**" has the meaning set forth in Section 7.7.1

"**License**" has the meaning set forth in the introductory paragraph.

"**Licensed Area**" means that portion of Navy Pier and the Adjoining Lake Area shown as such on Exhibit A.

"**Licensee**" has the meaning set forth in the introductory paragraph.

"**Licensee Concept Plans**" has the meaning set forth in Section 2.2.1 and as described on Exhibit B.

"**Licensee Improvements**" has the meaning set forth in Section 7.2.1.

"**Licensee's Development Budget**" has the meaning set forth in Section 7.3.1 and as described on Exhibit E.

"**Licensee's Financing Plan**" has the meaning set forth in Section 7.3.1 and as described on Exhibit E-1.

"**Licensee's Organizational Documents**" has the meaning set forth in Section 4.2.1.

"**Licensor**" has the meaning set forth in the introductory paragraph.

"**License Year**" means the consecutive twelve (12) month period beginning with the Term Commencement Date, except that if the Term Commencement Date is other than the first day of a calendar year, then the first License Year is the period from the Term Commencement Date through the date twelve (12) months after the last day of the calendar month in which the Term Commencement Date occurs, and each subsequent License Year is the period of twelve (12) months following the last day of the prior License Year.

"**Navy Pier**", means the mixed-use project at Navy Pier at Lake Shore Drive and Grand Avenue in Chicago, Illinois, as the same may be altered, reduced, expanded or replaced from time to time.

"**Navy Pier Facility Security Plan**" has the meaning set forth in Section 17.13.

"**Navy Pier Marks**" has the meaning set forth in Section 11.1.

"**Navy Pier Planned Development**" means that certain Planned Development No. 527, established pursuant to ordinance originally adopted September 16, 1992 as amended on September 14, 2016.

"**North Dock**" means the area designated as such on Exhibit A.

"**Official Brand**" or "**Official Brands**" have the meaning set forth in Section 11.2.

"**Open for Business**" has the meaning set forth in Section 5.1.3.

"**Operating Hours**" has the meaning set forth in Section 4.4.

"**Percentage Fee**" has the meaning set forth in Section 5.4.1.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

"**Permit Approval Deadline**" has the meaning set forth in Section 5.1.2.

"**Permitted Use**" has the meaning set forth in Section 2.2.1.

"**Person**" or "**Persons**" means individual(s), corporation(s), partnership(s), firm(s), other business association(s), or governmental entity or entities, whichever is required by the context.

"**Prime Lease**" has the meaning set forth in Recital C.

"**Prohibited Successor**" has the meaning set forth in Section 15.1.2.

"**Real Estate Taxes**" has the meaning set forth in Section 6.1.

"**Season**" means the period from and including April 1 through October 31 in each calendar year following the Effective Date.

"**Security Deposit**" has the meaning set forth in Section 7.7.1.

"**Winter Season**" means the period from and including November 1 through March 31 in each calendar year.

"**Term**" means the Initial Term if and as extended during the Extension Term, or earlier terminated in accordance with the terms of this License.

"**Term Commencement Date**" has the meaning set forth in Section 5.1.1.

**Section 1.2**    <u>**Attachments**</u>.

The following documents are attached to this License, and the documents, as well as all drawings and documents prepared pursuant to it, are considered to be a part of this License:

| Exhibit A | Site Plan |
|-----------|-----------|
| Exhibit B | Licensee Concept Plans |
| Exhibit C | Reserved |
| Exhibit D | Development Agreement |
| Exhibit E | Licensee's Development Budget |
| Exhibit E-1 | Licensee's Financing Plan |
| Exhibit F | Reserved |
| Exhibit G | Form of Letter of Credit |
| Exhibit H | Insurance |
| Exhibit I | Project Labor Agreement |

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## ARTICLE 2 -LICENSE

**Section 2.1     License Granted**.

**Section 2.1.1**           Licensor licenses to Licensee, and Licensee licenses from Licensor, the Licensed Area for the Permitted Use upon and subject to the terms and conditions herein set forth.  Licensor and Licensee acknowledge and agree that this License is subject and subordinate to all of the terms and conditions of the Prime Lease as amended and/or assigned from time to time and to all restrictions and encumbrances now or hereafter encumbering Navy Pier to the extent any further or additional restrictions or encumbrances do not materially and adversely affect the rights of the Licensee hereunder.  Licensee shall at all times comply with all Laws binding on the Authority, Licensor, Licensee, Navy Pier, and the Licensed Area.  In the event any Laws or the Prime Lease are modified and prohibit or materially and substantially restrict the Permitted Use, Licensee may elect to terminate the License.  In the event this termination is the result of a change to the Prime Lease, Licensor shall be liable to Licensee for actual damages, if any, Licensee incurs by reason of such termination, subject to the limitations set forth in Section 16.1.4.

**Section 2.1.2**           The location and configuration of the Docking Facilities are shown on Exhibit B.  It is understood that Licensor neither owns nor controls the open water of Lake Michigan (the **"Adjoining Lake Area"**) upon which portions of the Docking Facilities are to be located. As regards this Adjoining Lake Area, the license granted herein is limited to the extent of Licensor's jurisdiction and authority, if any, over the Adjoining Lake Area.  Licensee shall be responsible for obtaining any rights to the Adjoining Lake Area as may be required.  If Licensor controls any portion of bottom land of such Adjoining Lake Area, such portion shall be deemed part of the Licensed Area for the Permitted Use, but in no event shall Licensee have any responsibility for the maintenance, repair or restoration of such areas, except as Licensee may find necessary for its operation.

**Section 2.2     Permitted Use**.

**Section 2.2.1**           Licensee shall design, construct, finance, maintain and operate the Docking Facilities in accordance with the terms of this License.  Licensee's use of the Licensed Area shall be for the operation of transient boat slips. The Docking Facilities will consist of approximately 132 boat slips ranging from 40' to over 100' in length, containing approximately 6,460 lineal feet of flexibly designed dock space. Licensee, in its reasonable discretion, may reconfigure the Docking Facilities to accommodate more or less slips, different boat slip sizes and lineal feet of dock space as may be desirable to meet the needs of the Permitted Use, provided, however, such reconfiguration substantially conforms to the Docking Facilities' plan approved by Licensor.  The concept of the transient boat slips is further described in Exhibit B (**"Licensee Concept Plan"**). Licensee will be prohibited from operating a bar, restaurant, or retail store (other than the ancillary sale of sundries as from time to time approved by Licensor, to meet the boating needs of the Licensee's patrons) from the Docking Facilities without Licensor's prior written approval given, withheld or conditioned in Licensor's reasonable discretion (the **"Permitted Use"**).   Subject to Licensor's reasonable approval, the Permitted Use shall include the right to sell sundry items

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

including Licensee branded merchandise, bags of ice, boating equipment and snacks. Licensee shall not be permitted to serve or sell items or provide services not within the Permitted Use.

**Section 2.2.2**           Licensee will be responsible for complying with all laws and ordinances applicable for its operation of the Docking Facilities.

**Section 2.2.3**           Only the short-term mooring of boats for no more than 2 weeks on average and no more than 30 days for any individual boat shall be permitted unless previously approved by Licensor, in its reasonable decision. Furthermore, no boats that dock in the Licensed Area shall be permitted to conduct commercial activities which compete with other uses at Navy Pier or Ogden Slip unless approved by Licensor in advance in its sole discretion. No vending (except for the sale of permitted sundry items), game, and/or other amusement devises shall be permitted without the written approval of the Licensor, who shall have complete discretion in relation to such matter.

**Section 2.3     Licensor Approval Required**.

The concepts and themes of the Docking Facilities shall be subject to Licensor's prior written approval, and any material change thereto shall require Licensor's prior written approval, such approval not to be unreasonably withheld, conditioned or delayed. Licensee's Concept Plan attached as Exhibit "B" is deemed approved.

**Section 2.4     Access Rights**.

**Section 2.4.1**           Licensor grants to Licensee the right to the non-exclusive use of the Common Areas which Licensor shall, at its sole cost and expense, (a) cause to be open at all times for public access to and from the Licensed Area to and from the public streets serving Navy Pier during all days and hours, subject to closures for emergencies and other Force Majeure events; and (b) keep, repair, maintain, restore and replace, as and when needed to cause each to be in good, clean and safe condition and in compliance with all Laws and the Prime Lease. In the event the Common Areas necessary for the Permitted Use are not substantially open for public access for any reason not caused by Licensee, and such condition results in cessation of the Permitted Use for a period of five (5) days or more during the Boating Season, the Fees shall abate on a per diem basis during the period of such non-availability.

**Section 2.4.2**           The Docking Facilities are expected to include (i) a floating walkway affixed to and immediately north of the North Dock (the **"Docking Facility Walkway"**) and (ii) boat docking facilities extending from the Docking Facilities Walkway (the **"Docking Facilities Extensions"**), where water craft will be moored. The Docking Facilities Walkway will be designed and operated to permit public access along and upon such Navy Pier Walkway, provided Licensee may limit the number of people at any one time and the hours of such access as may be reasonably necessary for the safety of its customers and their boats as well as Licensee's improvements, including setting "quiet-hours" for such purposes. Licensee shall be permitted to install gates limiting access to the Docking Facility

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

Walkway that may be locked during agreed upon hours, it being understood that it is the goal of Licensor that public access to the Docking Facilities Walkway will be permitted during Navy Pier's operating hours.  In addition, Licensee shall be permitted to install gates limiting access to the Docking Facility Extensions that may be locked at all times.

## **ARTICLE 3 -TERM**

**Section 3.1    Term:**

The initial term (the "**Initial Term**") of the License will be 25 years commencing on the Term Commencement Date, as herein defined, and ending on December 31st of the year in which the 24th anniversary of the Term Commencement Date occurs (the "**Initial Expiration Date**").

**Section 3.2    Option to Extend:**

Licensee shall have the option to extend (the "**Extension Option**") for an additional ten (10) year period (the "**Extension Term**") following the Initial Expiration Date provided that Licensee meets the following requirements (the "**Extension Requirements**"):

      **Section 3.2.1**         Licensee shall deliver to Licensor written notice of its desire to extend the License for the Extension Term no later than nine (9) months prior to the Initial Expiration Date (the "**Extension Request**").  Receipt by Licensor of Licensee's Extension Request shall not automatically trigger the Extension Term.  The Extension Request shall merely serve as notice to Licensor of Licensee's desire to extend; and

      **Section 3.2.2**         Licensee shall not be in uncured material default under the License and no event or condition exists, which with the giving of notice or the passage of time, or both, would constitute an Event of Default during the last nine (9) month period of the Initial Term; and

      **Section 3.2.3**         Licensee delivers, at the same time as the Extension Request, Licensee's plans to refurbish and upgrade the Docking Facilities, including Licensee Improvements, furniture, fixtures, and equipment, if any are deemed necessary to Licensee or are required to meet or exceed the then current industry standards in Licensor's reasonable judgment.  On or before six (6) months prior to the expiration of the Initial Term, Licensee shall post a bond or other security reasonably acceptable to Licensor to ensure timely completion of such improvements within the first year of the Extension Term.

**Section 3.3    Termination.**

Unless terminated prior to the end of the Term pursuant to the terms of this License, or extended pursuant to the Extension Option, this License terminates at the end of the Term without the necessity of any notice from either Licensor or Licensee to terminate it, and Licensee waives notice to vacate or quit the Licensed Area and agrees that Licensor is entitled to the benefit of all provisions of applicable law respecting the recovery of possession of the Licensed Area from a licensee holding over to the same extent as if statutory notice had been given.  For the period of nine (9) months before the expiration of the Term (as the same may have been extended pursuant

11

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

to Licensee's Extension Option), Licensor has the right, upon twenty-four (24) hours advance written notice, to show the Licensed Area and all parts thereof to prospective licensees during the hours of 8:00 a.m. to 7:00 p.m., and all showings shall be conducted by Licensor in such a manner as to minimize interference with Licensee's operations in the Licensed Area.  Subject to the terms and provisions hereof, Licensor shall be permitted to remove its personal property and other improvements during the period of October 1 to December 31 following the final Season of the License.

**Section 3.4**      **Holding Over**.

If Licensee is in possession of the Licensed Area or any portion thereof at the end of the Term (as the same may be extended) with the written consent of Licensor, the Term under this License becomes one of month to month upon all the terms and conditions contained in this License and such Term shall be terminable by either party on not less than thirty (30) days' prior written notice to the other party specifying the termination date of this License.  If Licensee fails to surrender the Licensed Area at the end of the Term (as the same may be extended) to Licensor, Licensee shall pay a fee during any such holdover equal to one and one-half (1½) times the Base Fee payable by Licensee to Licensor during the last License Year of the Term, prorated on a per diem basis during the period of any holdover; provided, however, if Licensee holds over for greater than ninety (90) days, in addition to other remedies available to Licensor provided in this Agreement, Licensee shall be liable for any actual damages that Licensor suffers by reason of Licensee's failure to surrender possession of the Licensed Area.  Upon request, Licensor will confirm whether or not a replacement licensee has executed an agreement and the commencement date thereof.

## ARTICLE 4 -USE

**Section 4.1**      **Prompt Occupancy and Use**.

**Section 4.1.1**      Licensee shall Open for Business in the Docking Facilities on or before the Term Commencement Date and thereafter, Licensee shall continuously use and, except as otherwise provided for herein, operate the Licensed Area for the Permitted Use during the Boating Season throughout the entire Term; and may be Open for Business during the Off-Season, conditions permitting as determined by Licensee.  Licensee shall at all times during the Term of this License, at Licensee's sole cost and expense, perform and comply with Laws now or hereafter enacted or promulgated which are applicable to the Licensed Area and the business of Licensee conducted therein and thereon.

**Section 4.1.2**      Licensee shall have the right to have boats moored in the Licensed Area at the end of the Season and throughout the Winter Season, provided, however, Licensee shall not be obligated to maintain any staff at the Licensed Area during the Winter Season.

12

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Section 4.2**     **Licensee Organization and Management**.

> **Section 4.2.1**          Licensee has delivered copies of the documents and instruments creating the Licensee entity and the operating agreement and/or bylaws by which the Licensee entity operates (the "**Licensee's Organizational Documents**").   Licensee shall maintain the Licensee's Organizational Documents in full force and effect.

> **Section 4.2.2**          It is understood that Licensee may employ a third party marina operator to manage of the Docking Facility (the "**Docking Facility Manager**"), which Docking Facility Manager shall be subject to Licensor's reasonable prior approval, which consent shall not be unreasonably withheld, conditioned or delayed.   F3 Marina is deemed approved as Licensee's initial Docking Facility Manager.

**Section 4.3**     **Trade Name**.

Unless otherwise approved by Licensor, which consent shall not be unreasonably withheld, conditioned or delayed, Licensee shall conduct business in the Docking Facilities only under the Docking Facilities Trade Name.   Licensee agrees not to change the Docking Facilities Trade Name without Licensor's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

**Section 4.4**     **Operating Hours**.

The "**Operating Hours**" for the Docking Facilities shall be twenty-four (24) hours per day, seven (7) days per week during the Boating Season, not less than sixty (60) hours per week during that portion of the Season outside the Boating Season, and such other hours as the Parties may set during the Winter Season.   Licensor shall provide access to and egress from the Licensed Area, at all times and, subject to the foregoing access rights, to the remainder of the Common Areas during Navy Pier operating hours.   Except for the Winter Season, Licensee shall staff the Docking Facilities during such Operating Hours unless otherwise approved by Licensor in its reasonable discretion.

**Section 4.5**     **Compliance with Laws**.

> **Section 4.5.1**          Subject to the terms of this License, and as may be applicable to the Docking Facilities, Licensee, its officers, agents and employees shall comply with all laws, ordinances, rules, regulations, covenants, conditions, and restrictions enacted by any governmental authority, quasi-governmental authority, or association body which has the authority to regulate the Licensed Area, including Title III of the Americans with Disabilities Act (the "**ADA**") and the provision of such auxiliary aids or alternate services as may be required by the ADA, and the Navy Pier Planned Development (collectively "**Laws**").

> **Section 4.5.2**          Licensor, its officers, agents and employees shall comply with all Laws as defined in Section 4.5.1 enacted by any governmental authority, quasi-governmental authority, or association body which has the authority to regulate Navy Pier.

13

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## ARTICLE 5 -TERM COMMENCEMENT AND FEES

**Section 5.1     Term Commencement Date**.

**Section 5.1.1**          The Term shall commence (the "**Term Commencement Date**") on the date that is the first to occur of (1) the date on which the Docking Facilities are Open for Business (as hereinafter defined) or (2) the date that is eighteen (18) months following the date on which Licensee receives all required permits and approvals for the construction and operation of the Docking Facilities for the Permitted Use.

**Section 5.1.2**          Licensee shall promptly apply for and diligently pursue all permits and governmental approvals required to construct and operate the Docking Facility for the Permitted Use (the "**Governmental Approvals**"), including but not limited to retaining an expeditor to assist with processing such Governmental Approvals, to effect receipt of such permits and approvals not later than eighteen (18) months after the Effective Date (the "**Permit Approval Deadline**").  Upon request, Licensor shall reasonably cooperate with Licensee during the Governmental Approval process.  In addition, Licensor shall request, use its best efforts and take all steps reasonably necessary to have the Prime Lessor cooperate with Licensee during the Governmental Approval process to provide whatever approvals, certifications and other acknowledgements as are needed as owner of Navy Pier. Provided however, in the event Licensee, despite its good faith diligent efforts, is unable to secure the Governmental Approvals within such eighteen-month period, Licensee shall have the right to extend the Permit Approval Deadline up to an additional six (6) months (24 months in total) provided Licensee continues to diligently pursue the Governmental Approvals.  Either Party shall have the right to terminate this License upon written notice to the other party in the event the Governmental Approvals have not been obtained within twenty four (24) month after the Effective Date.

**Section 5.1.3**          The Docking Facilities shall be considered "**Open for Business**" on the date the Docking Facilities are first open to the public for the Permitted Use, even though all Docking Facilities may not be open.

**Section 5.2     Fees Payable**.

Commencing on the Base Fee Commencement Date, Licensee shall pay Licensor for the Licensed Area, the following:

      i.Base Fee specified in Section 5.3.

      ii.Percentage Fee specified in Section 5.4.

      iii.In addition, Licensee shall pay any and all additional sums, charges or amounts of whatever nature to be paid by Licensee to Licensor in accordance with the provisions of this License, whether or not the sums, charges or amounts are referred to as additional fees (collectively referred to as "**Additional Fees**").

14

The Base Fee, Percentage Fee and the Additional Fees are collectively the "**Fees**".

**Section 5.3**     **Base Fee**.

    **Section 5.3.1**     Commencing on the Base Fee Commencement Date (as defined below), a base fee (the "**Base Fee**") shall be Fifty Thousand and 00/100 Dollars ($50,000.00) annually, payable in seven (7) equal monthly installments during each Season following the Base Fee Commencement Date. The Base Fee Commencement Date shall be the first day of the Season occurring in the calendar year following the Term Commencement Date. Provided, in the event the Term Commencement Date occurs after June 1st, the Base Fee Commencement Date shall be the first day of the Season occurring in the second calendar year following the Term Commencement Date.

    **Section 5.3.2**     Commencing on the first day of the eleventh (11th) License Year and on each five (5) year anniversary thereof, including the Extension Term, (each such date, a "**Base Fee Adjustment Date**"), the annual Base Fee shall increase (but shall not decrease) to the greater of i) Fifty Thousand and No/100 Dollars ($50,000.00) as such amount may be increased by 10% every 5-years or ii) eighty percent (80%) of the average of the total Fee payable in the lower three years of the five-License Year period just ended. Promptly following calculation of the total Fee payable for the lower three years of the five-License Year period just ended, Licensor shall calculate the adjusted Base Fee payable in accordance with the foregoing and shall so notify Licensee in writing together with its supporting calculation (a "**Base Fee Adjustment Notice**"). From and after Licensee's receipt of the Base Fee Adjustment Notice and until Licensee receives a subsequent Base Fee Adjustment Notice in accordance with the foregoing, Licensee shall pay Base Fee in the amount set forth in the Base Fee Adjustment Notice. In the event Licensee objects to the Base Fee adjustment calculation, the parties shall work together to resolve the issues, and any adjustments shall be retroactive to the Base Fee Adjustment Date.

**Section 5.4**     **Percentage Fee.**

    **Section 5.4.1**     From and after the Base Fee Commencement Date, Licensee shall pay Licensor as percentage fee ("**Percentage Fee**") an amount equal to five percent (5%) of Gross Operating Revenue over One Million and No/100 Dollars ($1,000,000.00) (the "**First Breakpoint**") and ten percent (10%) of Gross Operating Revenue in excess of One Million Seven Hundred Fifty Thousand and No/100 Dollars ($1,750,000.00) (the "**Second Breakpoint**"). (For purpose of clarity, Percentage Fee shall be five percent (5%) from the First Breakpoint to and including the Second Breakpoint, and ten percent (10%) over the Second Breakpoint, and no Percentage Fee is payable on the first One Million and No/100 Dollars ($1,000,000.00) of Gross Operating Revenue.) Percentage Fee, if any, shall be paid at the time Licensee submits its monthly report as set forth in Section 5.5.1. Provided however, Percentage Fee shall be adjusted, and credits or additional payments made, upon submittal of the annual report as set forth in Section 5.5.2.

    **Section 5.4.2**     From and after any Base Fee Adjustment Date, the First Breakpoint and the Second Breakpoint shall be adjusted as follows: i) if the adjusted Base

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

Fee is less than Eight Seven Thousand Five Hundred and No/100 ($87,500.00), then the First Breakpoint shall be increased by the same percentage as the increase in the Base Fee and the Second Breakpoint shall remain unchanged, or ii) if the adjusted Base Fee is greater than Eighty Seven Thousand Five Hundred and No/100 Dollars ($87,500.00), then the First Breakpoint shall no longer be applicable and the Second Breakpoint shall be changed to the amount that equals One Million Seven Hundred Fifty Thousand and No/100 Dollars ($1,750,000.00) + [(Adjusted Base Fee - $87,500) ÷ 10%].

**Section 5.4.3**          Computation of the amount of Percentage Fee specified herein shall be made separately with regard to each License Year. Licensee's obligation to pay Percentage Fee for the final License Year shall survive the expiration or earlier termination of this License.

**Section 5.4.4**          Licensee shall maintain electronically full and accurate books of account, records and other pertinent data (including all supporting records) of the Gross Operating Revenues and shall at Licensor's request provide Licensor with electronic copies of reports of such Gross Operating Revenues. Licensee shall, upon Licensor's request, furnish a copy, certified by the Licensee, as true, of the sales tax reports of Licensee, insofar as such reports pertain to the Docking Facilities, filed by Licensee with the governmental authority charged with the collection of sales or other tax covering any period of time for which Licensee is required to furnish a statement of Gross Operating Revenues to Licensor. Such books and records shall provide records of each day's sales so that a report of day-by-day sales can be produced, and shall be retained for a period of five (5) years after the close of each License Year. The acceptance by Licensor of any statement or any payment of Percentage Fee for any period shall not bind Licensor as to the correctness of the statement or the payment until a period of three (3) years after the end of each License Year. Licensee shall require its sublicensees, operators, licensees and concessionaires (if any and to the extent approved by Licensor) operating in the Licensed Area to keep such books of account, records and other pertinent data, to provide such sales tax reports, to retain such books and records for a period of three (3) years after the end of each License Year, all in the manner such obligations are imposed on Licensee pursuant to the provisions of this Section. Licensor shall, at its own cost, have the right to inspect and audit such books of account, records and other pertinent data at Licensee's office or the Docking Facility Manager's office and at such times as Licensor may reasonably request in order to verify the accuracy thereof.

**Section 5.5     Statement of Gross Operating Revenues; Audit**.

**Section 5.5.1**          Licensee shall, at its cost and expense, be obligated to prepare and submit to the Licensor, within twenty (20) days after the close of each month that the Docking Facilities are operating, a monthly report summarizing the Gross Operating Revenues derived from operations of the Docking Facilities at Navy Pier for the preceding month of the Term. "**Gross Operating Revenues**" shall mean any and all receipts revenues, income and proceeds of any kind derived from Licensee's use of the Licensed Area, including, but not limited to, any and all revenues (without deduction for expenses, fees or taxes, except as otherwise might be provided for herein) in connection with the operation of the Docking Facilities during the month; slip rentals (less refunds, if any); amounts received

16

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

in connection with any sales conducted within the Licensed Area such as food and sundries; fees and other revenues from services provided [such as sewage, telecommunications and electrical services]. Gross Operating Revenues shall not include (i) the sale of trade fixtures, machinery or equipment after use in Licensee's business; (ii) insurance proceeds; (iii) amounts collected and paid to government authorities for fees or taxes; (iv) sale of gift cards until redeemed; and (v) any boat slip deposits until earned and applied.

**Section 5.5.2**         Licensee shall prepare and submit an annual report summarizing the Gross Operating Revenues derived from operations from the Docking Facilities. The annual report shall show the Gross Operating Revenues and other relevant data pertaining to the Docking Facilities separately from that of any other of Licensee's operations. The annual report shall consist of one of the following, prepared and submitted at Licensee's own expense: an audited financial statement from a certified public accountant licensed to practice in the State of Illinois; or, a review report (as defined by the American Institute of Certified Public Accountants (**"AICPA"**) from a certified public accountant licensed to practice in the State of Illinois, or, such statement certified as true and correct by an officer of Licensee. Whichever of these Licensee elects to submit, the audit or review reports shall be performed in accordance with generally accepted accounting principles.

**Section 5.5.3**         The annual report on Gross Operating Revenues accompanied by the certification shall be submitted to Licensor no later than April 1 of each year. However, if this License is terminated for any reason, the annual report on Gross Operating Revenues accompanied by the accountant's certification shall be submitted to the Licensor within sixty (60) calendar days of the date of termination.

**Section 5.5.4**         The monthly and annual reports must show the Gross Operating Revenues derived from the operations from the Docking Facilities during the Term (including upon termination of the License) and other relevant data pertaining to the Docking Facilities, including the source of all revenues and any allowable deductions, if any, during the period reported, itemizing each charge and other revenue activity.

**Section 5.5.5**         All statements and reports required under this Section shall be signed and certified as to authenticity and accuracy by a duly authorized officer of Licensee.

**Section 5.5.6**         In addition, Licensee shall keep and maintain for a period of three (3) years following the expiration or termination of this License, all books and records reasonably necessary to support such reports, including, but not limited to, original invoices, tax reports, canceled checks, journals, ledgers, registers, register tapes and so forth. Licensee hereby grants Licensor, or its authorized representatives, the right to inspect, abstract, copy and audit such books and records upon fifteen (15) days' written notice of its intent to do so, such audit to be conducted at a reasonable time and place in the corporate office of the Licensee or Dock Facility Manager in Milwaukee, Wisconsin or such other location as may be agreed upon by the Parties. If an audit is conducted, and if the audit indicates that the Licensee's audited Gross Operating Revenues varies by four percent (4%) or more above the amount of Gross Operating Revenues reported to the Licensor, Licensee shall bear the costs of the audit and shall promptly remit such costs, not to exceed Two Thousand and No/100

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

Dollars ($2,000.00) in any instance, together with any Fees due to the Licensor as a result of the audit, upon request therefore by the Licensor.  In the event that the audit reveals a refund is due to Licensee from the Licensor, the Licensor shall promptly remit any balance due to Licensee.

**Section 5.6**     **Payment of Fee**.

> **Section 5.6.1**       Licensee shall pay all Fees when due and payable, without any set off or deduction or prior demand for it whatsoever, except as otherwise expressly set forth herein.  All Fees must be paid in United States currency or by wire transfer or ACH.  Any Additional Fees that become due are payable, unless otherwise provided in this License, within thirty (30) days after receipt by Licensee of an invoice therefor together with reasonably detailed back-up documentation supporting said invoice.  Licensee shall not pay any Fee earlier than one (1) month in advance.  Any Fee that is not paid within ten (10) days after it is due shall bear interest at the Default Rate from the first day due until paid.

> **Section 5.6.2**       Any payment by Licensee or acceptance by Licensor of a lesser amount than is due from Licensee to Licensor or of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying the check, that the lesser amount is payment in full, is not intended, and must not be construed, to constitute an accord and satisfaction of any dispute between Licensor and Licensee regarding sums due and payable by Licensee under this License, unless Licensor specifically deems it as such in writing.  Licensor may accept any check without prejudice to any other rights or remedies that Licensor may have against Licensee.

## ARTICLE 6 -TAXES

**Section 6.1**     **Real Property Taxes**.  In the event the Licensed Area becomes subject to property taxes or a leasehold tax with respect to the Docking Facilities, Licensee shall be obligated to timely pay prior to delinquency all such real property taxes due ("**Real Estate Taxes**") directly to the Cook County Treasurer's Office in accordance with the tax bills provided to Licensee by the Cook County Tax Assessor ("**Assessor**").  Licensee agrees to indemnify and hold Licensor, its board members, officers, agents, and employees harmless from and against the payment of all such taxes due and owing.  Licensee will furnish to Licensor, upon request, receipts of the appropriate taxing authority or other proof reasonably satisfactory to Licensor evidencing the payment of such Real Estate Taxes.  Because taxes are collected in the year following actual assessment, beginning January 1 of the final License Year of the Term, Licensor shall have the right to require Licensee to monthly pay an amount equal to one hundred three percent (103%) of the actual taxes as most recently assessed on the Licensed Area by the Assessor, prorated over twelve (12) months.  Nothing contained herein is intended to create or obligate the Assessor to assess any Real Estate Taxes against the Licensed Area, which shall be assessed and payable only if applicable law permits the Assessor to tax a license agreement of this nature.

**Section 6.2**     **Other Taxes**.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Section 6.2.1**          Except as otherwise set forth below, Licensee shall pay all taxes and assessments of every kind that arise as a result of or in connection with this License and the rights granted under it to use the Licensed Area.  Licensee shall pay the appropriate agency, or Licensor if Licensor is charged with the responsibility of collecting the taxes, before the time they become delinquent or payable under penalty, all taxes, if any, imposed on or related to Licensee's operations, inventory, furniture, trade fixtures, apparatus, equipment, or Licensee Improvements installed by Licensee, and any other property of Licensee maintained at or upon the Licensed Area.

**Section 6.2.2**          Licensee shall collect and promptly disburse all taxes required of it by federal, state and local authorities, including, but not limited to any sales, amusement or excise tax and shall pay any applicable taxes imposed upon Licensee or Licensee's personal property, or by virtue of its operations or, by virtue of this License, upon the Licensed Area.  Without limitation of the foregoing and Licensee's obligation to pay all such applicable taxes, it is acknowledged that, as of the date hereof, such taxes currently include, but are not necessarily limited to the following:  (i) boat mooring tax on dockage fee; (ii) Illinois sales tax on taxable items sold by Licensee; (iii) state/city/MPEA sales/food tax on sales of food and beverages; (iv) city head tax on payroll; and (v) state/city use tax on items purchased not for resale if not charged by the vendor.

## Section 6.3    Evidence of Payment.

Licensee shall deliver to Licensor such evidence of payment of the taxes and assessments referred to in this Article 6 as Licensor may from time to time reasonably request.

## Section 6.4    Right to Contest.

Licensee shall have the right to contest the validity or amount of any taxes imposed or assessed upon Licensee and, as to Real Estate Taxes, may do so in its own name with Licensor's full cooperation but at no out of pocket third party cost or expense to Licensor.  In conjunction with any such contest, Licensor shall make available to Licensee all information in Licensor's possession or otherwise reasonably obtainable by Licensor as Licensee may reasonably request related to a tax contest, including information required by the Assessor or other taxing authority. Licensor shall provide Licensee with government notices of assessment (or reassessment) within ten (10) days after Licensor's receipt of such notices.  Licensee, at Licensee's sole cost and expense, shall have the right to contest, with the appropriate taxing body, any taxes which Licensee is obligated to pay pursuant to the terms of this License; provided however, Licensee shall (i) give Licensor written notice of any such intention to contest at least thirty (30) days before any delinquency could occur; (ii) indemnify and hold Licensor harmless from all liability on account of such contest; (iii) take such action as is necessary to remove the effect of any lien which attached to Navy Pier, or the Licensed Area thereon due to such contest, or in lieu thereof, at Licensor's election, furnish Licensor with adequate security for the amount of the taxes due plus interest and penalties provided that such security shall not exceed 25% over the amount of the taxes being the subject matter of the contest; and (iv) in the event of a final determination adverse to Licensee, prior to enforcement, foreclosure or sale, pay the amount involved together with all penalties, fines, interest, costs, and expenses which may have accrued.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## ARTICLE 7 - IMPROVEMENTS

**Section 7.1**     **Condition of the Docking Facilities**.

The acceptance of the delivery of the Licensed Area from Licensor to Licensee will be in its "**AS IS**" condition as of the date of each such delivery.  All design and construction of the Licensee Improvements shall be performed in accordance with the terms, provisions and requirements of this License and the Development Agreement.  Licensee shall construct the Docking Facilities, in accordance with the terms and conditions set forth in the Development Agreement.  Licensee, at its sole cost and expense, shall also be responsible for relocating any and all building systems, utilities and improvements currently serving other portions of Navy Pier so that at all times throughout the Term (including during any period of construction) the operations of Navy Pier (outside of the Docking Facilities) as currently conducted are not interrupted or adversely impacted, and Licensor will not unreasonably withhold its approval of any changes to the construction plans and specifications as may be necessary in connection with any such relocation (including changes due to concealed conditions or omissions by Licensee's architect).  It is understood that Licensee may connect its utilities ("**Licensee's Utility Connection Points**") either to Licensor maintained utility connections, where available, or directly to a public utility at Licensee's discretion.  At all times during the Term of the License, Licensor shall make available and maintain in good condition and repair the following: (i) where Licensee's Utility Connection Point is to a Licensor maintained utility connection, all utilities from the Licensor's connection point to a public utility ("**Licensor's Utility Connection Points**") up to Licensee's Utility Connection Point; (ii) the sea-wall adjacent to the Docking Facilities and Licensed Area; and (iii) access to the Common Areas.

**Section 7.2**     **Licensee Improvements Timelines**.

**Section 7.2.1**          Licensee shall be solely responsible for the construction of the Docking Facility (the "**Licensee Improvements**") within the Licensed Area as well as utility connections from the Licensed Area, to Licensee's Utility Connection Points or utility company connection point and all such construction shall be performed in accordance with the Development Agreement.

**Section 7.2.2**          Licensee Improvements shall generally conform to Licensee Concept Plans attached hereto as Exhibit B.  All Licensee Improvement plans ("**Licensee Improvement Plans**") are subject to prior review and approval by Licensor, which consent shall not be unreasonably withheld, conditioned or delayed, and shall be in conformance with the Licensee Concept Plans, except as modified as approved by Licensor.  Licensee shall not initiate any Licensee Improvements or other work or alterations in the Licensed Area without Licensor's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

**Section 7.2.3**          Simultaneously with the execution and delivery of this License, Licensor and Licensee shall enter into that certain development agreement (the "**Development Agreement**") in the form attached hereto as Exhibit D.  Licensee shall, at its sole cost and expense, complete all Licensee Improvements and other work to be performed

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

by it pursuant to the Development Agreement including, but not limited to, the procurement and installation of any furnishing, fixtures and equipment and approved work outside the Licensed Area necessary for the operation of the Docking Facilities.

**Section 7.2.4**            Not later than ninety (90) days after the Effective Date, Licensee shall submit an initial Licensee Improvement Plan for review and approval by the Licensor.

**Section 7.2.5**            As a condition to the granting of this License to Licensee, Licensee understands and agrees that all rights granted hereunder shall be subject, at all times, to all applicable zoning requirements and to all rules and regulations of Navy Pier, as in effect from time to time, and as established by the Licensor and provided in an electronic format to Licensee.  Licensee agrees to comply with such rules, and shall require its guests, employees, vendors, patrons, invitees and passengers to be made aware of, and to the extent possible comply with, such rules, and shall post such rules in conspicuous locations on the Docking Facilities so as to provide notice that such rules and regulations exist.  In addition, Licensee agrees to comply with all applicable laws, ordinances, rules and regulations of the United States, the State of Illinois, City of Chicago, and all of their respective agencies, including, but not limited to, the United States Coast Guard (the "**Coast Guard**") and U.S. Army Corp of Engineers, with respect to the Docking Facilities or the Permitted Use within the Licensed Area.

**Section 7.2.6**            It is understood that Licensor has tentatively agreed to permit the location of a memorial facility (the "**Chicago Navy Memorial**") at the western extreme of the Licensed Area as shown on Exhibit A (the "**Chicago Navy Memorial Area**").  The Chicago Navy Memorial is generally depicted on Exhibit A and is expected to include an interactive memorial open to the general public with displays honoring the men and women that serviced in the maritime service, periodic lectures and other educational programs, the use of the facilities for private events at time approved by Licensor, and the ancillary sale of merchandise thematically related to the exhibits.  Licensor's Agreement for the Chicago Navy Memorial shall require that it shall not interfere in any manner with the use of the Docking Facilities or its operations and shall not include a fountain with spraying water if such spray encroaches onto the Licensed Area for any reason.  In addition, Licensee shall have no obligation to maintain the Chicago Navy Memorial.  It is further understood that financing and actual installation of the Chicago Navy Memorial is uncertain. Licensee may, but shall not be obligated to, utilize the Chicago Navy Memorial Area for portions of the Docking Facilities, which areas shall be included within the Licensed Area when and to the extent so utilized.  Provided, Licensee shall design and construct the Docking Facilities in a manner which will permit removal of such portions of the Docking Facilities upon 90 days' written notice that the Chicago Navy Memorial will be installed within the Chicago Navy Memorial Area.  Upon written notice from the Licensor that the Chicago Navy Memorial Area is not to be used for the Chicago Navy Memorial, Licensee shall have the exclusive right for sixty (60) days to elect to use the Chicago Navy Memorial Area for the Permitted Purpose by giving written notice to Licensor.  In the event Licensee fails to give such notice of acceptance, or fails to so utilize the Chicago Navy Memorial Area for the Permitted Purpose within 12 months of Licensor's receipt of said notice, Licensor may utilize the

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Chicago Navy Memorial Area for any alternate purpose not otherwise in conflict with the provisions of this Agreement.

**Section 7.2.7** No later than 30 days after the date of Substantial Completion Licensee shall provide to Licensor a complete copy of the Docking Facilities construction closeout documentation. This shall be provided in electronic format (PDF or similar format acceptable to Licensor). The Docking Facilities construction closeout documentation shall include:

       i. Copy of Permit(s)

       ii. General Contractor / Construction Manager As-Constructed Drawings

       iii. Sub-Contractor As-Built Drawings

       iv. Project Contact Directory

**Section 7.2.8** It is understood that construction will take place at times when Licensor's facility is otherwise open and operating. Licensor and Licensee shall use good faith efforts to coordinate the construction of the Docking Facilities with any other users and activities occurring at Navy Pier. Prior to and during the construction process, the Parties will cooperate to minimize interference with Licensee's construction of the Docking Facilities and Licensor's operations. Licensor will coordinate with Licensee to provide reasonable access to Licensee, including its employees, architects, contractors, subcontractors, materialmen and others engaged in the construction of the Docking Facilities, for the planning, design, construction, maintenance, repair, restoration and reconstruction work performed pursuant to this License. Subject to Licensor's reasonable approval and conditions, Licensee will be permitted to use (i) the access roads for ingress and egress by construction vehicles and (ii) Common Areas, all in a manner which does not adversely and unreasonably interfere with operations of Licensor or other permitted users, and as reasonably approved by Licensor, for the performance of construction, maintenance, repair, restoration and reconstruction work.

**Section 7.3**     **Licensee's Financing.**

**Section 7.3.1** Licensee's initial budget for the development, design, construction, fixturing and opening of the Docking Facilities is attached hereto as **Exhibit E** ("**Licensee's Development Budget**") and its financing plan is attached as Exhibit E-1 ("**Licensee's Financing Plan**"). Licensee's Development Budget may change, from time-to-time, and Licensee shall provide Licensor with a copy of any change which results in a net increase of five percent (5%) or more.

**Section 7.3.2** Pursuant to Licensee's Financing Plan, Licensee estimates that fifty percent (50%) of the Docking Facilities construction costs will be funded with Licensee equity and fifty percent (50%) will be funded by a construction loan or other debt. Provided however, Licensee can finance any portion of the Docking Facilities that it deems desirable and is commercially reasonable, provided such financing cannot exceed seventy percent

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

(70%) of the Docking Facilities' construction costs.  A portion of the Docking Facilities construction costs may be funded by one or more grants which, if secured shall be credited against Licensee's equity requirement.  Licensee's loan documents shall expressly provide that Licensor shall be provided with any notice of default at the same time such notice is issued to Licensee.  An uncured default by Licensee of such construction loan or debt after applicable notice and cure periods shall constitute an Event of Default under this Agreement.  Prior to commencement of construction, Licensee shall provide Licensor with proof it has secured financing, including details regarding Licensee construction loan and evidence that Licensee has secured an amount equal to one hundred ten percent (110%) of Licensee's Development Budget, which can be satisfied by any combination of a Completion Security, equity or financing.  Licensor shall execute such documents that are reasonably required by the construction lender, including a recognition agreement, provided such documents shall be consistent with and shall not alter or modify any material term of this Agreement, including the terms and provisions of Article 15, except that Licensee's lender shall be permitted to succeed to the interests of Licensee in the event of a foreclosure of its lien against the leasehold estate and its improvements.  Any subsequent transfer of this License shall be subject to the terms of Article 15.

**Section 7.3.3**          Upon completion of the Docking Facilities, Licensee shall be permitted to secure permanent financing of the Docking Facilities not to exceed eighty five percent (85%) of its fair market value.  Licensor shall execute a recognition agreement and such other financing documents reasonably requested by Licensee's lender, provided, such documents shall be consistent with and shall not alter or modify any material term of this Agreement, including the terms and provisions of Article 15, except that Licensee's lender shall be permitted to succeed to the interests of Licensee in the event of a foreclosure of its lien against the leasehold estate and its improvements.  Any subsequent transfer of this License shall be subject to the terms of Article 15.

**Section 7.3.4**          Prior to the commencement of any demolition or construction on Navy Pier or construction of any Licensee Improvements thereon, Licensee shall deliver to Licensor the following:

> **7.3.4.1** Subject to the terms of Section 7.6.4 below, a secondary assignment of all construction contracts, documents, permits, and licenses required to complete the Licensee Improvements, as to the Docking Facilities, pursuant to which Licensor or its nominee shall have the right, but not the obligation, upon the occurrence of an Event of Default after all applicable notice and cure periods to cause the completion of the Licensee Improvements and to operate the Docking Facilities.

> **7.3.4.2** A a completion bond or other security (the "**Completion Security**") in the amount (not to exceed 110% of the Docking Facilities project cost), form and substance as may be acceptable to Licensor from a surety reasonably acceptable to Licensor which would enable Licensor to cause the completion and opening of the Docking Facilities in the event of an uncured Event of Default.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Section 7.4**     **Mechanic's Liens**.

No work performed by Licensee pursuant to this License, whether in the nature of erection, construction, alteration, or repair, shall be deemed to be for the immediate use and benefit of Licensor, and no mechanic's or other lien shall be allowed against the estate of Licensor, or against the Licensed Area or any portion of Navy Pier under any circumstances whatsoever. Licensee shall assure that provisions in all contracts and subcontracts for Licensee Improvements shall be inserted stating that no mechanic's liens will be asserted against Licensor's interest in the Licensed Area, the property of which the Licensed Area is a part, or any portion of Navy Pier.  Licensee shall pay, on time, all persons furnishing labor or materials with respect to any work performed by Licensee or its contractors on or about the Licensed Area.  If any mechanic's or other liens shall, at any time, be filed against the Licensed Area or the property of which the Licensed Area is a part, and/or any portion of Navy Pier by reason of, or related in any way to, work, labor, services, or materials performed or furnished, or alleged to have been performed or furnished, to Licensee, the Licensed Area, and/or to anyone utilizing the Licensed Area by, through, or under Licensee, then Licensee shall cause the same to be discharged of record or bonded over to the satisfaction of Licensor.  If Licensee shall fail to cause such lien to be so discharged within thirty (30) days after the recording or filing of such lien, then same shall constitute an Event of Default, provided, however, Licensee may contest same if Licensee bonds over the lien or establishes a title indemnify over it.  In such event, and in addition to any other right or remedy of Licensor, Licensor may (but shall not be obligated to) discharge the same by paying the amount claimed to be due, and the amount so paid by Licensor, including attorneys' fees incurred by Licensor either in defending against such lien or in procuring the discharge of such lien, together with interest thereon at the Default Rate, and an additional administration fee of five percent (5%), shall all be due and payable by Licensee to Licensor as Additional Fees. Licensor may draw upon and utilize the Letter of Credit required herein to pay such expenses.

**Section 7.5**     **Licensee's Improvements and Trade Fixtures**.

**Section 7.5.1**          Subject any rights available to Licensor by law and provided Licensee is not then in default, within thirty (30) days of the last day of the Term, Licensee shall have the right to remove Licensee Improvements (including the Docking Facilities) and trade fixtures, whether temporary or permanent in character, made in or upon the Licensed Area.  Any Licensee Improvements or property that remains after such date shall become Licensor's property and shall remain upon the Licensed Area without compensation to Licensee.  Provided, however, that Licensor shall have the right to require Licensee, by written notice to Licensee given no later than 60 days prior to the last day of the Term, to remove any Licensee Improvements at Licensee's sole cost and expense within thirty (30) days following the earlier of the expiration or early termination of this License.  Licensee shall repair any damage to the Licensed Area caused by the removal of any Licensee Improvements.  If Licensee fails to remove Licensee Improvements within 30 days following the expiration or early termination of this License, Licensor shall have the right, but not the obligation, to cause such removal and Licensee shall pay Licensor an amount equal to one hundred and five percent (105%) of the costs of such removal.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

**Section 7.6**    **Security Interest**.

**Section 7.6.1**    To protect Licensor in the event Licensee defaults hereunder, and subject to the terms and provisions of Section 7.6.4 below, Licensee hereby grants to Licensor a security interest in Licensee Improvements, certain goods, inventory, equipment, fixtures and personal property belonging to Licensee or in which Licensee has an interest which are or may be affixed or attached to or otherwise placed upon the Licensed Area during the Term and, if any, all proceeds of the foregoing and all of the other rights and property (the "**Collateral**").

**Section 7.6.2**    Except as set forth in Section 7.6.4 below, Licensee shall keep the Collateral free and clear of all liens, claims, security interests, encumbrances and rights of others at all times during the Term and shall not acquire any goods, inventory, equipment, fixtures or personal property for the Licensed Area pursuant to security agreements, conditional sales contracts, leases or other arrangements whereby a security interest or title is retained or the right is reserved to remove or repossess such goods, inventory, equipment, fixtures or personal property.

**Section 7.6.3**    Subject to the superior right of Licensee's lenders, as described in Section 7.6.4 below, the security interest granted hereby shall secure all amounts to be paid by Licensee to Licensor hereunder, and any other indebtedness of Licensee to Licensor, and is in addition to the Security Deposit.

**Section 7.6.4**    Notwithstanding anything contained herein to the contrary, the grant of a security interest herein shall be subject and subordinated to a first and prior security interest to be created by Licensee in the rights and property referred to in the preceding paragraph to (a) secure a construction loan or other loans to be made by one or more banks, financial institutions, or other commercial or private lenders providing loans to Licensee, (b) parties selling or leasing any goods, inventory, equipment or other personal property to Licensee pursuant to conditional sales contracts or leases ("**Party**" or "**Parties**") to finance a portion of the costs of constructing, furnishing and equipping the Licensed Area and of other costs of opening the Licensed Area for business. The foregoing banks, financial institutions, commercial lenders and Parties are referred to herein collectively as the "**First Lienholder**" or "**First Lienholders**." Each First Lienholder shall be a reputable bank, financial institution, commercial lender or Party and shall enter into any transaction with Licensee in the ordinary and usual course of its business. Licensor agrees, upon the reasonable request of Licensee and at Licensee's sole expense to enter into any reasonable agreements or instruments evidencing the subordination of Licensor's security interest as outlined herein. Notwithstanding anything herein to the contrary, Licensor does not agree to subordinate its security interest granted herein to any lien in favor of Licensee's shareholders, future partners or any other investor.

**Section 7.7**    **Security Deposit**.

**Section 7.7.1**    Prior to commencement of construction, Licensee shall deliver to Licensor a security deposit ("**Security Deposit**"), in the form of an irrevocable and

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

unconditional letter of credit ("**Letter of Credit**"), in the amount of Fifty Thousand and no/100 Dollars ($50,000.00). Provided, the Letter of Credit may be reduced to Twenty Five Thousand and No/100 Dollars ($25,000.00) from and after the 5th anniversary of the Term Commencement Date. The Letter of Credit shall be issued by a national banking institution acceptable to Licensor, and having offices, for drawing purposes, in Chicago, Illinois. Licensor, in its sole and absolute discretion, may permit Licensee to provide the Security Deposit in the form of cash deposit instead of a Letter of Credit. In such event, and to the fullest extent permitted by applicable law, Licensor shall not be obligated to place such cash Security Deposit in an interest-bearing account, nor to segregate such funds from Licensor's other accounts. The use, application, or retention of the Security Deposit, or any portion thereof, by Licensor shall not prevent Licensor from exercising any other right or remedy provided by this License or by law, it being intended that Licensor shall not first be required to proceed against the Security Deposit, and same shall not operate as a limitation on any recovery to which Licensor may otherwise be entitled. The Letter of Credit shall be substantially in the form attached hereto as Exhibit G, or another form reasonably satisfactory to Licensor.

**Section 7.7.2**        Licensee shall cause the Letter of Credit to remain in full force and effect during the entire Term. Therefore, Licensee shall ensure that the first Letter of Credit shall expire no earlier than twelve (12) months after its issuance, and the Letter of Credit shall state, on its face, that it shall be automatically renewable for additional twelve (12) month periods upon each expiry date, so that an unexpired Letter of Credit shall be in the possession of Licensor throughout the Term of this License and for a period of not less than sixty (60) days thereafter. The Letter of Credit shall expressly state that it shall not be subject to non-renewal absent Licensor's receipt of at least thirty (30) days' prior written notice, in which event, absent Licensee providing Licensor with a replacement Letter of Credit meeting the requirements of this License not less than fifteen (15) days prior to the expiration of the Letter of Credit, such failure shall, in Licensor's reasonable discretion, be deemed an Event of Default, and Licensor shall be entitled to draw on the entire Letter of Credit.

**Section 7.7.3**        The Security Deposit shall be held by Licensor as security for the payment by Licensee of the Fee or other amounts agreed to be paid pursuant to this License, as well as for the full and faithful performance by Licensee of all other covenants and other provisions contained in this License for which Licensee is responsible.

**Section 7.7.4**        If, at any time, Licensee is in default after written notice and the expiration of the applicable cure period (which shall include Licensee's failure to cause the Letter of Credit to be renewed as required herein), Licensor shall be entitled at its reasonable discretion, to draw on, use, apply and/or retain all or any part of the Security Deposit in payment of: (a) any Fee then due; (b) any reasonable expense incurred by Licensor in curing any such default; and/or (c) any damages, costs, and/or reasonable expenses (including reasonable attorneys' fees) incurred by Licensor due to Licensee's default and/or in causing Licensee to deliver, restore, and refund the portion of the Deposit so drawn on, used, or applied by Licensor. Subject to Licensee's obligation to replenish the Security Deposit,

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Licensee shall not be in default under this License if any draw is made by Licensor, and it compensates Licensor in full for any outstanding monetary obligations of Licensee.

**Section 7.7.5**        If Licensor draws on, uses, or applies the Security Deposit, or any portion thereof, then Licensee shall be obligated to restore the Security Deposit to its original amount within five (5) business days after Licensor's application of a cash Security Deposit or draw on the Letter of Credit. The Security Deposit shall be for the benefit of Licensor and its successors and assigns, shall be expressly assignable, and in the event of a Letter of Credit, same shall entitle Licensor or its successors or assigns to draw from time-to-time under the Letter of Credit in Chicago, Illinois, in whole or in part upon presentation of a sight draft. Licensee agrees that in the event of any assignment of the Letter of Credit, Licensor shall have the right, at its sole cost, to transfer or assign the Letter of Credit, as well as any unused proceeds related to any prior draws, to such assignee. Furthermore, in the event Licensor transfers the Security Deposit to its successors or assigns, Licensee shall look solely to such transferee for return of the Security Deposit. Licensee shall, within five (5) business days of request by Licensor, execute such further instruments or assurances as Licensor may deem reasonably necessary to evidence or confirm Licensor's transfer or assignment of the Security Deposit to such transferee, as well as the release of Licensor's obligations with respect thereto.

**Section 7.7.6**        Among other things, it is expressly understood that any proceeds received by Licensor as a result of a draw on the Letter of Credit ("**Draw Proceeds**"), or any application of a cash Security Deposit, will not be considered an advance payment of any Fee, nor a measure or limit of Licensor's damages resulting from any Licensee default hereunder (whether past, present, or future). Any delays in Licensor's draw on the Letter of Credit or in Licensor's use of the Draw Proceeds or cash Security Deposit will not constitute a waiver by Licensor of any of its rights hereunder with respect to the Letter of Credit, the Draw Proceeds, or a cash Security Deposit. Following any such application of any Security Deposit, Licensee will either pay to Licensor on demand the cash amount so applied in order to restore the cash Security Deposit to the full amount thereof immediately prior to such application, or cause the Letter of Credit to be replenished and redrafted to its full amount thereunder, as Licensor may require. To the fullest extent permitted by law, Licensor will not be liable for any indirect, consequential, special, or punitive damages incurred by Licensee arising from a claim that Licensor violated the Bankruptcy Code's automatic stay in connection with any draw by Licensor of any Draw Proceeds, Licensor's liability (if any) under such circumstances being limited to the reimbursement of direct costs as and to the extent expressly provided in this Section 7.7.6. Nothing in this License or in the Letter of Credit will confer upon Licensee any property rights or interests in any Draw Proceeds.

**Section 7.7.7**        So long as Licensee is not then in default under this License after written notice and the expiration of the applicable cure period, then Licensor shall return any Security Deposit which Licensor is holding at the expiration of the Term to Licensee (or at Licensor's option, to the last assignee of Licensee's interest hereunder), within the later to occur of: (i) sixty (60) days after the expiration of the Term, as same may be extended; (ii) Licensee's vacates and returns full and unencumbered possession of the Premises in

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

accordance with the terms of this License; and (iii) Licensee's satisfaction of all of its obligations under this License.

## ARTICLE 8 -OPERATIONS

**Section 8.1     Character of Business.**

In conducting its business, Licensee shall meet the standards of quality, service, cleanliness, and decor of a first-class business operated for the Permitted Use within the downtown Chicago area.

**Section 8.2     Design .**

At all times during the Term, with respect to any renovations of Licensee Improvements undertaken by Licensee, the design of the Licensed Area shall be subject to Licensor's written approval, which approval shall not be unreasonably withheld, conditioned or delayed. With respect to any construction work done by Licensee hereunder, Licensee agrees it shall, if required by local law or ordinance, employ a qualified engineer or architect approved by Licensor in writing, which approval shall not be unreasonably withheld, conditioned or delayed, who is experienced in design of similar businesses and who will be required by Licensee under the terms of its employment to coordinate its design efforts closely with the Licensor.

**Section 8.3     Additional Provisions Regarding Operations.**

**Section 8.3.1**          At all times during the Term and/or Licensee's use or occupancy of the Licensed Area, Licensee shall, at its sole cost and expense: (i) maintain the Licensed Area in a clean, orderly, and sanitary condition, free of insects, rodents, varmint, and other pests, and, in connection with pest control, use the same pest control provider that Licensor has in place from time-to-time (it being understood that the present contractor may change over the course of the Term); (ii) keep any garbage, trash, rubbish, or other refuse in rodent-proof containers within the Licensed Area until removed; (iii) have such garbage, trash, rubbish, and refuse removed on at least a daily basis; (iv) keep all mechanical apparatus (except for the routine noise of operating boats) free of vibration and noise which may be transmitted beyond the Licensed Area; (v) comply with all laws, ordinances, rules, and regulations of governmental agencies and authorities (including liquor licensing laws and ordinances) and recommendations of Licensor's casualty insurer and other applicable insurance rating organizations now or hereafter in effect; (ix) provide lighting of the Licensed Area and exterior signs (and/or turn the same off to the extent reasonably required by Licensor); (x) comply with and observe all Navy Pier Licensee Guidelines established by Licensor from time-to-time (xii) establish and maintain a suitable reservations system, and have sufficient number of personnel to maximize the profitability of the business in the Licensed Area; (xiii) provide its own janitorial or cleaning services for the Licensed Area, at its sole cost and expense, as set forth in Sections 8.6 and 8.8 hereof; and (xiv) comply as to its trash and refuse, at Licensee's sole cost and expense, with any requirements of Licensor at

28

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Navy Pier for recycling of recyclable refuse. Licensor reserves the right to change the Navy Pier Licensee Guidelines at any time, and shall notify Licensee of changes to the Navy Pier Licensee Guidelines.

**Section 8.3.2**          At all times during the Term and/or Licensee's use or occupancy of the Licensed Area, Licensee shall not:  (i) place or maintain any merchandise, trash, refuse, or other articles in any public walkways outside of the Licensed Area; (ii) use or permit the use of any advertising medium which is in any manner audible or visible outside of the Licensed Area, such as loudspeakers, audio players, public address systems, sound amplifiers, or playing of radio or television broadcasts within Navy Pier; (iii) permit excessive accumulations of, or burn, garbage; (iv) cause or permit any odors to emanate or to be dispelled from the Licensed Area, excluding any odors which are intrinsic to the operation of the vessels utilizing the Docking Facilities; (v) solicit business in any Common Area; (vi) distribute handbills or other advertising matter in any Common Area; (vii) permit the parking of vehicles within the Common Areas except in designated areas, or permit Licensee's employees to park in the Common Areas or anywhere on Navy Pier excluding the parking garages; (viii) receive or ship articles of any kind outside the designated loading areas and/or outside the designated loading times from time to time agreed to by the Parties for the Licensed Area; (ix) use Navy Pier corridors, or any other Common Area adjacent to the Licensed Area, for the sale or display of any merchandise or for any other business, occupation or undertaking; (x) conduct or permit to be conducted any auction, fire sale, going out of business sale, bankruptcy sale, unless directed by a court order, or other similar type discounting, sale, or promotion in or connected with the Licensed Area (but this provision shall not restrict the absolute freedom of Licensee in determining its own selling prices, nor shall it preclude the conduct of periodic seasonal, or occasional promotional or clearance sales); (xi) use or permit the use of any portion of the Licensed Area for any unlawful purpose, or for any activity of a type which is not generally considered appropriate for regional first-class boat mooring facilities, and/or nationally renowned public attractions conducted in accordance with good and generally accepted standards of operation; (xii) place a load upon any portion of Navy Pier which exceeds the load which such area was designed to accommodate; (xiii) display any vendor signage or display or use any articles, equipment or fixtures, on which any vendor name or logo is visible unless it is part of the Licensor approved store design and does not conflict with the provisions of Articles XII and/or XIII hereof; (xiv) sell, distribute, display or offer for sale any roach clip, water pipe, bong, coke spoon, cigarette papers, hypodermic syringe or other paraphernalia commonly used in the use or ingestion of illicit drugs, or any pornographic, lewd, suggestive, or "adult" newspaper, book, magazine, film, picture, representation or merchandise of any kind; or (xv) allow to continue activities or behavior of its employees, agents or patrons to create or cause an unreasonable disturbance or adversely interfere with other users of Navy Pier or the peace and quiet of adjacent neighborhoods, (it being understood that Licensee shall use commercially reasonable efforts to attempt to curtail such activities that it becomes aware of).  Moreover, Licensee shall comply with the provisions of Articles XII and XIII hereof regarding Licensor's reservation of certain rights.  Nothing set forth herein shall restrict the docking of boats at any time during the Term on a 24 hour basis, seven (7) days per week.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Section 8.3.3**        Licensee shall have the right, subject to the necessary regulatory approvals, to designate a no wake zone within the entire north slip area, and subject to Licensor's reasonable consent and the necessary regulatory approvals, to designate a no wake zone within the lake adjacent to the north slip.

**Section 8.3.4**        Licensee shall have the right to designate a no fishing area on the North Dock immediately south of the Docking Facilities.  Fishing shall be permitted on the North Dock east and west of the Docking Facilities at all times. Licensee shall have the right in its sole discretion to designate a no fishing area within the Licensed Area but will give consideration to allowing fishing from the Docking Facility Walkway (including access for such activity) at times when such activity does not present a danger to the safe operation of the Docking Facilities or interfere with its operation.

**Section 8.4    Signs and Advertising**.

Licensee shall not place or suffer to be placed or maintained on the exterior of the Licensed Area (or any part of the interior visible from the exterior thereof) any sign, banner, advertising matter, or any other thing of any kind, unless it has been placed and maintained in accordance with the prior written approval of Licensor, and unless it otherwise complies with the provisions of this License. A signage plan shall be subject to Licensor's reasonable approval in conjunction with approval of construction documents.  Such incidental visibility shall not be a violation of this Section 8.4.  Licensee shall, at its sole cost and expense, purchase the signage, and maintain such sign, decoration, lettering, advertising matter, or other thing as may be permitted hereunder in good condition and repair at all times.

**Section 8.5    Modifications and General Appearance**.

Licensee shall not change or modify any part of the Licensed Area except in accordance with Section 2.2.1 above and Section 9.4 below.  The general appearance of the Licensed Area shall be in keeping with the character and standards of the improvements within Navy Pier, as reasonably determined by Licensor from time-to-time.

**Section 8.6    Exterminator Service**.

Without limiting, but rather in addition to, Licensee's other obligations under this Article VIII, Licensee shall cause extermination services (including treatment for insects, spiders, rats, mice, moles, and other rodents) to be provided to the Licensed Area on a monthly basis during the Season and as needed during the Winter Season throughout the Term, and agrees to use the same pest control provider that Licensor has in place from time-to-time.  Provided, such service shall be provided at supplier's competitive market rate with no mark up or surcharge from Licensor.  Licensee acknowledges and agrees that the present contractor may change over the course of the Term, and Licensor shall have no liability to Licensee in connection therewith.

**Section 8.7    Trash and Garbage Removal**.

**Section 8.7.1**        Intentionally Omitted.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Section 8.7.2**        Licensee shall contract with, at Licensee's own cost and expense, the same trash removal collector that Licensor has in place from time-to-time (Licensee acknowledging and agreeing that the present contractor may change over the course of the Term, and Licensor shall have no liability to Licensee in connection therewith) for the removal from a site to be determined by Licensor of all of its rubbish, trash, garbage, and/or other refuse on a daily basis or as required by Licensor.  Provided, such service shall be provided at supplier's competitive market rate with no mark up or surcharge from Licensor

**Section 8.7.3**        Licensee has been made aware that Navy Pier management has implemented a recycling program and encourages all Licensees to participate in such program.  Licensee shall use its best efforts to comply with such program as to its personal trash and refuse throughout the Term.

**Section 8.8**    **Service Contracts**.

**Section 8.8.1**        Within ten (10) days after Licensor's request at any time during the Term, Licensee shall furnish Licensor copies of all maintenance, trash removal, and extermination contracts in effect with respect to the Licensed Area, including evidence to Licensor, of payment for services performed under such contracts.   With respect to Licensee's pest control contract, Licensee shall be obligated to provide Licensor with a monthly report during the Boating Season outlining in detail the services performed during the previous month, which report can be provided by the service provider to Licensor directly.

**Section 8.8.2**        Except where Licensee is required to use the services of Licensor's pest control provider or trash collector, all other services required to be made to the Licensed Area by Licensee shall be provided by a contractor or contractors reasonably satisfactory to Licensor, having good labor relations, and capable of working in harmony with other contractors retained by Licensor and by other tenants and licensees of Navy Pier.

**Section 8.9**    **Environmental Requirements**.

**Section 8.9.1**        During the Term:  (i) Licensee shall, at its own cost, comply with all environmental laws, and any environmental rules, regulations, orders, and codes (collectively, "**Environmental Laws**"), pertaining to the Licensed Area and the conduct of Licensee's business and Licensee's use of Navy Pier and the Licensed Area; (ii) Licensee shall not use any portion or all of Navy Pier or the Licensed Area for the generation, treatment, storage, accumulation, release, or threat of release, or disposal of, "hazardous materials;" "hazardous waste;" "hazardous substances;" "pollutants;" "toxic materials;" or "oil" (individually and collectively, "**Hazardous Materials**") as such terms are used in or defined under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601 et seq., as amended, the Resource Conservation and Recovery Act of 1976, 42 U.S.C. 6901 et seq., as amended, the Toxic Substance Control Act, and any and all other present or future environmental statutes which regulate the use of hazardous and/or dangerous substances, and the regulations promulgated thereunder and any and all present or future state and local laws, rules, and regulations, without the express prior

31

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

written consent of Licensor, and then only to extent that the presence or discharge of the Hazardous Materials is: (1) properly licensed and approved by all appropriate governmental officials and in accordance with all applicable laws and regulations; and (2) in compliance with any terms and conditions stated in the prior written approval by the Licensor. Licensee shall not dispose of Hazardous Materials in dumpsters provided by the Licensor for Licensee's disposal of ordinary refuse. Licensee shall not discharge Hazardous Materials into drains or sewers or Lake Michigan. Licensee shall not cause or allow a Release (defined hereafter) on, to, or from the Licensed Area. Licensee shall, at its own cost, arrange for the lawful transportation and off-site disposal at a properly permitted facility of all Hazardous Materials that it generates or releases. Licensee shall keep such records and obtain such permits as may be required for Licensee's activities under any and all applicable Environmental Laws. For purposes of this Section, the term "**Release**" shall mean release, leaking, spilling, disposal, exacerbation or deposit of any Hazardous Materials on, in, or from the Licensed Area.

**Section 8.9.2**        Licensee may employ normal and reasonable amounts of cleaning and pest control supplies reasonably necessary for maintenance of the Licensed Area, including Hazardous Materials used for boats and/or sold to boaters, so long as such Hazardous Materials are properly, safely, and lawfully stored and used by Licensee, and the quantity of such Hazardous Materials does not equal or exceed a "recordable quantity" as defined under 40 C.F.R. 302, as amended; provided that such storage and use is in accordance with all applicable statutes, laws, rules, and regulations and any manufacturer's instructions. Notwithstanding the foregoing, Licensee shall not Release any Hazardous Materials except as previously approved by Licensor in writing, and as provided by applicable statutes, laws, rules, and regulations and specifically may not discharge any Hazardous Materials into any public sewer, drain, drainpipe or Lake Michigan.

**Section 8.9.3**        Licensee shall promptly notify Licensor upon learning that any provision of this Section has been violated, that there has been a Release of any Hazardous Materials on any part of the Licensed Area or Navy Pier, that radon gas or urea formaldehyde has been detected on or in the Licensed Area, or that the Licensed Area is subject to any third party claim or action, or threat thereof, because of any environmental condition in, or originating on, in, from, or about the Licensed Area or Navy Pier. Licensee shall promptly provide Licensor with copies of all correspondence to and/or from third parties regarding such claims or actions or regarding environmental conditions in or originating from Licensee's operations in the Licensed Area or Navy Pier.

**Section 8.9.4**        In the event of a Release of any Hazardous Materials by Licensee or anyone acting by, through, or under Licensee, and/or any of Licensee's licensees, assignees, employees, contractors, agents, representatives, invitees, and the like (each such party, including Licensee, is a "**Licensee Party**," collectively, "**Licensee Parties**"), including the Release of any Hazardous Materials on, in, or from the Licensed Area by any Licensee Party, Licensee shall immediately cause complete remediation of the Release and restore the Licensed Area to the condition that existed before the Term Commencement Date or the date Licensee took possession of the Licensed Area for construction of Licensee Improvements, whichever is earlier. In addition, Licensee shall use reasonable efforts to

32

cause any boaters to remediate any spills caused by such boaters, provided, however, Licensee shall not be liable or responsible for any spills caused by the transient boatslip users. Licensor shall have the right, but not the obligation, to enter the Licensed Area and/or any portion of Navy Pier or adjoining property, and remediate any environmental condition on the Licensed Area to cause same to comply with all laws, regulations, and ordinances during which time Licensee shall not be entitled to any abatement of Fee. Furthermore, to the extent such environmental condition is caused or exacerbated by any Licensee Party, Licensor may complete such remediation at Licensee's sole cost and expense, plus an administrative charge of five percent (5%) of such actual out-of-pocket costs.

**Section 8.9.5**        In addition to any other indemnity required of Licensee under this License, Licensee hereby indemnifies and agrees to defend and hold Licensor, its officers, directors, officials, trustees, employees, partners, servants, and agents (each an "**Environmental Indemnified Party**," collectively, "**Environmental Indemnified Parties**"), harmless from and against and reimburse them upon demand for payments made in accordance with this Section, and for any and all damages incurred due to Licensee's breach of its obligations under this Section, Licensee's use or Release of any Hazardous Materials, or any other claim relating to or arising under any Environmental Law which may arise under Licensee's and/or any Licensee Party's occupancy or use of the Licensed Area or Navy Pier. Licensee's obligations under this Section shall survive the termination or expiration of this License, and shall not be affected in any way by the amount of, or absence in, any case of insurance coverage, or by the failure or refusal of any insurance carrier to perform any obligation on its part under insurance policies affecting the Licensed Area, or any part thereof.

**Section 8.9.6**        Nothing in this License shall limit or impair any rights or remedies of the Licensor against Licensee or any other person under any other agreement, any Environmental Law, or otherwise at law or in equity, including any rights of contribution or indemnification. Rights granted to the Licensor under this Section shall be exercisable by any Environmental Indemnity Party.

**Section 8.9.7**        Without limiting other provisions of this Section or any other provisions of this License, Licensee shall be responsible for the proper disposal of all materials, construction, and demolition debris, soil and other waste generated by Licensee's business operations, including the construction of any Licensee Improvements to the Licensed Area, all in accordance with all Environmental Laws. Licensee shall identify to Licensor any disposal site or transfer station for materials, debris, soil, or other waste of which Licensee is disposing, prior to its disposal, and shall complete and execute any form required by the Licensor identifying such site or station. Licensee shall not use or allow to be used for disposal or transfer any site or station not properly licensed or to which Licensor objects. Any substitution, for whatever reason, shall be at Licensee's cost. Licensee shall pay the cost to remove waste to a properly licensed site or station.

**Section 8.9.8**        To the extent required by law, Licensee must show evidence to the Licensor of, and keep current throughout the Term of this License: all permits of any kind (including waste hauling, special waste hauling, and disposal permits), and insurance

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

certificates required by federal, state, municipal, and/or other local governmental body or agency pursuant to any Environmental Law; copies of all load tickets, manifests, bills of lading, scale tickets, and other pertinent documents, including copies of all permits and licenses for the proposed transfer station or landfill; safety and accident reports; and records, reports, and permits required by the Illinois Environmental Protection Agency and/or the United States Occupational Safety and Health Administration, their successors, and/or other similarly empowered governmental and quasi-governmental entities. All such records and accounts shall be subject to review by the Licensor and shall be made available to the Licensor within two (2) business days following written request by Licensor, or immediately upon Licensor's oral request in the event of an emergency or apparent emergency. Licensor's review of any such records and accounts shall not limit Licensee's obligations or liability under the terms and conditions of this License or any Environmental Law.

**Section 8.9.9**      Licensor shall have no liability to Licensee (except as expressly provided in this License) or any permitted sublicensee, assignee, or occupant of the Licensed Area, or any portion thereof, or any of their respective members, employees, agents, partners, shareholders, officers, directors, contractors, licensees, or invitees, or other persons to whom Licensee has permitted entry or with whom Licensee has entered into a contract or understanding  (oral or written) to use or occupy the Licensed Area, as a result of Hazardous Materials located on the Licensed Area.

**Section 8.9.10**      Licensor reserves the right to conduct an environmental audit and inspection of the Licensed Area at any time during the Term, but not more frequent than once a calendar year to determine whether Licensee is complying, or has complied, with the terms of this Article VIII, and whether any Hazardous Materials exist in the Licensed Area in violation of the terms of this License.  Such audit shall be done at Licensor's expense, and Licensor shall not interfere with Licensee's business.

**Section 8.9.11**      Licensor represents, warrants and covenants that, to the best of its knowledge, (1) as of the date Licensor delivers possession of the Licensed Area, there shall be no Hazardous Materials in, on, under or from the Licensed Area or Navy Pier, except Hazardous Materials which are customarily used in the ordinary course of operating a first-class recreational, cultural, commercial or residential development and in material compliance with all Environmental Laws; (2) after the date Licensor delivers possession of the Licensed Area, Licensor shall not cause Hazardous Materials to be present in, on, under or from the Licensed Area as well as Navy Pier (except to the extent introduced by Licensee or which are customarily used in the ordinary course of operating a first-class recreational, cultural, commercial or residential development, and in full compliance with all Environmental Laws) or release, discharge or dispose of any Hazardous Materials in, on, under or from the Licensed Area or Navy Pier; (3) Licensor shall comply with all Environmental Laws relating to Navy Pier and shall use commercially reasonable efforts to not permit others to engage in any activity at Navy Pier in violation of any Environmental Laws; (4) there is no action, proceeding, claim, litigation, investigation or information request pending or, to Licensor's knowledge, threatened regarding the Licensed Area or Navy Pier relating to Hazardous Materials or Environmental Laws (collectively, "**Environmental Claims**"); and (5) Upon request, Licensor shall provide Licensee with copies of any

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

environmental reports in its possession so that Licensee, its agents and representatives may conduct, at Licensee's cost and expense, investigations of the environmental condition of Navy Pier (all such investigation activities are collectively called "**Environmental Investigations**").   Upon request, Licensor will promptly provide Licensee with an opportunity to review asbestos surveys for the Licensed Area and information on the location of other Hazardous Materials in the Licensed Area which are in the possession of or otherwise accessible to Licensor.   Licensor agrees to remove any asbestos containing materials in the Licensed Area during construction of the Docking Facilities.  With respect to any asbestos containing materials which are not so removed, Licensor agrees to be responsible for maintaining the condition of any asbestos containing materials present in the Licensed Area at the time of delivery in compliance with Environmental Laws, OSHA and state law requirements.

Licensor represents and warrants to Licensee that, to the best of its knowledge, as of the date Licensor delivers possession of the Licensed Area to Licensee, the Common Areas that affect Licensee's access to and use of the Licensed Area materially comply with (and no notices of violation have been received in connection therewith that have not been corrected) environmental, air quality, zoning, building, health, fire, safety and other governmental or regulatory rules, regulations, laws, ordinances, statutes, codes and requirements applicable to the Land or the Building (collectively, the "**Building Laws**"), including, without limitation, the ADA and any similar state and local rules, regulations, ordinances, statutes, codes and requirements.   Licensor shall cause Navy Pier and all of the Common Areas to be continuously in material compliance with all Building Laws (as the same may be amended **from time to time) that are enforced from time to time by the applicable government authorities.   Notwithstanding anything contained herein to the contrary, Licensee acknowledges that any ADA compliance with respect to the restrooms located in the Licensed Area are Licensee's responsibility.  Licensor's obligations hereunder are a material inducement to Licensee's entering into this License.**

**The foregoing notwithstanding, it is expressly understood that portions of Navy Pier and Polk Bros Park are within the Lindsey Light Superfund Site designated by the United States Environmental Protection Agency (https://www.epa.gov/lindsay-light) and may contain hazardous materials including but not limited to thorium and asbestos.**

## ARTICLE 9 - REPAIRS AND ALTERATIONS

### Section 9.1    Repairs to be Made by Licensor.

**Section 9.1.1**            Licensor, at its expense, will make, or cause to be made, within a reasonable period of time:

9.1.1.1 structural repairs to the existing Navy Pier infrastructure, including the seawall located adjacent to the Licensed Area (unless such repairs are caused or necessitated by the acts or omissions of any Licensee Party, in which case Licensor will make the repairs, or cause them to be made, at Licensee's sole cost and expense plus an administrative charge of five percent (5%) of such costs); and

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**9.1.1.2** repairs to base building systems outside the Licensed Area which serve the Licensed Area (unless such repairs are necessitated by the acts or omissions of any Licensee Party, in which case Licensor will make the repairs, or cause them to be made, at Licensee's sole cost and expense plus an administrative charge of five percent (5%) of such costs).

**Section 9.1.2**          Licensee shall monitor the condition of the Licensed Area and shall give Licensor notice of the necessity of any repairs to be made by Licensor under this Section 9.1 of which Licensee becomes aware. If any repairs are necessary because of the acts or omissions of Licensee, its agents, employees, invitees, licensees, or contractors, all such repairs shall be made at Licensee's sole cost and expense.

**Section 9.2**    **Repairs to be Made by Licensee.**

**Section 9.2.1**          Licensee shall make all repairs to the Licensed Area or any installations, equipment, or facilities therein at its expense, other than those repairs required to be made by Licensor pursuant to Section 9.1 or Section 14.1.

**Section 9.2.2**          Without limiting the generality of the foregoing, Licensee will keep the Licensed Area, together with all electrical, plumbing, and other mechanical installations in good working order and repair, and Licensee will make all replacements from time-to-time required thereto in Licensee's reasonable discretion and at its sole cost and expense.

**Section 9.2.3**          Licensee shall not overload the electrical wiring serving the Licensed Area or within the Licensed Area, and will install at its expense, subject to the provisions of Section 9.4, any additional electrical wiring which may be required in connection with Licensee's apparatus. Subject to insurance coverage and not intending to void any such coverage, any damage or injury sustained by any person because of mechanical, electrical, plumbing, or any other equipment or installations, whose maintenance and repair shall be the responsibility of Licensee, shall be paid for by Licensee.

**Section 9.2.4**

**9.2.4.1** If an Emergency Situation (as hereinafter defined) exists as a result of Licensor's failure to perform its obligations under this License, and corrective action is necessary to relieve an Emergency Situation (**"Emergency Action"**), then the following provisions will apply:

  i.  Licensor shall, promptly and in any event with 48 hours of learning of the need for Emergency Action (whether from written or oral notice from Licensee or otherwise) have qualified personnel evaluate the situations and commence the Emergency Action and pursue the same to completion with diligence;

  ii.  Licensor will provide to Licensee a preliminary schedule outlining the basic steps Licensor proposes to be taken to effect the

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Emergency Action, and the times when such work is proposed to be done;

iii.     Licensor shall do whatever is commercially reasonably necessary and feasible in order to accomplish the Emergency Action in the shortest reasonably feasible time; and

iv.     An "Emergency Situation" means a situation which imminently threatens damage to property or substantial injury or peril to persons in the Licensed Area or in those areas of Navy Pier used by Licensee.

**Section 9.3     <u>Damage to Licensed Area</u>**.

Licensee shall repair, at its expense, any damage to the Licensed Area within a reasonable period of time after notice of such matter.  Upon demand, Licensee shall reimburse Licensor (as Additional Fees) for the cost of the repair of any damage elsewhere in Navy Pier, caused by or arising from the installation or removal of property in or from the Licensed Area.  Unless prohibited by weather or Force Majeure, as defined in Section 17.28 hereof, if Licensee shall fail to commence such repairs within five (5) days after notice to do so, Licensor may, after 5 days prior written notice, make or cause such repairs to be made and Licensee agrees to pay such costs including interest thereon at the Default Rate until paid, as well as an administrative charge equal to five percent (5%) of such costs.

**Section 9.4     <u>Alterations by Licensee</u>**.

Licensee shall not make any structural or publicly visible alterations, renovations, improvements, or other installations in, or to any part of the Licensed Area (including any alterations whatsoever of the storefront, signs, structural alterations, or any cutting or drilling of any kind into any part of the Licensed Area or any securing of any fixtures, apparatus, or equipment of any kind to any part of the Licensed Area) without Licensor's prior written consent, which approval shall not be unreasonably withheld, conditioned or delayed.  However, with respect to any nonstructural alterations or cosmetic alterations to the Licensed Area costing Fifty Thousand and No/100 Dollars ($50,000.00) or less in the aggregate in any consecutive twelve (12) month period which are consistent with the design and materials previously approved, Licensee will give Licensor prior written notice but need not obtain Licensor's consent.  For the purposes of this Section 9.4, "cosmetic alterations" shall mean cosmetic alterations of a decorative nature (i.e., those alterations which consist solely of painting, carpeting, repairs and maintenance of the piers and other similar minor improvements which do not affect the structure of Navy Pier, the utility systems or other lines or systems in Navy Pier and do not require the issuance of a permit or Licensor to incur any costs for architectural and engineering review or construction management).

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Section 9.5**    <u>**Changes and Additions to Navy Pier**</u>.

Licensor reserves the right at any time, and from time-to-time to: (a) make or permit changes or revisions in the plan for Navy Pier (including additions to, subtractions from, rearrangements of, alterations, modifications, or supplements to, the building areas, walkways, driveways, parking areas, or other Common Areas); (b) construct other buildings or improvements in Navy Pier (including any portion of the Common Areas), and make alterations thereof or additions thereto (including any portion of the Common Areas) and construct additional facilities and uses on or in any such building(s) (or Common Areas) and build adjoining same; and (c) make or permit changes or revisions in Navy Pier, including additions thereto and alterations thereof, provided, however, Licensor shall not adversely change the ingress or egress to the Licensed Area or the visibility of the Licensed Area. No exercise by Licensor of any rights herein reserved shall entitle Licensee to any compensation, damages, abatement of Fee, or the like, for any injury, inconvenience, or loss of business thereby. In addition, Licensor shall provide access to the south side of Navy Pier during Navy Pier operating hours.

## **ARTICLE 10 - COMMON AREAS**

**Section 10.1**    <u>**Use of Common Areas**</u>.

Licensor grants to Licensee and its agents, employees, and customers, a non-exclusive license to use the Common Areas in common with others during the Term, subject to the exclusive control and management thereof at all times by Licensor or others, and subject, further, to the rights of Licensor set forth elsewhere in this License.

**Section 10.2**    <u>**Management and Operation of Common Areas**</u>.

Licensor will operate and maintain, or will cause to be operated and maintained, the Common Areas in a manner deemed by Licensor to be reasonable and appropriate in a first class manner and consistent with other national attractions and in the best interests of Navy Pier. Licensor will have the right: (a) to establish, modify, and enforce reasonable rules and regulations with respect to the Common Areas, including the Navy Pier Licensee Guidelines attached to this License, as same may be amended, supplemented, or replaced; (b) to enter into, modify, and terminate easements, licenses, and other agreements pertaining to the use and maintenance of the Common Areas; (c) to close all or any portion of the Common Areas to such extent as may, in the opinion of Licensor, be necessary to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; (d) to close temporarily or permanently, from time-to-time, any or all portions of the Common Areas; (e) to operate for its own account various income-producing facilities, kiosks, stands, vending machines, and the like in the Common Areas; and (f) to do and perform such other acts in and to these areas and improvements as Licensor shall determine in the exercise of its business judgment. No exercise by Licensor of any rights herein reserved shall entitle Licensee to any compensation, damages, abatement of Fee, or the like from Licensor for any injury, inconvenience, or loss of business thereby. Provided, Licensor shall apply and exercise its rights under this Section in a manner which does not discriminate against Licensee as compared to like situated occupants of navy Pier. It is understood that immediately adjoining the Licensed Area to the south is an access roadway used for deliveries as well as

access to other parts of Navy Pier. Licensor shall, at all times when the Docking Facilities are Open for Business, provide ingress to or egress from the Licensed Area for users of the Docking Facilities.

## ARTICLE 11 -- LICENSOR'S INTELLECTUAL PROPERTY/ SPONSORSHIP RIGHTS

**Section 11.1    Ownership Rights**.

Licensor licenses all right, title and interest to the trademarks and service marks, Navy Pier®, among others ("**Navy Pier Marks**"). Licensee must not use, or allow others to use, the Navy Pier Marks for any purpose without the Licensor's express written consent, subject to such terms and conditions as Licensor may, in its sole discretion, prescribe. Licensee may, however, use the words "Navy Pier," solely to denote the geographic location of the Licensed Area and Licensee's permitted business therein or as part of the Docking Facilities Trade Name as provided in this License.

**Section 11.2    Exclusive Sponsorship Agreements**.

Licensor reserves the right to enter into agreements to grant exclusive sales or advertising rights (each a "**Sponsorship Agreement**") to certain products, brands, and/or services (each an "**Official Brand**," collectively, "**Official Brands**") on Navy Pier. Accordingly, to the extent permitted by law, Licensee shall not sell, serve, advertise, promote, or display at Navy Pier any competing products, brands, or services within, from or outside of its Licensed Area or in any outdoor areas (whether or not considered part of the Licensed Area), including through displays or signs visible through or on any windows facing onto any part of Navy Pier, nor in advertisements, promotional material, or displays referring to Navy Pier or utilizing (if Licensor has not given its express prior written consent thereto) Licensor's logos or service marks. Licensee shall not interfere with Licensor's sponsors' events. If and when, from time-to-time, Licensor enters into any Sponsorship Agreement, then, to the extent permitted by law, Licensee shall, and hereby agrees to, sell, advertise, feature, promote, and display the Official Brand or Official Brands covered thereunder and no others within the same sponsorship category. These provisions do not preclude Licensee from negotiating and entering into a Sponsorship Agreement with Licensor, but Licensor shall have no obligation to do so.

## ARTICLE 12 -UTILITIES

**Section 12.1    Water, Electricity, Telephone and Sanitary Sewer**.

   **Section 12.1.1**         Licensor will allow Licensee the use of existing utility facilities to points of connection at the Licensed Area to enable Licensee to obtain for the Licensed Area water, electricity, telephone, and sanitary sewer service. Licensee shall arrange for such utility services and shall pay all charges for water, electricity, telephone, and sanitary sewer services used in the Licensed Area and supplied by a public utility company or public authority or any other person, firm or corporation, including Licensor, supplying the same in the area in which Navy Pier is located. Licensor shall at all times during the Term provide

39

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

utility facilities to the Licensed Area without any Licensor imposed hookup fees, mark-up or administrative charge. Licensee shall be responsible for any utility imposed hookup fees, mark-up or administrative charge.

**Section 12.1.2** Licensor, in its sole discretion but in a manner that does not materially and adversely interfere with Licensee's business, shall have the right, from time-to-time, to change the method and source of supply of water, electricity, telephone, and/or sanitary sewer to the Licensed Area, and Licensee agrees to execute and deliver to Licensor such reasonable documentation as may be required to effect such change.

**Section 12.2    Heating, Ventilating and Air Conditioning; Natural Gas; No Propane.**

**Section 12.2.1** To the extent called for in the Licensee Improvement Plans, Licensee shall install the facilities for heating, ventilating, and air-conditioning structures within the Licensed Area and shall operate, repair, maintain, and replace same during the Term, all at its sole cost and expense.

**Section 12.2.2** If Licensee requires natural gas for the normal operation of Licensee's business, it shall obtain and maintain natural gas utility service from the local gas provider, who shall provide the gas through the mains located in locations selected by Licensor. All costs and expenses relating to the provision of gas to the Licensed Area from such mains, including any installation and/or repair of lines and equipment necessary or desirable for Licensee's use, shall be at Licensee's expense. Licensee shall be responsible for the repair of any damage to the Common Areas and other parts of Navy Pier caused by installing and maintaining its natural gas utility service, from and after the connection point to the Licensed Area. The location of the equipment and lines utilized in connection with natural gas utility service are subject to Licensor's approval. All such lines and equipment shall be maintained, repaired, and/or replaced by Licensee at its sole cost and expense.

**Section 12.2.3** Licensee shall not bring propane gas onto, nor use propane gas within the Licensed Area for its primary heating source. However, Licensee and boats use propane as a fuel source for galley, space heating, outboard motors, and other ancillary uses, which uses shall be permitted under this Section.

**Section 12.3    Miscellaneous Utilities.**

Licensee shall be solely responsible for, and shall promptly pay all charges for the maintenance, repair, and replacement of, all systems and distributions channels relating to and contained within the Licensed Area (or to the point of connection, if further), miscellaneous utilities such as, but not limited to, telephone, internet, cable, electronic alarm services, guard or security services, janitors, and/or any other utility services used or consumed in the Licensed Area.

**Section 12.4    Fire Protection System.**

To the extent required by law, Licensee shall provide, install, repair, and maintain, or cause to be provided, installed, repaired, and maintained, a fire protection system in the Licensed Area.

40

**Section 12.5**   <u>**Discontinuances and Interruptions of Utility Services**</u>.

To the fullest extent permitted by law, Licensor reserves the right to cut-off and discontinue, upon thirty (30) days' written notice to Licensee, the furnishing of any utility services furnished by Licensor at any time when Licensee has failed to pay when due any amount (whether as Fee or otherwise) due under this License. Except as set forth below regarding an abatement of Fees, Licensee acknowledges and agrees that Licensor and its agents shall not be liable for damages, for failure to furnish or delay in furnishing any service required to be furnished by Licensor, if any. No such failures or delays in any service required to be furnished by Licensor, if any, nor any inability of Licensee to obtain utility service, nor any failure or delay of any utility service provider to provide utility service shall be deemed to constitute an eviction or disturbance of Licensee's use and possession of the Licensed Area, nor relieve Licensee from paying Fees or performing any of its obligations under this License. Notwithstanding anything herein to the contrary, and without in any manner abating or affecting any insurance Licensee may maintain, in the event of an interruption in services for any reason caused by Licensor, then, the Fees shall abate commencing on the fifth (5th) day of such interruption until the service is restored.

## <u>ARTICLE 13 -INDEMNITY AND INSURANCE</u>

**Section 13.1**   <u>**Indemnity by Licensee**</u>.

    **Section 13.1.1**       To the fullest extent permitted by law, Licensee shall and does hereby indemnify and agree to hold Licensor, its officers, agents, and employees, harmless, and, at Licensor's option, defend some or all of the foregoing, from and against any and all claims, actions, damages, liabilities, and expenses, including reasonable attorneys', court costs, and other professional fees and costs, in connection with loss of life, personal injury, or damage to or loss of property arising from or out of the occupancy or use by Licensee of the Licensed Area or any part thereof or any part of Navy Pier, or arising out of, or in any way relating to: (i) any act or omission of Licensee, or any Licensee Party; (ii) or any breach of Licensee's obligations and/or representations and warranties under this License.

    **Section 13.1.2**       Licensee's indemnity obligation is not limited in any way by the amounts required under insurance requirements contained in this License, and shall survive the termination or early expiration of this License.

    **Section 13.1.3**       To the fullest extent permitted by law, Licensor shall and does hereby indemnify and agree to hold Licensee, its officers, agents, and employees, harmless, and, at Licensee's option, defend some or all of the foregoing, from and against any and all claims, actions, damages, liabilities, and expenses, including reasonable attorneys', court costs, and other professional fees and costs, in connection with loss of life, personal injury, or damage to or loss of property arising from: (i) any act or omission of Licensor, or any Licensor Party; or (ii) any breach of Licensor's obligations and/or representations and warranties under this License.

**Section 13.2**   <u>**Parties Not Responsible for Acts of Others**</u>.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Section 13.2.1** Except as otherwise set forth herein or if prohibited by law, and to the fullest extent permitted by law, Licensor shall not be responsible or liable to Licensee, or to those claiming by, through or under Licensee, for any loss or damage which may be occasioned by or through the acts or omissions of persons occupying space adjoining the Licensed Area, or any part of the premises adjacent to or connecting with the Licensed Area, or any other part of Navy Pier, or otherwise, or for any loss or damage resulting to Licensee, or those claiming by, through or under Licensee, or its or their property, from the breaking, bursting, stoppage, or leaking of electrical cable and wires, or water, gas, sewer, or steam pipes. To the maximum extent permitted by law, Licensee agrees to use and occupy the Licensed Area, and to use such other portions of Navy Pier as Licensee is herein given the right to use, at Licensee's own risk.

**Section 13.2.2** Except as otherwise prohibited by law, and to the fullest extent permitted by law, Licensee shall not be responsible or liable to Licensor, or to those claiming by, through or under Licensor, for any loss or damage which may be occasioned by or through the acts or omissions of persons occupying space adjoining the Licensed Area, or any part of the premises adjacent to or connecting with the Licensed Area, or any other part of Navy Pier, or otherwise, or for any loss or damage resulting to Licensor, or those claiming by, through or under Licensor, or its or their property, from the breaking, bursting, stoppage, or leaking of electrical cable and wires, or water, gas, sewer, or steam pipes in areas other than the Licensed Area.

**Section 13.3** **Insurance**.

During the Term, Licensee and Licensor shall maintain insurance in accordance with the attached Exhibit H.

## ARTICLE 14 -- DAMAGE AND DESTRUCTION

**Section 14.1** **Licensee's Obligation to Repair**.

**Section 14.1.1** If the Licensed Area shall be damaged by fire, the elements, accident, or other casualty (any of such causes being referred to in this License as a "**Casualty**"), then, subject to the provisions of Section 14.2, Licensee shall cause such damage to be repaired and there shall be no abatement of Fee.

**Section 14.1.2** Excluding any interruptions caused by the gross negligence or willful misconduct of Licensor or its employees, contractors or agents, Licensor shall not be liable for interruption to Licensee's business or for damage to, or replacement or repair of, Licensee's personal property (including inventory, trade fixtures, floor coverings, furniture, and other property removable by Licensee under the provisions of this License) or to any Licensee Improvements, installed in the Licensed Area. Except as set forth above, such repair, replacement, and restoration of same shall solely be Licensee's responsibility.

42

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Section 14.1.3** Licensee will commence and proceed with reasonable diligence to repair, replace, and restore Licensee Improvements, in accordance with the terms of this License applicable to work performed by Licensee.

**Section 14.2** **Option to Terminate License**.

Notwithstanding anything contained in Section 14.1, if as a result of a Casualty and/or other similar occurrence in or to Navy Pier:

> i. the Licensed Area is: (i) rendered wholly or partially untenantable as reasonably determined by Licensee; (ii) damaged as a result of any cause which is not covered by Licensee's insurance or for which Licensee does not receive reimbursement; or (iii) damaged or destroyed in whole or in part during the last twenty-four (24) months of the Term;

> ii. a material portion of Navy Pier shall be so substantially damaged that it is reasonably necessary or desirable, in Licensor's sole judgment, to demolish all, or a material portion, of Navy Pier for the purpose of reconstruction;

> iii. any ground lease or other superior lease, including the Prime Lease (defined hereafter), is terminated;

> iv. repayment of the loan secured by a mortgage or other financing vehicle affecting all or any portion of Navy Pier is accelerated.

Then, with respect to (i) above, Licensee may elect to terminate this License by giving to Licensor notice of such election within one hundred twenty (120) days after the occurrence of such Casualty, and with respect to (ii), (iii) and (iv) above, Licensor may elect to terminate this License by giving to Licensee notice of such election within one hundred twenty (120) days after the occurrence of such Casualty. If such notice is given, the rights and obligations of the parties shall cease as of the date of such notice, except for obligations of Licensee accruing prior to such termination. In such case, Fee, including any Percentage Fee and Additional Fee due Licensor by reason of Licensee's failure to perform any of its obligations hereunder shall be adjusted as of the date of such termination.

**Section 14.3** **Insurance Proceeds**.

If, after a Casualty or other similar occurrence in or to Navy Pier, this License is not terminated pursuant to Section 14.2, Licensee shall use the proceeds of its insurance required to be carried under this License for repair and restoration of Licensee Improvements, and personal property in the Licensed Area. In case of termination of this License, all insurance proceeds payable with respect to Licensee Improvements and fixtures, plus any deductible shall be paid to Licensor by Licensee to the extent necessary to remove any remaining Docking Facilities and restore the Licensed Area.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## ARTICLE 15 -ASSIGNMENTS, TRANSFERS AND SUBLETTING

**Section 15.1   Licensor's Consent Required**.

**Section 15.1.1**          Except as expressly provided in this Section, Licensee shall not assign or otherwise transfer any right, title, or interest in this License, in whole or in part, nor sublet (including to franchisees or franchisors) all or any part of the Licensed Area, nor sub-license any part thereof, nor pledge or encumber by mortgage or other instruments its interest in this License, nor permit others to use or occupy the Licensed Area, without first obtaining the written consent of Licensor, which consent shall not be unreasonably withheld, conditioned or delayed.  If Licensee shall request Licensor's consent to any such assignment or sub-licensing, Licensee shall pay to Licensor:  (i) the sum of Two Thousand Dollars ($2,000.00) to cover Licensor's administrative costs and overhead in connection with such assignment or sub-licensing; and (ii) any additional costs and expenses, including reasonable attorneys' fees, incurred by Licensor in connection with Licensor's review of such assignment or sub-licensing not to exceed Two Thousand Five Hundred and No/100 Dollars ($2,500.00).  The aforementioned sums shall be payable to Licensor regardless of whether or not Licensor consents to such assignment or sublicense.

**Section 15.1.2**          Notwithstanding anything to the contrary contained in this License, (i) in no event shall an assignment of this License be permitted to any Person if it is a Prohibited Successor, and any assignment of this License to any such Prohibited Successor shall cause a termination of this License unless cured within thirty (30) days after the effective date of the assignment of this License to a Prohibited Successor and (ii) if the Licensee under the License shall at any time become a Prohibited Successor, then this License shall thereupon automatically and immediately terminate; provided, further, that to the extent the dismissal or removal of any Person would cause the Licensee to no longer be a Prohibited Successor, this License shall terminate only if the Licensee fails to dismiss or remove such Person within thirty (30) days of becoming a Prohibited Successor.  Following a permitted assignment of this License, the successor licensee shall be responsible for Licensee's obligations under this License, whether accruing prior to or after the date of such assignment. For purposes of this License, a **"Prohibited Successor"** means any Person who is, or whose agents, employees or officers are, subject to Debarment, and "Debarment" means the present debarment, prohibition, suspension, declaration of ineligibility, or voluntary exclusion as memorialized in a publicly-available document from transacting business by a party or entity or its agents, employees or officers with the federal government of the United States, the State of Illinois, Cook County, the City of Chicago, the Authority or any department or agency thereof.

**Section 15.1.3**          In the event of any sublicense of all or any portion of the Licensed Area, or assignment of this License, where the Fees reserved in the sublet exceeds the Fees or pro rata portion of the Fees, as the case may be, for such space reserved in this License, or where consideration is received for an assignment of this License, Licensee shall pay to Licensor:  (i) monthly, as Additional Fees, at the same time as the monthly installments of the Base Fee hereunder, fifty percent (50%) of the excess of the Fee reserved in the sublicense or assignment over the Fee reserved in this License applicable to the

44

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

sublicensed space, in case of a sublicense; and (ii) when any consideration received in case of an assignment.  Under no circumstances shall Licensee be obligated to pay to Licensor any consideration received by Licensee in consideration of the sale of its business or assets.

**Section 15.1.4**          Licensee shall submit to Licensor a request for permission to assign, transfer, or sublet this License, or any portion thereof or any portion of the Licensed Area, setting forth a proposed effective date of the assignment, transfer, or sublicense, which date shall be not less than thirty (30) days after such request has been made to Licensor. Licensee shall include with the notice a copy of the proposed sublicense, transfer, or assignment, copies of all agreements collateral thereto, and details regarding ownership interests, with respect to the proposed sublessee, transferee, or assignee and other information concerning the proposed sublicensee, transferee, or assignee, or its business that Licensor may reasonably request.  In addition to Licensor's right to approve or disapprove the proposed sublicense, transfer, or assignment, as set forth above, Licensor shall have the right, to be exercised by giving notice to Licensee within thirty (30) days after receipt of Licensee's notice, to terminate this License as to all the Licensed Area, and/or portion thereof, described in the proposed sublicense, transfer, or assignment.   If notice of termination is given as to the entire Licensed Area, then this License shall terminate on the proposed effective date of the sublicense, transfer, or assignment as if it were the expiration of the Term.  If the notice of termination covers only part of the Licensed Area, then this License shall terminate as to that portion of the Licensed Area as if it were the expiration of the Term as to that portion of the Licensed Area.  In such case, the Fees, First Breakpoint and Second Breakpoint shall be adjusted on the basis of the proportion of the gross square footage retained by Licensee to Licensee's Licensed Area originally identified, this License as so amended shall continue thereafter in full force and effect.  In such event, Licensee, at its sole cost and expense, shall separate the portion of the Licensed Area so removed from this License from the portion of the Licensed Area retained by Licensee.  No termination of this License with respect to all or part of the Licensed Area shall become effective without the prior written consent, where necessary, of each mortgagee, ground lessor, and Prime Lessor. Notwithstanding if Licensor gives notice of its termination under this paragraph, Licensee shall have the right, to be exercised by giving notice to Licensor within ten (10) days after receipt of Licensor's notice of termination, to withdraw its request for permission to assign, transfer or sublet (but Licensee's payment of the sums required by Section 15.1.1 shall remain due) and, in such event, Licensor's notice of termination shall be of no force or effect. The failure of Licensor to exercise its right of termination shall not be construed in any manner to be an approval of Licensee's request to assign, transfer, or sublet, such approval to be effective only if given in writing by Licensor to Licensee.

**Section 15.1.5**          Notwithstanding anything contained in this Section 15 to the contrary, Licensee shall have the right, upon prior written notice to Licensor but without Licensor's consent, to assign this License to a Permitted Assignee (as hereafter defined) or sublet all or any portion of the Licensed Area to a Permitted Sublicensee (as hereinafter defined), provided that such assignment or subletting shall not relieve Licensee of its primary responsibility for the performance of all obligations of Licensee hereunder, and in the event of an assignment to a Permitted Assignee, such Permitted Assignee assumes, pursuant to an agreement in form and substance reasonably satisfactory to Licensor, the obligations of

45

Licensee hereunder and in the event of a sublet, such sublet is governed by a form of sublicense reasonably approved in advance by Licensor. Without limiting the generality of the effect of the foregoing, any Permitted Assignee or Permitted Sublicensee shall be subject to all the terms and conditions of this License, including the restrictions on the Permitted Use set forth in Section 2.2 above. In addition to not requiring Licensor's consent, an assignment or sublease to a Permitted Assignee or Permitted Sublicensee shall not be subject to Section 15.1.4 above regarding Licensor's right to terminate this License or Section 15.1.3 above regarding Licensor's sharing in sublease profits. As used herein, a "Permitted Assignee" and "Permitted Sublicensee" shall mean (i) any entity owned or controlled by Licensee, (ii) any entity of which Licensee is a subsidiary (on any level), (iii) any entity which is under common ownership or control with Licensee, or (iv) an entity that acquires all or substantially all of the assets or membership interests of Licensee, provided that (x) the use of the Licensed Area remains unchanged and the reputation, business, and financial responsibility of the proposed assignee are consistent with the first-class nature of Navy Pier, (y) the assignee has a net worth at least equal to the net worth of Licensee immediately before such assignment, and (z) the principals of the proposed assignee are experienced in the operation of a Docking Facility and shall have previously owned, and/or operated and/or managed a business similar to the Permitted Use prior to such transfer. To the extent permitted by law, at least thirty (30) days prior to the effective date of such assignment or sublease, Licensee agrees to deliver to Licensor documentation evidencing that Licensor does not have the right to consent to such transaction pursuant to this Section 15.1.5. Further, to the extent permitted by law, Licensee agrees to deliver to Licensor, within ten (10) days prior to the effective date of such assignment or sublease, fully executed copies of the documents effectuating such assignment or sublease. In addition, any transfers of membership interests in Licensee for estate planning purposes shall be permitted hereunder.

**Section 15.2    Acceptance of Fee from Transferee.**

**Section 15.2.1**        The acceptance by Licensor of the payment of Fees following any assignment or other transfer prohibited by this Article shall not be deemed to be a consent by Licensor to any such assignment or other transfer, nor shall the same be deemed to be a waiver of any right or remedy of Licensor hereunder.

**Section 15.2.2**        If Licensee shall assign this License, to the extent permitted herein, the assignee shall expressly assume all of the obligations of Licensee hereunder in a written instrument satisfactory to Licensor, which instrument shall be furnished to Licensor not later than thirty (30) days prior to the effective date of the assignment. If Licensee shall sublease the Licensed Area as permitted herein, Licensee shall obtain and furnish to Licensor, not later than thirty (30) days prior to the effective date of such sublease and in form satisfactory to Licensor, the final, fully executed sublease agreement. Any such sublicense shall be consistent with the terms of this License, and shall contain the sublicensee's written agreement to the effect that the sublicensee will attorn to Licensor, at Licensor's option and written request, in the event this License terminates before the expiration of the sublicense, as well as other terms and conditions required by Licensor. Each sublicense shall require the sublicensee to carry insurance required under this License

46

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

for the benefit of Licensor and the Prime Licensor, and shall also include indemnity and waiver provisions as contained in this License for the benefit of Licensor.

## ARTICLE 16 -DEFAULTS AND REMEDIES

**Section 16.1**   **"Event of Default" Defined**.

Any one or more of the following events shall constitute an "**Event of Default**" for which Licensor shall have the remedies provided for it in Section 16.3 and elsewhere in this License:

> **16.1.1.1**   Failure of Licensee to pay any Fee or other sum of money on or prior to the date after five (5) days written notice.  Provided, late fees shall not be considered an Event of Default if such late fees occur not more than 2 times in any License Year and such fees are paid on or before the 10th day of the month.

> **16.1.1.2**   Failure by Licensee to perform or observe any material covenant or material agreement of this License (other than default in payment of Fee and other than the other defaults enumerated below), which failure is not cured within thirty (30) days after the giving of written notice thereof by Licensor, provided, however, there shall be no default if Licensee has commenced to cure same during said 30-day period and is diligently proceeding to cure same.

> **16.1.1.3**   Licensee abandons the Licensed Area, or fails to take possession of the Licensed Area when available for occupancy, whether or not Licensee thereafter continues to pay the Fee due under this license.

> **16.1.1.4**   A failure by Licensee to commence or continually conduct and operate its business in accordance with the provisions of this License.

> **16.1.1.5**   If Licensee or an agent of Licensee shall knowingly falsify or misrepresent any report or disclosure document or provide any other materially incorrect information required to be furnished to Licensor pursuant to the terms of this License.

> **16.1.1.6**   Licensee's failure to obtain and maintain the Letter of Credit required under Section 7.7.

> **16.1.1.7**   The making by Licensee of an assignment for the benefit of its creditors, or if in any other manner Licensee's interest in this License shall pass to another by any means prohibited herein, including by operation of law.

> **16.1.1.8**   The sale of Licensee's interest in the Licensed Area under attachment, execution, or similar legal process, or, if Licensee is adjudicated a bankrupt or insolvent.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

**16.1.1.9** The filing of a voluntary or involuntary petition proposing the adjudicating of Licensee or any guarantor of Licensee's obligations hereunder as a bankrupt or insolvent, or the reorganization of Licensee or any guarantor of this License, or an arrangement by Licensee or any such guarantor with its creditors, whether pursuant to the United States Bankruptcy Code, 11 U.S.C. §101, et. seq., as amended or superseded from time-to-time ("**Bankruptcy Code**") or any similar federal or state proceedings, unless such petition is filed by a party other than Licensee or any guarantor of this License, and same is withdrawn or dismissed within thirty (30) days after the date of filing.

**16.1.1.10** The appointment of a receiver or trustee for the business or property of Licensee or any guarantor of this License.

**16.1.1.11** An event of default after applicable notice and cure periods shall occur under Licensee's construction loan.

**16.1.1.12** The occurrence of any other event described as constituting an "Event of Default" or a default elsewhere in this License, after applicable notice and cure periods.

**16.1.1.13** An event of default after applicable notice and cure periods shall occur under the Development Agreement.

**Section 16.1.2** Except as otherwise provided hereinabove, Licensee shall be in default under the terms of this License for an Event of Default thirty (30) days after the receipt by Licensee of written notice by Licensor of such breach which notice shall specifically set out the breach. Licensee shall not be considered in default so long as Licensee commences to cure the breach in a diligent and prudent manner and is allowed such additional time as reasonably necessary to correct the breach.

**Section 16.1.3** Licensor shall be in default under the terms of this License in the event Licensor shall violate, neglect, or fail to observe, keep or perform any covenant or agreement which is not observed, kept, or performed by Licensor within ten (10) days after the receipt by Licensor of written notice by Licensee of such breach which notice shall specifically set out the breach. Licensor shall not be considered in default so long as Licensor commences to cure the breach in a diligent and prudent manner and is allowed such additional time as reasonably necessary to correct the breach.

**Section 16.1.4** To the fullest extent permitted by law, in no event shall either Party be liable for any consequential, punitive, special, or speculative damages whatsoever.

**Section 16.2    Bankruptcy.**

**Section 16.2.1** Upon the filing of a petition by or against Licensee under the Bankruptcy Code and upon such filing of the petition, Licensee, as debtor or as debtor in possession, agrees:

48

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**16.2.1.1**       To perform promptly and fully each and every obligation of Licensee under this License, including the obligations set forth in Section 5.1 of this License, until such time as this License is either rejected or assumed by order of a United States Bankruptcy Court or other United States Court of competent jurisdiction; or deemed rejected by operation of law, pursuant to 11 U.S.C. §365(c)(4).

**16.2.1.2**       Notwithstanding anything in this License to the contrary, all amounts payable by Licensee to or on behalf of Licensor hereunder, whether or not expressly denominated as Fee, shall constitute "rent" for the purposes of Section 502(b)(7) of the Bankruptcy Code, including reasonable attorneys' fees incurred by Licensor by reason of Licensee's bankruptcy.

**16.2.1.3**       That included within and in addition to any other conditions or obligations imposed upon Licensee in the event of assumption and/or assignment are the following:

      i.In the event of assignment, the execution and delivery to Licensor of an instrument by which the assignee assumes all of the obligations arising under this License from and after the date of assignment pursuant to the provisions of the Bankruptcy Code.

      ii.The cure of any defaults and the compensation of pecuniary loss resulting from any such default, within thirty (30) days after assumption.

      iii.The Permitted Use of the Licensed Area, and the maintenance of the quality, quantity, or lines of merchandise of any goods or service required to be offered for sale be offered from the Licensed Area as required under this License; it being understood and agreed that the provisions in this License relating to the Permitted Use, are essential to preserve the tenant mix in Navy Pier.

      iv.In the event of assignment, any options granted Licensee herein, such as expansion, extension, renewal, right of first refusal, right of first offer, termination, and the like, shall be deemed null and void to the fullest extent permitted by law.

      v.Adequate assurance of future performance under this License, for the purpose of assumption or assignment, shall include adequate assurance:

          (1)       of the source of Fee and other consideration due under this License, and in the event of assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be at least equal to

49

the financial condition and operating performance of the Licensee and its guarantors, if any, as of either: the time the Licensee became the lessee under this License; or the date immediately prior to such transfer, whichever is greater;

(2)     that any Percentage Fee due under this License will not decline;

(3)     that any assumption or assignment of this License is subject to all the provisions thereof, including (but not limited to) provisions such as radius, location, use, or exclusivity provisions, and will not breach any such provisions contained in any other license, financing agreement, or any other agreement relating to Navy Pier;

(4)     that assumption or assignment of this License will not disrupt any tenant mix or balance in Navy Pier in Licensor's sole reasonable opinion.

vi. The adequate assurance and demonstrations in writing by a debtor, debtor in possession, or assignee of such debtor in possession of such party's sufficient background, including, but not limited to, substantial retailing experience in shopping centers of comparable size and financial ability to operate out of the Licensed Area pursuant to the terms and conditions of this License, and to meet all other reasonable criteria of Licensor as did Licensee upon execution of this License.

vii. The Licensed Area, at all times will remain unchanged, and no physical changes of any kind are made thereto unless in compliance with the applicable provisions of this License.

**Section 16.2.2**     Nothing contained in this Section shall be deemed in any manner to limit, waive, or otherwise negatively affect Licensor's rights and remedies under the Bankruptcy Code, as presently existing or as may hereafter be amended.

**Section 16.2.3**     No default of this License by Licensee, either before or after the filing of any such petition, shall be deemed to have been waived unless expressly done so in writing by Licensor.

**Section 16.3**   **Remedies**.

**Section 16.3.1**     Upon the occurrence of an Event of Default, Licensor, without further notice to Licensee in any instance (except where expressly provided for below, or required by applicable law) shall have the option to pursue any one or more of the following

50

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

remedies without any notice or demand whatsoever, concurrently or consecutively and not alternatively:

16.3.1.1    perform on behalf and at the expense of Licensee, any obligation of Licensee under this License which Licensee has failed to perform. Without limiting the generality of the foregoing, Licensor may, at Licensor's option, enter into and upon the Licensed Area if Licensor determines in its sole discretion that Licensee is not acting within a commercially reasonable time to maintain, repair, or replace anything for which Licensee is responsible under this License or to otherwise effect compliance with its obligations under this License and correct the same, without being deemed in any manner guilty of trespass, eviction, or forcible entry and detainer, and without incurring any liability for any damage or interruption of Licensee's business resulting therefrom. In such event, Licensee agrees to reimburse Licensor within five (5) days of Licensor's demand as Additional Fees, for any expenses which Licensor may incur in thus effecting compliance with Licensee's obligations under this License, plus as administrative charge of five percent (5%) of such costs, all with interest at the Default Rate.

16.3.1.2    terminate this License;

16.3.1.3    terminate the right of Licensee to possession of the Licensed Area without terminating this License, whereupon the right of Licensee to possession of the Licensed Area or any part thereof shall cease;

16.3.1.4    enforce and protect the rights of Licensor hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein;

16.3.1.5    enforce any security interest granted under this License as permitted by law, including the sale at public or private sale of any Collateral; and/or

16.3.1.6    exercise any other legal or equitable right or remedy which it may have.

Section 16.3.2    Upon any termination of this License, whether by lapse of time or otherwise, or upon any termination of Licensee's right to possession without termination of this License, and provided Licensee is not then in material default, Licensee shall have the right to remove Licensee Improvements. However, if Licensee does not intend to remove Licensee Improvements, Licensor may require removal by Licensee at Licensee's cost. Utilities will be disconnected and properly capped at their disconnection points. The foregoing notwithstanding, upon such termination, Licensee shall surrender possession and promptly vacate the Licensed Area, and deliver possession thereof to Licensor, and Licensee hereby grants to Licensor full and free license to enter into and upon the Licensed Area in such event and to grant possession to Licensor of the Licensed Area and to expel or remove Licensee and any others who may be occupying or be within the Licensed Area and to

51

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

remove Licensee's signs and other evidence of tenancy and all other property of Licensee therefrom without being deemed in any manner guilty of trespass, eviction, or forcible entry or detainer, and without incurring any liability for any damage resulting therefrom, Licensee waiving any right to claim damages for such re-entry and expulsion, and without relinquishing Licensor's right to the Fees or any other right given to Licensor under this License or by operation of law.

**Section 16.3.3**        Upon any termination of this License, whether by lapse of time or otherwise, Licensor shall further be entitled to recover as damages, all Fees, including any amounts treated as Additional Fees under this License, and other sums due and payable by Licensee on the date of termination, plus as partial damages and not as a penalty, an amount equal to the sum of: (i) an amount equal to the then present value of the Fee (including Annual Base Fee at the annual rate or respective annual rates for the remainder of the Term specified in this License, Percentage Fee (as calculated pursuant to Section 16.7 below), including any amounts treated as Additional Fees under this License and all other sums provided in this License to be paid by Licensee, discounted at a rate of five percent (5%); (ii) the estimated expenses described in Subsection 16.3.2 relating to recovery of the Licensed Area; (iii) the cost of performing any other covenants which would have otherwise been performed by Licensee; (iv) any sums to which Licensee has agreed to indemnify Licensor under any of the provisions of this License; and (v) all other costs and expenses incurred by Licensor as a result of such Event of Default for reasonable attorneys' fees and costs.

**Section 16.3.4**        Upon any termination of Licensee's right to possession only without termination of this License:

> **16.3.4.1**        Neither such termination of Licensee's right to possession nor Licensor's taking and holding possession thereof as provided in Subsection 16.3.2 shall terminate this License or release Licensee, in whole or in part, from any obligation, including Licensee's obligation to pay the Fee, including any amounts treated as Additional Fees, under this License for the full Term, and if Licensor so elects, Licensee shall continue to pay to Licensor the entire amount of the Fee as and when it becomes due, including any amounts treated as Percentage Fee (as calculated pursuant to Section 16.7 below) and any amounts treated as Additional Fees under this License, for the remainder of the Term plus any other sums provided in this License to be paid by Licensee for the remainder of the Term.

> **16.3.4.2**        Unless and until such time as Licensor shall elect to terminate this License, and shall thereupon be entitled to recover the amounts specified in this License, Licensee shall pay to Licensor upon demand the full amount of all Fees, including any amounts treated as Additional Fees under this License and other sums reserved in this License for the remaining Term, including Percentage Fee, together with the costs of repairs, alterations, additions, redecorating, and Licensor's expenses of re-licensing and the collection of the fee accruing therefrom (including reasonable attorney's fees and broker's commissions), as the same shall then be due or become due from time-to-time,

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

less only such net consideration as Licensor may have received from any re-licensing of the Licensed Area. Licensee agrees that Licensor may file suits from time-to-time to recover any sums falling due under this Article as they become due. Any net proceeds of re-licensing received by Licensor in excess of the amount then owed by Licensee to Licensor from time-to-time shall be credited against Licensee's future obligations under this License, but shall not otherwise be refunded to Licensee or inure to Licensee's benefit.

**Section 16.4    <u>Remedies Cumulative</u>.**

No remedy herein or otherwise conferred upon or reserved to Licensor shall be considered to exclude or suspend any other remedy, but the same shall be cumulative and shall be in addition to every other remedy given hereunder now or hereafter existing at law or in equity or by statute, and/or every power and remedy given by this License to Licensor may be exercised from time-to-time, and as often as occasion may rise or as may be deemed expedient. No delay or omission of Licensor to exercise any right or power arising from any default or Event of Default, shall impair any such right or power or shall be construed to be a waiver of any such default or any acquiescence therein. Neither the rights herein given to receive, collect, sue for, or distrain for any Fee or moneys, or payments, or to enforce the terms, provisions, and conditions of this License, or to prevent the breach or non-observance thereof, or the exercise of any such right or of any other right or remedy hereunder or otherwise granted or arising, shall in any way affect or impair or toll the right or power of Licensor to declare the Term hereby granted ended, and to terminate this License as provided for in this License, or to repossess without terminating this License, because of any Event of Default in, or breach or default of, the covenants, provisions, and/or conditions of this License.

**Section 16.5    <u>No Waiver</u>.**

No waiver of any breach of any of the covenants of this License shall be construed, taken, or held to be a waiver of any other breach or waiver, acquiescence in, or consent to, any further or succeeding breach of the same covenant. Forbearance by Licensor to enforce one or more of the remedies herein provided upon an Event of Default shall not be deemed or construed to constitute a waiver of such default, or create, by "course of dealing" or otherwise, an express or implied amendment to this License. Licensor is entitled to accept, receive, and cash or deposit any payment made by Licensee for any reason or purpose or in any amount whatsoever, and apply the same at Licensor's option to any obligation of Licensee and the same shall not constitute payment of any amount owed except that to which Licensor has applied the same. No endorsement or statement on any check or letter of Licensee shall be deemed an accord and satisfaction or otherwise recognized for any purpose whatsoever. The acceptance of any such check or payment shall be without prejudice to Licensor's right to recover any and all amounts owed by Licensee hereunder and Licensor's right to pursue any other available remedy.

**Section 16.6    <u>Right to Re-Enter</u>.**

If Licensor terminates this License or terminates Licensee's right of possession as provided above, Licensee shall remove all of its personal property and improvements and vacate the

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Licensed Area and deliver possession thereof to Licensor within thirty (30) days' written notice from Licensor. Licensor may re-enter and take complete and peaceful possession of the Licensed Area, with or without resorting to legal process, full and complete license to do so upon thirty (30) days' written notice being hereby granted to Licensor, and Licensor may remove all occupants and property therefrom, without being deemed in any manner guilty of trespass, eviction, or forcible entry and detainer, and without relinquishing Licensor's right to Fee or any other right given to Licensor hereunder or by operation of law.

**Section 16.7**   <u>**Calculation of Percentage Fee Following Event of Default**</u>.

If termination of this License or termination of Licensee's possession under this License on account of an Event of Default shall take place after the expiration of three (3) or more License Years then, for purposes of computing damages, the Percentage Fee payable with respect to each License Year following termination (including the License Year in which such termination shall take place) shall be conclusively presumed to be equal to the average Percentage Fee payable with respect to the three (3) complete License Year most recently preceding termination. If such termination of this License or termination of Licensee's possession shall take place before the expiration of three (3) License Years then, for purposes of computing damages, the Percentage Fee payable with respect to each License Year following termination (including the License Year in which such termination shall take place) shall be conclusively presumed to be equal to twelve (12) times the average monthly payment of Percentage Fee due before such termination

**Section 16.8**   <u>**Removal of Property**</u>.

All property of Licensee removed from the Licensed Area by Licensor pursuant to any provisions of this License or of law may be handled, removed, or stored by Licensor at the cost and expense of Licensee, and Licensor in no event shall be responsible for the value, preservation or safekeeping thereof. Licensee shall pay Licensor for all actual expenses incurred by Licensor for such handling, removal, and storage plus an administrative charge of five percent (5%) of such costs. All such property not removed by Licensee from the Licensed Area or removed from storage by Licensee within sixty (60) days of the later of termination or removal by Licensor, shall, at Licensor's option, be conclusively deemed to have been conveyed by Licensee to Licensor as if by a bill of sale, without further payment or credit by Licensor to Licensee.

**Section 16.9**   <u>**Attorneys' Fees**</u>.

A defaulting party shall pay all of the other party's costs, charges, and expenses, including court costs and attorneys' fees, incurred by the non-defaulting party: (a) in enforcing the defaulting party's obligations under this License; (b) in any action brought by a party in which such party is the prevailing party; and/or (c) in any litigation, negotiation, or transaction in which one party causes the other party, without such party's material fault, to become involved or concerned.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

## ARTICLE 17 -MISCELLANEOUS

**Section 17.1**    **Parking**.

   **Section 17.1.1**    There are two (2) parking garages on Navy Pier; namely, the East Parking Garage and the West Parking Garage (each a "**Parking Garage**," collectively, "**Parking Garages**") available for use by tenants, customers, employees, and guests of Licensor and tenants, including Licensee.  Parking is made available on a first-come, first-served basis, and Licensee shall not be deemed entitled, nor be deemed given, the exclusive rights, to any space or spaces whatsoever.

   **Section 17.1.2**    Generally, users of the Parking Garages shall pay for parking on an hourly or daily basis at rates in effect by the operator of the Parking Garages.

   **Section 17.1.3**    Licensor shall not be in default under this License for failure to provide parking at Navy Pier, including in the Garages, at any time, and Licensor reserves the right to discontinue parking at any time.

   **Section 17.1.4**    Licensor may, at its reasonable discretion, provide, or cause to be provided, valet parking services for customers of certain tenants at Navy Pier during hours established by Licensor or its operator from time-to-time.  Users of valet parking must pay for valet parking on any basis determined by Licensor or its operator.  Licensor or its operator may impose a requirement that a user of valet parking obtain validation of a parking ticket to qualify for valet parking or any discount.  Licensee shall validate valet parking tickets of Licensee's customers only, and may not charge a fee for parking.  Licensor shall be entitled to all revenue from valet parking.  Licensor may discontinue any valet parking service at any time.

   **Section 17.1.5**    Parking will be provided for Licensee's personnel on the same terms and conditions as included in the then-current discount parking program available to contractors and other tenants at Navy Pier.  Currently, such program provides for a discount to contractors or personnel parking at Navy Pier except on those days when Licensor anticipates heavy attendance, during which days the discount is not available. Licensor reserves the right to change or eliminate the discount parking program in its sole discretion.

**Section 17.2**    **Marketing Program**.

   **Section 17.2.1**    Licensee agrees, at no cost to Licensee, to participate to the fullest extent in Licensor's program from time-to-time for the general promotion of Navy Pier and Navy Pier events, which program may include:  special events; shows; displays; signs; marquees; maps and brochures; décor; seasonal events; print; television; radio; and other media advertisements and market research.  Licensor may employ a marketing director, and/or marketing agency, to facilitate programming.

   **Section 17.2.2**    In advertising Licensee's business in the Licensed Area, Licensor shall have the right to the use of Licensee's logo and the use of the name of the Licensee's business at Navy Pier.  In addition, within five (5) business days after Licensor's request,

55

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Licensee shall provide Licensor with copies of Licensee's most recent advertising material in electronic format for use by Licensor in advertising Licensee's store and/or business in the Licensed Area. Licensor shall include Licensee's business on advertising programs, general kiosks and key maps, and other advertising medium deployed by Licensor in its reasonable discretion.

**Section 17.3    Notices**.

**Section 17.3.1**        Any notice, request, demand, approval, or consent given or required to be given under this License (except as expressly set forth herein) shall be in writing and shall be given by United States registered or certified mail, return receipt requested, by commercial delivery service, or by nationally recognized overnight courier, with all delivery and postage charges prepaid, and same shall be deemed to have been given on the day actually received or refused, or if unclaimed, on the third (3rd) day following the day on which the same shall have been sent by commercial delivery or overnight courier service or deposited with the United States Postal Service. Any such communication to Licensor shall be addressed:

To Licensor at:

>                         Navy Pier, Inc.
>                         Attn:  President / CEO
>                         Navy Pier
>                         600 East Grand Avenue
>                         Chicago, Illinois 60611
>
>                         With copy to
>
>                         Navy Pier, Inc.
>                         Attn:  Chief Operating Officer
>                         Navy Pier
>                         600 East Grand Avenue
>                         Chicago, Illinois 60611

To Licensee at:

>                         NPM Venture LLC
>                         Attn:  Randy D. Podolsky, Manager
>                         1700 West Higgins Road, Suite 280
>                         Des Plaines, Illinois 60018
>
>                         With a copy to:
>
>                         Much Shelist
>                         191 North Wacker Drive, Suite 1800
>                         Chicago, Illinois 60606
>                         Attn:  Glenn Taxman

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

except that payment of Fees and reports of Gross Sales shall be delivered to Licensor's management office in Navy Pier during normal business hours, or at such other place as Licensor may from time-to-time designate in a notice to Licensee.

**Section 17.3.2** Either party may, at any time, change its address for the above purposes by sending a notice to the other party stating the change and setting forth the new address.

**Section 17.4** **Estoppel Certificates**.

Provided the other Party is not then in material breach and representations are correct, at any time, and from time-to-time, within ten (10) business days after request made by either party to the other, the receiving party shall sign, acknowledge and deliver to the requesting party or other party as may be designated by the requesting party, an estoppel certificate in a form reasonably requested by the requesting party including, without limitation, a statement certifying that this License is unmodified (except as identified in the estoppel certificate) and in full force and effect, describing the dates to which the Fees and other charges have been paid, representing that, to the actual knowledge of the responding party, there is no default (or stating the nature of the alleged default) and any other matters relating to this License or to the status of performance of the obligations of the parties under this License as may be reasonably requested by the requesting party. The matters as set forth in the certificate may be relied upon by the requesting party and any other party for whose benefit the certificate is requested if referred to in the request.

**Section 17.5** **Inspections and Access by Licensor**.

Licensee will permit Licensor, its agents, employees, and contractors to enter all parts of the Licensed Area at any reasonable time within business hours, except in the case of an emergency, with notice, which may be oral, to show the Licensed Area to prospective purchasers or lenders of Navy Pier, to inspect same, and to enforce or carry out any provision of this License, including any access necessary for the making of any improvements or repairs which are Licensor's right or obligation hereunder. For the period of nine (9) months before the expiration of the Term, as may be extended, Licensor shall have the right to show the Licensed Area and all parts thereof to prospective tenants, upon not less than 24 hours prior notice, and at any time, if the Licensed Area is vacated, to make improvements to or otherwise prepare the Licensed Area for subsequent license, all without relieving Licensee of any liability herein or constituting an eviction hereof. Licensee shall have the right to have a representative at any such inspection or showing. If Licensee shall not be personally present to open and permit an entry into the Licensed Area, Licensor or Licensor's agents may enter the same by a master key, or may forcibly enter the same, without rendering Licensor or such agents liable therefor, and without in any manner affecting the obligations and covenants of this License. Nothing in this Section 17.5 shall be deemed to permit Licensee to abandon the Licensed Area under any circumstances whatsoever.

**Section 17.6** **Successors and Assigns**.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

This License and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Licensor and its successors and assigns, and shall be binding upon Licensee, its successors and assigns, and shall inure to the benefit of Licensee and only such assigns and sublicensees of Licensee to whom the assignment or sublicensing of this License by Licensee has been consented to in writing by Licensor, if so required pursuant to the terms of this License. Upon any sale or other transfer by Licensor of its interest in the Licensed Area and in this License, Licensor shall deliver written notice thereof to Licensee, and Licensor shall be relieved of all obligations under this License accruing from and after the effective date of such assignment.

**Section 17.7   <u>Compliance with Laws and Regulations</u>.**

Each party, at its sole cost and expense, shall comply with applicable laws and regulations. Without limitation to the foregoing, Licensee, at its sole cost and expense, shall cause the Licensed Area and all work performed by Licensee, its agents, and contractors, to comply with: (a) all federal, state, county, municipal, and other governmental statutes, laws, rules, codes, orders, regulations, and ordinances affecting any part of the Licensed Area, or the use thereof, including, but not limited to, those which require the making of any unforeseen and/or extraordinary changes, whether or not any such statutes, laws, rules, orders, regulations, or ordinances which may be hereafter enacted involve a change of policy on the part of the governmental body enacting the same; and (b) all rules, orders and regulations of the National Board of Fire Underwriters, Licensor's casualty insurers, and other applicable insurance rating organizations or other bodies exercising similar functions in connection with the prevention of fire or the correction of hazardous conditions which apply to the Licensed Area.

**Section 17.8   <u>Americans with Disabilities Act</u>.**

The Americans With Disabilities Act of 1990 (42 U.S.C. §12101 et seq.), and regulations and guidelines promulgated thereunder, as all of the same may be amended and supplemented from time-to-time (collectively referred to herein as the "**ADA**") establish requirements under Title III of the ADA ("**Title III**") pertaining to business operations, accessibility and barrier removal, which may apply to the Licensed Area and to all or limited portions of Navy Pier.  The parties hereby allocate compliance with Title III of the ADA as follows, notwithstanding that either or both may be liable for compliance with Title III ADA requirements:  (a) Licensee shall be responsible for all ADA Title III compliance and costs in connection with the Licensed Area, including structural work, if any, and including any Licensee Improvements or other work to be performed in the Licensed Area; (b) Licensor shall be responsible for all ADA Title III compliance and costs in connection with Navy Pier and the Common Areas; (c) Licensor shall perform, and Licensee shall be responsible for the cost of, any ADA Title III "path of travel" requirements triggered by any construction activities or alterations in the Licensed Area or use of the Licensed Area; and (d) any additional current or future requirements to the Licensed Area shall be the sole responsibility of Licensee.

**Section 17.9   <u>Captions and Headings</u>.**

58

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

The Table of Contents and the Article and Section captions and headings are for convenience of reference only, and in no way shall be used to construe or modify the provisions set forth in this License.

## Section 17.10 <u>Additional or Successor Docking Facilities</u>.

  **Section 17.10.1**    Subject to the provisions of this Section 17.10, it is understood and agreed by the Parties that the Licensor does not currently have plans to develop, operate, or allow others to develop or operate recreational boat docking facilities at Navy Pier and/or that portion of Ogden Slip under Licensor's control. All requests for the installation and operation of recreational boat docking facilities made by Licensor's other tenants and licensees as an addition to their permitted use will be referred to Licensee. Licensee shall endeavor to provide slips to other tenants and licensees of Navy Pier as a priority, under terms to be agreed upon between Licensee and such other tenant or licensee.

  **Section 17.10.2**  In the event that Licensor elects to license the development and/or operation of an additional permanent or transient recreational docking facility at Navy Pier or in that portion of Ogden Slip under Licensor's control, Licensor shall first offer to negotiate such license with Licensee in good faith and on an exclusive basis (the "**ROFO**"). In the event that i) Licensee does not elect to pursue such opportunity or ii) Licensor and Licensee fail to enter into a binding agreement within one hundred twenty (120) days of the offer by Licensor, this exclusive offer shall expire, and Licensor shall be free to solicit, negotiate, and enter into a license agreement with other entities. In the event an agreement is not entered into between Licensor and a third party within eighteen (18) months after the expiration of the exclusive negotiating period, then, the ROFO shall be reinstated in favor of Licensee, and Licensor shall be obligated to comply with the terms hereof.

  **Section 17.10.3**  In the event that Licensor elects to license, lease or otherwise provide for the operation of the Docking Facilities after the Term expires (as may be extended), then, Licensee shall be given an equal opportunity to bid on the new license.

## Section 17.11 <u>Employment; Customers</u>.

During the Term, Licensee agrees as follows:

    **17.11.1.1**  It will comply with the Illinois Human Rights Act and the Rules and Regulations of the Illinois Department of Human Rights ("**Department**"), and all other applicable equal opportunity laws, rules, and regulations.

    **17.11.1.2**  It will not discriminate against any employee or applicant for employment because of race, color, religion, sex, marital status, national origin or ancestry, age, physical or mental handicap unrelated to ability, unfavorable discharge from military service, or other class of individual or group protected against discrimination by applicable law; and further it will examine all job classifications to determine if minority persons or women are underutilized

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

and will take appropriate affirmative action and makes good faith efforts to eliminate such underutilization.

**17.11.1.3**     In all solicitations or advertisements for employees placed by it or on its behalf, it will state that all applicants will be afforded equal opportunity without discrimination because of race, color, religion, sex, marital status, national origin or ancestry, age, physical or mental handicap unrelated to ability, unfavorable discharge from military service, or other class of individual or group protected against discrimination by applicable law.

**17.11.1.4**     It will send to each labor organization or representative of workers with which it has or is bound by a collective bargaining or other agreement or understanding, a notice advising such labor organization or representative of Licensee's obligations under the Illinois Human Rights Act and the Department's Rules and Regulations.   If any such labor organization or representative fails or requests to cooperate with Licensee in its efforts to comply with such Act and Rules and Regulations, Licensee will promptly so notify the Department and Licensor and will recruit employees from other sources when necessary to fulfill its obligations thereunder.

**17.11.1.5**     It will permit access to all relevant books, records, accounts, and work sites by authorized personnel of the Department for purposes of investigation to ascertain compliance with the Illinois Human Rights Act and the Department's Rules and Regulations.

**17.11.1.6**     This License involves the use of public property and activities which service the public.   Licensee covenants and agrees that in all matters pertaining to the performance of this License, it shall, at all times, conduct its business in a manner which assures fair, equal, and nondiscriminatory treatment of all persons in accordance with the law.   It is the Licensor's policy that all customers, employees, licensees, and invitees of all tenants and licensees shall have the opportunity to obtain all the goods, services, accommodations, advantages, facilities, and privileges of Navy Pier without discrimination because of race, creed, color, sex, age, national origin, disability, ancestry, or other class of individual or group now or hereafter protected against discrimination by applicable law.   To that end, Licensee shall not discriminate in the conduct and operation of its business at Navy Pier, against any person or group of persons because of the race, creed, color, sex, age, national origin, disability, (provided that, with respect to employment, the disability is unrelated to ability to perform the work required) ancestry of such person or group of persons, or other class of individual or group now or hereafter protected against discrimination by applicable law.

**17.11.1.7**     Licensee understands that Licensor has established goals of twenty-five percent (25%) and five percent (5%) respectively, for the participation of minority owned businesses (**"MBE"**) and women owned

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

businesses ("**WBE**"), as well as goals for the employment of minorities and women in all contracts let for work at Navy Pier. In connection with the contractors for construction of any Improvements and/or operation of the Premises, Licensee shall use good faith efforts for MBE and WBE participation and the employment of minorities and women consistent with this goal, provided, Licensee's failure to actually meet such goals, after the exercise of such reasonable, good faith efforts, shall not be deemed a default or Event of Default of Licensee under this License.

**Section 17.12** <u>**Project Labor Agreements**</u>.

Licensor has entered into, and may hereafter enter into, agreements with certain trade unions for Navy Pier related to construction of improvements (the "**Project Labor Agreement**" attached as <u>Exhibit I</u>). In performing any work at Navy Pier, including Licensee Improvements, if any, Licensee and all of its contractors (including subcontractors of any tier), shall strictly comply with the Project Labor Agreements to the extent applicable to Navy Pier.

**Section 17.13** <u>**Security**</u>.

**Section 17.13.1** Although Licensor does not guaranty the safety of any persons using Navy Pier, Licensor may furnish, or cause to be furnished, periodic patrols or other security personnel or systems to monitor Pier activity. The frequency and type of such monitoring shall be at Licensor's sole discretion. In addition, Licensee shall use commercially reasonable efforts to secure the Licensed Area and Docking Facilities, and Licensee shall have the right to furnish periodic patrols and other security personnel or systems to monitor activity at the Licensed Area at its sole cost.

**Section 17.13.2** Upon request, Licensor may from time to time review the security measures implemented by Licensee. The Parties understand that Licensor is required to and does maintain a plan of security related to Navy Pier (the "**Navy Pier Facility Security Plan**"). Licensee shall comply with any security measures set forth in the Navy Pier Facility Security Plan as such may be modified from time to time and approved by the U.S. Coast Guard or other applicable governmental entity having jurisdiction over same. Provided, in the event provisions within the Navy Pier Facility Security Plan prohibit or materially and substantially restrict the Permitted Use for more than one year, Licensee may elect to terminate the License, and Licensor shall be liable to Licensee for actual damages, if any, Licensee incurs by reason of such termination, subject to the limitations set forth in Section 16.1.4, and further provided, that if the prohibition or restriction is mandated by law or a governmental authority, then Licensor shall not be responsible for damages and the provision of Section 2.1.1 shall control. Upon request, Licensor shall make available to Licensee and its mortgagee excerpts from the Navy Pier Facility Security Plan that are applicable to Licensee and the Licensed Area if any. Licensee, the mortgagee and their representatives shall execute a nondisclosure agreement if required by Licensor. Provided, in the event the Navy Pier Facility Security Plan or parts thereof are confidential and the government agency does not allow such plan or provisions to be released to Licensee despite having a signed confidentiality agreement, Licensor shall provide a summary, certified by

61

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Licensor to be true and accurate in all respects, of the relevant provisions applicable to the Docking Facilities and Licensed Area.

**Section 17.14  No Joint Venture**.

Any intention to create a joint venture or partnership relation between the parties hereto is hereby expressly disclaimed.  The provisions of this License in regard to the payment by Licensee and the acceptance by Licensor of a percentage of Gross Sales of Licensee and others is a reservation for Fee for the use of the Licensed Area.

**Section 17.15  No Modification**.

This writing is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms thereof, all negotiations, considerations, and representations between the parties having been incorporated in this License.  No course of prior dealings between the parties or their officers, employees, agents, or affiliates shall be relevant or admissible to supplement, explain, or vary any of the terms of this License.  Acceptance of, or acquiescence in, a course of performance rendered under this or any prior agreement between the parties or their affiliates shall not be relevant or admissible to determine the meaning of any of the terms of this License other than those specifically set forth in this License.  This License can be modified only by a writing signed by the party against whom the modification is enforceable.

**Section 17.16  Construction**.

This License shall not be construed more strictly against Licensor merely by virtue of the fact that it has been prepared by Licensor or its managing agent or counsel, it being recognized both of the parties hereto have contributed substantially and materially to the preparation and negotiation of this License.  Whenever used in this License, the word "including" (and variations thereof) shall mean "including but not limited to."

**Section 17.17  Severability**.

If any portion of any term or provision of this License, or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this License, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this License shall be valid and be enforced to the fullest extent permitted by law.

**Section 17.18  Third Party Beneficiary**.

Nothing contained in this License shall be construed so as to confer upon any other party the rights of a third party beneficiary, other than for the benefit of a mortgagee, ground lessor, and Prime Licensor.

**Section 17.19  No Recording**.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Neither this License nor a short form of memorandum thereof shall be recorded in the public records.

**Section 17.20  <u>Corporate Licensees; Fictitious Names</u>.**

    **Section 17.20.1**    If Licensee is a corporation, the persons executing this License on behalf of Licensee hereby represent and warrant that:  Licensee is a duly constituted corporation organized within and qualified to conduct business in the State of Illinois; the Licensee is in good standing and authorized and qualified to conduct business in the State of Illinois; all of Licensee's franchise and corporate taxes have been paid to date; all future forms, reports, fees, and other documents and payments necessary for Licensee to comply with applicable laws will be filed and paid by Licensee when due; and such persons are duly authorized by the board of directors of such corporation to execute and deliver this License on behalf of the corporation.

    **Section 17.20.2**    If Licensee is a limited partnership or limited liability company, the persons executing this License on behalf of Licensee hereby represent and warrant that Licensee is duly created and existing under the laws of the State of Illinois, and that Licensee is in good standing, and authorized and qualified to conduct business in the State of Illinois.

**Section 17.21  <u>Applicable Law</u>.**

This License and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the State of Illinois.  Licensee hereby submits itself irrevocably to the jurisdiction of the courts located in Cook County, Illinois, and, to the fullest extent permitted by law, covenants and agrees that if it should bring any action against Licensor, it shall do so in those and only those courts.

**Section 17.22  <u>Waiver of Jury Trial</u>.**

Licensee waives any and all rights which it may have to request a jury trial in any proceeding at law or in equity in any court of competent jurisdiction involving a claim for possession of the Licensed Area by Licensor.

**Section 17.23  <u>Limitation of Right of Recovery Against Licensor</u>.**

The liability of Licensor (which for purposes of this Section shall include all:  board members; partners, both general and limited, of any partnership; members and managers of any limited liability company; and the officers, directors, and shareholders of any corporation, and includes any officials of any governmental entity which is Prime Lessor and/or which owns and/or operates Navy Pier) under this License shall be limited to Licensor's interest in Navy Pier.  No personal judgment shall lie against Licensor upon extinguishment of its rights in Navy Pier and/or the Licensed Area, and any judgment so rendered shall not give rise to any right of execution or levy against Licensor's assets.  The provisions hereof shall inure to Licensor's successors and assigns including any mortgagee, ground lessor, and Prime Lessor.  The foregoing provisions are not intended to relieve Licensor from the performance of any of

Licensor's obligations under this License, but only to limit the personal liability of Licensor in case of recovery of a judgment against Licensor.

**Section 17.24 <u>Licensee's Intellectual Property</u>.**

Licensee represents and warrants that it has, and will have throughout the entire Term, full and sufficient right to use or grant the rights to use the logos, service marks, trademarks, and any and all intellectual and/or protected property that Licensee will use or authorize to be used, from time-to-time, in operation and promotion of its business, and the proposed uses of the intellectual property do not and will not infringe any patents, copyrights, trademarks, or other intellectual property rights (including trade secrets), privacy or similar rights of any person or entity, nor has any claim (whether or not embodied in any action, past or present) of such infringement been threatened or asserted, nor is such a claim pending against the Licensee (or, insofar as Licensee is aware), against any entity from which the Licensee has obtained any rights.

**Section 17.25 <u>Time of Essence</u>.**

Time is of the essence in each and every instance hereunder with respect to the covenants, undertakings, and conditions to be performed hereunder by Licensee.

**Section 17.26 <u>License Subject to Prime Lease</u>.**

Licensee acknowledges and agrees that this "License" is, in fact, a sublicense, and that Licensor leases all of Navy Pier pursuant to the Prime Lease by and between Prime Lessor and Licensor as "tenant," as same has been and may be amended from time-to-time. As a result, the terms of this License, and all of Licensee's rights hereunder are subject and subordinate in all respects to the terms of the Prime Lease, and Licensee shall be required to comply with the terms of the Prime Lease as well as the terms of this License. A true, correct and complete copy of the Prime Lease has been delivered to Licensee, and Licensor represents and warrants to Licensee that (i) the Prime Lease is in full force and effect and there are no defaults thereunder and (ii) Licensor is permitted under the Prime Lease to enter into this License. In the event of a conflict between the terms of this License and the Prime Lease, the Prime Lease shall prevail, unless Licensee is released from such compliance by Prime Lessor in writing. Furthermore, except as otherwise hereinafter provided, the rights and interests of Licensee under this License shall be subject and subordinate to any other current or future ground license, as well as any mortgage or trust deed that may be placed upon the Licensed Area, and to any and all advances to be made thereunder, and to the interest thereon, and all renewals, replacements, and extensions thereof. Any ground lessor, mortgagee, or trustee may elect to give the rights and interest of Licensee under this License priority over the lien of its ground license, mortgage, or deed of trust. In the event of such election and upon notification by such ground lessor, mortgagee, or trustee to Licensee to that effect, the rights and interest of Licensee under this License shall be deemed to have priority over the lien of said ground license, mortgage, or trust deed, whether this License is dated prior to or subsequent to the date of said ground license, mortgage, or trust deed. Licensee shall, upon the request of Licensor, or any such ground lessor, mortgagee, or trustee, execute and deliver whatever instructions may be reasonably required for such purposes, within ten (10) days after receiving a written request.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Section 17.27 <u>Employees Appearance</u>.**

Licensee's employees shall, at all times, be required to present a clean and well-groomed appearance. Licensee's employees shall be required to wear uniforms in good taste.

**Section 17.28 <u>Force Majeure</u>.**

If either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure material, failure of power, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work, or doing acts required under this Lease (collectively, "**Force Majeure**"), the period provided or required hereunder for the performance of any such act shall be extended for a period equivalent to the period of such delay.

**Section 17.29 <u>Brokers</u>.**

Licensee and Licensor warrant each to the other that it has had no dealings with any broker or agent in connection with this Lease, and each party covenants to pay, hold harmless and indemnify the other from and against any and all costs expense or liability for any compensation, commissions and charges claimed by any broker, or agent with respect to this License or the negotiation thereof by virtue of the acts or commitments of such indemnifying party.

**Section 17.30 <u>Quiet Enjoyment</u>.**

If Licensee pays the Fees and other amounts herein provided, and observes and performs all the covenants, terms and conditions hereof, Licensee shall peaceably and quietly hold and enjoy the Licensed Area for the Term without interruption by Licensor or any person or persons claiming by, through or under Licensor, subject, nevertheless, to the terms and conditions of this License.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

IN WITNESS WHEREOF, the parties have executed this License Agreement as of the Effective Date.

LICENSOR:

NAVY PIER, INC., an Illinois not-for-profit corporation

By: _Marilyn Gardner_ _____
Name: _Marilyn Gardner_ _____
Its: _President & CEO_ _____

LICENSEE:

NPM VENTURE LLC, a Delaware limited liability company

By: _____
Name: _Andy D. Podolsky_ _____
Its: _Manager_ _____

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Exhibit A     Site Plan**

FILED DATE: 9/8/2021 9:45 AM    2021CH04537



EXHIBIT A
SITE PLAN

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Exhibit B      Licensee Concept Plans**

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

**EXHIBIT B**

**LICENSEE CONCEPT PLANS**



Conceptual Plan



Conceptual Plan with Extended Breakwater

**CONCEPT DESCRIPTION**

Developer will create a world class destination marina that complements the Centennial Vision currently underway at Navy Pier. Developer will work with NPI and its design team to refine its initial concept vision to best coordinate the improvements, materials, signage, and circulation patterns to make the most of every opportunity to integrate the transient marina with the improvements now underway on Navy Pier.

The design of the marina itself will incorporate the highest quality floating dock systems, most likely utilizing a very durable floating modular concrete system designed specifically for this environment or possibly a floating aluminum frame system with concrete floats which is an upgraded dock system over that used in the Chicago Park District system. The marina basin itself will be protected from wave attack either by a concrete floating wave attenuator, or possibly a fixed breakwater system if warranted by the final wave studies.

Utilities within the marina will meet the highest standards for the industry, and will be sized appropriately for increasing future electrical demands. In particular, Developer will implement individual monitoring and ground fault interruption by slip to provide the highest protection against the risk of electrical shock drowning to provide the safest and most reliable marina in Chicago. Potable water will be provided, as well as sanitary pump-out at each slip, providing the utmost in convenience and achieving the highest clean marina standards.

The public facilities should achieve universal accessibility, and the marina will exceed the standards required by the Americans with Disabilities Act. The Project will go beyond making the docks accessible, and provide adjustable platforms that allow an individual user to access any boat with dignity regardless of their abilities or the relationship of the vessel to the docks. The facilities will be arranged to take best advantage of the pedestrian and vehicular circulation patterns of Navy Pier.

Developer will implement a range of strategies to ensure it achieves Illinois Clean Marina designation and creates the most efficient marina with the lowest environmental impact possible. This will include individual monitoring of utilities to encourage boaters to conserve resources, as well as implementation of energy and water efficient lighting and utility systems.

The Project will serve all elements of the transient boater market, ranging from the internationally based superyacht looking for a premier Great Lakes destination for a month long stay in the City to local Chicago boaters looking for first-class marina access to visit Navy Pier for dinner, a show or any one of its myriad attractions. The Project will attract boaters from all across the Great Lakes, and help expand the reach of Navy Pier as the first point of arrival to the City of Chicago. Developer will construct the marina to provide maximum flexibility so that it always has space to accommodate its visitors, as well as special events such as sailing regattas, tall ship festivals, in-water boat shows, and similar events.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Management and Operations Plan

Developer's plan for the management of the Project is built upon the premise that the marina is part of the Navy Pier community, forming a connection that provides an amenity to boaters and an economic driver to Navy Pier.

The Transient Slip Marina at Navy Pier will be a premier docking location in the City of Chicago with state-of-the-art facilities, exceptional service to boaters, and located for convenient access to Navy Pier and downtown Chicago. To maximize the boater experience, Developer will provide a number of advantages:

1. Marketing to Potential Boaters/Shoppers

    Transient boaters wishing to visit Navy Pier will originate from other marinas on Lake Michigan. Boaters located in a Chicago marina will become aware of the new slips at Navy Pier very quickly. Boaters based in the Chicago market will be an important part of the customer base for daytime hourly visits and guaranteed to utilize the amenities and businesses at Navy Pier. Additionally, the primary targeted boaters for overnight dockage at Navy Pier will be those boaters from outside the City of Chicago. Boaters planning to stay overnight will spend much more time at Navy Pier and spend more on services offered by the vendors at Navy Pier, making them the unique visitor that NPI is seeking with this development. That said, boaters seasonally moored outside of the City are far more difficult to reach for marketing purposes and Developer will reach them quickly, and repeatedly, due to its already in place Lake Michigan presence and marketing programs. One of the entities that comprises Developer, SG Marina, is the largest marina manager outside the Chicago market on Lake Michigan with nearly 2,000 boat slips. This enables Developer direct access to these boaters to promote the Transient Slip Marina at Navy Pier to these important, but hard to reach, boaters, visitors and shoppers.

2. Hospitality/Service

    Properly staffing the marina starts with hiring people that have hospitality embedded in their personality. All of Developer's staff will take the Cultural Index survey online that identifies personality traits to match the position to ensure the right people are in place. Employees will be trained to create a "positive memorable experience" for boaters at every opportunity.  Some of Developer's services include:

    a. Guaranteed reservations will be able to be made in advance online.  This is critical to the success of this transient marina's.

    b. Boaters will be greeted at the slip by courteous and knowledgeable staff to complete their check-in and electronically accept payment with smartphones.

    c. A professionally prepared welcome packet will be provided to boaters along with appropriate marketing information about the amenities at Navy Pier. Boaters will also be directed to Developer's Navy Pier Boater Visitor Center at the Marina Office on the transient pier. The Navy Pier Boater Visitor Center will provide boaters with discounts, brochures, maps and other information related to shops and entertainment inside Navy Pier.

3. Retail Experience/Merchant Relations

    Developer will foster a close relationship with NPI, its merchants, tenants, and other users. Developer will act as an ambassador for the Navy Pier community to maximize the benefit of the marina. Boaters also find this as an additional amenity to the marina as they view this as a concierge service. Staff will regularly meet with Navy Pier merchants to work together on promotions and programs that can be targeted to boaters to encourage visits and spending at Navy Pier.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

4.  America's Great Loop Cruisers' Association
    The AGLCA membership includes thousands of boaters that are planning to make the Great Loop that runs down the Mississippi, around Florida, up the Intracoastal Waterway, and through the Great Lakes. The Transient Boat Slip Facility at Navy Pier will be the only marina as a member of the AGLCA in the Chicago market, reaching the many cruisers that make their way through the Chicago River to the Mississippi.

5.  Social Media
    The Project will have a custom Website with links to an automatic reservation system along with extensive Navy Pier visitor information. A Facebook page will have regular postings. Staff will obtain boater email addresses to create a database of boaters that will receive marketing material to promote the marina and Navy Pier.

6.  Ships Store
    A small convenience store will provide boating supplies that are commonly needed as an amenity to boaters. This would include life safety equipment and other boating supplies and equipment, ice, small snacks and other sundries, subject to the approval of NPI.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

**Exhibit C      Reserved**

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Exhibit D      Development Agreement**

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

*EXHIBIT D*

**DEVELOPMENT AGREEMENT**

This Development Agreement ("**Agreement**") is attached to and forms a part of the License Agreement (the "**License**") dated as of August 7, 2017 by and between **NAVY PIER, INC.,** an Illinois not-for-profit corporation, as "Licensor," and **NPM VENTURE LLC,** a Delaware limited liability company, as "Licensee," covering a certain Licensed Area described in the License, and (together with the License) sets forth the agreement between Licensor and Licensee with respect to Licensee's construction of the Licensee Work (as hereinafter defined) and the Project. The "**Project**" shall mean all improvements to the Licensed Area as may be required for the installation and operation of the Docking Facilities, including any required infrastructure connections outside the Licensed Area. All terms not defined herein that are defined in the License shall have the same meaning as set forth in the License.

1.    **Construction Documents**.

a.    **Generally**.

    i.    Subject to the terms and conditions set forth herein and in the License, Licensee shall, at its sole cost and expense except as expressly provided herein, cause to be constructed, a Docking Facility within the Licensed Area, including infrastructure connections outside the Licensed Area as necessary (the "**Project**") substantially in accordance with the Construction Documents (as hereinafter defined), as such plans may be modified from time to time in accordance with the terms of this Agreement (the work described and depicted in such Construction Documents, which shall include, without limitation, all work necessary to complete the Project is referred to herein as the "**Licensee Work**").

    ii.    All drawings and specifications included in the Schematic Design Documents, the Design Development Documents and the Construction Documents (and modifications thereto), including but not limited to any mechanical, structural, and electrical drawings and specifications, shall be prepared at Licensee's sole cost and expense by Edgewater Resources ("**Licensee's Architect**") or a licensed engineer designated by Licensee and approved by Licensor as provided herein.

    iii.    All drawing sets shall be posted at an accessible website from which they can be electronically transferred by means of Licensor downloading them from the website.

b.    **Schematic Design Documents**. Licensee shall prepare and deliver to Licensor for Licensor reasonable review and approval as provided in Section 1(e) ("**Licensor's Approval**") a set of preliminary plans and Project description (collectively, the "**Schematic Design Documents**") to be prepared by Licensee's Architect which will set forth the conceptual design of the Project illustrating the scale and relationship of the Project components. The Schematic Design Documents will include preliminary plans and renderings necessary to convey the

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

character of the Project.  Preliminary selections of construction materials shall be noted on the drawings or described in writing.

      **c.**    **Design Development Documents.**  Promptly after Licensor approval of the Schematic Design Documents, Licensee shall cause to be prepared and made available for electronic transfer to and review and approval by Licensor as provided in Section 1(e), detailed, comprehensive Design Development Documents, drawings and specifications of the Project (as the same may be modified from time to time in accordance with the terms of this Agreement) (the "**Design Development Documents**"), which shall illustrate and describe the refinement of the design of the Project, establishing the scope, relationship, forms, size and appearance of the Project by means of plans, sections and elevations, typical construction details, and equipment layouts.  The Design Development Documents shall include drawings for all major structural and mechanical, docking and anchoring, and wave attenuation systems; specifications that identify major materials and systems and establish in general their quality levels; and a preliminary description of the physical aspects and logistics of how Licensee intends to build the Project, by phase, including without limitation, identifying vehicle access, staging, location of trailers and job site support, barge locations, fencing, and deliveries (the "**Preliminary Construction Phasing Plan**").

      **d.**    **Construction Documents.**  Promptly after Licensor has approved the Design Development Documents, Licensee shall cause to be prepared and made available to Licensor for electronic transfer to and review by Licensor, detailed drawings, schedules, plans and specifications (collectively, the "**Construction Documents**") which shall set forth in detail the requirements for construction of the Project and shall include drawings and specifications that establish in detail the quality levels of materials and systems required and a construction phasing plan ("**Construction Phasing Plan**") for Licensor's Approval.  The Construction Phasing Plan shall set forth the physical aspects and logistics of how Licensee intends to build the Project, by phase, including without limitation, identifying vehicle access, staging, location of trailers and job site support, barge locations, fencing, and deliveries.  For purposes hereof, the term "**Construction Documents**" shall mean the Construction Documents, as revised, which have been finalized by Licensee, which have been so reasonably approved by Licensor in accordance with the procedures in section 1(e), and which are suitable for permit, procurement and construction.

      **e.**    **Licensor Review and Approval Process.**

      **i.**    Within fifteen (15) Business Days after the date on which Licensor is notified by Licensee that the Schematic Design Documents, the Design Development Documents or the Construction Documents are available to Licensor for electronic transfer to and approval by Licensor, Licensor shall notify Licensee, in writing, that Licensor has approved the applicable documents or provide a specific statement of its reasons for any disapproval of the applicable documents or potions thereof.

      **ii.**    If Licensor disapproves or requests changes to the Schematic Design Documents, the Design Development Documents or Construction Document (or any portion thereof), Licensee shall, after taking into consideration, reasonably and in good

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

faith, Licensor's advice as to the changes which may be required for Licensor's Approval thereof, revise (at Licensee's sole cost and expense) such Schematic Design Documents, the Design Development Documents or Construction Document. Licensor shall review the revised plans and, within ten (10) Business Days after Licensor is notified by Licensee that such revised plans are available for electronic transfer to and review by Licensor, advise Licensee of further changes, if any, to obtain Licensor's Approval thereof. This process shall continue until Licensee has obtained Licensor's Approval of such Schematic Design Documents, the Design Development Documents or the Construction Document (which approval shall be in Licensor's reasonable discretion).

 **f.**   **Compliance of Plans**.  All Construction Documents shall comply with all Laws (including, without limitation, all applicable codes, zoning, rules, regulations of the Americans With Disabilities Act of 1990, as amended, and with any applicable portions of the Illinois Accessibility Code (IAC) 1997, as amended, to the extent governing the Project) and with all applicable requirements of Licensor's fire insurance underwriters.  Neither review or approval by Licensor of the Schematic Design Documents, Design Development Documents or Construction Documents, or any changes thereto, shall constitute a representation or warranty by Licensor that such plans either (i) are complete or suitable for their intended purpose, or (ii) comply with any Laws or other requirements, including zoning considerations, it being expressly agreed by Licensee that Licensor assumes no responsibility or liability whatsoever to Licensee or to any other person or entity for such completeness, suitability or compliance.  Licensee shall not make any material changes to the Construction Documents that constitute a change to the Project, without Licensor's prior written approval, except as specifically permitted by this Agreement, which consent shall not be unreasonably withheld, conditioned or delayed.

 **2.**   **Construction of Licensee Work**.  Licensee shall cause all Licensee Work to be fully completed substantially in accordance with the Construction Documents, and in accordance with the time frames and other requirements set forth in this Agreement and in the License.  The general contractor which will perform the Licensee Work (**"Licensee's General Contractor;"** and, together with all other contractors, subcontractors and material suppliers performing or providing materials for the Licensee Work, the **"Licensee's Contractors"**) shall be a reputable contractor selected by Licensee and approved by Licensor, which approval shall not be unreasonably withheld or delayed.  Upon not less than ten (10) days prior written notice to Licensee (except in the event of an emergency in which case, no prior notice shall be required), Licensor shall have the right, but not the obligation, to perform, on behalf of and for the account of Licensee, subject to reimbursement of the cost thereof by Licensee, any and all of the Licensee Work which Licensor determines, in its reasonable discretion, should be performed immediately for the protection of the Licensed Area or other portions of Navy Pier and the operations thereon, including, without limitation, work which pertains to safety, sprinkler and fire alarm work, utilities, leaks, structural components, removal of unduly accumulated construction material and debris and other conditions which violate the terms and provisions of this Development Agreement.

 **3.**   **Details of Construction of Licensee Work**.

 **a.**   **Substantial Completion**.  Subject to delays caused by Force Majeure, as defined in the License, Licensee shall use commercially reasonable efforts to cause the Licensee Work to

7822288_3

be performed on the Licensed Area pursuant to the Construction Documents to be substantially completed (as hereinafter defined) on or prior to the Term Commencement Date.

**b.** **Construction Warranties; No Release**.

**i.** Licensee hereby warrants to Licensor: (1) all Licensee Work shall be performed in a good and workmanlike manner, (2) all materials, supplies and equipment furnished in connection with the Licensee Work shall be new and of good quality, (3) the Licensee Work shall be of good and workmanlike quality and free from defects, and (4) the Licensee Work shall be performed in compliance (where applicable) with (A) the Construction Documents, this Agreement and the License, in all substantial respects, (B) current first class standards and practices in metropolitan Chicago of the applicable profession, industry or trade for work of a similar value and purpose; and (C) all applicable Laws (including, without limitation, the Americans With Disabilities Act of 1990 (as amended), and any applicable portions of the Illinois Accessibility Code (IAC) 1997 (as amended), to the extent governing the Licensee Work, and all applicable building, zoning, fire and safety codes) and the requirements of Licensee's fire insurance underwriters. If Licensor shall discover any failure or breach of the Licensee's warranties set forth in this Section 3(b)i, within one (1) year after the Commencement Date, then Licensee shall, upon written notice from Licensor and at Licensee's sole cost and expense, promptly cause Licensee's General Contractor or other contractor to commence and diligently perform the correction of such failure or breach (which corrective action may include, without limitation, any necessary removal, disassembly, reinstallation, repair, replacement, re-assembly, reconstruction, re-testing and/or re-inspection of any portion of the Licensee Work and any other property damaged or affected by such failure, breach or corrective action), all in a manner that minimizes any disruption of or interference to any other portion of Navy Pier, including Licensor's facilities that are impacted by the Project (and the other areas of Navy Pier that Licensee has the right to use under the License), and in compliance with the terms of the License. Licensor agrees to provide Licensee with notice of any claim to be made by Licensor under this Section 3(b)i promptly after Licensor discovers any failure or breach of the Licensee's warranties set forth in this Section 3(b)i, but no failure by Licensor to provide such prompt written notice shall affect the validity thereof, except to the extent that such failure prejudices Licensee to any material extent (e.g., prompt notice would have allowed Licensee to pursue claims under contractors' warranties which are no longer then available).

**ii.** Licensee shall obtain construction warranties against defects in labor, materials and equipment of at least one (1) year (or such longer period as is customary with respect to various components of the Licensee Work) from Licensee's Contractors with respect to all components of the Licensee Work.

**iii.** Nothing contained in this Agreement shall relieve Licensee from any of Licensee's duties and responsibilities under the License with respect to the performance of the Licensee Work, and/or the maintenance, repair and operation of the Licensed Area (including the Project).

D-4

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**c.** **Protection of Navy Pier**.  Licensee shall take all reasonable and customary precautionary steps to protect its facilities and the facilities of others affected by the Licensee Work and to properly police same.  Licensee shall keep all Common Areas free from accumulations of waste materials or rubbish and shall cause all areas in which the Licensee Work is occurring to be properly barricaded from adjacent portions of the Common Areas that are open to the Licensees of Navy Pier.  Licensor shall have the right to review and approve any and all signage placed on any such barricades which approval shall not be unreasonably withheld, conditioned or delayed.

**d.** **Navy Pier Business**.  Licensee acknowledges Licensor conducts business at Navy Pier and Navy Pier's operations will be open during construction of the Project.  Licensee's construction of the Project and the Construction Phasing Plan shall account for the business operations of Licensor, Navy Pier and other licensees and tenants at Navy Pier, all of which shall be subject to Licensor's reasonable approval throughout construction of the Project.  Licensee and Licensor shall cooperate fully with each other and other licensees and tenants at Navy Pier during construction of the Project to allow for full operation of their respective businesses with limited, if any, impact to business during Navy Pier business hours.

**e.** **Accidents**.  Licensee's construction contracts with Licensee's Contractors shall require Licensee's Contractors to take all reasonable safety precautions with respect to the Licensee Work, and to comply with all applicable Laws for the safety of persons and property, and Licensee shall use commercially reasonable efforts to enforce all such terms of such contracts.

**f.** **Delivery of As-Built Plans and Other Materials**.  As promptly as reasonably possible following the substantial completion of the Project, Licensee, at its cost and expense, shall provide Licensor with "as-built" drawings for the Project.

**g.** **Licensor's Prior Approval of Contractors.**  Whenever Licensor's approval of any contractor, subcontractor, architect, engineer or other consultant is required hereunder, Licensee may at any time hereafter (but prior to the time such approval is required) provide Licensor with a list of such contractors, subcontractors, architects, engineers or other consultants for pre-approval by Licensor together with a general description of the work for which such contractor or other service provider is sought to be approved, and Licensor shall either approve or disapprove such contractor or other service provider for the work generally described (which approval shall not be unreasonably withheld, conditioned or delayed, and with the reasons for such disapproval specified) by giving notice of same to Licensee in writing from time to time within seven (7) Business Days after Licensor's receipt of such list.

**4.** **Standards of Design and Construction and Conditions of Licensor's and Licensee's Performance**.  All work done on the Project by Licensee pursuant to this Agreement shall be done according to the standards set forth in this Section 4.

**a.** **Compliance with Laws**.  Licensee shall cause Licensee Work to comply with all applicable Laws.

7822288_3

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**b.** **Permits**.  Licensee shall, at its own cost and expense, obtain all required Construction Approvals, including but not necessarily limited to, building permits and approvals as, by reason of the nature of the Licensee Work, may be required from any governmental authority having jurisdiction, including without limitation any zoning approvals as provided in the License.

**c.** **Compliance with Cooperation Standards**.   Licensee's Contractors shall comply with the Project Labor Agreement set forth on Exhibit K of the License Agreement and made a part hereof (the "**PLA**"), and Licensee shall cause the PLA to be a part of the contract with Licensee's General Contractor (subject to immaterial variations required by such contractors or variations mutually and reasonably agreed to between Licensor and Licensee) and require such contractors to include them in contracts entered into with their respective subcontractors.   Licensee's General Contractor shall be required to hire subcontractors possessing good labor relations, capable of performing quality workmanship and working in harmony with each other's contractors and subcontractors and with other contractors and subcontractors on the Project. Licensee shall conduct its respective labor relations and relations with their respective contractors, subcontractors and employees in an effort to avoid strikes, picketing, and boycotts of, on or about the Licensed Area or Navy Pier.

**d.** **Rules and Regulations**.  Notwithstanding anything to the contrary contained in this Agreement, Licensee and Licensee's Contractors shall make reasonable efforts and take reasonable steps appropriate to assure that all construction activities undertaken do not unreasonably interfere with the operation of Navy Pier or with other licensees and tenants and occupants of the Navy Pier, including without limitation compliance with the Construction Phasing Plan  Licensee and Licensee's Contractors shall take reasonable, precautionary steps to minimize dust, noise (excluding ordinary construction noise) and construction traffic, and to protect their facilities and the facilities of others affected by the Licensee Work and to properly police the same.  Licensee's and Licensee's Contractors' construction equipment and materials are to be kept within the Licensed Area (except that if it is impracticable to keep such any equipment or materials within the Licensed Area, then Licensor shall not unreasonably withhold its consent to their temporary location outside the Licensed Area, at Licensee's sole risk). Licensee's delivery and loading of equipment and materials shall be done at such reasonable locations and at such times as Licensor and Licensee shall reasonably schedule so as not to burden the construction or operation of Navy Pier.

**e.** **MBE/WBE Participation**.  Licensor has established minority business enterprise and women business enterprise participation goals and policies for the Licensee Work as set forth in the License Agreement.  Licensee shall comply with the MBE/WBE Goals during performance of the Licensee Work.

**f.** **Utilities and Debris**.

**i.** If provided by or through Licensor all costs or charges for any services including utilities, to the Licensed Area shall be the responsibility of Licensee.  All amounts payable above shall be paid within thirty (30) days after an invoice therefor is delivered by Licensor to Licensee as may be apportioned.

7822288_3

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

     **ii.**    Licensee shall arrange and pay for removal of its construction debris and shall not place or store debris in the Navy Pier's waste containers.

     **g.**    <u>**Inspection**</u>.  During the construction of, and upon completion of, the Licensee Work and subject to Licensee's reasonable scheduling requirements, Licensor and Licensor's representatives shall have the right to inspect the Licensed Area to monitor the progress of construction of the Licensee's Work; provided, however, Licensor shall conduct such inspection in a manner which minimizes any interference with the work and Licensee shall have the right to accompany Licensor and Licensor's representatives during any such inspections.

     **h.**    <u>**Progress Advisories; Coordination Meetings**</u>.  Licensee shall keep Licensor advised with respect to the progress of the Licensee Work and the estimated date of substantial completion of the Licensee Work, and shall permit Licensor's representatives to attend any relevant project meetings.  Licensee shall be available to meet with the Licensor's representatives to review specific items, including construction progress and coordination with Navy Pier.  Licensee shall arrange regular coordination meetings with Licensor as reasonably required during construction of the Project.

     **i.**    <u>**Agreement Enforcement**</u>.  Licensee shall use commercially reasonable efforts to impose on and enforce all applicable terms of this Agreement against its respective architects, contractors and subcontractors.

     **j.**    <u>**Damage to Navy Pier**</u>.  Notwithstanding anything to the contrary contained herein, to the extent any portions of Navy Pier are damaged by any of Licensee's Contractors, during the course of any improvements, Licensee shall be responsible for the repair of such damage to the condition of the area so damaged prior to any such damage.  Licensee, at its sole cost and expense, shall also be responsible for relocating any and all building systems, utilities and improvements currently serving other portions of Navy Pier so that at all times throughout the Term (including during any period of construction) the operations of Navy Pier (outside of the Licensed Area) as currently conducted are not interrupted or adversely impacted.

     **k.**    <u>**Construction Rules and Regulations**</u>.  Licensor shall have the right to deliver (or to cause Licensee to deliver) Licensor's construction rules and regulations, together with reasonable modifications or supplements to such construction rules and regulations that are consistent with the terms and provisions of this Agreement to Licensee's Contractors performing the Licensee Work, in which event Licensee shall cause such rules and regulations, including any such reasonable modifications or supplements thereto (subject to immaterial variations required by such contractors and/or variations mutually and reasonably agreed to between Licensor and Licensee), to be incorporated into the contracts of Licensee's Contractors performing the Licensee Work, and shall thereafter use reasonable efforts to enforce such rules and regulations, including any such reasonable modifications or supplements thereto, in connection with the performance of the Licensee Work (it being agreed, however, that in the event of any conflict or inconsistency between the terms and provisions of any such construction rules and regulations delivered by Licensor and the terms and provisions of the License or this Agreement, the terms and provisions of the License or this Agreement shall govern).

7822288_3

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

5. **Insurance, Indemnification and Bonds**.

a. **Licensee's Insurance.** The Licensee must procure and maintain, or cause its general contractor, architect or engineer to procure and maintain, at its/their own expense and for as long as the contract is in effect, the insurance coverages in amounts specified in Exhibit D-1 attached hereto and made a part hereof, in amounts specified therein and must provide Licensor with certificates evidencing such coverage prior to performing Licensee Work.

b. **Indemnification**. To the fullest extent permitted by law, Licensee shall indemnify, defend, protect, and hold harmless Licensor Protected Parties from and against any and all claims, suits, fines, costs (including reasonable attorneys' fees) brought by, or liabilities to or judgments in favor of, any person, firm or organization for bodily injury or death to any person (including without limitation, the employees of company and contractor group), and damage to, or loss or destruction of any property (including without limitation, the work covered hereunder and the property of contractor and company) (all of the above collectively called "**claims**"), to the extent arising, directly or indirectly, from the activities of Licensee, its employees, agents, contractors, subcontractors or any other person or entity performing any Licensee Work, in connection with this Agreement, whether caused by the negligence or other legal fault, including strict liability, of Licensee, Licensee's Contractors or any third party providing services or labor to the Licensed Area, excluding, however, the gross negligence or willful misconduct of Licensor or any of the Licensor Protected Parties.

    i. Provided further that, if this section contains an indemnity obligation that is unenforceable under applicable law, then, but only in such event, this section shall be modified, read, construed and enforced to the fullest extent permitted by law, and any obligation that is enforceable shall remain in full force and effect and be binding on the parties to this contract and upon any party with an indemnity obligation by reason of this contract.

    ii. In claims against any person or entity indemnified under this Section 6.b by an employee of a contractor, subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for a contractor or subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

c. **Payment and Performance Bonds**. Except as agreed by the Licensor in writing, Licensee shall require Licensee's General Contractor or contractors to provide a payment and performance bond in an amount equal to one hundred percent (100%) of the cost of the Licensee Work or such other security reasonably acceptable to Licensor as security for completion of the Work. All performance and payment bonds shall name Licensor as a dual obligee. The surety for the payment and performance bond must be rated at least A X or better (or such surety is otherwise approved by Licensor) by the most recent edition of Best's Key Rating Guide and be reasonably acceptable to Lender. All performance and payment bonds shall be on AIA Document A312 "Performance and Payment Bond" or other bond form acceptable to Owner in form and terms. Licensee's failure to obtain and deliver the bonds described in this Section 6.c shall constitute a material breach of this Agreement.

7822288_3

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**6.** **Meetings**.

**a.** **Appointment of Representatives**.  Each of Licensor and Licensee shall appoint in writing one or more individual representatives who are authorized to act on behalf of Licensor or Licensee, as the case may be, with respect to any approvals, consents or authorizations of Licensor or Licensee hereunder.  Licensee's initial representative is Randy Podolsky.

**b.** **Meetings**.  Except as otherwise agreed by Licensor and Licensee, Licensor and Licensee shall meet regularly to review the status of the performance of the Licensee Work at the principal offices of Licensor.  At the request of either party, Licensor and Licensee shall meet more or less frequently at the request of a party who determines in good faith that such meeting is necessary or desirable to advance the completion of the Licensee Work.

**7.** **Disputes; Remedies**.

**a.** **Generally**.  Any dispute which shall arise under this Agreement (except to the extent specifically provided herein), or any dispute which shall arise under the License and is specifically to be subject to the Agreement Dispute Procedures, shall be resolved pursuant to the procedures provided for in this <u>Section 7</u> (the "**Agreement Dispute Procedures**").  Except as otherwise expressly provided herein or in the License, sums in dispute shall not be payable or credited until such dispute is resolved as herein provided.

**b.** **Failure to Resolve; Arbitration**.  Unless otherwise mutually agreed, if any dispute which is to be governed by the Agreement Dispute Procedures has not been resolved to the mutual satisfaction of both parties within ten (10) Business Days after written notice of the same shall have been provided by one party to the other, then such dispute shall be resolved by arbitration as provided in this <u>Section 7.b</u> below:

    **i.**  Within seven (7) days after the expiration of the ten (10) Business Day period described in <u>Section 7.b</u> above, Licensor and Licensee shall select a mutually acceptable arbitrator (the "**Agreement Qualified Arbitrator**"), who shall be an architect, engineer or general contractor (depending on the nature of the dispute) having at least ten (10) years' continuous experience in representing (or contracting with) licensors or licensees, or both, in the performance or design of improvements comparable to the Licensee Work.  If the parties fail to agree on the selection of an Agreement Qualified Arbitrator within such seven (7) day period, then, within a second period of seven (7) days, each party shall select an Agreement Qualified Arbitrator, and within a third period of seven (7) days thereafter, the two appointed Agreement Qualified Arbitrators shall select a third Agreement Qualified Arbitrator and the third Agreement Qualified Arbitrator shall be the arbitrator and shall resolve the subject dispute.  If one party shall fail to make such selection within said third seven (7) day period, then the Agreement Qualified Arbitrator chosen by the other party shall be the sole arbitrator.  If the two appointed Agreement Qualified Arbitrators shall fail to select a third Agreement Qualified Arbitrator, then the third Agreement Qualified Arbitrator shall be selected by the Director of the Chicago Chapter of the American Arbitration Association (or comparable organization, if the Chicago Chapter of the American Arbitration Association does not then exist).

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

    **ii.**    Once the Agreement Qualified Arbitrator has been selected as provided in <u>Section 7.b.i</u> above, each of Licensor and Licensee, if it so elects, shall present evidence and materials to such Agreement Qualified Arbitrator, and, as soon thereafter as practicable, but in any case within ten (10) Business Days after such selection, the Agreement Qualified Arbitrator shall deliver its resolution of the dispute in question. Any such decision shall include, if applicable, an express determination of the prevailing party in such dispute, and any costs, if any, resulting from the matter(s) that are the subject of such dispute. Such decision of the Agreement Qualified Arbitrator shall be submitted in writing to, and be final and binding on, each of Licensor and Licensee. If the Agreement Qualified Arbitrator believes that expert advice would materially assist him or her, (s)he may retain one or more qualified persons, including, but not limited to, legal counsel, contractors, architects or engineers, to provide such expert advice. All costs and expenses pertaining to any such arbitration shall be borne by the party so required to bear the cost of the Agreement Dispute Procedures provided elsewhere in this Agreement. If, however, no such party is so provided, then: (1) the non-prevailing party in the arbitration (as determined by the Agreement Qualified Arbitrator) shall pay the costs of the Agreement Qualified Arbitrator and of any experts retained by the Agreement Qualified Arbitrator, (2) any fees of any counsel or expert engaged directly by the Licensor or Licensee and the fees of any appointed Agreement Qualified Arbitrator engaged to select a third Agreement Qualified Arbitrator, however, shall be borne by the party obtaining such counsel, expert or arbitrator, and (3) if a compromise of any such dispute is reached between the parties, the cost of the arbitration shall be equally divided between the parties.

    **iii.**    Any determination by an Agreement Qualified Arbitrator pursuant to this <u>Section 7</u> shall be deemed an arbitration award, and judgment on the award may be entered in any court having jurisdiction thereof.

**8.**    <u>**Miscellaneous**</u>.

    **a.**    Except as expressly set forth herein or in the License, Licensor has no oral or written agreement with Licensee to do any work with respect to the Project or Licensed Area.

    **b.**    Time is of the essence under this Agreement.

    **c.**    All notices, requests, consents, approvals, demands and other communications (including any required drawings, plans and specifications) under this Agreement shall be in writing and shall be given (and deemed received) in the same manner as notices under the License.

    **d.**    This Agreement, together with the License, sets forth the entire agreement of Licensee and Licensor regarding Licensee Work. This Agreement may only be amended if in writing and duly executed by both Licensor and Licensee.

    **e.**    Wherever under the terms and provisions of this Agreement the time for payment or performance falls upon a Saturday, Sunday or Holiday, such time for payment or performance shall be extended to the next Business Day.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**f.**     In the event of any express inconsistencies between the License and this Agreement, the terms of the Agreement shall govern and control.  Any default by a party hereunder shall constitute a default under the License and, except to the extent otherwise expressly provided herein, shall be subject to the notice and cure periods and the remedies and other provisions applicable thereto under the License.

*[Remainder of Page Intentionally Blank]*

7822288_3

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

**SIGNED:**

**LICENSOR**:

**NAVY PIER INC.**, an Illinois not-for-profit corporation

By: _____

Name: _Marilynn Gardner_____

Title: _President & CEO_____

Approved as to form and legality:

By: _____
   _Dan Blodin, Gen Counsel_

**LICENSEE**:

**NPM VENTURE LLC**, a Delaware limited liability company

By: _____

Name: _Andy D. Podolsky_____

Title: _Manager_____

D-12

7822288_3



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## Exhibit D-1 INSURANCE REQUIREMENTS

1.      The Licensee must procure and maintain, or cause its general contractor, architect or engineer to procure and maintain, at its/their own expense and for as long as the contract is in effect, the insurance coverages in amounts specified therein and must provide Licensor with certificates evidencing such coverage prior to performing Licensee Work:

### a.      Commercial General Liability

**Coverage**        **Limit**

General Aggregate     $2,000,000
Products Liability/Completed
Oper. Aggregate       $1,000,000
Each Occurrence       $1,000,000
Personal & Advertising Injury        $1,000,000

Endorsement specifically covering the liability assumed by the Licensee/Contractor under this Contract or evidence of blanket contractual liability that specifically addresses the exposures of this Contract, Products & Completed Operations Liability including claims brought by divers and their tenders, sudden & accidental seepage & pollution coverage, watercraft exclusion deleted, and "in rem" endorsement with minimum limits of $1,000,000 per occurrence.

If Commercial General Liability or other form with a general aggregate limit is used, the general aggregate limit shall be twice the required occurrence limit. The general liability coverage must also include additional insured wording equivalent to CG 2010(11/85).

### b.      Workers' Compensation and Employer's Liability

**Coverage**        **Limit**

Workers' Compensation          Statutory
Employer's Liability
                Each Accident $1,000,000
                Per Employee - Disease      $1,000,000
                Annual Aggregate - Disease  $1,000,000

Including occupational disease and coverage under the United States Longshoremen's and Harbor Worker's Compensation Act, Employer's Liability Insurance extended to include coverage for Maritime Employer's Liability (i.e., Jones Act, Death on the High Seas Act and transportation, wages, maintenance and cure)

Workers Compensation/ Employer's Liability policies shall be endorsed to waive the insurer's right of subrogation against Licensor and MPEA.

### c.      Hull & Machinery, Protection & Indemnity (P&I) and Pollution

D-13

7822288_3

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

| Coverage | Limit | |
|----------|-------|---|
| Hull and Machinery | | |
|   Occurrence | Vessel Value | |
| P&I | | |
|   Occurrence | $1,000,000 | |
| Pollution | | $5,000,000 |

<u>Hull & Machinery</u> per American Institute Hull Clauses (amended for the vessel operations at the shipyard) or equivalent to the fair market value of the vessel. Any references to "other than Company" or other Company limitations will be deleted by endorsement to the policy as respects the naming of Navy Pier as an additional assured;

<u>P&I</u> per P&I form SP 23 or equivalent (amended for the vessel operations at the shipyard) with a minimum limit of $1,000,000 per occurrence. Any references to "other than Company" or other Company limitations will be deleted by endorsement to the policy as respects the naming of Navy Pier as an additional assured;

<u>Pollution</u> per Water Quality Insurance Syndicate (WQIS) or equivalent with a minimum limit of $5,000,000.

    d.    **Automobile Liability**

| Coverage | Limit |
|----------|-------|
| Bodily Injury and Property Damage | |
|   Combined - Combined Single Limits | $1,000,000 |
| Uninsured/Underinsured Motorist - | |
|   Occurrence | $1,000,000 |

This Policy must provide coverage for all owned, non-owned, and hired autos.

    e.    **Bumbershoot Marine Umbrella Coverage**

| Coverage | Limit |
|----------|-------|
| Per Occurrence | $20,000,000 |
| General Aggregate | $20,000,000 |

Coverage must be in excess of Commercial General Liability including Marine coverages, Auto Liability and Employers Liability. It must be no more restrictive than the primary coverage.

    f.    **Engineers Errors and Omissions or Professional Liability Coverage**

**Coverage**                                                   **Limit**

7822288_3

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

|                        |             |
|------------------------|-------------|
| Per Wrongful Act       | $5,000,000  |
| Annual Policy Aggregate| $5,000,000  |

Definition of Professional Services must encompass all professional services associated with this agreement and the policy definition of professional service should require Navy Pier Inc. written approval and authorization.

**g.      Builders Risk Insurance**

Builder's Risk Insurance naming Navy Pier as a named insured and loss payee as interests may appear, covering the equipment, all materials and the work for the full insurable value against all risks, including but not limited to fire, while under conversion, repair and/or fitting out including materials in buildings, workshops, yards and docks of Navy Pier, or on quays, pontoons, craft, etc., and against all risks of loss or damage through collapse of supports or ways from any cause whatever, and all liability risks of contractor and Navy Pier with respect to completion of the project. Such insurance will be in the amount of the full insurable value of the equipment, materials and work.

2.      All insurance companies must be rated A-VIII or better by the A. M. Best Company.

3.      Licensee / Contractor's assumption of liability is independent from, and not limited in any manner by, the Contractor's insurance coverage obtained pursuant to this contract, or otherwise.  All amounts owed by Licensee / Contractor to Licensor and MPEA as a result of the liability provisions of the Licensee / Contractor shall be paid on demand.

4.      None of the requirements contained herein as to types and limits or Licensor and MPEA approval of insurance, coverage to be maintained by the Licensee / Contractor are intended to and shall not in any manner limit, qualify or quantify the liabilities and obligations assumed by Licensee / Contractor under the Agreement, for the term of this Agreement and any other agreement with Licensor and MPEA or otherwise provided by law.

5.      Licensee / Contractor expressly understands and agrees that any insurance or self-insurance programs maintained by Licensor and MPEA shall apply in excess of and not contribute with insurance provided by them under the Agreement.

6.      All policies should be written on an occurrence basis with the exception of professional liability coverage.

7.      All policies must amend the other insurance clause to be Primary and Non Contributory for any liability arising directly or indirectly from the Services.

8.      Licensor and MPEA, their facilities, agents, officers, board members and employees must be named as additional insureds on the general liability, auto liability and umbrella liability policies.

7822288_3

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

9.      Licensee / Contractor agrees to require its subcontractors to comply with the insurance provisions required of Contractor pursuant to this Agreement unless Contractor, Licensor and MPEA mutually agree to modify these requirements for subcontractors whose work is of relatively small scope.  Contractor agrees that it will contractually obligate its subcontractors to promptly advise Contractor of any changes or lapses of the requisite insurance coverage and Contractor agrees to promptly advise Licensor and MPEA of any such notices Contractor receives from its subcontractors.  Contractor agrees that it will contractually obligate its subcontractors to indemnify and hold harmless Licensor and MPEA to the same extent that Contractor is required to do so as provided in this Agreement.  Contractor assumes all responsibility for monitoring subcontractor's contracts and insurance certificates for compliance with the insurance and other provisions of this Agreement until final completion of services.

10.     All coverage must contain a Waiver of Subrogation in favor of Licensor and MPEA.

11.     If policies are canceled for any reason, thirty (30) day notice is required to be given to the Risk Management Department.

12.     Failure to obtain and maintain required insurance shall constitute a breach of the Agreement and the Licensee will be liable for any and all costs, liabilities, damages and penalties resulting to Licensor and MPEA from such breach, unless a written waiver of the specific insurance requirement is provided to the Licensee by Licensor and MPEA.

7822288_3

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

**Exhibit E      Licensee's Development Budget**

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

EXHIBIT E

LICENSEE'S DEVELOPMENT BUDGET

**Preliminary Development Budget**

| | | | |
|---|---|---|---:|
| 1 | 6,000 SF floating breakwater @ $150/sf | $ | 900,000 |
| 2 | 35,400 sf Floating Docks including Main Pier @ $90/sf | $ | 3,186,000 |
| 3 | Dock utilities on site, 132 ea @ $5,000 | $ | 660,000 |
| 4 | Slip utilities off site | $ | 250,000 |
| 5 | Gangways with Security Gates, 3 @ $50,000 | $ | 150,000 |
| 6 | Reception & Bathroom facility | $ | 400,000 |
| 7 | Design & Engineering Fees | | |
| | a. RFP Documents | $ | 35,000 |
| | b. Permitting/Entitlements | $ | 150,000 |
| | c. Allowance for Special Environmental Studies | $ | 25,000 |
| | d. Final Engineering Design, Bid and CD's @ 6% | $ | 330,000 |
| | e. Construction Administration of GC @ 3% | $ | 165,000 |
| 8 | Construction Contingency @ 7.3% | $ | 404,000 |
| 9 | Development & Financing Fees | | |
| | a. Development Fees to GP Members | $ | 350,000 |
| | b. Bank Fees, Due Diligence & Appraisal Allowance | $ | 100,000 |
| | c. Contingency for Financing Costs | $ | 215,000 |
| 10 | Legal Fees | $ | 60,000 |
| **Total Estimated Budget** | | $ | 7,380,000 |

Note: USFWS BIG Grant max is $1,500,000

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Exhibit E-1    Licensee's Financing Plan**

**EXHIBIT E-1**

**LICENSEE'S FINANCING PLAN**

Navy Pier Marina will be financed by the Developer as follows:

PRE-CONSTRUCTION FINANCING:
      100% of the pre-development budget will be funded by the Developer partners.

PRE-CONSTRUCTION COMPLETION FINANCING*:
      50% of the Project costs will be funded in equity by the three Developer partners.
      50% of the Project costs will be funded by a construction to operation loan.
      A USFWS BIG Grant in the amount of $1,500,000 will be applied for.

POST-CONSTRUCTION COMPLETION FINANCING:
      Post completion and in operating mode, additional financing or re-financing will be sought in an amount NTE 85% of its fair market value.

* Development of marina is not contingent upon receipt of the grant and if it is not received, then the loan amount and equity would be increased equally to fund the development. The provisions of Section 7.3 of the Lease shall govern.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**EXHIBIT E-1**

**LICENSEE'S FINANCING PLAN**

Navy Pier Marina will be financed by the Developer as follows:

PRE-CONSTRUCTION FINANCING:
    100% of the pre-development budget will be funded by the Developer partners.

PRE-CONSTRUCTION COMPLETION FINANCING*:
    50% of the Project costs will be funded in equity by the three Developer partners.
    50% of the Project costs will be funded by a construction to operation loan.
    A USFWS BIG Grant in the amount of $1,500,000 will be applied for.

POST-CONSTRUCTION COMPLETION FINANCING:
    Post completion and in operating mode, additional financing or re-financing will be sought in an amount NTE 85% of its fair market value.

* Development of marina is not contingent upon receipt of the grant and if it is not received, then the loan amount and equity would be increased equally to fund the development.  The provisions of Section 7.3 of the Lease shall govern.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**EXHIBIT E-1**

**LICENSEE'S FINANCING PLAN**

Navy Pier Marina will be financed by the Developer as follows:

PRE-CONSTRUCTION FINANCING:
>       100% of the pre-development budget will be funded by the Developer partners.

PRE-CONSTRUCTION COMPLETION FINANCING*:
>       50% of the Project costs will be funded in equity by the three Developer partners.
>       50% of the Project costs will be funded by a construction to operation loan.
>       A USFWS BIG Grant in the amount of $1,500,000 will be applied for.

POST-CONSTRUCTION COMPLETION FINANCING:
>       Post completion and in operating mode, additional financing or re-financing will be sought in an amount NTE
>       85% of its fair market value.

\* Development of marina is not contingent upon receipt of the grant and if it is not received, then the loan amount and equity would be increased equally to fund the development.  The provisions of Section 7.3 of the Lease shall govern.

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

**Exhibit F      Reserved**

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

**Exhibit G – Form of Letter of Credit**


Beneficiary:
Navy Pier, Inc.
600 E. Grand Ave.
Chicago, IL 60616

Irrevocable Letter of Credit
No. [Insert Number]


By order of our client, _____ (the "Applicant"), we hereby establish this Irrevocable Letter of Credit No. _____ in favor of the Navy Pier, Inc. (the "Beneficiary") for an amount up to but not exceeding the aggregate sum of _____ Dollars ($_____) effective immediately, and expiring at our offices one year from the date hereof unless renewed as hereinafter provided.

Funds under this Letter of Credit are available to you against presentation by you of your sight draft(s), signed by one of your officers, drawn on us bearing the clause "Drawn under Credit No. _____." The sight draft shall be accompanied by the following:

A statement signed as follows: "The drawer hereunder is entitled to draw upon this letter of credit pursuant to that certain License Agreement dated _____, 2017, by and between Navy Pier, Inc., as Licensor, and NPM Venture LLC, as Licensee."

Partial draws are permitted. If presentment is made on a Business Day on or prior to 10:00 A.M. (Central Standard Time), payment under this Letter of Credit will be made on the same Business Day of presentment. If presentment is made on a Business Day after 10:00 A.M. (Central Standard Time), payment under this Letter of Credit will be made by 12:00 noon (Central Standard Time) on the immediately succeeding Business Day. "Business Day" shall mean any day other than a Saturday or Sunday or day on which commercial banking institutions in Chicago, Illinois are authorized or required by law to close.

This Letter of Credit will be automatically renewed for a one-year period upon the expiration date set forth above and upon each anniversary of such date, unless at least thirty (30) days prior to such expiration date, or at least thirty (30) days prior to any anniversary of such date, we notify both you and the Applicant in writing by certified mail that we elect not to so renew the Letter of Credit. This Letter of Credit is freely transferable by the Beneficiary.

Upon receipt by you of our notice of election not to renew this Letter of Credit, you may draw hereunder at any time before the expiry date by presentation of your sight draft(s), signed by one of your officers, drawn on us bearing the clause "Drawn under Credit No. _____.",

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

This Letter of Credit sets forth in full the terms of our undertaking and such undertaking shall not in any way be modified, amended or amplified by reference to any document or instrument referred to herein or in which this Letter of Credit is referred to or to which this Letter of Credit relates, and no such reference shall be deemed to incorporate herein by reference any document or instrument.

All bank charges and commissions incurred in this transaction are for the Applicant's account.

We hereby agree with the drawers, endorsers, and bona fide holders of drafts drawn under and in compliance with the terms of this Letter of Credit that such drafts will be duly honored upon presentation to the drawee.

Except as otherwise expressly stated herein, this Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision), l.C.C. Publication No. 500.

Very truly yours, Authorized Signature

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## Exhibit H - INSURANCE REQUIREMENTS

1.   The Licensee must procure and maintain, at its own expense, for as long as the contract is in effect, the insurance coverages set forth below, in amounts specified herein and must provide Licensor with certificates evidencing such coverage prior to performing any of the licensed  services:

    a.   **Commercial General Liability**

| **Coverage** | **Limit** |
|---|---|
| General Aggregate | $2,000,000 |
| Products Liability/Completed Oper. Aggregate | $1,000,000 |
| Each Occurrence | $1,000,000 |
| Personal & Advertising Injury | $1,000,000 |

Endorsement specifically covering the liability assumed by the Licensee/Contractor under this Contract or evidence of blanket contractual liability that specifically addresses the exposures of this Contract, Products & Completed Operations Liability including claims brought by divers and their tenders,  sudden & accidental seepage & pollution coverage, watercraft exclusion deleted, and "in rem" endorsement with minimum limits of $1,000,000 per occurrence.

If Commercial General Liability or other form with a general aggregate limit is used, the general aggregate limit shall be twice the required occurrence limit.  The general liability coverage must also include additional insured wording equivalent to CG 2010(11/85).

    b.   **Workers' Compensation and Employer's Liability**

| **Coverage** | **Limit** |
|---|---|
| Workers' Compensation | Statutory |
| Employer's Liability | |
|     Each Accident | $1,000,000 |
|     Per Employee - Disease | $1,000,000 |
|     Annual Aggregate - Disease | $1,000,000 |

Including occupational disease and coverage under the United States Longshoremen's and Harbor Worker's Compensation Act, Employer's Liability Insurance extended to include coverage for Maritime Employer's Liability (i.e., Jones Act, Death on the High Seas Act and transportation, wages, maintenance and cure)

Workers Compensation/ Employer's Liability policies shall be endorsed to waive the insurer's right of subrogation against Licensor and MPEA.

76

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

c.     **Hull & Machinery, Protection & Indemnity (P&I) and Pollution**

| Coverage | Limit |
|---|---|
| Hull and Machinery | |
| Occurrence | Vessel Value |
| P&I | |
| Occurrence | $1,000,000 |
| Pollution | $5,000,000 |

Hull & Machinery per American Institute Hull Clauses (amended for the vessel operations at the shipyard) or equivalent to the fair market value of the vessel. Any references to "other than Company" or other Company limitations will be deleted by endorsement to the policy as respects the naming of Navy Pier as an additional assured;
P&I per P&I form SP 23 or equivalent (amended for the vessel operations at the shipyard) with a minimum limit of $1,000,000 per occurrence. Any references to "other than Company" or other Company limitations will be deleted by endorsement to the policy as respects the naming of Navy Pier as an additional assured;
Pollution per Water Quality Insurance Syndicate (WQIS) or equivalent with a minimum limit of $5,000,000.

d.     **Automobile Liability**

| Coverage | Limit |
|---|---|
| Bodily Injury and Property Damage | |
| Combined - Combined Single Limits | $1,000,000 |
| Uninsured/Underinsured Motorist - | |
| Occurrence | $1,000,000 |

This Policy must provide coverage for all owned, non-owned, and hired autos.

e.     **Bumbershoot Marine Umbrella Coverage**

| Coverage | Limit |
|---|---|
| Per Occurrence | $20,000,000 |
| General Aggregate | $20,000,000 |

Coverage must be in excess of Commercial General Liability including Marine coverages, Auto Liability and Employers Liability. It must be no more restrictive than the primary coverage.

2.     All insurance companies must be rated A-VIII or better by the A. M. Best Company.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

3.    Licensee / Contractor's assumption of liability is independent from, and not limited in any manner by, the Contractor's insurance coverage obtained pursuant to this contract, or otherwise.  All amounts owed by Licensee / Contractor to Licensor and MPEA as a result of the liability provisions of the Licensee / Contractor shall be paid on demand.

4.    None of the requirements contained herein as to types and limits or Licensor and MPEA approval of insurance, coverage to be maintained by the Licensee / Contractor are intended to and shall not in any manner limit, qualify or quantify the liabilities and obligations assumed by Licensee / Contractor under the Agreement, for the term of this Agreement and any other agreement with Licensor and MPEA or otherwise provided by law.

5.    Licensee / Contractor expressly understands and agrees that any insurance or self-insurance programs maintained by Licensor and MPEA shall apply in excess of and not contribute with insurance provided by them under the Agreement.

6.    All policies should be written on an occurrence basis with the exception of professional liability coverage.

7.    All policies must amend the other insurance clause to be Primary and Non Contributory for any liability arising directly or indirectly from the Services.

8.    Licensor and MPEA, their facilities, agents, officers, board members and employees must be named as additional insureds on the general liability, auto liability and umbrella liability policies.

9.    Licensee / Contractor agrees to require its subcontractors to comply with the insurance provisions required of Contractor pursuant to this Agreement unless Contractor, Licensor and MPEA mutually agree to modify these requirements for subcontractors whose work is of relatively small scope.  Contractor agrees that it will contractually obligate its subcontractors to promptly advise Contractor of any changes or lapses of the requisite insurance coverage and Contractor agrees to promptly advise Licensor and MPEA of any such notices Contractor receives from its subcontractors.  Contractor agrees that it will contractually obligate its subcontractors to indemnify and hold harmless Licensor and MPEA to the same extent that Contractor is required to do so as provided in this Agreement.  Contractor assumes all responsibility for monitoring subcontractor's contracts and insurance certificates for compliance with the insurance and other provisions of this Agreement until final completion of services.

10.    All coverage must contain a Waiver of Subrogation in favor of Licensor and MPEA.

11.    If policies are canceled for any reason, thirty (30) day notice is required to be given to the Risk Management Department.

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

12.     Failure to obtain and maintain required insurance shall constitute a breach of the Agreement and the Licensee will be liable for any and all costs, liabilities, damages and penalties resulting to Licensor and MPEA from such breach, unless a written waiver of the specific insurance requirement is provided to the Licensee by Licensor and MPEA.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Exhibit I      Project Labor Agreement**

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# PROJECT LABOR AGREEMENT
## for
## NAVY PIER and McCORMICK PLACE

This Agreement is entered into by and between the Metropolitan Pier and Exposition Authority, an Illinois governmental entity (hereinafter "Authority"), and each of the Unions signatory hereto.

Because of the scope, cost and duration of, and important public purpose to be served by the expansion of the McCormick Place Complex facilities, the parties to this Agreement have determined that it is in the public interest to have this Project and related Projects ("Projects") completed in the most timely, productive, economical and orderly manner possible and without labor disputes or disruptions of any kind that might interfere with or delay the Projects.

The parties have determined that it is desirable to eliminate the potential for friction on and disruption of these Projects by using their best efforts and ensuring that all work is performed by the trade unions that are signatory hereto and which have traditionally performed and have trade and geographic jurisdiction over such work. Experience has proven the value of such cooperation and that such mutual undertakings should be maintained and, if possible, strengthened and that the ultimate beneficiaries remain the taxpayers and visitors to Chicago.

To further these goals and to maintain a spirit of harmony, labor-management cooperation and stability, the parties hereto agree, as follows:

1.       During the term of this Agreement, the Authority shall not contract or subcontract, nor permit any other person, firm, company or entity to contract or subcontract, any construction, alteration, painting, repair, or other work to be done at the site of the Projects to any person, firm, company or entity that does not have, or does not agree to be

185906.2

2

bound by, and operate under, a current collective bargaining agreement with a Union affiliated with the AFL-CIO Building and Construction Trades Department, or, as appropriate, the Teamsters Joint Council No. 25 or its affiliates, or, as appropriate, the Chicago and Northeast Illinois District Council of Carpenters and Joiners of America, which Union has jurisdiction over the particular work in question. Copies of all such current agreements constitute Appendix A to this Agreement, attached hereto and as may be modified from time-to-time and made a part hereof. The provisions of this Agreement shall apply to the parties and their affiliates, as well as to all contractors and subcontractors, irrespective of tier level, performing work on, or for, Projects of the Authority and any tenant of the Authority.

2.      With respect to a contractor or subcontractor who is the successful bidder, but is not signatory to the applicable collective bargaining agreement, the collective bargaining agreement executed by said bidder shall be executed before work begins and shall be the relevant area agreement regulating the wages, hours and other terms and conditions of employment.

3.      Deliveries to the Project site or sites of construction materials shall be made by employees covered by collective bargaining agreements providing for the payment of the prevailing wage or subject to the applicable state or federal laws providing for the payment of the prevailing wage.

4.      During the term of this Agreement, the Authority and its contractors or subcontractors shall engage in no lockout at the situs of the Projects.

5.      During the term of this Agreement, no Union or any of its members, officers, stewards, agents or representatives, nor any employee, shall instigate, authorize, support,

185906.2

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

3

sanction, maintain, or participate in any strike, walkout, work stoppage, work slowdown, work curtailment, cessation or interruption of production, or in any picketing of the Projects' premises for any reason whatsoever, including, but not limited to, a dispute between the Authority or any contractor or subcontractor and any Union or any employee, or by and between any Union, or in sympathy with any Union or employee or with any other individual or group.

6.    Each Union agrees that it will use its best efforts to prevent any of the acts forbidden in Section 5 and that in the event any such acts take place or are engaged in by any employee or group of employees, each Union further agrees that it will use its best efforts (including its full disciplinary power under its applicable Constitution and By-Laws) to cause an immediate cessation thereof.

7.    The Authority shall have the right to deny access to the premises and any contractor or subcontractor shall have the right to discharge or discipline any employee (and such discipline need not be uniform) who violates the provisions of Section 5. Such discharge or discipline by a contractor or subcontractor shall be subject to the grievance-arbitration procedure of the applicable collective bargaining contract only as to the fact of such employee's violation of this Agreement. If such fact is established, the penalty imposed shall not be subject to review and shall not be disturbed.

8.    The parties expressly authorize a court of competent jurisdiction to order appropriate injunctive relief to restrain any violation of this Agreement and any form of self-help remedy is expressly forbidden.

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

**4**

9.      In the event any contract dispute (excluding a dispute covered by Paragraph 10 of this Agreement) shall arise between any contractor or subcontractor of the project and any signatory labor organization relating to a contract and/or project covered by the provisions of this Agreement, and said dispute is resolved by the grievance arbitration procedure of the applicable collective bargaining agreement, any failure of a party to fully comply with such a final resolution shall result in the removal of the non-complying party from the Project upon proper notice to the Union, contractor, or subcontractor.

10.      In addition to the obligations set forth in this Agreement, in the event any jurisdictional dispute arises between any affiliated unions or between Chicago and Cook County Building and Construction Trades Council, the AFL-CIO Building and Construction Trades Department, Teamsters Joint Council No. 25, or Chicago and Northeast Illinois District Council of Carpenters and Joiners of America, the parties shall notify the individual designated in Paragraph 11 of the existence of a problem and use their best efforts to resolve said jurisdictional dispute in an expeditious manner.  In the event no resolution is achieved within forty-eight (48) hours, the parties shall select, by availability, one of the five agreed-upon arbitrators set out in Appendix "B" to hear and determine the dispute within forty-eight (48) hours.  The arbitrator's decision shall be in writing and shall be limited to the particular dispute presented.  In reaching his decision, the arbitrator shall consider, where appropriate, the following factors: (1) certifications and collective bargaining agreements; (2) agreements between the unions; (3) company preference and past practice; (4) area and industry practice; (5) relative skills and safety; (6) economy and efficiency of operations; and (7) prior

185906.2

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

5

jurisdictional dispute determinations. The written decision shall be final and binding upon all parties to the dispute and may be a short form decision. The fees and costs of the arbitrator shall be divided evenly between the parties except that any party wishing a full opinion and decision beyond the short form decision shall bear the reasonable fees and costs of such full opinion. During the pendency of the jurisdictional dispute resolution and thereafter, the provisions of Paragraphs 4 and 5 set forth above shall be strictly enforced and the progress of the work will continue.

11.    The parties agree that in the implementation and administration of this Agreement, it is vitally necessary to maintain effective and immediate communication so as to minimize the potential of disputes arising out of this Agreement. To that end, each party hereto agrees to designate, in writing, a representative to whom problems can be directed which may arise during the term of this Agreement. Within forty-eight (48) hours after notice of the existence of any problem, representatives of each party shall meet to discuss and, where possible, resolve such problems.

12.    This Agreement shall be incorporated into, and become a part of, the collective bargaining agreement between any contractor or subcontractor and each Union signatory. In the event of inconsistency between this Agreement and any such collective bargaining contract, the terms of this Agreement shall supercede and prevail.

13.    This constitutes the entire agreement between the parties hereto and may not be changed or modified except by the subsequent written agreement of the parties.

185906.2

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this __27th__ day of __June__, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____
          ACTING  C/O O.

Signatory Labor Organizations

By: _____
Its: _____

185906.2

MAY-30-2002 13:31 FRANCZEK SULLIVAN P C 3129869192 P.02
MAY 30 '02 01:28PM (312)9511540 ASHER G G & D, Ltd. P.2/307

6

13. This constitutes the entire agreement between the parties hereto and may not be changed or modified except by the subsequent written agreement of the parties.

14. All parties represent that they have the full legal authority to enter into this Agreement.

15. If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16. This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _Frank J. Libby_
Its: _Representative_

_Chicago District Council_
_of Carpenters_

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

## SIDE LETTER

In consideration for the Chicago & Northeast Illinois District Council of Carpenters ("Union") agreement to become signatory to the MPEA Project Labor Agreement, MPEA agrees to use its best efforts, consistent with the competitive procurement requirements of the MPEA Act 70 ILCS 210 et seq., to insure that all customized architectural millwork to be installed at the site of construction will be fabricated by companies that are signatory to, or who agree to become signatory to, an agreement with an Illinois affiliate of the United Brotherhood of Carpenters and Joiners of America, including the Chicago & Northeast Illinois District Council of Carpenters.

Metropolitan Pier & Exposition Authority

Chicago & Northeast Illinois District Council of Carpenters

Dated: May 30, 2002

101716.1

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____ 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _Fred Schreier_____
Its: _PRESIDENT  Riggers  Local 136_

JUN-12-2002  10:12       FRANCZEK SULLIVAN P C              3129869672    P.03/
JUN-12-2002  10:39       MPEA                              312 7916543   P.03/03

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

6

14.  All parties represent that they have the full legal authority to enter into this Agreement.

15.  If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.  This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _John P_____
Title: _LABORERS DISTRICT COUNCIL_

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

MAY-03-2002  16:28        FRANCZEK SULLIVAN P C              3129869672    P.03
05/03/2002 15:27 FAX 312 263 1520        ASHER G G & D, Ltd.              @003

May-01-02 01:19P Marion
                Chgo Bldg Trades Cncl  Fax:312-372-7342       Apr 26 '02  10:19   P.07

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible.  In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects.  The Union signatories are listed on Appendix C.

                                    Metropolitan Pier and Exposition Authority


                                    By: _____
                                    Title: _____


Signatory Labor Organizations
     SPRINKLER FITTERS LOCAL 281 U.A.
By: _____
Its: _____
     BUSINESS MANAGER

                                                                              L97862

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

MAY-03-2002  16:28     FRANCZEK SULLIVAN P C                3129869672     P.04
05/03/2002 15:27 FAX 312 263 1520      ASHER G G & D, Ltd.                  ☑004

MAY-03-02 11:08  FROM:GLAZIERS LOCAL      708-485-3024      TO:312 372 7342      PAGE:001

6

14.    All parties represent that they have the full legal authority to enter into this
Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be
determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in
whole or in part, and such determination shall become final, such provision or portion shall be
deemed to be severed or limited, but only to the extent required to render the remaining
provisions and portion of this Agreement enforceable. This Agreement as thus amended shall
be enforced so as to give effect to the intention of the parties insofar as that is possible. In
addition, the parties hereby expressly empower a court of competent jurisdiction to modify any
term or provision of this Agreement to the extent necessary to comply with existing law and
to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____,
2002, and shall remain in effect for the duration of the Projects. The Union signatories are
listed on Appendix G.

                                        Metropolitan Pier and Exposition Authority

                                        By: _____
                                        Title: _____

Signatory Labor Organizations

By: _____
Its: BUS. REP
    GLAZIERS L.V. 87

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

6

14. All parties represent that they have the full legal authority to enter into this Agreement.

15. If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement is thus intended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16. This Agreement shall become effective on the _____ day of _____, 2002, and shall remain in effect for the duration of the Project. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By:_____
Title:_____

Signatory Labor Organization

By: Robert R. Bohbrick President/BM
Int: Iron Workers Local Union #1

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

6

14. All parties represent that they have the full legal authority to enter into this Agreement.

15. If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provisions or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16. This Agreement shall become effective on the _____ day of _____, 2002, and shall remain in effect for the duration of the Project. The Union signatories are listed on Appendix C.

Signatory Labor Organizations

By: _____
Its: _____
POINTERS, CLEANERS & CAULKERS LOCAL #52
901 ... AVENUE
CHICAGO, ILLINOIS 60607

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

6

14.   All parties represent that they have the full legal authority to enter into this Agreement.

15.   If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.   This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Project. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: FRANK O'LONE #69
Its: _____

SENT BY:L.U. 587, U.A.      ; 4-26- 2 ;   8:33 ;  PIPEFITTERS ASSOC.→      312 372 7342;# 1/

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _Jerrod Buchanan_____
Its: _Pipefitters Local Union 597_

04/25/2002    13:18    IBEW #134 → 3727342                    NO.680    D

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _Michael Fitzgerald_
In: _Business Manager / General Secretary_

1259063

APR-25-02 THU 2:44 PM

Chgo Bldg Trades Cncl Fax:312-372-7342          Apr 25 '00  12:02     P.02          P. 2

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _25_ day of _April_ 2002, and shall remain in effect for the duration of the Project. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _____
Its: _____

113906.2

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

APR-26-2002  08:42       BOILERMAKER LOCAL 1          1 773 247 0093   P.02/02

6

13.   This constitutes the entire agreement between the parties hereto and may not be changed or modified except by the subsequent written agreement of the parties.

14.   All parties represent that they have the full legal authority to enter into this Agreement.

15.   If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.   This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Project. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _____
Its: BUS. AGR./SEC. TREASURER
     BOILERMAKERS LOCAL #ONE

TOTAL P.02

04-25-02   14:21     From-SHEET MTL WRK 73                    3127281400              T-662  P.02/02  F-705

6

14.   All parties represent that they have the full legal authority to enter into this Agreement.

15.   If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.   This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____  _____
Title: _____  _____

Signatory Labor Organizations

By: _Stanley Karynski_
Its: _President_

185906.2

4-25-02 12:19                              ID=                              P02

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _Terry Lynch_   Heat and Frost Insulators  Local 17
Its: _Business Manager_

1CH0062

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Project. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

ROOFERS UNION
1050 W. ROOSEVELT RD.
WESTCHESTER, ILL. 60154

Signatory Labor Organizations

By: _____
Its: _BUS. REP._

6

14.   All parties represent that they have the full legal authority to enter into this Agreement.

15.   If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.   This Agreement shall become effective on this _____ day of __ _____, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: *Robert J Wesselhoff*
Its:

CEMENT MASONS UNION LOCAL 502
730 E. 25th AVE.
BELLWOOD, IL 60104
ROBERT J. WESSELHOFF JR. Secretary-Treasurer

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____ 2002, and shall remain in effect for the duration of the Project. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _____
Its: _____

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _Vane Michunic_____
Its: _President / Business Manager_____
_Marble Setters Local 662_

185906.2

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

<div align="right">

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

</div>

Signatory Labor Organizations

By: _____
Its: _____

1859062

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Project. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _____
Its: _____

185906.2

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects. The Union signatories are listed on Appendix C.

                                    Metropolitan Pier and Exposition Authority


                                    By: _____
                                    Title: _____


Signatory Labor Organizations


By: _Plasterers Local #5_____
Its: _Richard Oehme Pre/Bus Mgr_____

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**6**

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible. In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Project. The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____ _____

Title: _____

Signatory Labor Organizations

By: _Gerald M Sullivan_ — BUSINESS MANAGER

Its: _CHICAGO JOURNEYMEN PLUMBERS' LU 130_

185904.2

6

14.    All parties represent that they have the full legal authority to enter into this Agreement.

15.    If any provision, section, subsection or other portion of this Agreement shall be determined by any court of competent jurisdiction to be invalid, illegal or unenforceable in whole or in part, and such determination shall become final, such provision or portion shall be deemed to be severed or limited, but only to the extent required to render the remaining provisions and portion of this Agreement enforceable. This Agreement as thus amended shall be enforced so as to give effect to the intention of the parties insofar as that is possible.  In addition, the parties hereby expressly empower a court of competent jurisdiction to modify any term or provision of this Agreement to the extent necessary to comply with existing law and to enforce this Agreement as modified.

16.    This Agreement shall become effective on this _____ day of _____, 2002, and shall remain in effect for the duration of the Projects.  The Union signatories are listed on Appendix C.

Metropolitan Pier and Exposition Authority

By: _____
Title: _____

Signatory Labor Organizations

By: _William Waldmer_____
Its: _President._____

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# F R A N C Z E K   S U L L I V A N P.C.
## ATTORNEYS AT LAW

Exhibit B

300 SOUTH WACKER DRIVE
SUITE 3400
CHICAGO, ILLINOIS 60606
PHONE 312-986-0300
FAX 312-986-9192
http://www.franczek.com

JAMES C. FRANCZEK, JR.
312-786-6110
jcf@franczek.com

June 25, 2002

Mr. Marvin Gittler
Asher, Gittler, Greenfield & D'Alba, Ltd.
200 West Jackson Boulevard - Suite 1900
Chicago, IL 60606

Re:  MPEA Project Labor Agreement

Dear Marv:

This letter will confirm that each of the following arbitrators have agreed to act as required in Paragraph 10 of the Project Labor Agreement, if and as called upon. For your convenience, I have added their current address and telephone numbers:

Steven M. Bierig
Arbitrator
P.O. Box 438
Highland Park, IL  60035
847-236-1003

Robert W. McAllister
Arbitrator
No. 13, The Landmark
Northfield, IL  60093
847-441-7727

Robert Perkovich, Esq.
Arbitrator
P.O. Box 146759
Chicago, IL  60614-6759
312-733-1678

194485.1

# FRANCZEK SULLIVAN P.C.
## ATTORNEYS AT LAW

Mr. Marvin Gittler
June 25, 2002
Page 2

FILED DATE: 9/8/2021 9:45 AM  2021CH04537

Thomas F. Gibbons
c/o DePaul Center for Dispute Resolution
25 East Jackson Boulevard – Suite 1600
Chicago, IL 60604
312-362-6316

Byron Yaffe
Arbitrator
5000 North Marine Drive – No. 14A
Chicago, IL 60640
773-561-4470

This letter will further confirm that, by mutual written agreement, the parties may remove any designated arbitrator and substitute other arbitrators who may agree to assume the responsibility defined in Paragraph 10.

Please indicate your acknowledgement in the spaced provided below.

Very truly yours,

James C. Franczek, Jr.

JCF:mp

AGREED:

_____

Marvin Gittler

Date: _____

194485.1

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Exhibit C

## Chicago & Cook County Building & Construction Trades Council
150 North Wacker Drive - Suite 1850
Chicago, Illinois 60606
312/372-2049

Bricklayers Local 21
1950 West 43rd Street, Chicago  60609.....................................773/650-1841

Boilermakers Local 1
2941 Archer Avenue, Chicago  60608......................................773/247-5225

Cement Finishers Local 502 · 7
739 25th Avenue, Bellwood  60104.........................................708/544-9100

Ceramic Tile Layers Local 67
6425 South Central, Chicago  60638.......................................773/884-6500

Electrical Workers Local 134
600 West Washington, Chicago  60661.....................................312/454-1340

Glaziers Local 27
9223 West Ogden Avenue, Brookfield  60513.......................708/485-3014

Heat & Frost Insulators Local 17
3850 South Racine, Chicago  60609.........................................773/247-8184

Iron Workers District Council
1108 First Street, LaSalle  61301............................................815/224-1099

Iron Workers Local 1 (Structural)
7720 West Industrial Drive, Forest Park  60130.....................708/366-6695

Iron Workers Local 136 (Machinery Movers)
8114 West Grand Avenue, River Grove  60171.....................708/453-9300

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

**Machinists Local 126**
120 East Ogden Avenue #18A, Hinsdale  60521................630/655-1930

**Marble Cutters, Setters & Masons Local 66**
6425 South Central, Chicago  60638........................773/735-2450

**Marble Finishers & Polishers Local 87**
6425 South Central, Chicago  60638........................773/884-0087

**Operating Engineers Local 150**
6200 Joliet Road, Countryside  60525......................708/482-8800

**Painters District Council #14**
1456 West Adams, Chicago  60607.........................312/421-0046

**Pipefitters Local 597**
45 North Ogden Avenue, Chicago  60607...................312/829-4191

**Plasterers Local 5**
6631 West Stanley, Berwyn  60402.........................708/749-3660

**Plumbers Local 130**
1340 West Washington, Chicago  60607....................312/421-1010

**Pointers, Cleaners & Caulkers Local 52**
1111 South Western, Chicago  60612.......................312/243-3340

**Roofers Local 11**
9838 West Roosevelt Road, Westchester  60153...........708/345-0970

**Sheet Metal Workers Local 73**
205 West Wacker, Chicago  60606.........................312/726-3673

**Sprinklerfitters Local 281**
11900 South Laramie, Alsip  60658........................708/597-1800

**Chicago & NE IL District Council of Carpenters**

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## AMENDMENT 1 TO LICENSE AGREEMENT

## NAVY PIER MARINA

**THIS AMENDMENT NO. 1** (the "Amendment No. 1") is made effective February 1, 2019, between Navy Pier Inc., an Illinois Not for Profit corporation ("Licensor") and **NPM VENTURE LLC**, a Delaware limited liability company ("**Licensee**"). Licensor and Licensee may be referred to herein as a "Party" or the "Parties" as the context may indicate.

## RECITALS

**Whereas,** the Parties have previously entered into a License Agreement dated August 7, 2015 related to the construction and operation of a marina at Navy Pier, Chicago (the "2015 License Agreement"); and

**Whereas,** the parties have agreed to amend the 2015 License Agreement as provided herein.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth in this Amendment No. 1 and Assignment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the undersigned, the parties hereto hereby agree as follows:

**Section 1.1** The provisions in the preamble are incorporated into and made a part of this Amendment No. 1.

**Section 1.2** Section 5.1.2 of the 2015 License Agreement is amended to read, in full, as follows:

**Section 5.1.2.** Licensee shall promptly apply for and diligently pursue all permits and governmental approvals required to construct and operate the Docking Facility for the Permitted Use (the "**Governmental Approvals**"), including but not limited to retaining an expeditor to assist with processing such Governmental Approvals, to effect receipt of such permits and approvals not later than eighteen (18) months after the Effective Date (the "**Permit Approval Deadline**"). Upon request, Licensor shall reasonably cooperate with Licensee during the Governmental Approval process. In addition, Licensor shall upon request, use its best efforts and take all steps reasonably necessary to have the Prime Lessor cooperate with Licensee during the Governmental Approval process to provide whatever approvals, certifications and other acknowledgements as are needed as owner of Navy Pier. Provided however, in the event Licensee, despite its good faith diligent efforts, is unable to secure the Governmental Approvals within such eighteen-month period, Licensee shall have the right to extend the Permit Approval Deadline up to an additional twelve (12) (30 months in total) provided Licensee continues to diligently pursue the Governmental Approvals. Either Party shall have the right to terminate this License upon written notice to the other party in the event the Governmental Approvals have not been obtained within thirty (30) month after the Effective Date.

**Section 1.3** Licensee hereby exercises its option to extend the Permit Approval Deadline an additional twelve (12) months as provided in Section 5.1.2, as amended; and Licensor accepts such extension.

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have executed this Amendment No. 1 effective as of February 1, 2019.

Navy Pier Inc.:

By: _____
Marilynn Gardner, President/CEO

NPM VENTURE LLC, Inc.

By: _____
Print Name: RANDY D. PODOLSKY
Print Title: MANAGER

1

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## AMENDMENT 2 TO LICENSE AGREEMENT

## NAVY PIER MARINA

**THIS AMENDMENT NO. 2** (the "Amendment No. 2") is made effective February 1, 2020, between Navy Pier Inc., an Illinois Not for Profit corporation ("Licensor") and **NPM VENTURE LLC**, a Delaware limited liability company ("**Licensee**").  Licensor and Licensee may be referred to herein as a "Party" or the "Parties" as the context may indicate.

## RECITALS

**Whereas,** the Parties have previously entered into a License Agreement dated August 7, 2017, and amended effective February 1, 2019, related to the construction and operation of a marina at Navy Pier, Chicago (the "2017 License Agreement"); and

**Whereas,** the parties have agreed to further amend the 2017 License Agreement as provided herein.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth in this Amendment No. 1 and Assignment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the undersigned, the parties hereto hereby agree as follows:

**Section 1.1**        The provisions in the preamble are incorporated into and made a part of this Amendment No. 1.

**Section 1.2**        The erroneous dates of 2015 noted in Amendment No. 1 pertaining to the date of the License Agreement are hereby corrected to 2017.

**Section 1.3**        Section 5.1.2 of the 2017 License Agreement is amended to read, in full, as follows:

**Section 5.1.2.**   Licensee shall promptly apply for and diligently pursue all permits and governmental approvals required to construct and operate the Docking Facility for the Permitted Use (the "**Governmental Approvals**"), including but not limited to retaining an expeditor to assist with processing such Governmental Approvals, to effect receipt of such permits and approvals not later than December 1, 2020 (the "**Permit Approval Deadline**").  Upon request, Licensor shall reasonably cooperate with Licensee during the Governmental Approval process.  In addition, upon request, Licensor shall request, use its best efforts and take all steps reasonably necessary to have the Prime Lessor cooperate with Licensee during the Governmental Approval process to provide whatever approvals, certifications and other acknowledgements as are needed as owner of Navy Pier.  Either Party shall have the right to terminate this License upon written notice to the other party in the event the Governmental Approvals have not been obtained by the Permit Approval Deadline.

**Section 1.4**        Except as set forth herein, the terms of the 2017 License Agreement remain unchanged.

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have executed this Amendment No. 1 effective as of February 1, 2020.

Navy Pier Inc.:

By: _Marilynn Gardner_

**Marilynn Gardner, President/CEO**

NPM VENTURE LLC:

By: _____

**Print Name: Randy D. Podolsky, Manager**

1

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

## AMENDMENT 3 TO LICENSE AGREEMENT

## NAVY PIER MARINA

**THIS AMENDMENT NO. 3** (the "Amendment No. 3") is made effective October 13, 2020, between Navy Pier Inc., an Illinois Not for Profit corporation ("Licensor") and **NPM VENTURE LLC**, a Delaware limited liability company ("**Licensee**").  Licensor and Licensee may be referred to herein as a "Party" or the "Parties" as the context may indicate.

## RECITALS

**Whereas,** the Parties have previously entered into a License Agreement dated August 7, 2017, amended effective February 1, 2019, and further amended February 1, 2020, related to the construction and operation of a marina at Navy Pier, Chicago (the "2017 License Agreement"); and

**Whereas,** the parties have agreed to further amend the 2017 License Agreement as provided herein.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth in this Amendment No. 1 and Assignment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the undersigned, the parties hereto hereby agree as follows:

**Section 1.1**        The provisions in the preamble are incorporated into and made a part of this Amendment No. 1.

**Section 1.2**        Section 5.1.2 of the 2017 License Agreement is amended to read, in full, as follows:

**Section 5.1.2.**  Licensee shall promptly apply for and diligently pursue all permits and governmental approvals required to construct and operate the Docking Facility for the Permitted Use (the "**Governmental Approvals**"), including but not limited to retaining an expeditor to assist with processing such Governmental Approvals, to effect receipt of such permits and approvals not later than December 1, 2021 (the "**Permit Approval Deadline**").  Upon request, Licensor shall reasonably cooperate with Licensee during the Governmental Approval process.  In addition, upon request, Licensor shall request, use its best efforts and take all steps reasonably necessary to have the Prime Lessor cooperate with Licensee during the Governmental Approval process to provide whatever approvals, certifications and other acknowledgements as are needed as owner of Navy Pier.  Either Party shall have the right to terminate this License upon written notice to the other party in the event the Governmental Approvals have not been obtained by the Permit Approval Deadline.

**Section 1.3**        Except as set forth herein, the terms of the 2017 License Agreement remain unchanged.

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have executed this Amendment No. 3 effective as of October 13, 2020.

**Navy Pier Inc.:**                                          **NPM VENTURE LLC:**

By: _____        By: _____
**Marilynn Gardner, President/CEO**                **Print Name: Randy D. Podolsky, Manager**

10/16/2020

1

DocuSign Envelope ID: 27199B36-E51D-4233-9A41-2ACB2ACA074A

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

## AMENDMENT NO. 4 TO LICENSE AGREEMENT

This Amendment No. 4 to the Navy Pier License Agreement Between Navy Pier, Inc. ("Licensor") and NPM Venture LLC ("Licensee") as amended ("License Agreement") is made this 08th day of March, 2021.

WHEREAS, Licensor and the Metropolitan Pier and Exposition Authority ("MPEA") are parties to a Lease Agreement pursuant to which MPEA transferred to Licensor the responsibility for the management, operation and maintenance of Navy Pier and implementation of a Framework Plan for future development of Navy Pier;

WHEREAS, MPEA granted Licensor under the Lease Agreement, among other things, full and unimpaired access to and use of Navy Pier and all improvements to Navy Pier and the right to enter into contracts of any term in connection with the operation, repair and maintenance of Navy Pier and implementation of all improvements in connection with the Framework Plan;

WHEREAS, the Lease Agreement provided that Navy Pier may be used for any lawful purpose in compliance with the City of Chicago Institutional Planned Development No. 527, as amended and as may be amended from time to time ("PD 527");

WHEREAS, on application of MPEA, the City of Chicago amended PD 527 on September 25, 2016, to provide, among other things, for construction and operation of a marina on the north side of Navy Pier across the North Slip from the Jardine Water Treatment Plant ("the proposed north side marina");

WHEREAS, the Framework Plan, announced as the Centennial Vision, provides, among other things, for construction and operation of the proposed north side marina;

WHEREAS, in 2016, Licensor solicited proposals to develop, construct and operate the proposed north side marina through a two-part Request for Qualifications and Request for Proposals process;

WHEREAS, Licensor selected Licensee to develop, construct and operate the proposed north side marina and the parties executed the License Agreement as of August 7, 2017;

WHEREAS, the License Agreement granted Licensee a license to design, construct, finance, maintain  and operate the proposed north side marina and promised that Licensee shall peaceably and quietly hold and enjoy the proposed north side marina for the term of the License;

WHEREAS, Licensor intended in the License Agreement that Licensee be authorized to take all lawful steps and actions necessary to the purpose of Licensee designing, constructing, financing, maintaining and operating the proposed north side marina;

WHEREAS, paragraph 5.1.2 of the License Agreement required Licensee to promptly apply for and diligently pursue all permits and governmental approvals required to construct and operate the proposed north side marina and required Licensor to "reasonably cooperate" with

67555150v.3

DocuSign Envelope ID: 27109B36-E51D-4233-9A44-2ACB2ACA074A

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

Licensee during the governmental approval process and to use its "best efforts and take all steps reasonably necessary to have the Prime Lessor (Metropolitan Pier and Exhibition Authority--MPEA) cooperate with" Licensee during the governmental approval process.

WHEREAS, Licensee expended substantial monetary and other resources preparing to begin development and construction of the proposed north side marina, including pursuing necessary construction permits, and stands ready to complete construction of the marina;

WHEREAS, at Licensee's behest and expense, and pursuant to the License Agreement, and as required by the various government permitting authorities, MPEA as owner of Navy Pier signed a Joint Application for construction permits that Licensee initially submitted on August 24, 2017 and amended by submission dated April 8, 2020;

WHEREAS, the Army Corps of Engineers and the Illinois Department of Natural Resources initially issued the requested permits, but Chicago Department of Transportation ("CDOT") denied the requested Harbor Permit because it determined that the location of the proposed north side marina "presents unacceptable security risks due to its proximity to the Jardine Water Treatment Plant."

WHEREAS, Licensee believes that CDOT's denial of a Harbor Permit is contrary to applicable law for a variety of reasons and has caused substantial damage to Licensee;

WHEREAS, Licensee delivered a letter to CDOT on November 6, 2020, which Licensor reviewed and approved in advance, outlining some, but not all, potential legal claims against CDOT and the City of Chicago, and requesting CDOT to reconsider denial of a Harbor Permit for the proposed north side marina, but CDOT has not reconsidered its denial of a Harbor Permit for the marina;

WHEREAS, Licensor and Licensee have begun discussing the possibility of Licensee exclusively designing, constructing and operating a marina on the south side of Navy Pier ("the proposed south side marina") in lieu of constructing and operating the proposed north side marina as currently designed;

WHEREAS, Licensee has authority under the License Agreement to pursue claims against CDOT and the City of Chicago over CDOT's denial of a Harbor Permit, but Licensor and Licensee are interested in negotiating for a limited period of time to determine if they can reach agreement on a proposed south side marina, in order possibly to avoid Licensee pursuing such claims;

WHEREAS, Licensor and Licensee do not want to waive any rights and claims under the License Agreement or under applicable law or claims arising from denial of a Harbor Permit for the proposed north side marina pending negotiations regarding a proposed south side marina;

NOW THEREFORE, for good and valuable consideration, receipt of which is acknowledged by the Parties, Licensor and Licensee further agree as follows:

1.      The above recitals are agreed by the Parties, incorporated herein and are an integral part of this Amendment No. 4 to License Agreement.

2

DocuSign Envelope ID: 27109B36-E51D-4232-9A44-2ACB2ACA074A

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

2.      This Amendment No. 4 to License Agreement supplements, but does not replace, the Parties' rights and obligations under the License Agreement and is without prejudice to or waiver of any claim that either party currently has or may in the future have for breach of the License Agreement or any claim that either party has or may in the future have arising from denial of a Harbor Permit for the proposed north side marina.

3.      Licensor will cooperate with Licensee and its counsel in connection with any actual or proposed legal action between Licensee and CDOT and/or the City of Chicago, and anyone acting in concert or participation with them. Without limiting the foregoing, Licensor will, if requested, timely provide copies of all non-privileged documents in its possession, custody or control that are relevant to any claim or defense in such legal action.  Licensor will also make its agents and employees reasonably available to provide non-privileged, truthful and accurate information and affidavits to Licensee and its counsel relating to any claim or defense in such legal action and to provide non-privileged, truthful and accurate testimony, as necessary. Licensor and Licensee will execute the Common Interest Agreement in the form attached as Exhibit 1.

4.      Nothing in this Amendment No. 4 to License Agreement or otherwise requires Licensor to join as a plaintiff in any legal proceeding against CDOT, the City of Chicago, and/or anyone acting in concert or participation with them, or otherwise to assert any claim, right or cause of action or to bring any legal action against any of them arising from CDOT's denial of a Harbor Permit for the north side marina.

5.      Nothing in this Amendment No. 4 to License Agreement or otherwise requires NPM to assert any claim, right or cause of action or to bring any legal action against CDOT and/or the City of Chicago, and anyone acting in concert or participation with them, arising from CDOT's denial of a Harbor Permit for the proposed north side marina and nothing in this Amendment No. 4 to License Agreement or otherwise precludes NPM from asserting any such claim, right, cause of action or legal action. NPM will control, in its sole judgment and discretion, the prosecution and settlement of any legal action that it brings.

6.      The Permit Approval Deadline in Section 5.1.2 of the License Agreement is hereby amended and changed from December 1, 2021, as specified in Amendment No. 3 of the License Agreement, to December 31, 2024.

7.      For 45 days from the date of this Amendment No. 4 to License Agreement, or for such longer period as Licensee may in its sole discretion agree, Licensor and Licensee will negotiate to determine if they can reach an agreement for Licensee exclusively to design, construct and operate the proposed south side marina (including mooring facilities for cruise ships) on mutually agreeable terms. Licensor will use its best efforts to obtain within the 45-day negotiation period the commitment of MPEA and the City of Chicago and all relevant City Departments, including, without limitation, CDOT, the Department of Water Management, Chicago Park District (if required), the Fire, Police and Building Departments, and the Office of Emergency Management, to Licensee's design, construction and operation of the proposed south side marina.

67555150v.3

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound hereby, have executed this Amendment No. 4 to License Agreement, effective March 8th, 2021.

Navy Pier, Inc./Licensor                    NPM Venture LLC

By: _____              By: _____
Marilynn Gardner, President/CEO             Randy Podolsky, Manager

4

67555150v.3

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
          Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# EXHIBIT 6

FILED DATE: 9/8/2021 9:45 AM 2021CH04537



# CHICAGO DEPARTMENT OF TRANSPORTATION

## CITY OF CHICAGO

April 24, 2020

Larita Clark, CEO
Metropolitan Pier and Exposition Authority
301 East Cermak Road
Chicago, Illinois 60616

Subject:     Navy Pier Marina
             600 E. Grand Ave.
             Chicago, IL 60611

Dear Ms. Larita Clark:

Your request for a Harbor Permit at 600 East Grand Ave., Chicago, IL 60611 has been denied. This construction would result in a marina on the north side of Navy Pier for the transient mooring of vessels. A marina development along the lines you have proposed and at the location you have applied for presents unacceptable security risks, including due to its proximity to the Jardine Water Treatment Plant.

If you have any questions regarding this matter, please contact me, or Luis D. Benitez, P.E., S.E. at (312) 744-5807.

Sincerely,

Gia Biagi
Commissioner

cc:     L. Benitez
        O. Chaves

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
          Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# EXHIBIT 7

FILED DATE: 9/8/2021 9:45 AM    2021CH04537



# Chicago Department of Transportation

## City of Chicago

June 15, 2020

Larita Clark, CEO
Metropolitan Pier and Exposition Authority
301 East Cermak Road
Chicago, Illinois 60616

Subject:      Navy Pier Marina - Modification
                  600 E. Grand Avenue
                  Chicago, IL 60611

Dear Ms. Clark:

The Chicago Department Transportation reviewed the revised plans prepared by Edgewater Resources for a Navy Pier Marina at 600 East Grand Avenue, Chicago, Illinois 60611. The revised plans for the marina show that the orientation of the docks has changed and that you are proposing to construct more fixed docks. The overall marina area was reduced from 69,000 square feet to 61,100 square feet. The Harbor Permit for this installation is denied. This construction would still result in a marina on the north side of Navy Pier for the transient mooring of vessels. The revised marina development along the lines you have proposed and at the location you have applied for presents unacceptable security risks due to its proximity to the Jardine Water Treatment Plant.

If you have any questions regarding this matter, please contact me, or Luis D. Benitez, P.E., S.E. at (312) 744-5807.


Sincerely,


Gia Biagi
Commissioner


Originated by:

Luis D. Benitez, S.E, P.E.
Chief Bridge Engineer

cc:      O. Chaves

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
    Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

# EXHIBIT 8

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

## DEPARTMENT OF THE ARMY

NOTE.—It is to be understood that this instrument does not give any property rights either in real estate or material, or any exclusive privileges; and that it does not authorize any injury to private property or invasion of private rights, or any infringement of Federal, State, or local laws or regulations, nor does it obviate the necessity of obtaining State assent to the work authorized. It merely expresses the assent of the Federal Government so far as concerns the public rights of navigation. (See Cummings v. Chicago, 188 U. S., 410.)

## PERMIT

WHEREAS by Section 10 of an act of Congress approved March 3, 1899, entitled "An Act making appropriations for the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes," it is provided that it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army, and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or enclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same (30 Stat. 1151; 33 U.S.C. 403);

AND WHEREAS application has been made to the Secretary of the Army by the CITY OF CHICAGO, CHICAGO, ILLINOIS for authority to construct a fill in Chicago Harbor north of Navy Pier according to plans hereto attached;

NOW THEREFORE, This is to certify that the said plans and work are recommended by the Chief of Engineers and are authorized by the Secretary of the Army under the provisions of the aforesaid statute, upon the following conditions:

1.   That the work shall be subject to the supervision and approval of the district engineer, in charge of the locality, who may temporarily suspend the work at any time, if, in his judgment, the interests of navigation so require.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

2.     That any material dredged in the prosecution of the work herein authorized shall be removed evenly, and no large refuse piles, ridges across the bed of the waterway or deep holes that may have a tendency to cause injury to navigable channels or to the banks of the waterway shall be left.   If any pipe, wire, or cable hereby authorized is laid in a trench, the formation of permanent ridges across the bed of the waterway shall be avoided and the back filling shall be so done as not to increase the cost of future dredging for navigation.   Any material to be deposited or dumped under this authorization, either in the waterway or on shore above high-water mark shall be deposited or dumped at the locality shown on the drawing hereto attached, and, if so prescribed thereon, within or behind a good and substantial bulkhead or bulkheads, such as will prevent escape of the material into the waterway.

3.     That there shall be no unreasonable interference with navigation by the work herein authorized.

4.     That if inspections or any other operations by the United States are necessary in the interests of navigation, all expenses connected therewith shall be borne by the permittee.

5.     That no attempt shall be made by the permittee or the owner to forbid the full and free use by the public of all navigable waters at or adjacent to the work or structure.

6.     That if future operations by the United States require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army, it shall cause unreasonable obstruction to the free navigation of said water, the owner will be required, upon due notice from the Secretary of the Army, to remove or alter the structural work or obstructions caused thereby without expense to the United States, so as to render navigation reasonably free, easy, and unobstructed; and if, upon the expiration or revocation of this permit, the structure, fill, excavation, or other modification of the watercourse hereby authorized shall not be completed, the owner shall, without expense to the United States, and to such extent and in such time and manner as the Secretary of the Army may require, remove all or any portion of the uncompleted structure or fill and restore to its former condition the navigable capacity of the watercourse.   No claim shall be made against the United States on account of any such removal or alteration.

7.     That the United States shall in no case be liable for any damage or injury to the structure or work herein authorized which may be caused by or result from future operations undertaken by the Government for the conservation or improvement of navigation, or for other purposes, and no claim or right to compensation shall accrue from any such damage.

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

8.    That if the display of lights and signals on any work hereby authorized is not otherwise provided for by law, such lights and signals as may be prescribed by the U. S. Coast Guard, shall be installed and maintained by and at the expense of the owner.

9.    That the permittee shall notify the said district engineer at what time the work will be commenced, and as far in advance of the time of commencement as the said district engineer may specify, and shall also notify him promptly, in writing, of the commencement of work, suspension of work, if for a period of more than one week, resumption of work, and its completion.

10.    That if the structure or work herein authorized is not completed on or before the 31st day of December 1955, this permit, if not previously revoked or specifically extended, shall cease and be null and void.

11.    The City of Chicago shall provide free docking space and mooring facilities for two large commercial vessels requiring approximately 1,400 lineal feet along the south side of the filtration plant in the slip between said plant and Navy Pier.

12.    When required by commercial navigation and at the request of the district engineer, the City of Chicago will dredge the approach channel and slip indicated on the permit drawings to a depth of 21 feet below Low Water Datum.

13.    The City of Chicago, if and when requested to do so by the district engineer, will reimburse the Corps of Engineers in the amount of 25 per cent of the expense involved in dredging shoals caused by accretions in the entrance channel between the gap in the outer breakwater and the lock at the mouth of the Chicago River. _____

WITNESS my hand this —11th— day of—September—1950

J. S. BRAGDON
Brigadier General, U. S. A.
Acting Chief of Engineers

IN WITNESS WHEREOF I have hereunto set my hand by direction of the Under Secretary of the Army this— /9 —day of—January 1951.

HARRY C. CHUCK
Colonel, JAGC
Chief, Civil and Legal Branch
OUSA

FILED DATE: 9/8/2021 9:45 AM  2021CH04537



WATER MAP
CITY OF CHICAGO

APPLICATION BY –
    CITY OF CHICAGO
DEPARTMENT OF PUBLIC WORKS
    BUREAU OF ENGINEERING
    FILTRATION DESIGN SECTION
CORRECT                              LOCATION OF PROPOSED COFFERDAM
APPROVED  John R. Baylis            CENTRAL DISTRICT FILTRATION PLANT
APPROVED                             CENTRAL AND NORTH WATER DISTRICTS
APPROVED                                  CITY OF CHICAGO
APPROVED

DECEMBER 13, 1949

FILED DATE: 9/8/2021 9:45 AM  2021CH04537



LEGEND

TO BE DREDGED WHEN REQUIRED

N

*Soundings and Elevations are in Feet and refer to Low Water Datum Lake Michigan = 578.50' above Mean Tide New York.*

APPLICATION BY:-
CITY OF CHICAGO
DEPARTMENT OF PUBLIC WORKS
BUREAU OF ENGINEERING
FILTRATION DESIGN SECTION
CORRECT
FILTRATION DESIGN ENGINEER
APPROVED
ENGINEER OF WATER PURIFICATION
APPROVED
ASSISTANT CITY ENGINEER
APPROVED
CITY ENGINEER
APPROVED
COMMISSIONER OF PUBLIC WORKS

0   1000   3000
  500   2000
Scale in Feet

GENERAL PLAN
PROPOSED COFFERDAM
CENTRAL DISTRICT FILTRATION PLANT
CITY OF CHICAGO

DECEMBER 13, 1949

NOTE: This Map copied from U.S. Lake Survey Chart No. 752.

Case: 1:21-cv-05353 Document #: 1-1 Filed: 10/08/21 Page 356 of 383 PageID #:360

FILED DATE: 9/8/2021 9:45 AM  2021CH04537



DETAILS OF PROPOSED COFFERDAM
CENTRAL DISTRICT FILTRATION PLANT
CITY OF CHICAGO

DECEMBER 13, 1949

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
          Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# EXHIBIT 9

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

WHEREAS, the City of Chicago on December 13, 1949, filed with the District Engineer of the Chicago District, Corps of Engineers, U. S. Army, an application for a permit to construct the Central District Filteration Plant at the location designated by the City Council November 29, 1949 (Council Proceedings, pages 5105 and 5106), and

WHEREAS, a permit pursuant to the above mentioned application has been recommended by the Chief of Engineers and authorized by the Secretary of the Army upon the following conditions:

1. That the work shall be subject to the supervision and approval of the district engineer, in charge of the locality, who may temporarily suspend the work at any time, if, in his judgment, the interests of navigation so require.

2. That any material dredged in the prosecution of the work herein authorized shall be removed evenly, and no large refuse piles, ridges across the bed of the waterway or deep holes that may have a tendency to cause injury to navigable channels or to the banks of the waterway shall be left. If any pipe, wire, or cable hereby authorized is laid in a trench, the formation of permanent ridges across the bed of the waterway shall be avoided and the back filling shall be so done as not to increase the cost of future dredging for navigation. Any material to be deposited or dumped under this authorization, either in the waterway or on shore above high-water mark shall be deposited or dumped at the locality shown on the drawing hereto attached, and, if so prescribed thereon, within or behind a good and substantial bulkhead or bulkheads, such as will prevent escape of the material into the waterway.

3. That there shall be no unreasonable interference with navigation by the work herein authorized.

4. That if inspections or any other operations by the United States are necessary in the interests of navigation, all expenses connected therewith shall be borne by the permittee.

5. That no attempt shall be made by the permittee or the owner to forbid the full and free use by the public of all navigable waters at or adjacent to the work or structure.

6. That if future operations by the United States require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army, it shall cause unreasonable obstruction to the free navigation of said water, the owner will be required, upon due notice from the Secretary of the Army, to remove or alter the structural work or obstructions caused thereby without expense to the United States, so as to render navigation reasonably free, easy, and unobstructed; and if, upon the expiration or revocation of this permit, the structure, fill, excavation, or other modification of the watercourse hereby authorized shall not be completed, the owner shall, without expense to the United States, and to such extent and in such time and manner as the Secretary of the Army may require, remove all or any portion of the uncompleted structure or fill and restore to its former condition the navigable capacity of the watercourse. No claim shall be made against the United States on account of any such removal or alteration.

7. That the United States shall in no case be liable for any damage or injury to the structure or work herein authorized which may be caused by or result from future operations undertaken by the Government for the conservation or improvement of navigation, or for other purposes, and no claim or right to compensation shall accrue from any such damage.

8. That if the display of lights and signals on any work hereby authorized is not otherwise provided for by law, such lights and signals as may be prescribed by the U. S. Coast Guard, shall be installed and maintained by and at the expense of the owner.

9. That the permittee shall notify the said district engineer at what time the work will be commenced, and as far in advance of the time of commencement as the said district engineer may specify, and shall also notify him promptly, in writing, of the commencement of work, suspension of work, if for a period of more than one week, resumption of work, and its completion.

10. That of the structure or work herein authorized is not completed on or before the 31st day of December, 1955, this permit, if not previously revoked or specfically extended, shall cease and be null and void.

11. The City of Chicago shall provide free docking space and mooring facilities for two large commercial vessels requiring approximately 1,400 lineal feet along the south side of the filtration plant in the slip between said plant and Navy Pier.

12. When required by commercial navigation and at the request of the district engineer, the City of Chicago will dredge the approach channel and slip indicated on the permit drawings to a depth of 21 feet below Low Water Datum.

13. The City of Chicago, if and when requested to do so by the district engineer, will reimburse the Corps of Engineers in the amount of 25 per cent of the expense involved in dredging shoals caused by accretions in the entrance channel between the gap in the outer breakwater and the lock at the mouth of the Chicago River.

WHEREAS, said conditions impose no new feature in design of said proposed work and add nothing to what the City is already committed to do and are, in the opinion of the City Engineers, reasonable and are by them recommended to be accepted; now therefore,

*Be It Ordained by the City Council of the City of Chicago:*

SECTION 1. That the Commissioner of Public Works is authorized to accept on behalf of the City of Chicago the permit issued by the Secretary of the Army under date of January 19, 1951, pursuant to the application of the City of Chicago made December 13, 1949, providing for the construction of the Central District Filtration Plant at the location described in the resolution passed by the City Council on November 29, 1949 and appearing in the Journal of Council Proceedings for that date at pages 5105 and 5106, which said permit contains certain conditions as above set forth.

SECTION 2. This ordinance shall be effective upon its passage.

118 Form C.C. 19¼ 1M 8-52 (5097)

FILED DATE: 9/8/2021 9:45 AM 2021CH04537

STATE OF ILLINOIS,⎫
   County of Cook. ⎬ ss.
           ⎭

I, ............LUDWIG D. SCHREIBER................, City Clerk of the City of Chicago in the County of Cook and State of Illinois, DO HEREBY CERTIFY that the annexed and foregoing is a true and correct copy of that certain ordinance now on file in my office.......authorizing the Commissioner of Public Works to accept a Federal permit for construction of the Central District Filtration Plant.........................................................................................................................................

I DO FURTHER CERTIFY that the said ordinance was passed by the City Council of the said City of Chicago on the.........second..........................(....2nd.) day of..........March..............., A. D. 1951.... and deposited in my office on the........second.........................(....2nd.....) day of....March........................, A. D. 1951......

I DO FURTHER CERTIFY that the vote on the question of the passage of the said ordinance by the said City Council was taken by yeas and nays and recorded in the Journal of the Proceedings of the said City Council, and that the result of said vote so taken was as follows, to wit: Yeas........43......., Nays........1........

I DO FURTHER CERTIFY that the said ordinance was delivered to the Mayor of the said City of Chicago after the passage thereof by the said City Council, without delay, by the City Clerk of the said City of Chicago, and that the said Mayor failed to return the said ordinance to the said City Council with his written objections thereto at the next regular meeting of the said City Council occurring not less than five days after the passage of the said ordinance.

I DO FURTHER CERTIFY that the original, of which the foregoing is a true copy, is entrusted to my care for safe keeping, and that I am the lawful keeper of the same.

                IN WITNESS WHEREOF, I have hereunto set my hand and affixed the corporate seal of the City of Chicago aforesaid, at the said City, in the

[L. S.]     County and State aforesaid, this.....twenty-first.....................(..21st....) day of.................May.............................................., A. D. 19.53..

                                                         City Clerk.

CORRECT

Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

# EXHIBIT 10

FILED DATE: 9/8/2021 9:45 AM    2021CH04537



2021CH04537

FILED DATE: 9/8/2021 9:4    M





FILED DATE: 9/8/2021 9:45 AM 2021CH04537



© 2016 critter



FILED DATE: 9/8/2021 9:45 AM   2021CH04537



FILED DATE: 9/8/2021 9:45 AM   2021CH04537



FILED DATE: 9/8/2021 9:45 AM 2021CH04637





FILED DATE: 9/8/2021 9:45 AM   2021CH04537

FILED DATE: 9/8/2021 9:45 AM   2021CH04537



Hearing Date: 1/6/2022 9:30 AM - 9:30 AM
Courtroom Number: 2502
Location: District 1 Court
Cook County, IL

FILED
9/8/2021 9:45 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021CH04537

14728753

FILED DATE: 9/8/2021 9:45 AM    2021CH04537

# EXHIBIT 11



**Seyfarth Shaw LLP**
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606-6448
**T** (312) 460-5000
**F** (312) 460-7000

mlevinson@seyfarth.com
T (312) 460-5868

www.seyfarth.com

FILED DATE: 9/8/2021 9:45 AM   2021CH04537

November 6, 2020

<u>**VIA FEDERAL EXPRESS**</u>

Commissioner Gia Biagi
Chicago Department of Transportation
2 N. LaSalle Street
Suite 1100
Chicago, IL  60602

Re:     **Navy Pier Marina Harbor Permit**

Dear Commissioner Biagi:

     We are counsel for NPM Venture, LLC ("NPM"), which was licensed by Navy Pier, Inc. ("NPI") in an August 17, 2017 Navy Pier License Agreement, as amended, to develop, construct and operate a marina at Navy Pier ("the marina"). NPI, in turn, is responsible for operating and developing Navy Pier pursuant to an April 26, 2011 Lease Agreement, as amended, from the Metropolitan Pier and Exposition Authority ("MPEA"). We are writing this letter to request that the Department of Transportation ("CDOT") reconsider its June 15, 2020 denial of MPEA's application for a Harbor Permit for the marina.

     As discussed below, CDOT exceeded its legal authority in denying the Permit, its denial violates both the 1954 Illinois Supreme Court decision, *Bowes v. City of Chicago*, 3 Ill. 2d 175 (1954) and MPEA's riparian rights, including such rights licensed to NPM, and CDOT's conclusion that the location of the marina "presents unacceptable security risks due to its proximity to the Jardine Water Treatment Plant" is arbitrary and without any rational basis. The presence of the marina will not make the Plant any less secure, but will, in fact, enhance security in the North Slip, where the marina will be located.

     The Secretary of the Army, the State of Illinois and the City of Chicago have all approved locating the marina on the north side of Navy Pier as proposed in MPEA's Harbor Permit application and construction and operation of the marina will provide jobs and revenues and will enhance Chicago's standing as a great international city. CDOT should promptly reconsider and reverse its denial of the Permit.

I.     **BACKGROUND**

    A.     **MPEA Announces Navy Pier Centennial Vision and Marina**

     In June 2011, MPEA announced the Navy Pier Centennial Vision, the first phase of a comprehensive development plan for Navy Pier. The Centennial Vison set forth a framework for



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

future development and ultimately included a proposed transient boat slip or marina located on the north-east side of Navy Pier, part of an area called the "North Slip," between Navy Pier and the Jardine Water Plant. The Chicago Park District had urged MPEA to develop a marina there to complement its existing harbor system. The North Slip is located inside the Chicago Harbor breakwater in a larger area known as the "Playpen." During boating season, hundreds if not thousands, of recreational boats transit the Playpen. Large scale events such as Boat-A-Palooza also draw a large number of boats to the area. Recreational boats are free to transit the north and east sides of the Jardine Water Plant without restriction or monitoring of any kind. Though the City has placed two "keep out" buoys at the east end of the North Slip, boats are nonetheless legally free to transit that area too without restriction. Boats have even docked in that area from time to time, such as during the America's Cup race.

### B.   City of Chicago Approves the Marina

MPEA, pursuant to the rights granted to NPM under its License Agreement, applied for approval to build and operate the marina in the North Slip and the City Council unanimously approved and authorized the marina as part of the City's Planned Development ("PD") process. In the City's words, the PD process is "required for certain projects to ensure adequate public review, encourage unified planning and development, promote economically beneficial development patterns that are compatible with the character of the existing neighborhoods, allow design flexibility, and encourage protection and construction of the city's natural resources."

The PD process involved a detailed review of the proposed marina, including hearings by the Plan Commission, the Department of Planning & Development Review, the Zoning Administrator, the City Council Committee on Zoning, Landmarks and Building Standards and, ultimately, the City Council. The Municipal Code requires that the review specifically determine "whether the proposed development is compatible with the character of the surrounding area in terms of uses . . ." (Chap. 17-13-0609-B).

On September 25, 2016, the City Council approved the marina in the North Slip. The City Council was satisfied that there were no unacceptable security risks because of the marina's proximity to the Jardine Water Plant. The Council passed an Ordinance amending PD 527, the Navy Pier Planned Development, to provide for a marina as follows:

> The perimeter of the north and south dock area of Navy Pier and Headlands
> Subareas may be used to dock boats and ships, and passengers May embark
> and disembark from such boats and ships along the docks of Navy Pier . . .
> (31829)

The Amended PD 527 Ordinance depicts the marina and its location at the north edge of Navy Pier directly across the North Slip from the Jardine Water Plant:



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Jardine Plant



Navy Pier

The Amended PD 527 Ordinance requires that "[a]ll work in the public way" be done "in accordance with Department of Transportation Construction Standards," but states that "no further approvals shall be required under this Planned Development or the Zoning Ordinance for the improvements undertaken in accordance with the plans  . . ."

### C.      NPI Issues RFQ/RFP to Develop, Build and Operate the Marina

On May 25, 2016,  NPI issued a "Request for Qualifications and Proposals Part 1 Transient Boat Slip and Operation" to develop and operate a marina in the North Slip, in the exact location set forth in MPEA's PD application and later approved by the City Council in the Amended PD 527 Ordinance. The RFQ/RFP specified that that location "will be the only area for the project" and  "[w]hile the project does not require the full use of the designated area, the project itself is limited to that area."

NPM, among other Firms, responded to Part 1 of the RFQ/RFP. On September 22, 2016 MPEA issued Part 2 of the RFQ/RFP, requesting detailed proposals from the Firms, including NPM, short-listed as a result of Part 1 of the process. Once again, Part 2 made clear that the marina was to be built and operated "on the north side of Navy Pier," in accordance with MPEA's application and the subsequently Amended PD 527 Ordinance.

As a result of this process, NPI selected NPM to develop and build the marina. NPI and NPM signed a Memorandum of Understanding on February 28, 2017 and the Navy Pier License Agreement on August 17, 2017. The License Agreement granted NPM a license to design, construct, finance and operate "a transient watercraft docking facility, boat slips and ancillary facilities" on the north side of Navy Pier, again at the exact location approved by the City Council in Amended PD 527. The License Agreement specifically authorizes NPM on NPI and



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

MPEA's behalf to "promptly apply for and diligently pursue all permits and governmental approvals required to construct and operate" the marina.

Mayor Emanuel personally announced and celebrated the marina at Navy Pier's 2017 fundraiser dinner and NPI further noted the marina as part of the Centennial Vision in its October 16, 2019 Press Release for its 2019 fundraiser.

### D.     The Army Corps of Engineers and the State of Illinois Approve the Marina

On August 24, 2017, MPEA submitted a Joint Application prepared by NPM to the United States Army Corps of Engineers ("USACE") and the Illinois Department of Natural Resources ("IDNR") for construction of the marina in the North Slip. USACE has the authority under 33 C.F.R. 325.8(b) to evaluate and issue permits for construction projects in connection with navigable waters. The Rivers, Lakes and Streams Act, 615 ILCS 5/18(c) ("RLS Act"), authorizes the Illinois Department of Natural Resources ("IDNR") to issue a permit to "any person, firm or corporation" to construct "harbor or mooring facilities for watercraft" in the North Slip.

NPM provided substantial and detailed information and drawings to USACE and IDNR and IDNR issued a Public Notice of MPEA's application and took public comments on the proposed marina. Both USACE and IDNR issued permits preliminarily approving construction of the marina in the North Slip, subject to MPEA obtaining any other necessary permits.[1]

### E.     The Coast Guard Is Responsible For Safety and Security on Lake Michigan

The Coast Guard is responsible for security and safety in all navigable waters within the United States, including the waters surrounding the Jardine Water Plant. 14 U.S.C. § 1 *et. seq.* There is no Coast Guard Safety Zone covering the North Slip and the Coast Guard does not preclude construction or operation of a marina there.  The Coast Guard does not require any permits for the marina.

### F.     The Jardine Water Plant

The City built the Jardine Water Plant under permit from the Secretary of the Army. That permit specifically stipulated that construction and operation of the Plant would not cause any "unreasonable obstruction to the free navigation" of the waters surrounding the Plant. *Bowes v. City Chicago*, 3 Ill. 2d 175 (1954). Indeed, the Secretary of the Army is authorized to require the City to remediate any obstruction to navigation created by the Plant "so as to render navigation reasonably free, easy, and unobstructed." *Id.* In upholding the City's right to build the Plant in 1954 in a lawsuit brought by several groups of plaintiffs, the Illinois Supreme Court relied on the finding that "construction of the filtration plant will not  .  .  . materially interfere with navigation  .  .  ." *Id.*

---

[1] Separately, NPM applied for a permit from the Illinois Environmental Protection Agency, which was issued on April 12, 2018, and from the United States Coast Guard for a PATON ("Private Aid to Navigation") permit for a data collection buoy in the North Slip, which was issued on August 15, 2017.



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

As discussed above, boats are legally free to transit the North Slip, as well as the north and east side of the Jardine Water Plant.  Other than the two "keep out" buoys, there is nothing preventing boat access to the North Slip or to the Plant. The Jardine Plant has no barrier or fence preventing access to the outside of the Plant from any of its borders with Lake Michigan, including from the North Slip.

G.     **CDOT Denies Harbor Permit Application**

Section 10-40-330 of the Municipal Code governs "construction and repairs of structures in harbor." It requires a special permit from CDOT to "build, construct or repair" any dock, bridge or other structure in or within 40 feet of the harbor, which includes the North Slip. The Commissioner is required to "solicit input from relevant alderman and City Departments and may also consult with IDNR, USACE, and the Coast Guard, among others. This Section of the Code further provides:

> The Commissioner shall issue the permit desired, upon payment of the permit fees hereinafter provided, unless it shall appear that the work to be done will result in unduly obstructing the harbor or endangering the users or the navigability of the harbor or in endangering the safety of any dock, pier, bridge breakwater or other structure located upon and along the harbor or pollute the harbor or is inconsistent with the Chicago River Design guidelines.

Significantly, Section 10-40-330 does not vest the Commissioner with any authority to deny a Harbor Permit unless the "work to be done" creates one of the enumerated hazards. In other words, the Commissioner may not deny a Permit based on any belief that the contemplated use of the completed structure itself poses the hazard.

CDOT published a chart entitled "Harbor Permits-Agency Jurisdictions and Responsibilities" ("CDOT Jurisdiction Chart"), which outlines approvals and agency roles regarding waterway construction. That chart indicates that CDOT has no operational, administrative or regulatory role in any of the following: navigable channel designation, navigable channel and harbor maintenance, removal of navigation hazards, protection of life and safety, monitoring of commercial traffic, and monitoring of hazardous shipments. The CDOT Jurisdiction Chart indicates that CDOT's role in connection with Harbor Permits is, consistent with Section 10-40-330, focused on permitting or approving the "work to be done" in connection with construction.

In accordance with CDOT's Regulations, NPM submitted extensive project construction drawings to CDOT for the marina. CDOT did not raise any issue or objection to any aspect of the proposed construction. But notwithstanding that the Illinois Legislature approved locating a marina in the North Slip in the RLS Act and the Chicago City Council specifically approved the location of the marina in the Amended PD 527 Ordinance, CDOT denied the  application for a Harbor Permit by letter dated June 15, 2020. The sole basis for CDOT's denial was that the "marina development along the lines you have proposed and at the location you have applied for presents unacceptable security risks due to its proximity to the Jardine Water Treatment Plant." CDOT did not determine that the work to be done in constructing the marina created any of the hazards enumerated in Section 10-40-330.



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

II.     **CDOT SHOULD RECONSIDER AND PROMPTLY ISSUE THE HARBOR PERMIT**

A.      **CDOT Exceeded Its Authority In Denying the Harbor Permit**

CDOT exceeded its authority when it denied the Harbor Permit solely based on the location of the marina in the North Slip. "An administrative agency has no general or common law powers. * * *  The agency is limited to those powers granted to it by the legislature in its enabling statute.." *Julie Q v. Department of Children and Family Services*, 995 N.E. 2d 977, 982 (2013). "Agency action is arbitrary and capricious if the agency  . . .  relies on factors the legislature did not intend for the agency to consider." *Greer v. Housing Development Authority*, 524 N.E.2d 561, 589 (1988).

Section 10-40-330 is clear on its face that CDOT's discretion to deny a Harbor Permit is limited to situations where the "work to be done," meaning the construction itself, creates one of the enumerated hazards. Section 10-40-330 does not authorize CDOT to deny a Harbor Permit when CDOT believes that the location of the completed structure presents "security risks." As CDOT's own CDOT Jurisdiction Chart recognizes, CDOT's authority is to assure that construction in and on public ways is done competently and safely, not to second-guess whether any particular development project is or is not a good idea in the first place. "Because an administrative agency can only act pursuant to its statutory authority, any action beyond that authority is void." *Walsh v. Champaign County Sheriff's Merit Comm'n*, 404 Ill. App. 3d 933, 938 (4th Dist. 2010); *McCardle v. Rodriguez*, 277 Ill. App. 3d 365, 373 (1st Dist. 1995).

CDOT's lack of authority in this regard is confirmed by the facts that the State of Illinois approved  locating a marina in the North Slip in the RLS Act and the City Council approved the specific location of the marina in the Amended PD 527 Ordinance. Those bodies, not CDOT, have the authority to determine whether a marina in the proposed location is compatible with the surrounding area. Both determined that it was. CDOT's authority is simply to assure that the construction work itself does not create one of the hazards enumerated in Section 10-40-330. That is exactly as provided in the Amended PD 527 Ordinance, which requires that all "work in the public way  . . . be  . . .  in accordance with" CDOT standards, but specifies that "no further approvals shall be required  . . .."

By denying the Harbor Permit based on the location previously approved by the State and the City, CDOT has usurped legislative authority and exceeded its own jurisdiction.  *Julie Q*, 995 N.E.2d at 982 ("When the agency renders a decision that it is without authority to make, it is without jurisdiction and the decision is void"); *Delgado v. Board of Election Commissioners of Chicago*, 865 N.E.2d 183, 186 (2007) ("Any action or decision taken by an administrative agency in excess of or contrary to its authority is void"); see also, *Gen. Serv. Employees Union Local 73 SEIU AFL-CIO v. Illinois Educational Labor Relations Board*, 673 N.E. 2d 1084, 1090 (1st Dist. 1996) (Agency action is arbitrary and capricious if it contravenes the legislature's intent  . . ."). Simply put, CDOT may not overrule the Illinois Legislature or the City Council.

Illinois courts have not hesitated to order government agencies and officials to issue permits or licenses which, like the Harbor Permit for the marina, were improperly denied. See e.g., *Drury Displays v. Brown*, 306 Ill. App. 3d 1160, 1165 (1999) (compelling IDOT to issue billboard permit); *People ex. Rel Shell Oil v. City of Chicago*, 9 Ill. App. 3d 242, 245 (1st Dist. 1972) (compelling City to issue driveway permits); see also *Outcom Inc v. Department of*



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

*Transportation et. al.*, 882 N.E. 2d 696, 703 ("We find no discretion vested in the Department to deny a fully compliant permit application").

Because CDOT did not deny the Harbor Permit based on any hazard presented by construction of the marina, but rather based on locating a marina in the North Slip in the first place, CDOT exceeded its authority and jurisdiction and contravened both the Illinois Legislature and the Chicago City Council.

**B.      CDOT'S Denial of the Harbor Permit Violates *Bowes* and MPEA/NPM's Riparian Rights**

The Illinois Supreme Court was clear in *Bowes* that construction and operation of the Jardine Water Plant would not cause any "unreasonable obstruction to the free navigation" of the waters around the Plant. Yet, by denying the Harbor Permit, CDOT is doing just that. It is obstructing navigation in, to and from the North slip. Denying Navy Pier the ability to build and operate the marina because of its proximity to the Plant forecloses the very navigation which the Supreme Court insisted in *Bowes* be left open.

*Bowes* also recognized that "riparian rights of a shore owner have been defined as the right of accretion and the right of access to the water from the land." *Bowes*, 3 Ill. 2d at 197. CDOT's denial of the Harbor Permit for reasons that have nothing to do with any hazard of construction, improperly interferes with MPEA's riparian rights to access the north boundary of Navy Pier and NPM's derivative riparian rights, through the License Agreement, to build and operate the marina. See *Gibbons v. Clarkson Grain Co.*, 281 Ill. App. 3d 529, 533 (4th Dist. 1996) (barge-loading facility violated adjacent riparian owner's rights by preventing owner from "utiliz[ing] the property as a marina." Indeed, the City recognized these riparian rights in the amended PD 527 Ordinance.

CDOT's denial of the Harbor Permit thus contravenes *Bowes* and interferes with MPEA's and NPM's riparian rights and those are additional reasons why the denial is void. See *Delgado*, 865 N.E. 2d at 186 (Supreme Court exercises supervisory powers to vacate Board of Elections decision as "void and therefore a nullity").

**C.      CDOT'S Denial of the Harbor Permit Was Arbitrary and Without Any Rational Basis**

Not only does CDOT have no authority to deny the Harbor Permit, but CDOT's reason for the denial was, in and of itself, arbitrary, irrational and demonstrably wrong.

CDOT did not articulate any specific security reason for denying the Harbor Permit, just the general statement that the marina's "proximity" to the Jardine Water Plant "presents unacceptable security risks."  There is no explanation of why proximity creates risk. There is no indication that CDOT identified any particular risks. There is no evidence that addition of a marina would make the Jardine Water Plant any less secure than it is currently.  CDOT did not provide any opportunity for NPM, NPI or MPEA to address the asserted security risks.  CDOT is required by law to consider all crucial aspects of the issue and act rationally in its decision-making. *Greer*, 524 N.E. 2d at 589; *Gen. Serv. Employees Union*, 673 N.E. 2d at 1090. CDOT's denial of the Harbor Permit fails this requirement.



It does not follow, as CDOT apparently simply assumes, that adding a marina where none currently exists, would threaten security. The Jardine Water Plant has sat unprotected in the North Slip for nearly 70 years. Nothing prevents access to the North Slip or to the Plant from the North Slip, yet the only "security" the Department of Water Management ("DWM") has seen fit to install are two "keep out" buoys. An actively managed marina at Navy Pier will provide greater security in the North Slip. The boats docking at the marina will be identified and supervised, unlike the boats which currently transit the waters around the Jardine Water Plant without limit, supervision or identification.

Notwithstanding that the marina would actually enhance security in the North Slip, NPM has nonetheless previously committed to DWM to take extra security precautions for the Jardine Water Plant specifically, including:

- establishing and clearly identifying a restricted area along the entire south edge of the Jardine property

- placing buoys every 300 feet in the areas east and west of the central part of the property and every 100 feet in the central area

- providing signage along the south edge of the property warning that no mooring is allowed

- providing DWM with two NPI security cameras with intrusion detection capabilities that tie into Jardine's existing security to monitor the restricted area

- contributing a reasonable amount of money towards fencing along the south edge of the property

- employing an armed guard from 11 PM to 7 AM, employing such additional security as is consistent with what Navy Pier ordinarily provides and coordinating its security efforts with Jardine personnel

- requiring all boaters mooring at the marina to provide boat registration or Coast Guard documentation numbers, credit card details and a photo ID, among other things

- requiring boaters who have not pre-registered to radio or telephone marina security in advance and wait in a separate "check-in" area until all registration materials are processed

- inviting the Chicago Marine Police, the IDNR Police, the Chicago Fire Department and/or the Coast Guard to moor vessels for first responders in the most accessible slips at the east entry of the marina

FILED DATE: 9/8/2021 9:45 AM   2021CH04537



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

The marina will also fully comply with Navy Pier's Security Plan.  In addition, NPM has promulgated detailed Rules for the marina which focus on security issues, among others, and it is required under its license to provide insurance to NPI/MPEA.[2]

The Coast Guard and USACE, the federal authorities responsible for navigation and safety, have no issue with the proposed marina. As a result, and particularly in light of the security enhancements identified above, it is, quite simply, irrational for CDOT to conclude that the proximity of the marina to the Jardine Water Plant presents unacceptable security risks.

*          *          *

NPM respectfully requests that CDOT reconsider its prior denial and promptly grant a Harbor Permit for construction of the marina, which will be funded with private dollars for the benefit of NPI and MPEA. No one disputes that the marina will create revenues and jobs, attract travelers to Chicago and be a tremendous boon to the City. It has been endorsed by the Chicago Park District, among many others, and both NPI and MPEA  strongly support the marina as an important part of Navy Pier's ongoing redevelopment and long-term viability. If CDOT truly seeks to "ensure that Chicago continues to be a vibrant international city successfully competing in the global market place," as set forth on its website, it will reconsider and allow the marina to be built.

We would like the opportunity to meet with you either in person in a protected environment or via Zoom to discuss the above matters in more detail and to answer any questions you might have. To that end, we will contact you to schedule a meeting.

Finally, NPM requests that you provide us with copies of all documents relating to the proposed marina and CDOT's decision to deny the Harbor Permit. We are prepared to seek these documents through a Freedom of Information Act request, if you prefer.

Please understand that this letter is not a comprehensive statement of our legal position and we reserve all rights, claims and causes of action.

Please do not hesitate to contact me if you have any questions or if you require anything further.

Thank you for your consideration.

---

[2] Attached is a rendering of the marina which depicts some of the planned security measures.



FILED DATE: 9/8/2021 9:45 AM   2021CH04537

Very truly yours,

SEYFARTH SHAW LLP

Michael R. Levinson
Counsel for NPM Venture, LLC


MRL:jw

Cc:     Larita Clark, CEO MPEA
        Matthew Simmons, General Counsel, MPEA
        Marilyn Gardner, President & CEO NPI
        Brian S. Murphy, COO NPI
        Daniel Blondin, Executive VP & General Counsel NPI
        Randy D. Podolsky, Manager, NPM Venture
        Mark A. Flessner, Corporation Counsel



FILED DATE: 9/8/2021 9:45 AM 2021CH04537

**Legend**

A. Security Exclusion Zone Marked By Buoys
B. Restricted Area Check-In Signage
C. Security/Check In
D. First Responder Slip
E. Navy Pier Marina Challenge Boat
F. Temporary Check In Mooring Area

*Additional Security Measures*

- 24 Hr. Site Security During Boating Season
- Improved Navy Pier Security Cameras
- Infared Camera Focused On Marina Entrance For Enhanced Nightime Security




## Navy Pier Marina
Chicago, Illinois

*Security Enhancements*

*November 12, 2019*

N